## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x

In re:                                                :        Chapter 11
                                                      :
QUANTUM FOODS, LLC, *et al.*,[1]                      :        Case No.  14-10318 (___)
                                                      :
        Debtors.                                   :        Joint Administration Requested
                                                      :

---------------------------------------------------------------- x

## DECLARATION OF EDGAR REILLY IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

Edgar Reilly declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

1.      I am the Chief Administrative Officer of Quantum Foods, LLC, a Delaware limited liability company ("**Quantum Foods**"), one of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"). I have served in various roles at the Quantum Foods since late 2007. In this capacity, I am generally familiar with the Debtors' day-to-day operations, business affairs, books and records.

2.      On the date hereof (the "**Petition Date**"), the Debtors filed with this Court voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have sought an order directing that their cases be jointly administered for procedural

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Quantum Foods LLC (9437); Quantum Foods 213-D, LLC (1862); Quantum Culinary, LLC (1302); GDC Logistics, LLC (1997); Choice One Foods, LLC (9512).  Quantum Foods, LLC has requested joint administration of these Debtors' chapter 11 cases. The Debtors' mailing address is c/o Quantum Foods, LLC, 750 South Schmidt Road, Bolingbrook, Illinois 60440.

purposes only by this Court. No trustee, examiner or official committee has been appointed in these cases.

3.     As discussed below, the Debtors' primary objective in commencing these chapter 11 cases is to pursue a prompt sale of their assets in order to maximize value for stakeholders, preserving jobs, minimizing supply disruptions for the Debtors' customers and ensuring an uninterrupted supply chain for the Debtors' vendors.

4.     To minimize the effects of filing for bankruptcy protection on the Debtors' business and employees, and to maximize the possibility these cases are successful, the Debtors have requested various types of "**first day**" relief (collectively, the "**First Day Pleadings**").[2] Each First Day Pleading seeks relief intended to allow the Debtors to perform and meet those obligations necessary to fulfill their duties as debtors in possession in the chapter 11 cases.

5.     I am generally familiar with the contents of each First Day Pleading (including the exhibits thereto) and believe that the relief sought in each First Day Pleading is necessary to enable the Debtors to operate in chapter 11 with minimum disruption or loss of productivity or value, as well as to avoid immediate and irreparable harm to the Debtors' estates. The approval of the First Day Pleadings would assist the Debtors in maximizing the value of their estates and best serves the interests of the Debtors' estates and creditors.

6.     Accordingly, I submit this declaration (the "**Declaration**") in support of the Debtors' chapter 11 petitions and the relief requested in the First Day Pleadings. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information supplied to me by other members of the Debtors' management (without further review of same), my review of relevant documents or information supplied to me by other

---

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the applicable First Day Pleading.

members of the Debtors' management or professionals (without further review of same), or my
opinion based upon my experience, discussions with the Debtors' advisors, and knowledge of the
Debtors' operations and financial condition. I am authorized to submit this Declaration on behalf
of the Debtors. I am of sound mind and, if called to testify, I would attest to the facts described
herein.

7.       This Declaration is divided into two main sections. Part I contains a
discussion of the nature of the Debtors' corporate structure, business operations, prepetition
capital structure, and the circumstances leading to the commencement of the chapter 11 cases.
Part II contains a brief discussion of the First Day Pleadings filed by the Debtors.

## I.       THE DEBTORS' BUSINESS, CAPITAL STRUCTURE AND CIRCUMSTANCES LEADING TO THE FILING

### A.       The Debtors' Corporate Structure

8.       The Debtors are comprised of five (5) separate privately held entities.
Quantum Foods is the corporate parent of Quantum Foods 213-D, LLC, a Delaware limited
liability company ("**213**"), Quantum Culinary, LLC, an Illinois limited liability company
("**Culinary**"), GDC Logistics, LLC, a Delaware limited liability company ("**GDC**"), and Choice
One Foods, LLC, a Delaware limited liability company ("**Choice One**"). Quantum Food's
membership interests are held by the following non-debtors: Quantum Rosa Mystica Enterprises,
LLC, an Illinois limited liability company ("**Rosa**") (99.9997%) and Edward Bleka (.0003%).
Rosa, in turn, is owned by QF Foods, Inc., Edward Bleka, Jane Bleka and six different Bleka
family trusts.[3] The Debtors' organizational structure is set forth on Exhibit A hereto.

---

[3] As of the Petition Date, none of QF Foods, Inc., Edward Bleka, Jane Bleka nor any of those trusts are party to this
    or any other bankruptcy proceeding.

9.      The Debtors and the businesses they operated have existed in this structure since 2006.

**B.      The Debtors' Business**

10.      The Debtors, headquartered in Bolingbrook, Illinois, are a leading further-processor of proteins, including beef, pork and poultry.

11.      Founded in 1990 as a hand-cut steak butchering operation, the Debtors provide custom-menu solutions for national and regional chains, including full-service and quick-service restaurants. The Debtors are also an important co-packer to the nation's largest retailers and serves the hospitality industry and the United States military. The Debtors' enjoy long-standing, "blue-chip" customer bases in the foodservice, retail, industrial and specialty (e.g., military, schools, home delivery and distributors) channels. The Debtors have had the privilege to have provided protein solutions to certain of its clients for over 20 years.

12.      In laymen's terms, the Debtors purchase raw protein products and further prepare them for the needs of the Debtors' customers at the Debtors' state of the art Bolingbrook facilities. This preparation process includes specific portioning and packaging of serving sizes custom ordered by the Debtors' clients.  The Debtors' provide their restaurant clients with precise portion controlled meat products, a quality that customers in the Debtors' business greatly value. The Debtors' products include both fully cooked and ready-to-cook items. The Debtors' ready to cook offerings include portion controlled, breaded, par-cooked, unbreaded and seasoned steaks, cutlets, tenders and stripes.  The Debtors' fully cooked offerings include whole muscle, as well as sliced, pulled, unbreaded, seasoned, smoked and sauced meats, often contained in reheatable bags.

13.      Among other major clients, the Debtors are a primary provider of proteins to one of the world's largest sandwich franchises, providing that client with beef and meatballs used in sandwiches served nationwide.

14.      The Debtors have historically purchased their protein raw material from suppliers on a purchase order basis, and either prepay, pay within 10-15 days of delivery under specified lines of credit or work off of an open line of credit with that supplier. The Debtors' primary protein materials include beef, including tri-tips, short loins, rib eyes, ball tips, strip loins, lean trimmings and cap and wedge meat in addition to poultry including chicken breasts, legs and thighs and pork products, including trimmings, baby back ribs and rib tips.

15.      <u>The Debtors' Leased Facilities</u>. The Debtors' Bolingbrook campus includes the following separate facilities, each of which is leased by the Debtors:

- "Food Facility", located at 750 South Schmidt Road, Bolingbrook, Illinois

  o Leased by 213.

  o Lease is guaranteed by Quantum Foods, GDC; Choice One; Culinary and non-Debtor QF, Inc.

  o Headquarters and primary manufacturing facility.

  o Includes a research and development pilot plant used to co-create new products with the Debtors' customers without interrupting the Debtors' production lines or the customers' facilities and operations.

  o Includes a customer innovation center with a full, restaurant style kitchen to replicate the customer's end user preparation and serving environment.

- "Culinary Facility", located at 525 Crossroads Parkway, Bolingbrook, Illinois

  o Leased by Culinary.

  o Lease is guaranteed by Quantum Foods, 213; Choice One; GDC and non-Debtor QF Foods, Inc.

  o Provides the Debtors with a secondary manufacturing facility.

- Global Distribution Center, located at 550 West North Frontage Road, Bolingbrook, Illinois

  o Leased by GDC.

  o Lease is guaranteed by Quantum Foods, 213; Choice One; Culinary and non-Debtor QF Foods, Inc.

  o Primary distribution facility which allows for efficient movement of products between Food Facility and Culinary Facility.

  o Stores both raw and finished product.

  o Located close to interstate for easy access for customers and suppliers.

  o Includes a state of the art high pressure pasteurization system and a component assembly operation, which allows the Debtors to assemble pre-packaged products for door to door sale and delivery by certain customers.

16.    The Debtors' Bolingbrook campus includes state of the art research, manufacturing, and distribution facility which allows the Debtors the ability to work side by side

with their customers to develop, refine and test new products; manufacture those products; and store and ship them to market in an efficient manner.

17.    In addition to the Debtors' facilities in Bolingbrook, Illinois, Choice One is lessee of a facility located in Compton, California which formerly housed the Debtors' west coast production facility which has not been used for a number of years. That lease is subject to a sublease agreement with Proportion Foods, LLC, a third party that is not affiliated with the Debtors. The sublease agreement with Proportion Foods, LLC allows that facility to operate on a substantially cash flow neutral basis.

**C.    Prepetition Capital Structure**

18.    Senior Debt. The Debtors' primary secured indebtedness is a senior credit facility pursuant to that certain Credit Agreement, dated as of February 6, 2013 (as the same may have been amended, restated, supplemented or modified, and together with any security documents or agreements ancillary thereto, the "**Credit Agreement**"), among Quantum Foods and its subsidiaries, as borrowers (the "**Borrowers**"), the lenders party thereto, and Crystal Financial, LLC ("**Crystal Financial**"), as administrative and collateral agent for the lenders thereto (collectively, the "**Pre-Petition Secured Parties**"). Northstar and Rosa have guaranteed all of the indebtedness under the Credit Agreement. Edward Bleka, Jane Bleka and Bleka Properties, LLC are guarantors of indebtedness under the Credit Agreement, with liability limited to $10,000,000 plus enforcement costs.

19.    Prior to its entry into the Credit Agreement, the Debtors were in default under their prior senior lending agreement for several months. Unable to escape that long-term default status, the Debtors sought out replacement financing with the aid of a third party investment banker. That banker polled multiple funding sources in late 2012. During that process, I was informed that only non-institutional lenders were willing to consider providing

funding to the Debtors, and the Debtors subsequently consummated a transaction with Crystal

Financial pursuant to the terms set forth in the Credit Agreement.

20.     The Credit Agreement provided the Debtors with revolving loan and a

term loan, and as of the Petition Date, approximately $50,246,397 in obligations are outstanding

under the Credit Agreement.

21.     Each Borrower and Northstar pledged all of their assets to Crystal

Financial as security for the obligations under the Credit Agreement.

**D.      Circumstances Leading to the Filing**

22.     A number of factors have contributed to the Debtors' determination that

chapter 11 filings were necessary.

23.     <u>Commodity Price Increases</u>. The Debtors do not raise cattle, pigs or fowl

themselves; instead, they purchase raw protein materials and process it. As a result, the Debtors

are directly affected by changes in commodity prices. Recent macro-economic factors, including

decreased herd sizes and increased overseas demand, have caused a drastic increase in the price

of raw beef.

24.     The Debtors' clients are largely resistant to price changes, both for what

they pay to the Debtors and what they charge to the end consumer, and as a result, the Debtors

are often pressured to absorb some or all of any increases in raw material pricing. Additionally,

in order to offset increased raw material prices, certain of the Debtors' customers have decreased

portion size, thereby decreasing the amount of product it purchases from the Debtors. This

adversely impacts the Debtors as it results in less finished product (by weight) sold into market

while requiring the same amount of labor to produce. To give an example, an 11 ounce steak

costs the Debtors roughly the same to butcher as a 9 ounce steak, but nets a lower price as it represents less finished product, by weight, per order.

25.    These changes in raw material price and customer orders have caused an overall decline in the Debtors' business over time.

26.    <u>Recent Business Losses.</u> Over approximately the past ten years, the Debtors saw explosive growth in the provision of protein solutions to military personnel and contractors overseas to support "in theater" military operations around the world, but largely focused in the middle east. Over time, as those military operations expanded, "in theater" operations increased as a portion of the Debtors' overall business.  The Debtors' "in theater" business eventually became, in aggregate, one of the Debtors' top 5 customers.

27.    The "in theater" business recently decreased dramatically. Recent troop withdrawals due to the cessation of certain middle east operations by various arms of the United States military have had a crippling impact on the Debtors' "in theater" business; specifically, from 2012 to 2013, the Debtors saw a substantial decrease in their "in theater" business.

28.    In addition, changes in customer behavior at casual dining restaurant chains have also negatively impacted the Debtors' revenue. For example, the Debtors supply another of its top 5 customers, a well-known casual dining chain, steaks that represent one of the higher priced options on that restaurant's menu. This casual dining chain has seen the consumer's food dollar gravitate towards lower priced menu options, creating decreased demand for the Debtors' product. As a result, the Debtors have seen a substantial decrease in business with this top customer.

29.    Finally, the Debtors' weakened financial state  recently caused the loss of business from a well-known family dining chain, which was another of the Debtors' top 5

customers. The Debtors' industry is extremely intolerant to the inability to accurately fulfill orders when made. Historically, the Debtors have had a strong track record of fulfilling orders in a timely fashion.

30.     Unfortunately, the Debtors' cash shortages in 2013 resulted in the Debtors being unable to order all raw material necessary to fulfill their customers' orders on a timely basis. As a result, the Debtors began missing orders or under-fulfilling orders. After the aforementioned family dining customer identified this occurring on multiple occasions, that customer requested the Debtors provide assurances that the Debtors had continued access to capital and could fulfill future orders in a timely manner.  Unable to provide this assurance to the customer's satisfaction, the customer canceled its purchase agreements with the Debtors, resulting in the complete loss of this key customer and worsening the Debtors' financial standing.

31.     <u>Loss of Vendor Financing</u>. Traditionally, the Debtors have relied on short term financing from their vendors when ordering raw materials. In the Debtors' industry, it is common for such vendors to closely track the financial condition of their customers credit-worthiness on a regular basis by requesting financial information from time to time and subscribing to industry credit rating agencies. The Debtors' vendors are no different. Many of the Debtors' most important vendors became increasingly concerned about the Debtors' recent financial condition and year over year losses. In addition, the Debtors' cash shortages resulted in the Debtors slowing or stretching repayment on many of their vendor credit lines. The concerns over the Debtors' slowed repayment and existing concerns over the Debtors' financial condition generally were amplified in late 2013 when an industry credit rating agency decreased the

Debtors' rating.  This resulted in multiple vendors canceling the Debtors' credit lines and shifting the Debtors to cash in advance terms.

32.    As a result of the loss of credit and business caused the Debtors to exist in a constant "overadvance" under the Credit Agreement; in other words, because the Debtors were suddenly and unexpectedly required to purchase virtually all of their raw materials in cash, its financing requirements increased dramatically and every week it was forced to ask Crystal Financial to extend loans to it "out of formula" of the Credit Agreement. This increased concern on the part of the Pre-Petition Secured Parties and it became increasingly clear to the Debtors over time that its lenders were not comfortable with financing the Debtors under these conditions.

33.    <u>Performance Improvement Efforts</u>. Notwithstanding its recent financial weakness, the Debtors made a concerted effort to improve their operational and financial performance over the past 12 months, in some instances at the request of Crystal Financial and in other instances, initiated entirely by the Debtors and its management. First, the debtors sought out and hired an improved management team, including a new president, chief financial officer and sales lead, who in turn revamped the Debtors' sales team. In October 2013, the Debtors engaged a leading operational consultant to study the Debtors' operations and create an operational improvement plan. While the effects of this plan have yet to be realized, their projections suggest annualized savings in excess of $10 million. Finally, the Debtors engaged FTI Consulting, Inc. to provide financial support and City Capital Advisors to seek out potential acquirers or capital infusion sources.

34.    Additionally, the Debtors have made efforts to right-size their work force and salaries. As best as they have been able, the Debtors have decreased their work force through

attrition and in January 2014, conducted a reduction in force of approximately 20 employees. In addition, the Debtors' most senior executives all agreed, prior to the Petition Date, to defer 20% of their salaries until a later date.

35.     In sum, though I believe the efforts to improve the Debtors' operations and finances have been worthwhile and will continue to positively impact the Debtors, they were not enough to avoid the commencement of these bankruptcy cases.

36.     <u>Forbearances and Amendments to Credit Agreement</u>. The Borrowers' weakened financial performance caused them to default on covenants under the Credit Agreement in April 2013.

37.     As a result of the Debtors' on-going defaults, the Debtors and Crystal Financial entered into a series of amendments to the Credit Agreement, which lead to substantial changes in the terms of the Credit Agreement and to the Debtors' operations.

38.     On May 13, 2013, the Debtors and Crystal Financial entered into that certain First Amendment to Credit Agreement which required, among other things, that the Debtors retain FTI to assist them in financial matters and amended other provisions in the Credit Agreement.

39.     On November 18, 2013, after the occurrence of further events of default, the Debtors and Crystal Financial entered into that certain Second Amendment to Credit Agreement (the "**Second Amendment**") which required, among other things, that the Debtors' retain an investment banker to market the Debtors' assets and obtain a capital infusion on a basis junior to liens in favor of Crystal Financial of at least $10,000,000. In addition, pursuant to the Second Amendment, the Credit Agreement was amended to increase the rate of interest accruing

on  loans outstanding under the Credit Agreement, further hampering the Debtors' financial position.

40.     On December 6, 2013, the Debtors and Crystal Financial entered into that certain Third Amendment to Credit Agreement which amended certain of the Credit Agreement's reporting requirements.

41.     On January 2, 2014, the Borrowers, North Star and Rosa entered into a Forbearance and Modification Agreement (the "**Forbearance Agreement**") with Crystal Financial and the Lenders pursuant to which the Lenders agreed to forbear from exercising remedies until January 30, 2014 and Rosa agreed to become a guarantor of the obligations under the Credit Agreement. The Forbearance Agreement was amended from time to time, and finally terminated on February 10, 2014, at which time Crystal Financial indicated to the Debtors it would not be extended again, and the Debtors shifted their energies to preparation for a bankruptcy filing. On February 14, 2014, Crystal Financial sent an acceleration and termination notice to the Debtors, indicating no further financing was available to the Debtors, and reserving the right to exercise remedies, making filing these cases a necessity.

42.     <u>Sale Process</u>. In late 2013, the Debtors began exploring strategic alternatives in compliance with the terms of the Second Amendment. On October 20, 2013, in compliance with the Second Amendment, the Debtors engaged City Capital Advisors ("**City Capital**") as investment banker in efforts to explore strategic alternatives and to assist the Debtors with negotiations with interested parties, preparing for and initiating marketing efforts as well as facilitating due diligence by various parties.

43.     Quantum Foods executed over 30 non-disclosure agreements with parties identified by City Capital and maintained a dataroom for those parties which the Debtors populated with a wide range of information about the Debtors.

44.     CTI Foods Holding Co., LLC ("**CTI**") has been identified as the debtors' stalking horse bidder, and the Debtors have executed a term sheet with CTI dated as of the date hereof. Concurrently with the First Day Pleadings, the Debtors have also filed their motion to approve bid procedures, the Stalking Horse Bidder and the break-up fee (the "**Bid Procedures Motion**"). At the hearing on the First Day Pleadings, the Debtors will ask the Court to schedule a hearing to approve the Bid Procedures Motion approximately 21 days after the Petition Date, a timeline which I am advised is consistent with the requirements of the Debtors' DIP financing.

45.     <u>DIP Loan Negotiations</u>.  The Debtors' cash needs, its overadvances, as well as the concern in the market place and damage being done to the Debtors' business due to their distressed state, dictated that a chapter 11 filing and section 363 sale was the best course of action to maximize value for all stakeholders.

46.     When it became apparent that a chapter 11 filing was possible, the Debtors, with the aid of FTI, began the process of identifying potential providers of post-petition financing, as set forth in greater detail in the Declaration of Michael Buenzow.

47.     As a result of the foregoing developments, the Debtors have filed (a) their bankruptcy petitions and (b) the First Day Pleadings relating to relief needed in connection with these bankruptcy filings.

48.     The Debtors intend to prospectively maintain their operations, to the extent possible, on a "business as usual" basis during the pendency of these chapter 11 cases and seek to sell their assets in a manner which maximizes value for their stakeholders. The Debtors

believe the filing of their bankruptcy petitions, the relief the Debtors request in their First Day

Pleadings and the availability of post-petition financing will aid the Debtors' operations and

assuage the fears of their vendors and customers regarding the Debtors' ongoing operations.

**II.    FIRST DAY MOTIONS AND OTHER PLEADINGS**

49.    To minimize the adverse effects of the commencement of their chapter 11

cases on their business and employees, the Debtors have requested various types of relief in their

First Day Pleadings, all of which are being filed concurrently with this Declaration. I believe that

the relief requested in each of the First Day Pleadings is necessary, appropriate, and is in the best

interest of the Debtors' estates, creditors and other parties in interest.

50.    I have reviewed each of the First Day Pleadings (including the exhibits

and schedules attached thereto), and, to the best of my knowledge, I believe that the facts set

forth in the First Day Pleadings are true and correct. If I were called upon to testify, I could and

would, based on the foregoing, testify competently to the facts set forth in each of the First Day

Pleadings. That testimony would establish that the failure to receive the relief requested by the

First Day Pleadings would have a deleterious effect on the Debtors' operations and value.

**Administrative Motions**

**Debtors' Motion for an Order Authorizing Joint Administration of Their Chapter 11 Cases Pursuant to Bankruptcy Rule 1015 and Local rule 1015-1**

51.    Many of the motions, applications, hearings and orders that will arise in

these chapter 11 cases will jointly affect all of the Debtors. For this reason, I believe that the

interests of the Debtors, their creditors and other parties in interest would be best served by the

joint administration of these chapter 11 cases for procedural purposes only, under the case

number assigned to Quantum Foods, LLC. I believe that joint administration will significantly

reduce the volume of paper that otherwise would be filed with the Clerk of this Court, render the

completion of various administrative tasks less costly and minimize the number of unnecessary delays. Moreover, I believe that the relief requested by this motion will also simplify supervision of the administrative aspects of these cases by the United States Trustee (the "**U.S. Trustee**"). For these reasons, I believe, and the Debtors submit, that the relief requested in this motion is in the best interests of the Debtors, their estates and their creditors and should therefore be approved.

**Application of Debtors for Order Authorizing Appointment of BMC Group, Inc. as Claims and Noticing Agent, *Nunc Pro Tunc* to the Petition Date**

52.    The Debtors request entry of an order appointing BMC Group, Inc. ("BMC") as the Claims and Noticing Agent for the Debtors and their chapter 11 cases, including assuming full responsibility for the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in the Debtors' chapter 11 cases. It is my understanding that the Debtors' selection of BMC to act as the Claims and Noticing Agent has satisfied the Court's *Protocol for the Employment of Claims and Noticing Agents under 28 U.S. C. § 156(c)*, in that the Debtors, with the assistance of their advisors, have obtained and reviewed engagement proposals from at least two other court-approved claims and noticing agents to ensure selection through a competitive process. Moreover, I submit, based on all engagement proposals obtained and reviewed, that BMC's rates are competitive and reasonable given BMC's quality of services and expertise.

53.    Although the Debtors have not yet filed their schedules of assets and liabilities, they anticipate that there will be well in excess of 300 entities to be noticed. In view of the number of anticipated claimants and the complexity of the Debtors' businesses, the Debtors submit that the appointment of a claims and noticing agent is required by Local Rule 2002-1(f) and is otherwise in the best interests of both the Debtors' estates and their creditors.

**Operations Motions**

**Debtors' Motion for an Order (I) Approving Cash Management System; (II) Authorizing
Use of Prepetition Bank Accounts and Business Forms; and (III) Waiving the
Requirements of  11 U.S.C. § 345(b) on an Interim Basis (the "Cash Management Motion")**

54.     Pursuant to the Cash Management Motion, the Debtors' seek the Court's
approval to maintain their Cash Management System. That system is substantially similar to the
system that the Debtors have used in the day to day operations of their business since early 2013,
when the Debtors entered into the Credit Agreement. The Cash Management System constitutes
an essential business practice and is substantially similar to systems currently utilized by
comparable corporate enterprises. The bank accounts (collectively, the "**Bank Accounts**")
through which the Cash Management System is operated are part of a company-wide accounting
and cash concentration and disbursement system used by the Debtors.

A.     The Bank Accounts

55.     Quantum Foods maintains the Bank Accounts with Union Bank.

56.     Quantum Foods primarily operates the Cash Management System for the
Debtors through the Bank Accounts and maintains two lock box accounts at Union Bank (the
"**Lockbox Accounts**") for the purpose of holding funds received from customers by check.
Amounts received into the Lockbox Accounts are transferred to a depository account at Union
Bank (the "**Depository Account**"). In addition to checks received into the Lockbox Accounts,
certain customers pay the Debtors by wire transfer directly into the Depository Account. Funds
considered available in the Depository Account are swept daily into Crystal Financial's account
at Citibank. This account is not maintained by the Debtors and is under the sole dominion and
control of Crystal Financial. On a daily basis, Crystal Financial wires to the Debtors'
concentration account (the "**Concentration Account**") amounts necessary to fund the Debtors'
disbursements, subject to availability under the Credit Agreement.

57.     From the Concentration Account, various transfers are made to other accounts and to customers. Funds necessary to write checks for general accounts payable are wired into an accounts payable disbursement account at Union Bank. Funds necessary to cover payroll are wired into a payroll account at Union Bank. Funds necessary to fund the Debtors' flexible spending requirement are transferred to a flexible spending account at Union Bank. Finally, certain vendors who receive wire transfers receive them directly out of the Concentration Account. Various wire and other electronic transfers are sent and received from these accounts from time to time.;

58.     The aforementioned accounts at Union Bank are subject to deposit account control agreements made and entered into by and among Quantum Foods, Union Bank and Crystal Financial.

B.      Business Forms

59.     In the ordinary course of business, the Debtors use a number of business forms, including checks, letterhead, purchase orders, and invoices. If the Debtors were required to obtain new business focus as a result of the filing of these cases, the Debtors would incur significant expense and attendant delay in effectuating their ordinary course, prepetition business transactions.

C.      Investment Policies

60.     The Debtors do not currently maintain investment accounts or cash accounts other than those described above.

61.     The Debtors' Cash Management System has been employed in substantially similar form for the past year and is an essential business practice. I believe that the use of this system provides numerous benefits to the Debtors, including the ability to ensure cash availability and to reduce administrative expenses by facilitating the movement of funds. In light

of the complexity of the Debtors' operations, the successful transition into chapter 11, as well as the preservation and enhancement of the Debtors' values as going concerns, would be markedly more difficult if the Debtors' cash management procedures are substantially disrupted.

62.     I submit that reserving a "business as usual" atmosphere and avoiding the unnecessary distractions that inevitably would be associated with any substantial disruption of the Cash Management System will facilitate the Debtors' stabilization of their Post-Petition business operations. The commencement of the Debtors' chapter 11 cases will undoubtedly place a substantial strain on their relationships with certain of their vendors that are vital to the Debtors' continued operations and to the achievement of a successful resolution of these cases. Requiring the Debtors to open new debtor in possession bank accounts could cause delay and confusion among such vendors, potentially straining these relationships. Indeed, among other things, a transition to new debtor in possession bank accounts could disrupt the Debtors' efforts to collect funds at this crucial juncture. Therefore, I submit that the Debtors should be permitted to continue to manage their cash and transfer monies among the Bank Accounts as needed in accordance with the Cash Management System. The Debtors will continue to maintain detailed records of all transfers of cash.

63.     It is imperative that the Debtors be permitted to continue to use their existing business forms, including their checks. A substantial amount of time and expense would be required to print new business forms and stationery (and to dispose of existing forms and stationery). This likely would result in a risk of disruption to the Debtors' ordinary business affairs at these initial stages of their bankruptcy cases, which could easily interrupt payments to vendors and disrupt the Debtors' relationships with various third-parties. In short, the costs to the Debtors and their estates of obtaining new checks and other business forms are significant, and

the Debtors have already taken other measures to address the policies underlying the U.S.

Trustee's operating guidelines (including alerting parties-in-interest that they are in bankruptcy

and seeking to prevent the unauthorized payment of prepetition debts).

64.     I submit that cause exists for allowing the Debtors to maintain their cash

within the Cash Management System without meeting the bond requirements of Bankruptcy

Code section 345(b). The Debtors are sophisticated entities with a Cash Management System

that relies on multiple Bank Accounts on a daily basis. The Debtors' Bank Accounts are with a

financially stable banking institution and have FDIC insurance up to the applicable limit per

account.

**Debtors' Motion for an Order, Pursuant to Bankruptcy Code Sections 105(a), 363(b), 503(b), 507(a)(4), and 507(a)(8), and Bankruptcy Rules 6003 and 6004, (A) Authorizing the Debtors to (I) Pay Certain Employee Compensation and Benefits and (II) Maintain and Continue Such Benefits and Other Employee-Related Programs and  (B) Authorizing and Directing Banks and Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations (the "Employee Wages and Benefits Motion")**

65.     As of the Petition Date, the Debtors employed approximately 1,100

employees, all based in the Debtors' facilities in Bolingbrook, Illinois. Of those employees,

approximately 100 are salaried and approximately 1,000 are paid hourly. As of the Petition Date,

approximately 850 of the Debtors' employees are subject to a collective bargaining agreement

with the United Food and Commercial Workers International Union. The Debtors' aggregate

annual payroll is approximately $40,000,000.

66.     The Debtors depend on their employees to oversee virtually every aspect

of their businesses. The employees' skills, their relationships with vendors, suppliers, customers,

and other third parties, and their specialized knowledge and understanding of the Debtors'

operations and the custom food products they supplies to their customers are all essential to the

Debtors' ability to continue their operations and reorganize successfully. Put simply, a

significant unplanned loss of employees would substantially diminish the Debtors' value as a going concern.

67.     By the Employee Wages and Benefits Motion, the Debtors seek entry of (i) an interim order (a) authorizing, but not directing, the Debtors, in their sole discretion and in the exercise of their business judgment, as deemed necessary to continue to operate and preserve value, and subject to the DIP Financing and any orders entered by the Court with respect to the DIP Financing, to pay certain prepetition wage, staffing and independent contractor obligations (collectively, the "Wage Obligations"), payroll taxes and deductions , certain fringe benefits (collectively, the "Fringe Benefits"), the Debtors' current severance program, certain expense reimbursements, employee health and welfare benefits, and (7) the 401(k) Plan (collectively, the "Employee Obligations"), as well as all costs incident to the foregoing, and to continue to honor their practices, programs and policies for their employees as those practices, programs and policies were in effect as of the Petition Date and as such practice, programs and policies may be modified, amended, or supplemented from time to time in the ordinary course of the Debtors' business; and (b) directing all financial institutions to receive, honor, process, and pay any and all checks and wire transfers drawn on the Debtors' accounts in satisfaction of the Employee Obligations, and (ii) entry of a final order granting this relief on a final basis.

68.     The Wage Obligations consist of prepetition amount due to employees, including wages, salaries, overtime, paid time-off, sales commissions, broker commission, and independent contractor obligations. In addition to wages, salaries and commission, the Debtors also pay temporary workers, as well as a staffing agency, to supplement the Debtors usual workforce. With respect to payroll taxes and deductions, the Debtors are required by law to withhold from an employee's wages amount related to federal, state and local income taxes, and

social security and Medicare taxes and to remit the same to the appropriate taxing authority.  The

Debtors are also required to make certain payments from their own funds on account of social

security and Medicare taxes and to pay the relevant taxing authorities.  Additionally, the Debtors

withdraw amounts for garnishments and other pre-tax and after-tax deductions.

       69.     The Debtors provide employees with standard Fringe Benefits, including

vacation pay, holiday pay, bereavement leave pay, jury duty pay, and relocation expense

reimbursement.  The Debtors are also engaged in an educational reimbursement program which

currently has one employee participant.  Prior to the Petition Date, the Debtors terminated

employees who are now eligible to receive payments due to their termination and the Debtors'

reduction in force.  Terminated employees were granted one week of severance pay for every

two years of services, subject to a two-week minimum and a twelve-week maximum.  The

Debtors' reimburse employees for various expenses in the discharge of their duties, including

expense for traveling, lodging and meals. The Debtors' employees are also provided with a

standard range of health, dental, disability and other health and welfare benefits.

       70.     As of the Petition Date, the Debtors estimate that the Prepetition

Employee Obligations do not exceed $12,475 with respect to any single employee. Accordingly,

the Debtors request entry of an interim and final orders, authorizing, but not directing, the

Debtors to pay Prepetition Employee obligations in an aggregate amount not to exceed $12,475

per employee.

       71.     The success of these Cases depends on the retention and cooperation of

the Debtors' employees. Any delay or failure to pay wages, salaries, benefits, and other similar

items would irreparably impair the employees' morale, dedication, confidence, and cooperation

and would adversely impact the Debtors' relationship with their employees. At this early stage,

the Debtors simply cannot risk the substantial damage and potential value destruction to their businesses that would inevitably follow as a result of any trained and knowledgeable employee seeking employment elsewhere. Consequently, it is critical that the Debtors be authorized to satisfy their Employee Obligations and continue their ordinary course employee benefits obligations in effect as of the Petition Date.  This authorization should include the authorization to continue to pay ongoing severance payments in the ordinary course of business, and to pay further severance payments to the extent the Debtors conduct a future reduction in force during the pendency of these cases.  If severance payments to these former employees are not honored, current eligible employees may become concerned about the Debtors' employment practices, causing them to seek out new employment opportunities, to the detriment of the Debtors.

72.     Moreover, if the checks issued and fund transfers requested in payment of the Employee Obligations are dishonored, or if such Employee Obligations are not timely paid during the post-petition period, the Debtors' employees could suffer extreme personal hardship, including, in some instances, being unable to pay their daily living expenses. It would also be inequitable to require the Debtors' employees to bear personally the cost of any business expenses they incurred prepetition, for the benefit of the Debtors, with the understanding that they would be reimbursed.

73.     Accordingly, I believe that payment of all prepetition Employee Obligations in accordance with the Debtors' prepetition business practices will enable the Debtors to retain qualified employees and is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

**Motion of Debtors for Order Authorizing (I) Payment of Prepetition Obligations Incurred in the Ordinary Court of Business in Connection with Liability, Property, and Other Insurance Programs, Including Payment of Policy Premiums and (II) Continuation of Insurance Premium Financing Programs (the "Insurance Motion")**

74.     In the ordinary course of their businesses, the Debtors maintain numerous insurance policies that provide coverage for, among other things, property, casualty, directors and officers liability and other insurance programs (collectively, with the Workers' Compensation Program (as defined below), the "**Insurance Programs**"), as summarized in the motion. The Insurance Programs are essential to the preservation of the Debtors' businesses, properties, and assets, and in many cases coverage is required by various laws and contracts that govern the Debtors' business conduct. Furthermore, I am informed that the Guidelines of the Office of the U.S. Trustee for the District of Delaware, which were promulgated in 1996, require debtors to maintain insurance coverage throughout these chapter 11 cases. The Insurance Programs include coverage from third-party insurance carriers (the "**Insurance Policies**") for the Debtors' Insurance Programs. Pursuant to the Insurance Motion, the Debtors seek authority to maintain their Insurance Programs post-petition.

A.     The Insurance Policies

75.     The Debtors maintain insurance coverage for all of their directors and officers. The total aggregate annual premium paid by the Debtors for the D&O Policy is $79,535. The Debtors maintain general liability insurance that insures, in part, personal injury, property damage, automotive liability, workers' compensation and employee liability. The aggregate annual payment on account of that General Policy, including premium payments and contribution to a loss fund, is approximately $1,693,000. The Debtors maintain property and machinery insurance that insures the Debtors' property for perils such as, but not limited to, earthquake, flood, and service interruptions. The aggregate annual premium for the Property

Policy coverage is approximately $367,382. The Debtors maintain an umbrella insurance policy that, in part, further insures the Debtors for employee benefits liability, automobile liability, and pollution.  The aggregate annual premium for the Umbrella Policy coverage is approximately $111,404. The Debtors maintain crime insurance that insures the Debtors for damages caused by crimes committed against the Debtors, such as employee theft, forgery, and computer fraud.  The aggregate annual premium for the Crime Policy is approximately $16,378. The Debtors maintain contaminated products insurance, which insure the Debtors for, among other items, pre-recall costs, recall cots, retaining of consultant costs, and increased cost of working.  The annual premium for the Products Policies is approximately $215,000.  Additionally, the Debtors maintain excess contaminated products insurance, which has an approximate annual premium of $95,000. The Debtors maintain trade credit insurance, which insures the Debtors for domestic export credit insurance.  The aggregate annual premium for the Trade Credit Policy is approximately $130,000. The Debtors maintain two additional excess liability insurance policies. The aggregate annual premiums for the Excess Policies are approximately $25,500 and $41,006.

B.    Insurance Premium Finance

76.    As of the Petition Date, the Debtors have financed all of their Insurance Policies and fees related thereto (the "**Financed Programs**"), excluding the General Policy, pursuant to a premium finance agreement (the "**PFA**") with AFCO Premium Credit LLC ("**AFCO**").  The PFA requires that the Debtors make eleven monthly payments to AFCO commencing January 30, 2014, each in the amount of $111,656.87.

77.    I submit that absent the relief requested in the motion, the Debtors would be required to obtain replacement insurance on an expedited basis and at significant cost to the estates.

78.     Further, failing to maintain current insurance and related benefits would have a negative effect on the morale of the Debtors' employees at a time when the support of such employees is most critical. Without the support of their workforce, the Debtors' operations would be severely impaired. On the other hand, continuation of these programs will facilitate the Debtors' reorganization efforts by creating a morale boosting sense of "**business as usual.**"

79.     Any prepetition amounts that the Debtors may pay in respect of the Insurance Obligations are extremely small in light of the size of the Debtors' estates and benefits to be derived therefrom. Thus, I submit that the continuation of the Insurance Policies and the payment of all prepetition and Post-Petition Insurance Obligations arising thereunder are essential to preserve the Debtors' assets and protect against unknowable losses.

80.     Furthermore, it is essential that the relief requested in the motion be granted expeditiously considering the necessity of keeping appropriate insurance coverage in place and the potential adverse consequences to the Debtors.

81.     To summarize, if the Debtors cannot continue those programs and ensure that any Insurance Obligations in respect of those programs will be paid in the ordinary course of business, the Debtors could face severe consequences for failure to comply with applicable state laws and risk a loss of value in their business operations, including, among other things, potentially significant litigation exposure and increased costs for alternative arrangements for workers' compensation coverage. For the foregoing reasons, I believe it is vital that the relief requested in the Insurance Motion be granted.

**Debtors' Motion For an Order Authorizing the Debtors to Honor Certain Prepetition Customer Obligations and to Continue Prepetition Customer Programs and Practices in the Ordinary Course of Business (the "Customer Programs Motion")**

82.     The Debtors, in the ordinary course of their business, engage in a number of practices to develop and sustain a positive reputation with their Customers and in the

marketplace generally (collectively, the "**Customer Programs**").  The Customer Programs are customary in the Debtors' industry, and generally are comprised of certain marketing and sale practices that are targeted to develop and sustain a positive reputation for their goods, enhance loyalty and sales among the Debtors' existing customer base, and attract new customers in a highly competitive industry.  In addition, certain of the Debtors' customers require the Debtors to provide these programs as a condition to business, and without providing them, I believe the Debtors would lose some or all of the Debtors' business with those customers.

83.     Each Customer Program varies per Customer in regards to payment frequency and amount, as well as other variables determined by the Debtors.  The Customer Programs include, but are not limited to, the following practices: volume rebate, marketing allowance, sales and marketing incentives, and spoilage allowance.  Payment frequencies in respect to the Customer Programs may be quarterly or monthly, dependent on invoice, or as otherwise determined by the Debtors in conjunction with the relevant customer from time to time. I have been informed that the Debtors reimburse their customers approximately $8 million to $9 million per year to customers through the Customer Programs.

84.     In the Debtors' highly competitive industry, customer loyalty is crucial to the Debtors' ongoing operations.  The Debtors' customers are already apprehensive. Some have canceled or attempted to cancel their contracts. I believe that without the requested relief, the stability of the Debtors' business will be significantly undermined, and otherwise loyal customers will explore alternative sources.

85.     As the Debtors pursue a going-concern sale of substantially all of their assets, it is essential that they maintain a strong connection with their current customers and provide the tools to allow the Debtors to compete for new customers.  Ultimately, I believe that it

is in the best interest of the estates to continue to honor the Customer Programs in order to maintain the productive relationships the Debtors have with their customers and to attract new customers. I believe that ending any of these programs will have a devastating effect on the value of the Debtors' estates.

86.     The cost of the Customer Programs is far outweighed by the revenue that the programs generate. For the reasons set forth in the motion, I believe it is in the best interests of the Debtors and their estates to continue, in the ordinary course of their businesses, the Customer Programs that the Debtors determine to be beneficial, and therefore believe the relief requested in the Customer Programs Motion is vital to the Debtors' operations during the pendency of its cases.

**Debtors' Motion For Interim and Final Orders, Pursuant to Section 105(a) and 366 of the Bankruptcy Code, (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment (the "Utilities Motion")**

87.     In the ordinary course of business and in connection with the management of their properties and operation of their businesses, the Debtors obtain electricity, gas, trash collection, water, telephone services and/or other similar services (collectively, the "**Utility Services**") from a number of utility companies (collectively, the "**Utility Providers**"). The Debtors estimate that in 2013, they paid approximately $5,439,000 million to the Utility Providers for Utility Services rendered before the Petition Date.

88.     The Debtors' access to uninterrupted Utility Services is essential to their ongoing operations and to their reorganization efforts. Should a Utility Provider refuse or discontinue Utility Services, even for a brief period, the Debtors' business operations could be severely disrupted. If such disruption occurred, the impact on the Debtors' business operations

and revenue would be extremely harmful and would jeopardize the Debtors' reorganization efforts. It is therefore critical that the Utility Services continue uninterrupted.

89.     To ensure uninterrupted Utility Services, pursuant to the Utilities Motion, the Debtors are seeking approval to provide to each Utility Provider security equal to the Debtors' estimate of four weeks' worth of utility fees by depositing such sums in a segregated account (the "**Proposed Adequate Assurance**"), as set forth in greater detail in the Utilities Motion.

90.     Notwithstanding my belief that the Proposed Adequate Assurance will provide the Utility Providers with adequate assurance of future payment in these chapter 11 cases, the Debtors have proposed the Procedures as a reasonable procedure for the Utility Providers to request additional adequate assurance under any unique facts and circumstances that may exist. I believe that separate negotiations with each of the Utility Providers with respect to adequate assurance would be time-consuming and unnecessarily divert the Debtors' personnel from other critical tasks related to the operation of their business and the restructuring. This is especially true during the first days of these chapter 11 cases. If the Debtors fail to reach early agreement with each Utility Provider, they would have to file motions seeking expedited determinations as to adequate assurance or risk service termination.

**Debtors' Motion for an Order Pursuant to Sections 105(a), 363(b), 507(a)(8), and 541 of the Bankruptcy Code Authorizing (I) Payment of Certain Prepetition Taxes and (II) Financial Institutions to Honor and Process  Cash Related Checks and Transfers (the "Taxes Motion")**

91.     Pursuant to the Taxes Motion, the Debtors are requesting authority to pay certain prepetition sales, use, transportation, excise, immigration, fuel and employment taxes as well as prepetition fees for licenses, permits, and other similar charges and assessments owed to

various taxing, licensing, and other governmental authorities, as they arise after the Petition

Date.

92.     In the ordinary course of business, the Debtors incur and/or collect certain

taxes and fees and remit same to the applicable authorities. Continuing this practice is vital to the

Debtors' operations. Failing to do so could cause the applicable authorities to file liens or seek to

lift the automatic stay or take severe action against the Debtors' directors and officers for unpaid

taxes, which would take those persons' attention away from working on the Debtors'

restructuring.

93.     I have been informed that, as of the Petition Date, the Debtors' estimate of

prepetition liabilities owing to the various taxing authorities will not exceed approximately

$1,200,000 exclusive of any Taxes that may have been paid prior to the Petition Date but had not

cleared as of the Petition Date.  I believe it is likely that the failure to satisfy prepetition taxes

will have a detrimental effect on the Debtors' operations and these Chapter 11 Cases, as I have

been informed that the failure to pay these amounts could lead to taxing authorities auditing the

Debtors and, in certain cases, personal liability for the Debtors' insiders.

94.     Thus, to prevent immediate and irreparable harm to the Debtors' business,

I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors'

estates, their creditors and all other parties in interest. Accordingly, on behalf of the Debtors, I

respectfully submit that the Taxes Motion should be approved.

**Debtors' Motion for Entry of Interim and Final Orders Authorizing The Debtors to Pay
Prepetition Claims of Certain Critical Vendors (the "Critical Vendors Motion")**

95.     The Debtors have long standing relationships with many of their primary

vendors, but due to the nature of the Debtors' business and its weakened financial state, certain

of those vendors have grown increasingly worried about the Debtors' financial position. Many of

the Debtors' key vendors have already placed the Debtors on cash in advance or on delivery

basis. I anticipate that certain other vendors that have not placed the Debtors on such terms will

be reluctant to do business with the Debtors absent prompt payment in full of their pre-petition

claims. Certain of these vendors (the "**Critical Vendors**"), particularly those who supply the

Debtors with raw material protein products, spices, packaging supplies, plant operating items, as

well as their freight carriers and warehousemen, are vital to the Debtors' ongoing operations and

the success of these cases. In determining which vendors are Critical Vendors, the Debtors

considered, among others, the following criteria: (a) whether the supplier is a "sole source"

provider; (b) whether the Debtors can secure the goods or services of a reasonable alternative

supplier at a reasonable cost within a reasonable timeframe; and (c) whether the Debtors have

sufficient goods in inventory or may procure sufficient services to continue operations while a

replacement vendor is found. Accordingly, in the Critical Vendor Motion, the Debtors request

authorization to pay the pre-petition fixed, liquidated, and undisputed claims of Critical Vendors

(the "**Critical Vendor Claims**"), because payment of such claims is necessary to achieve their

chapter 11 objectives and preserve value for their various constituencies.

        96.     It is my understanding that the Debtors will attempt to condition the

payment of individual Critical Vendor Claims on the agreement of the Critical Vendor to

continue supplying goods and/or services to the Debtors on the same trade terms that, or better

trade terms than, such Critical Vendors offered the Debtors immediately prior to the Petition

Date or, if more favorable, within the 60 day period prior to the Petition Date, or pursuant to

such other trade practices and programs that are favorable to the Debtors. In the Critical Vendor

Motion, The Debtors seek to reserve the right to negotiate new trade terms with any Critical

Vendor as a condition to payment of any Critical Vendor Claim. The Debtors further propose to

limit the aggregate amount of payments to be made on account of Critical Vendor Claims to $3,000,000 unless further authorization is obtained from this Court.

97.    To prevent immediate and irreparable harm to the Debtors' business, I believe that the relief requested in the Critical Vendors Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest. Accordingly, on behalf of the Debtors, I respectfully submit that the Critical Vendors Motion should be approved

**Motion For Interim and Final Orders Authorizing the Debtors to Obtain Senior Secured Superpriority Post-Petition Financing and Utilize Cash Collateral (the "DIP Motion")**

98.    By the DIP Motion, the Debtors seek entry of interim and final orders: (i) authorizing the Debtors to obtain the DIP Financing on a senior secured superpriority basis; (ii) authorizing use of cash collateral ("**Cash Collateral**"); (iii) granting priming liens, priority liens, and superpriority claims to the DIP Lenders (as defined in the motion); (iv) granting adequate protection; and (v) granting related relief.

99.    Accordingly, the Debtors negotiated with the Pre-Petition Secured Parties to obtain Post-Petition financing (the "**DIP Financing**") to fund the Debtors' operations during these Chapter 11 Cases. Specifically, the Debtors have negotiated a post-petition financing facility to be provided by Crystal Financial, as agent for the lenders party to the DIP Financing, in the aggregate principal amount of up to approximately $60,000,000 million minus the Debtors' obligations pursuant to the Credit agreement.

100.    The DIP Financing is essential to preserving and maximizing the value of the Debtors' estates. Since the Prepetition Secured Parties are no longer willing to extend loans to the Debtors, the Debtors' management has determined that, absent the funding provided by the DIP Financing, the Debtors would not have sufficient funds to continue to operate their businesses. The Debtors need to purchase perishable raw materials for what amounts to "just in

time" manufacturing throughout these chapter 11 cases, and to do so must have ready access to credit. Many of the Debtors' vendors are no longer willing to ship to the Debtors on credit and instead require payment in advance or on delivery. The Debtors cannot do so without sufficient capital. Thus, by providing the Debtors with immediate access to the capital that they need to, among other things, build their inventory and pay employees and vendors during the Chapter 11 Cases, the DIP Financing will enable the Debtors to continue to operate as a going concern while they conduct an orderly sale for the benefit of all parties in interest. This is impossible outside of bankruptcy since the Prepetition Secured Parties refused to extend the Debtors further credit.

101.    For these reasons, the Debtors' management believes that the DIP Financing offered by the Pre-Petition Secured Parties represents the best available option for the Debtors and will benefit all parties in interest.

102.    The DIP Financing and the other related agreements regarding the use of Cash Collateral and adequate protection (collectively, the "**DIP Documents**") are the result of extensive negotiations with the Prepetition Secured Lenders, conducted in good faith and at arm's length. The Debtors and their advisors believe that the proposed DIP Financing is the only viable option available to the Debtors, and the Debtors have therefore negotiated to obtain the DIP Financing on the best and most realistic terms available. The circumstances of these Chapter 11 Cases necessitate Post-Petition financing under section 364(c) and (d) of the Bankruptcy Code, and the DIP Financing offered by the Prepetition Secured Lenders reflects the sound exercise of the Debtors' business judgment.

103.    The Debtors have been and are unable to obtain sufficient and otherwise viable financing without granting priming liens pursuant to section 364(d) of the Bankruptcy Code. Specifically, none of the alternative proposals they received that contemplated Post-

Petition financing on an unsecured or non-consensual priming basis or on a priority junior to that of the Prepetition Secured Parties would have provided the Debtors with sufficient liquidity to fund these Chapter 11 Cases. Accordingly, the Debtors propose to obtain the DIP Financing by providing, among other things, superpriority claims, security interests, and liens pursuant to sections 364(c)(l), (2), (3), and (d) of the Bankruptcy Code.

104.    The Debtors also require the use of Cash Collateral to ensure that they have the liquidity necessary to fund their ordinary course business operations and the administration of these Chapter 11 Cases while effectuating the sale of substantially all of their assets. Without the ability to use Cash Collateral, the Debtors' liquidity needs would not be satisfied, jeopardizing the Debtors' ability to conduct an efficient and effective sale process in accordance with the timeline set forth in the DIP Documents and the Purchase Agreement. Thus, the use of Cash Collateral is imperative to the success of these Chapter 11 Cases.

105.    Approval of the DIP Financing and the use of Cash Collateral will provide immediate access to capital that is needed to, among other things, pay employees and vendors while minimizing disruptions to day-to-day businesses, thereby preserving and maximizing the value of the Debtors' estates. Absent the DIP Financing, the Debtors' operations would come to a halt, resulting in irreparable harm to their businesses and their going-concern value.

106.    The Debtors anticipate the DIP Financing being satisfied in full out of the proceeds of the sale of the Debtors' assets to the Stalking Horse Bidder or another party providing a higher and better offer for the Debtors' assets.

107.    Accordingly, for these reasons, I believe that the relief requested in the DIP Motion is in the best interest of the Debtors, their estates and creditors, and all parties in interest.

108.    I declare under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

Dated: February _18_, 2014
Wilmington, Delaware

Name: Edgar Reilly
Title:   Chief Administrative Officer

**Exhibit A**

