## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------------- x
In re                                            :   Chapter 11
                                                 :
QUANTUM FOODS, LLC, et al.,¹                     :   Case No.  14-10318 (___)
                                                 :
              Debtors.                           :   Joint Administration Requested
                                                 :
------------------------------------------------------------------- x
```

**MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(C)(1), 364(C)(3), 364(D)(1), 364(E) AND 507, (B) UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (C) GRANT PRIMING LIENS AND SUPERPRIORITY CLAIMS TO THE DIP LENDERS, (D) PROVIDE ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364, AND (E) REPAY IN FULL AMOUNTS OWED IN CONNECTION WITH THE PREPETITION SECURED LOANS OR OTHERWISE CONVERTING THE PREPETITION SECURED OBLIGATIONS INTO POSTPETITION SECURED OBLIGATIONS, (II) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND (C) AND (III) GRANTING RELATED RELIEF**

Quantum Foods, LLC and certain of its subsidiaries, as debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" or the "Company"), file this motion (this "Motion") for (a) entry of an interim order substantially in the form attached hereto as Exhibit A (the "Interim Order") (I) authorizing the Debtors to (A) obtain postpetition senior secured super-priority financing, (B) use the cash collateral of the Prepetition Secured Lenders (as defined below), (C) grant priming liens, priority liens, and superpriority claims to the DIP Lenders (as defined below), (D) provide adequate protection to the Prepetition Secured Lenders and (E) repay in full amounts owed in connection with the Prepetition Credit Agreement (as

---

¹  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Quantum Foods, LLC (9437); Quantum Foods 213-D, LLC (1862); Quantum Culinary, LLC (1302); GDC Logistics, LLC (1997); Choice One Foods, LLC (9512).  The Debtors' mailing address is c/o Quantum Foods, LLC, 750 South Schmidt Road, Bolingbrook, Illinois 60440.

defined below) or otherwise convert the prepetition debt into postpetition obligations; (II) scheduling a hearing to consider the relief requested in this Motion on a final basis (the "Final Hearing"); and (III) granting related relief; (b) entry of a final order (i) authorizing, among other things, the Debtors to repay in full amounts owed in connection with the Prepetition Term Loan Credit Agreement (as defined below) and (ii) granting the relief requested in this Motion on a final basis (such final order  the "Final Order," and together with the Interim Order, the "DIP Orders").[2]  In support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION

1.    The United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") has jurisdiction over this matter pursuant to 20 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated as of February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    The statutory bases for the relief requested herein are sections 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(l), 364(e), and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedures (the "Local Rules").

---

[2]  The Debtors will provide a proposed Final Order to the Bankruptcy Court, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), and all parties in interest upon appropriate notice in advance of the Final Hearing.

## INTRODUCTION

4.    Prior to the filing of the Debtors' chapter 11 cases (the "Chapter 11 Cases"), the Debtors, after extensive good faith and arm's length negotiations with their prepetition secured lenders, successfully negotiated postpetition financing to ensure continuation of the Debtors' businesses as a going concern and to maximize value for the estates.

5.    By this Motion, the Debtors seek approval of, among other things, (i) super-priority postpetition revolving credit financing in the aggregate principal amount of up to $60,000,000 minus the amounts outstanding under the Prepetition Credit Agreement (as defined below) to be provided by Crystal Financial LLC as administrative agent for the lenders (the "DIP Facility"); (ii) use of Cash Collateral (as defined below); (iii) provide adequate protection to Prepetition Secured Parties (as defined below); and (iv) pursuant to the Final Order (as defined below), repay in full all amounts due to the Prepetition Secured Parties.

6.    As set forth below, access to the DIP Facility and Cash Collateral is critical to the Debtors' ability to continue to operate and to permit the Debtors to maximize value for all stakeholders.  Moreover, the DIP Facility is the best and only viable financing option available to the Debtors.

7.    As of the date of the commencement of these cases (the "Petition Date"), absent the liquidity solution offered by the DIP Facility proposed by the Agent under the Debtors' prepetition secured credit facilities, the Debtors would have been required to commence an immediate shut down of their operations and liquidation of their assets to the detriment of their vendors, employees and all other stakeholders.  Instead, the DIP Facility, which is conditioned on a sale of substantially all of the Debtors' businesses pursuant to section 363(b) of the Bankruptcy Code (the "Sale") in accordance with the milestones required under the DIP

3

Facility, permit the Debtors to run a competitive sale process designed to maximize value for their creditors because the sale is subject to an auction process conducted by recognized investment bankers that will yield the highest and best offer.

8.      Approval of the DIP Facility and the use of Cash Collateral will enable the Debtors to pursue approval of the sale of the Debtors' assets without delay, while simultaneously permitting the Debtors to satisfy their current and ongoing operating expenses, including postpetition wages and salaries, utilities, taxes, and vendor costs.  Absent the required financing, the Debtors' operations would come to an immediate halt, resulting in irreparable harm to their businesses, their going concern value, and ultimately, their ability to pursue a sale of substantially all of their assets − a course of action that the Debtors believe to be the most expeditious and effective means of maximizing value for their stakeholders.

9.      In sum, approval of the DIP Facility is necessary to support the proposed sale process and to satisfy critical financial obligations during these Chapter 11 Cases.

## **RELIEF REQUESTED**

10.     By this Motion and for the reasons set forth below, pursuant to sections 105, 361, 362, 363(c), 363(e), 364(d)(1), 364(e) and 507 of the Bankruptcy Code, Bankruptcy Rule 2002, 4001, and 9014, and Local Rule 4001-2, the Debtors respectfully request that the Bankruptcy Court:

> a.   authorize the Debtors, on an interim basis, to (i) obtain postpetition senior
>      secured financing up to an aggregate principal amount of $27,500,000
>      provided that, although the total aggregate commitment under the DIP
>      Facility of $60 million minus the amounts outstanding under the
>      Prepetition Credit Agreement shall be made available on the Closing Date

following entry of the Interim Order, during such interim period, the Debtors shall be permitted to use only such amounts as are consistent with the Budget (as defined below) and the DIP Credit Agreement, (ii) enter into and execute the DIP Credit Agreement (as defined below), (iii) use the Cash Collateral of the Prepetition Secured Lenders (as defined below), (iv) grant priming liens and superpriority claims to the DIP Lenders, and (v) grant adequate protection to the Prepetition Secured Lenders;

b. schedule the Final Hearing to be held within thirty (30 days) of the entry of the Interim Order; and

c. grant related relief, in each case, on the terms and subject to the conditions described in this Motion and set forth in the proposed Interim Order and the DIP Credit Agreement.

## SUMMARY OF RELIEF REQUESTED[3]

11. By this Motion, the Debtors request entry of the DIP Orders, which, among other things, provide the Debtors with the following relief:

a. Cash Collateral: authority to use the Debtors' cash on hand, cash proceeds of Prepetition Collateral (as defined below) and other cash that constitutes the Prepetition Secured Lenders' "cash collateral," as that term is defined in section 363(a) of the Bankruptcy Code (the "Cash Collateral");

b. DIP Facility: authority on an interim basis to obtain postpetition financing pursuant to the terms of the Senior Secured Super

---

[3] Unless otherwise specified, capitalized terms used but not defined in this concise statement shall have the meanings ascribed to such terms in the respective DIP Credit Agreement (as defined below) and the Interim Order. The summaries and descriptions of the terms and conditions of the DIP Credit Agreement and the Interim Order set forth in this Motion are intended solely for informational purposes to provide the Bankruptcy Court and parties in interest with an overview of significant terms of the DIP Credit Agreement and the Interim Order. In the event of any inconsistency between this Motion and the DIP Credit Agreement, the Interim Order and the DIP Credit Agreement, shall control in all respects.

Priority Debtor-in-Possession Credit Agreement between the Debtors, as Borrowers and Guarantors and Crystal Financial, LLC, as Administrative and Collateral Agent, and certain lenders (the "DIP Credit Agreement")[4] in an amount not to exceed $27,500,000;

Borrowings under the DIP Credit Agreement will be used, among other things, for payment of (a) postpetition operating expenses and other working capital and financing requirements of the DIP Borrowers (as defined below) subject to the Budget (as defined below), (b) certain transaction and chapter 11-related fees, costs and expenses, (c) the Carve-Out (as defined below), and (d) "adequate protection" (as set forth in section 361 of the Bankruptcy Code);

c.   DIP Facility Documents:  authority to execute and deliver the DIP Credit Agreement and all agreements, documents and instruments contemplated by each (collectively, the "DIP Documents"), and to take all actions necessary, appropriate or required to comply with the Debtors' obligations thereunder and under the DIP Order, including obligations to pay certain pre-and postpetition fees and expenses (including, without limitation, reasonable fees and expenses of counsel and financial advisors) owed to the DIP Agent and the DIP Lenders thereunder;

d.   DIP Liens and Claims:  as more fully described below, authority to grant the DIP Agent, for their own benefit and for the benefit of the DIP Lenders, senior, first priority, priming liens on the DIP Collateral (as defined in the Interim Order) securing, and superpriority claims in respect of, the DIP Facility (the "DIP Liens");

e.   Adequate Protection:  approval of the Adequate Protection (as defined below) to be provided to the Prepetition Agent (as defined below) and the Prepetition Secured Lenders (as defined herein and, collectively, the "Prepetition Secured Parties") to protect the Prepetition Secured Parties' interests in the personal and real property of the Debtors constituting Prepetition Collateral (as defined below) under the Prepetition Loan Agreement (as defined below); and

f.   Repay in Full (or "Roll Up") Amounts Outstanding Under The Prepetition Credit Agreement.  Upon entry of the Final Order, authorization to use the proceeds of the DIP Facility to fully repay

---

[4]  A copy of the DIP Credit Agreement in substantially final form is attached to this Motion as Exhibit B.

all amounts outstanding (the "Roll Up Obligations") under that certain Credit Agreement dated as of February 6, 2013 among Quantum Foods, LLC and the other borrowers party thereto, as borrowers; Crystal Financial, LLC as agent (in that capacity, the "Prepetition Agent") for the lenders from time to time party thereto (the "Prepetition Lenders"), and the guarantors party thereto (the "Prepetition Credit Agreement").

g.  Final Hearing:  Scheduling a date for a hearing on this Motion to consider entry of the Final Order, to be held within twenty-five (25) days of the entry of the Interim Order.

## SUMMARY OF PRINCIPAL TERMS OF DIP FACILITY

12.    Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, the following

are the material provisions of the DIP Credit Agreement and the Interim Order:

| | |
|---|---|
| **Borrowers**<br>*Bankruptcy Rule 4001(c)(1)(B)* | **The Borrowers for the DIP Facility are as follows:**<br>Quantum Foods, LLC, Quantum Foods 213-D, LLC, Quantum Culinary, LLC, GDC Logistics, LLC and Choice One Foods, LLC, as Debtors and Debtors-in-Possession (each a "DIP Borrower," and, collectively, the "DIP Borrowers") |
| **Guarantors**<br>*Bankruptcy Rule 4001(c)(1)(B)* | **The Guarantors for the DIP Facility are as follows:**<br>Each of North Star Foods (QRME), LLC and Quantum Rosa Mystica Enterprises, LLC, will guaranty the DIP Facility, and each of Edward Bleka, Jane Bleka and Bleka Properties, LLC will provide limited guaranties for the DIP Facility, in each case consistent with the guaranties under the Prepetition Credit Agreement (collectively, the "DIP Guarantors," and, together with the DIP Borrowers, the "DIP Obligors") |
| **Administrative and Collateral Agent(s)**<br>*Bankruptcy Rule 4001(c)(1)(B)* | **The Agent for the DIP Facility:**<br>Crystal Financial, LLC (the "DIP Agent") |
| **DIP Lenders**<br>*Bankruptcy Rule 4001(c)(1)(B)* | **The DIP Lenders:**<br>Crystal Financial LLC, Solar Capital Ltd., Crystal Financial SPV LLC, and DA Funding LLC (the "DIP Lenders"). |
| **Commitment**<br>*Bankruptcy Rule 4001(c)(1)(B)*<br>*Local Rule 4001-2(a)(ii)* | Super-priority revolving credit facility of $60,000,000 minus the amounts outstanding under the Prepetition Credit Agreement and, upon entry of the Final Order, a roll up in full of the Roll Up Obligations (Interim Order ¶ 3; DIP Credit Agreement § 2.01(a)) |

| | |
|---|---|
| **Term**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)*<br>*Local Rule 4001-2(a)(ii)* | Thirty (30) days after closing, unless the Final Order has been entered prior to such date and the earliest of (i) 6 months after closing; (ii) an event of default by the Borrowers as specified under the proposed DIP Facility documents; or (iii) the closing of the sale of all or substantially all the assets of the Borrowers. (DIP Order § 28; DIP Credit Agreement § 1) |
| **Use of DIP Facility**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | The DIP Facility will be used to pay related transaction fees and expenses and to finance working capital and general corporate purposes of the Borrowers arising in the Borrower's Chapter 11 case as may be approved by the Bankruptcy Court (to the extent required) and as set forth in the Budget as approved by the Agent.  Thereafter, upon entry of a Final Order, the DIP Facility will be used to repay any remaining Roll Up Obligations.<br><br>(Interim Order ¶ 4; DIP Credit Agreement § 7.11) |
| **Entities with Interests in Cash Collateral**<br>*Bankruptcy Rule*<br>*4001(b)(1)(B)(i)* | The Prepetition Agent on behalf of the Prepetition Lenders. (Interim Order ¶ E5) |
| **Use of Cash Collateral**<br>*Bankruptcy Rule*<br>*4001(b)(1)(B)(ii) and*<br>*(iii) Local Rule 4001-*<br>*2(a)(ii)* | Authorized prior to the Debtors receiving notice from the DIP Lenders of (i) an event of default has occurred and is continuing under the Interim Order, and (ii) the termination of the DIP Facility.<br><br>(Interim Order ¶¶ 12-13) |
| **Interim Financing**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)*<br>*Local Rule 4001-2(a)(ii)* | Super-priority revolving credit facility of (on an interim basis) $27,500,000, but in any event in accordance with the Budget, subject to variances set forth in the Interim Order.  (Interim Order ¶¶ 3-4) |
| **Interest Rates**[5]<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)*<br>*Local Rule 4001-2(a)(ii)* | <u>Non-Default Rate</u>: LIBOR rate + 11.5% per annum, payable monthly in cash in arrears, calculated on an actual 360 day basis. (DIP Credit Agreement § 2.06)<br><br><u>Default Rate</u>:  + 2.00% per annum, calculated on an actual 360 day basis.  (DIP Credit Agreement § 2.06) |

---

[5]  The Debtors pay interest under the Prepetition Credit Agreement at a rate of LIBOR plus 11.5%.

| | |
|---|---|
| **Fees**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | <u>Commitment Fee</u>: 0.50% per annum charged on the average unused portion of the DIP Facility, earned and payable monthly, for the ratable benefit of the DIP Lenders.  (DIP Credit Agreement § 2.07(a))<br><br><u>Closing Fee</u>:  $1,650,000, fully earned at Closing and payable on the Termination Date, ratably to the DIP Lenders, against which shall be credited 50% of the termination fee due and owing under the Prepetition Credit Agreement.  (DIP Credit Agreement § 2.07(b))<br><br><u>Administrative Agency Fee</u>:  $5,000 per month, payable to the Agent at Closing, and on the first day of each calendar month thereafter.  (DIP Credit Agreement § 2.07(c)) |
| **Approved Budget**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)*<br>*Local Rule 4001-2(a)(ii)* | A budget, approved by the DIP Borrowers and DIP Agent prior to commencement of the Chapter 11 Cases, and including, without limitation, a thirteen-week cash flow forecast, such thirteen-week cash flow forecast to be updated (in substantially the same format as the prior thirteen-week cash flow forecast) monthly by the DIP Borrowers, submitted to the DIP Agent and, upon acceptance by the DIP Agent in their sole discretion, the prior budget, as modified by the updated thirteen-week cash flow forecast shall constitute the budget.  (DIP Credit Agreement § 7.15) |
| **Milestones**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)(vi)* | The DIP Borrowers shall comply with certain sale-related milestones and covenants including:<br><br>(i)      On the Petition Date, the Borrowers shall have filed the Sale Motion in the Chapter 11 Case.  Incidental to the filing of such Sale Motion:<br><br>(ii)      From and after the Petition Date, the Borrowers shall establish and maintain an electronic data room with current information to facilitate diligence by any potential bidders with respect to such sale.<br><br>(iii)      On or before the date that is two (2) days following the Petition Date, the Borrowers shall have forwarded so-called "bid packages" to any potential bidders, including, without limitation, alternative bid packages to liquidation firms.<br><br>(iv)      On or before the date that is five (5) days following the Petition Date, the Borrowers shall have selected one or more so-called "stalking horse" bid(s) acceptable to the Agent with respect |

| | |
|---|---|
| | to such sale.<br><br>(v)    Within twenty-one (21) days after the Petition Date, the Borrowers shall have obtained approval of the bid procedures from the Bankruptcy Court (satisfactory to the Agent) approving bid procedures for the sale of the Borrowers' assets and the assumption and assignment of the Borrowers' Leases.<br><br>(vi)    Within forty-three (43) days following the Petition Date, an auction among all qualified bidders shall be conducted with the highest and best bid or combination of bids being selected, in consultation with the Agent.<br><br>(vii)    Within forty-five (45) days following the Petition Date, the Bankruptcy Court shall have conducted a sale hearing with respect to such sale and the Borrowers shall have obtained an order of the Bankruptcy Court approving the Sale Motion.  The Borrowers shall consummate the sale of the assets described therein within two (2) Business Days after such order is entered.<br><br>Unless the DIP Agent otherwise agrees, the sale shall be for cash proceeds sufficient to pay in full DIP Facility and amounts due under the Prepetition Credit Agreement and the proceeds shall be so utilized without further order of the Bankruptcy Court.<br><br>(DIP Credit Agreement Section 6.21) |
| **Other Covenants** | Compliance with affirmative and negative covenants as are customary for debtor in possession financing, including, but not limited to:<br><br>**Budget Variance Test:**<br><br>(A) The Borrower's actual cash receipts shall not be less than 85% of the projected amounts set forth in the Budget.<br><br>(B) The Borrower's actual aggregate expenses and cash expenditures shall not be greater than 105% of the projected amount set forth in the Budget.<br><br>(C) The Borrower's actual expenses and cash expenditures with respect to each line item shall not be greater than 110% of the projected amount set forth in the Budget, as calculated on a rolling three-week basis<br><br>(D) The Borrowers may only incur expenses and make cash expenditures for the categories set forth in the Budget. |

(DIP Credit Agreement Section 7.16)

**Other Covenants:**

(A) City Capital Advisors, LLC will continue to be retained by the Borrowers and approved by the Bankruptcy Court as the Borrower's sell-side advisor in connection with such going concern sale.  City Capital Advisors, LLC shall be available at all times during the engagement thereof to discuss such sale and other matters with the Agent as reasonably required by the Agent.

(B) FTI Consulting will continue to be retained by the Borrowers and approved by the Bankruptcy Court as the Borrower's financial and restructuring advisor and Michael Buenzow will continue to serve as the Debtors' Chief Restructuring Officer.  Further, the Borrowers acknowledge and agree that (i) the Agent retains the right, in its sole and exclusive discretion, to continue to engage its own consultant, (ii) the Borrowers and their representatives will cooperate fully with any such consultant and (iii) the consultant shall be granted full and complete access to the Borrower's books and records as reasonably required by the Agent.

(C) The Borrowers shall deliver to the Agent on Wednesday of each week commencing with the first (1st) week after the Petition Date, a weekly variance report showing the Borrower's actual performance compared to the Budget for the immediately preceding week and on a cumulative basis on and after the Petition Date.

(D) The Agent will have the right to conduct commercial finance examinations, inventory appraisals and machinery and equipment appraisals as it deems reasonable, each at the Borrower's expense

(DIP Credit Agreement §§ 6.01(e); 6.10; 6.19; 6.20; )

| | |
|---|---|
| **Liens and Priorities**<br> *Bankruptcy Rule 4001(c)(1)(B)(i) Local Rule 4001-2(a)(i)(D) and (G), 4001-2(a)(ii)* | The DIP Lenders under the DIP Facility shall be afforded certain liens and claims, including priming liens and superpriority claims on property of the estate, as described in section E of this Motion. (Interim Order ¶¶ 6 and 7) |

| | |
|---|---|
| **Carve-Out** | The Carve Out shall mean a carve out for: (a) allowed administrative expenses pursuant to 28 U.S.C. § 1930(a)(6) and 28 U.S.C. § 156(c) for fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee; (b) all accrued and unpaid fees, disbursements, costs and expenses, to the extent allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice and incurred by professionals retained by the Debtors or a Committee, if any, (the "Case Professionals") through the date of service by the DIP Agent of the Carve Out Trigger Notice (as defined below), as limited by the respective Approved Budget amounts for each Case Professional or category of Case Professional through the date of service of said Carve Out Trigger Notice (including partial amounts for any Carve Out Trigger Notice given other than at the end of a week), less the amount of pre-petition retainers received by such Case Professionals; and (c) all accrued and unpaid fees, disbursements, costs and expenses incurred by the Case Professionals after the date of service of a Carve Out Trigger Notice, to the extent allowed at any time, in an aggregate amount not to exceed $150,000 less the amount of pre-petition retainers received by such Case Professionals and not applied to the fees, disbursements, costs and expenses set forth in clause (b) above. The Carve-Out shall be reduced on a dollar-for-dollar basis by any payments of fees or expenses of the Case Professionals. For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by the DIP Agent to the Borrowers and their counsel, the U.S. Trustee, and lead counsel to any Committee, which notice may be delivered at any time following the occurrence and continuance of any DIP Order Event of Default.  (Interim Order ¶ 25; DIP Credit Agreement § 1.01) |
| **Waiver of Rights** <br> *Bankruptcy Rule 4001(c)(1)(B)(viii) and (x) Local Rule 4001-2(a)(i)(B) and (C)* | The Debtors waive any and all claims, counterclaims, causes of action, defenses or setoff rights against the Prepetition Agent and each of the Prepetition Lenders, and the time within which any non-debtor party in interest or the Committee may challenge the obligations to or liens of the Prepetition Agent and Prepetition Lenders (each, a "Lender Claim") will be limited to the later of (a) 60 days after the appointment of the first statutory committee and (b) 75 days from the entry of the Final Order.  Any party other than the Debtors may investigate claims and issues with respect to the Prepetition Loan Documents (the "Investigation").  Subject to entry of the Final Order, the Debtors shall be prohibited from asserting any claims under section 506(c) of the Bankruptcy Code against the Prepetition Agent, the Prepetition Lenders, the DIP Agent, and the DIP Lenders.  (Interim Order ¶¶ 22-23) |

| | |
|---|---|
| **Stipulations to Prepetition Liens and Claims**<br>*Bankruptcy Rule 4001(c)(1)(B)(iii)*<br>*Local Rule 4001-2(a)(i)(B)* | The Debtors stipulate to the enforceability of the Prepetition Debt and the validity of the liens securing the Prepetition Debt (the "Prepetition Liens"). Except to the extent that a Lender Claim is timely commenced and results in the Bankruptcy Court ruling in favor of the plaintiff, the Prepetition Debt (as defined below) shall constitute allowed, secured claims for all purposes in the Chapter 11 Cases and any subsequent proceedings under the Bankruptcy Code, and the liens securing the Prepetition Debt shall be deemed legal, valid, perfected, enforceable and binding. The Prepetition Debt and Prepetition Security Interests (as defined in the Interim Order) shall not be subject to any further challenge by any party in interest seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto (including any chapter 7 or chapter 11 trustee). (Interim Order ¶ E) |
| **Adequate Protection**<br>*Bankruptcy Rule 4001(b)(1)(B)(iv),*<br>*4001(c)(1)(B)(ii)* | Adequate protection for the Prepetition Secured Lenders and Prepetition Agent includes (a) replacement security interests in and liens on all DIP Collateral, subject only to (i) the DIP Liens and any liens on the DIP Collateral that are senior to the DIP Liens and (ii) the Carve-Out, (b) allowed superpriority claims pursuant to section 507(b) of the Bankruptcy Code, (c) payment of unpaid prepetition interest and fees incurred in connection with the Prepetition Loan Agreement and payment of postpetition interest accruing under and in accordance with the Prepetition Loan Agreement, (d) payment of all fees and expenses, including reasonable fees and expenses for counsel and other consultants for the Prepetition Agent or Prepetition Secured Lenders, arising before and after the Petition Date (e) upon the closing of the Sale, adequate protection in the form of Prepetition Liens, Prepetition Replacement Liens, and DIP Liens attaching to the proceeds thereof and (f) upon the earlier of the Sale and the entry of the Final Order, the establishment of an indemnity account. (Interim Order ¶ 14) |
| **Events of Default**<br>*Bankruptcy Rule 4001(c)(1)(B)*<br>*Local Rule 4001-2(a)(ii)* | The DIP Credit Agreement contains certain customary Events of Default and other Events of Default, including, but not limited to, a default under any sale process milestones. (DIP Credit Agreement § 8.01) |
| **Waiver / Modification of Automatic Stay**<br>*Bankruptcy Rule 4001(c)(1)(B)(iv)* | The automatic stay shall be modified solely with respect to the DIP Facility, to permit the DIP Agent and DIP Lenders to exercise (i) immediately upon the occurrence of an Event of Default, all rights and remedies under the applicable DIP Documents other than those rights set forth in clause (ii) and (ii) upon the occurrence and during the continuance of an Event of |

| | |
|---|---|
| | Default and subject to three business days' prior written notice to the Debtors (with a copy to counsel to the Committee, if appointed, and to the U.S. Trustee), to the extent provided for in any DIP Document, the exercise of all rights and remedies by the DIP Agent and the DIP Lenders, with a full waiver by all parties in interest of all rights to contest such termination except with respect to the existence and/or continuance of an Event of Default.  (Interim Order ¶ 31) |
| **Waiver / Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens** *Bankruptcy Rule 4001(c)(1)(B)(vii)* | Liens on recoveries on avoidance actions pursuant to Section 549 of the Bankruptcy Code and recoveries on other avoidance actions under the Bankruptcy Code, but granted solely in such amounts necessary to reimburse the Agent for the amount of the Carve Out, if any, used to finance the pursuit of such recoveries (Interim Order ¶ 6(b)) |
| **Roll-Up** *Bankruptcy Rule 4001(c)(1)(B)(ii) Local Rule 4001-2(a)(i)(E)* | Upon entry of the Final Order, all Roll Up Obligations shall, pursuant to a cashless exchange, be refinanced and converted into loans under the DIP Facility.  Amounts of the Roll Up Obligations refinanced through the DIP Facility may not be reborrowed.  (Interim Order ¶14(c)(iv)) |
| **Indemnification** *Bankruptcy Rule 4001(c)(1)(B)(ix)* | The DIP Obligors agree to certain indemnities as described in ¶ 14(e) of the Interim Order and sections 9.13 and 10.4(b) of the DIP Credit Agreement<br><br>Upon the earlier to occur of the entry of the Final Order and the consummation of the Sale, the Debtors are required to fund a prepetition indemnity account with $150,000 of Cash Collateral, available to the Prepetition Lenders and Prepetition Agent against indemnity obligations under sections 10.04 (a) and (b) of the Prepetition Credit Agreement. (Interim Order ¶ 14(e)) |
| **Conditions to Borrowing** *Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii)* | Conditions precedent to initial borrowings under the DIP Facility include, among other things, the following, in each case in form and substance satisfactory to the DIP Agent: (i) the execution of various loan documents; (ii) the receipt of a borrowing base certificate executed by the CRO; (iii) the entry of the Interim Order; (iv) the receipt and review of various first day motions; (v) the review and approval of a budget; (vi) the first day motions shall be reasonably satisfactory to the DIP Agent; (vii) no indebtedness except permitted indebtedness; (viii) material compliance with laws; (ix) material compliance with contracts; (x) the payment of all fees due to the DIP Agent; and (xi) the completion by the DIP Agent of all "know your customer" review.  (DIP Credit Agreement §4.02) |

| | |
|---|---|
| **Liens on Avoidance Actions**<br>*Bankruptcy Rule 4001(c)(1)(B)(xi)*<br>*Local Rule 4001-2(a)(i)(D)* | The DIP Agent shall be granted liens on recoveries on avoidance actions pursuant to Section 549 of the Bankruptcy Code and recoveries on other avoidance actions under the Bankruptcy Code solely in such amounts necessary to reimburse the Agent for the amount of the Carve Out, if any, used to finance the pursuit of such recoveries.  (Interim Order ¶ 6(b)) |

## KEY PROVISIONS TO BE HIGHLIGHTED PURSUANT TO LOCAL RULE 4001-2

13.    The Debtors believe that the following provisions of the DIP Credit

Agreement or the Interim Order must be highlighted pursuant to Local Rule 4001-2:

a.    **Stipulations to Validity, Perfection, and Amount of Prepetition Liens; Waiver of Prepetition Claims**.  Although the Interim Order includes certain stipulations by the Debtors with respect to the enforceability of the Prepetition Debt (as defined in the Interim Order), the validity of the Prepetition Liens, and certain waivers by the Debtors of rights and causes of action against the Prepetition Agent and the Prepetition Secured Lenders, the Interim Order reserves the rights of non-debtor parties in interest, including any Committee, if appointed, to initiate a Lender Claim by the later of (a) sixty (60) days after the date the first statutory committee, if any, is formed, and (b) with seventy-five (75) days after the entry of the Final Order.  (Interim Order ¶ 21(a))

b.    **Liens on Avoidance Actions**. Upon entry of the Interim Order, the DIP Agent shall be granted liens on recoveries on avoidance actions pursuant to Section 549 of the Bankruptcy Code and recoveries on other avoidance actions under the Bankruptcy Code solely in such amounts necessary to reimburse the Agent for the amount of the Carve Out, if any, used to finance the pursuit of such recoveries.  (Interim Order ¶ 6.6)

c.    **Waiver of Section 506(c) Surcharge**.  Upon entry of the Final Order, except to the extent of the Carve-Out, the Debtors shall waive the ability to charge costs and expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom against or recovered from the DIP Collateral, the Prepetition Collateral or the Cash Collateral without the prior written consent of the DIP Agent or the Prepetition Agent, as applicable.  (Interim Order ¶¶ 37-38)

d.    **Roll-Up of Prepetition Debt**.  Upon entry of the Final Order, the DIP Facility shall be used to pay in full all unpaid amounts of Roll Up Obligations, pursuant to a cashless exchange, be refinanced and

converted into loans under the DIP Facility.  (Interim Order ¶ 14(c)(iv))

## **BACKGROUND**

14.     On the Petition Date, each of the Debtors filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to manage and operate their businesses as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.

15.     No trustee, examiner or official committee has been appointed in the Chapter 11 Cases.

16.     The Debtors, headquartered in Bolingbrook, Illinois, are a leading further-processor of proteins, including beef, pork and poultry.

17.     Founded in 1990 as a hand-cut steak butchering operation, the Debtors provide custom-menu solutions for national and regional chains, including full-service and quick-service restaurants. The Debtors are also an important co-packer to the nation's largest retailers and serve the hospitality industry and the United States military. The Debtors' customer base includes household names in the foodservice, retail, industrial and specialty (e.g., military, schools, home delivery and distributor) channels.

18.     In laymen's terms, the Debtors purchase raw protein products and further prepare them for the needs of the Debtors' customers at the Debtors' state of the art Bolingbrook facilities. This preparation process includes specific portioning and packaging of serving sizes custom ordered by the Debtors' clients.  The Debtors provide their restaurant clients with precise portion controlled meat products, a quality that customers in the Debtors' business greatly value. The Debtors' product offerings include both fully cooked and ready-to-cook products. The

Debtors' ready to cook offerings include portion controlled, breaded and par-cooked and unbreaded and seasoned steaks, cutlets, tenders and strips.  The Debtors' fully cooked offerings include whole muscle, sliced meats, pulled meats, unbreaded seasoned, smoked meats and sauced meats in reheatable bags.

19.    Information regarding the Debtors' businesses, their capital and debt structure, the events leading to the filing of the Chapter 11 Cases, and the Debtors' efforts to obtain debtor-in-possession financing is contained in the Firs*t Day Declaration of Edgar Reilly in Support of Chapter 11 Petitions and First Day Relief* (the "First Day Declaration") and the *Declaration of Michael Buenzow* in support of this motion (the "Buenzow Delcaration").[6]  As described in the First Day Declaration, the Debtors respectfully state as follows.[7]

## A.    Prepetition Secured Indebtedness

20.    As described in the First Day Declaration, each of the Debtors are borrowers under the Prepetition Credit Agreement.  The Prepetition Credit Agreement matures on February 6, 2018. As of the Petition Date, the Debtors had approximately $50,246,397 million in outstanding principal secured indebtedness, consisting of loans outstanding under the Prepetition Credit Agreement.

21.    The Debtors' obligations under the Prepetition Credit Agreement are guaranteed by non-Debtor affiliates Quantum Rosa Mystica Enterprises, LLC and North Star Foods (QRME), LLC ("North Star"). In addition, Edward Bleka, Jane Bleka and an unrelated entity called Bleka Enterprises, LLC have guaranteed up to $10,000,000 in obligations under the

---

[6]  The First Day Declaration and the Buenzow Declaration are being filed substantially contemporaneously with this Motion and are incorporated herein by reference.

[7]  Unless otherwise specified, capitalized terms used but not defined in this Motion shall have the meanings ascribed to them in the First Day Declaration.

Prepetition Credit Agreement.  Obligations under the Prepetition Credit Agreement are secured by a first-priority security interest in substantially all of the assets of the Debtors; in addition, North Star's guaranty is secured by a pledge of its assets.  Interest on the prepetition obligations accrue at a rate of LIBOR plus 11.5%.

**B.**     **Need for DIP Financing and Efforts to Obtain DIP Financing**

22.     As discussed more fully in the First Day Declaration, the Debtors' business operations are contingent on their ability to access raw materials on a regular basis. Traditionally, the Debtors have purchased these materials on credit from their vendors. Recently, as the marketplace began to sense the Debtors' weakened financial position, their suppliers began to decrease, or cancel, the credit lines previously made available to the Debtors. These vendors now generally require cash in advance or cash on delivery terms. This sea change in the Debtors' business operations caused the Debtors to rely more heavily on loans under their Prepetition Credit Agreement, putting the Debtors into an "overadvance" on their availability the Prepetition Credit Agreement, requiring the Prepetition Lenders to provide the Debtors with loans, if at all, on a basis not permitted under the Prepetition Credit Agreement.

23.     The Prepetition Lenders accommodated numerous overadvance loan requests but over time grew concerned about the cost of these loans to the Prepetition Lenders and the Debtors' inability to "return to formula" under the Prepetition Credit Agreement absent new lines of credit from the Debtors' various vendors, a prospect that is unlikely absent a significant de-levering of the Debtors' balance sheet.  See First Day Declaration, ¶¶ 31-32.

24.     To aid the Debtors in improving operations, seek new liquidity and other restructuring alternatives, in April 2013, the Company engaged FTI Consulting ("FTI") as financial advisors; in October 2013, engaged City Capital Advisors ("City Capital"), as its

investment bankers; and in January 2014, engaged Winston & Strawn LLP ("W&S") as its legal advisors.

25.      In light of the overadvances and other defaults, on January 2, 2014, the Prepetition Secured Lenders, the Debtors and the guarantors entered into that certain Forbearance and Modification Agreement and in the weeks thereafter, multiple amendments thereto extending the forbearance period.  During this forbearance period, the Prepetiton Lenders funded multiple "overadvance" loans, but in early February 2014 informed the Debtors they were unwilling to extend the forbearance period beyond February 10, 2014 or provide additional loans on an "overadvance" basis outside of a chapter 11 filing. The Prepetition Lenders subsequently presented the Debtors with a DIP proposal.

26.      The postpetition financing proposal from the Prepetition Lenders was conditioned on certain milestones, including a sale of substantially all of the Company's assets by way of a section 363 auction process, with a stalking horse bidder identified by City Capital. As part of this proposal, the DIP Lenders would provide debtor-in-possession financing to the Debtors to fund their Chapter 11 Cases.

27.      In light of this potential lack of financing outside of a chapter 11 filing, the Debtors worked quickly to prepare for a bankruptcy filing. Given the Prepetition Secured Lenders' respective liens on substantially all of the Company's assets and history with the Company, the Prepetition Lenders were an obvious source of post-petition financing.  Indeed, in light of the substantially fully encumbered nature of the Company's assets, the prospect of obtaining postpetition financing from a third party lender outside of the Prepetition Lender base would have contemplated one of four difficult alternatives: (a) to find a lender willing to extend postpetition financing on an unsecured basis, (b) to find a lender willing to extend postpetition

financing with priority junior to that of the Prepetition Secured Parties, (c) to obtain postpetition financing that primed the liens of the Prepetition Secured Parties without such parties' consent, or (d) to arrange a refinancing of the Prepetition Obligations. Nonetheless, FTI approached twelve third parties, representing a cross section of traditional and non-traditional lenders to ascertain whether or not such third parties would be willing to provide postpetition financing.[8]

28. In light of the existence of the Prepetiton Agent's liens on all of the Debtors' assets, and the likelihood of any postpetition financing they provide being subordinate to that of the Prepetition Secured Parties, each of these parties declined to make a DIP proposal to the Debtors.[9]

29. In light of the Debtors' inability to receive alternative proposals, the Company determined in consultation with its advisors, including FTI, that under the circumstances, including the Company's liquidity position, the termination of its forbearance period, the current debtor-in-possession financing market, and the results of recent conversations with a variety of stakeholders and other parties, the DIP Facility provided by the Prepetition Agent and Prepetition Lenders was the best option available to the Debtors to provide them with sufficient liquidity to continue to operate their business operations and to conclude their restructuring. The Company also determined that the other proposals received were inferior in comparison to the postpetition financing proposals the Prepetition Lenders, including amongst other things, because they did not provide sufficient liquidity to fund the Chapter 11 Cases, and thus, the Company concluded there were no viable alternatives to the DIP Facility.

---

[8] See Buenzow Declaration ¶ 4.

[9] See Buenzow Declaration ¶ 5.

30.     The DIP Facility is agreeable to the Prepetition Lenders, and in addition to providing the Company with the necessary liquidity, avoids the need for a lengthy and uncertain priming dispute.  As such, it represents the best postpetition financing option available to the Company.

31.     The following factors, among others, weighed in favor of the DIP Facility offered by the DIP Lenders: (i) the Company's familiarity and prior experience with the DIP Lenders, (ii) the lack of execution risk, (iii) certainty of closing, and (iv) likelihood of flexibility and supportiveness in the future.

32.     Accordingly, in light of their imminent liquidity needs, the Debtors determined that it would not be prudent or productive to incur further costs or devote additional resources to soliciting interest from further potential third party sources of postpetition financing. Rather, the Debtors and their advisors focused their efforts on finalizing and documenting the DIP Facility proposed by the DIP Lenders.

33.     Throughout the weeks leading up to the Petition Date, the Company and the DIP Agent engaged in extensive good faith and arm's length negotiations with respect to the terms and conditions of the postpetition financing.  The result of such good faith and arms' length negotiations was the execution of the DIP Credit Agreement submitted to the Bankruptcy Court for approval pursuant to this Motion.

**C.      The Debtors' Liquidity Needs to Effectuate the Sale and Administer the Chapter 11 Cases**

34.     In light of the conditions imposed by the proposed DIP Facility, including a sale of substantially all of the Company's assets within 37 days after the Petition Date, the Company, with the assistance of FTI and W&S, analyzed the amount of cash necessary for the Debtors to (i) implement the sale process required by the DIP Facility and (ii) to operate the

Debtors' businesses in the ordinary course.  In determining the amount of liquidity needed for this purpose, FTI conferred with certain of the Company's operations and management personnel with respect to anticipated cash receipts and disbursements.  The Company, in consultation with FTI and W&S, ultimately determined that the Debtors would require access to a line of credit equal to approximately $12,000,000 in postpetition financing during the Chapter 11 Cases, which is equal to $60,000,000 minus the amounts outstanding under the Prepetition Credit Agreement.  To that end, the Debtors, in consultation with FTI and W&S, provided the DIP Agent with a budget forecasting projected cash flow for the thirteen (13) week period following the Petition Date, which has been approved in form and substance by the DIP Agent (as may be subsequently amended, modified, and updated from time to time in accordance with the DIP Credit Agreement, the "Budget").[10]

35.     Upon entry of the Interim Order and the closing of the DIP Facility (the "Closing Date"), up to an aggregate principal or face amount not to exceed $27,500,000 will be made available.  However, during the period from the Closing Date through entry of the Final Order, the Debtors shall be permitted to use only such amounts as are consistent with the Budget and the DIP Credit Agreement.

36.     As reflected in the Budget, the Debtors have an immediate need during the interim period to access at least $27,500,000 under the DIP Facility during the period from the Petition Date through the entry of the Final Order approving the DIP Facility.  Upon entry of the Final Order, the Debtors will need the balance of the DIP Facility for the remainder of these Chapter 11 Cases.  Absent the ability to access the proceeds of the financing available under the DIP Facility as set forth above pending entry of the Final Order, the Debtors would not have

---

[10] The Budget is attached hereto as Exhibit C.

sufficient cash on hand to administer the Chapter 11 Cases, pay their employees, satisfy essential postpetition obligations as they come due, promptly pursue consummation of a sale in accordance with the conditions of the DIP Facility, preserve the value of their assets and satisfy the proposed adequate protection payments to the Prepetition Secured Parties.  Accordingly, access to funds on an interim basis is necessary to avoid immediate and irreparable harm to the Debtors' estates.

37.     Furthermore, as evidenced by the Budget, the DIP Facility, which is the Debtors' only sources of postpetition financing, is appropriately sized given the Debtors' projected liquidity pending completion of the sale process.  The Debtors believe that the Budget is feasible, includes all expenses that the Debtors believe they will incur after the Petition Date and will provide the Debtors with sufficient liquidity to support the Debtors' pursuit of the sale process and satisfy essential financial obligations during the Chapter 11 Cases, all in order to maximize the value of the Debtors' estates for the benefit of parties in interest.

**D.     DIP Liens and DIP Superpriority Claims**

38.     Pursuant to the proposed DIP Order, as security for the loans and obligations under the DIP Facility (the "DIP Obligations"), the DIP Agent, for the benefit of the DIP Lenders, shall be granted, pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(l) of the Bankruptcy Code, (a) valid, binding, continuing, enforceable, fully perfected first priority senior security interest in and lien upon all pre and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected and non-avoidable liens (collectively, "Unencumbered Property"), (b) valid, binding, continuing, enforceable, fully perfected first priority senior priming security interests in and liens upon all pre- and postpetition property of the Debtors and (c) valid, binding,

continuing, enforceable, fully perfected security interests in and liens upon all pre- and postpetition property of the Debtors pursuant to Bankruptcy Code section 364(c)(3), whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by Bankruptcy Code section 546(b), which security interests and liens in favor of the DIP Agent are junior to such valid, perfected and unavoidable liens (all property identified in clauses (a), (b) and (c) above being collectively referred to as the "DIP Collateral," and the foregoing liens on the DIP Collateral being collectively referred to as the "DIP Liens").  The DIP Collateral for the DIP Facility shall further include, without limitation, initially proceeds of claims or causes of action under section 549 of the Bankruptcy Code and, subject to entry of the Final Order, proceeds of all claims or causes of action under chapter 5 of the Bankruptcy Code and similar laws, and any proceeds thereof and property received thereby whether by judgment, settlement or otherwise, solely in such amounts necessary to reimburse the Agent for the amount of the Carve Out, if any, used to finance the pursuit of such recoveries (collectively, the "Avoidance Actions").

39.     The DIP Liens shall be valid, perfected, enforceable, and effective as of the date of entry of the Interim Order without any further action by any party and without the need for the execution by the DIP Obligors of mortgages, security agreements, pledge agreements, financing statements, or other documents.

40.     In addition to the DIP Liens, pursuant to sections 364(c)(l), 503, and 507 of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims (the "DIP Superpriority Claims") with priority over any and all

administrative expenses of the Debtors, whether heretofore or hereafter incurred, of the kind specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 364, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, 1114 or any other provisions of the Bankruptcy Code, which DIP Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors, including, but not limited to, the proceeds of Avoidance Actions, and all proceeds thereof.

**E.**    **Milestone Schedule**

41. The DIP Credit Agreement contains the following milestones for the sale process (the "Sale Milestones"):[11]

1. From and after the Petition Date, the Debtors shall establish and maintain an electronic data room with current information to facilitate diligence by any potential bidders with respect to such sale.

2. On or before the date that is two (2) days following the Petition Date, the Debtors shall have forwarded so-called "bid packages" to any potential bidders, including, without limitation, alternative bid packages to liquidation firms.

3. On or before the date that is five (5) days following the Petition Date, the Debtors shall have selected one or more so-called "stalking horse" bid(s) acceptable to the Agent with respect to such sale.

4. Within twenty-one (21) days after the Petition Date, the Debtors shall have obtained approval of the bid procedures from the Bankruptcy Court (satisfactory to the DIP Agent) approving bid procedures for the sale of the Debtors' assets and the assumption and assignment of the Debtors' leases.

5. Within forty-three (43) days following the Petition Date, an auction among all qualified bidders shall be conducted with the highest and best bid or combination of bids being selected, in consultation with the DIP Agent.

---

[11] Failure to achieve any of these milestones constitutes an Event of Default under the DIP Facility.

6.  Within forty-five (45) days following the Petition Date, the Bankruptcy Court shall have conducted a sale hearing with respect to such sale and the Debtors shall have obtained an order of the Bankruptcy Court approving the sale.  The Debtors shall consummate the sale of the assets described therein within two (2) Business Days after such order is entered. Unless the DIP Agent otherwise agrees, the sale shall be for cash proceeds sufficient to pay in full the DIP Facility and obligations under the Pre-Petition Credit Agreement, and the proceeds shall be so utilized without further order of the Bankruptcy Court.

**F.      Use of Cash Collateral and Adequate Protection**

42.     Most, if not all, of the cash, cash equivalents, and other amounts on deposit or maintained in the Debtors' bank accounts constitute proceeds that, to the extent subject to valid and perfected liens, are the Cash Collateral of the Prepetition Secured Parties in accordance with section 552(b) of the Bankruptcy Code.

43.     The Prepetition Secured Parties have consented to the Debtors' use of Cash Collateral in the ordinary course of business and in accordance with the Budget, subject to the grant of adequate protection proposed in this Motion and the other terms and conditions set forth in the Interim Order.

44.     To the extent their interests in the Prepetition Collateral constitute valid, perfected, and enforceable security interests and liens as of the Petition Date, the Prepetition Secured Parties are entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral to the extent of any diminution in the value of their interests in the Prepetition Collateral from and after the Petition Date.

45.     The Prepetition Secured Lenders' Adequate Protection Liens shall be valid, perfected, enforceable, and effective as of the date of entry of the Interim Order, without any further action by the DIP Obligors, the DIP Agent, the Prepetition Agent, or the Prepetition

26

Secured Lenders and without the need for the execution by the DIP Obligors of mortgages, security agreements, pledge agreements, financing statements, or other documents.

## BASIS FOR RELIEF REQUESTED

### A.        The DIP Facility Should Be Approved

46.        The Debtors' available and projected Cash Collateral alone is insufficient to fund the Chapter 11 Cases.  Thus, the credit provided under the DIP Facility is essential to the continuity of the Debtors' operations and timely pursuit of the contemplated sale transaction, which serves the interests of all of the Debtors' economic stakeholders.  Furthermore, the availability of Cash Collateral and credit under the DIP Facility will instill much needed confidence in parties that are critical to the success of the Chapter 11 Cases − the Debtors' employees, vendors, and customers, as well as potential bidders for the Debtors' assets.  This assurance greatly enhances the likelihood that the Debtors will continue to receive the support of key constituents during the pendency of the Chapter 11 Cases, and increases the opportunity for a robust, competitive sale process that will yield the greatest recovery for the Debtors' estates and creditors.

47.        As described above, the Debtors' efforts to procure postpetition financing or other financial accommodations from any other prospective lender on terms and conditions more favorable than the proposed DIP Facility proved unsuccessful.

48.        Based on the circumstances, the Debtors determined in their sound business judgment that the proposed DIP Facility was the only viable alternative to avoid a value-destructive, disorderly liquidation of their assets.  Given these circumstances, the proper exercise of the Debtors' fiduciary obligations mandated entry into the proposed DIP Facility to

prevent immediate and irreparable harm to the Debtors' estates and maximize recoveries to the Debtors' creditors.

49.     The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and a hearing, that the debtors are  "unable to obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code]." 11 U.S.C. § 364(c).  Indeed, section 364(c) financing is appropriate when the debtor in possession is unable to obtain unsecured credit allowable as an ordinary administrative claim.  See In re Ames Dep't Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

50.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

(a)     the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;

(b)     the credit transaction is necessary to preserve the assets of the estate; and

(c)     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Ames Dep't Stores, 115 B.R. at 37-39.

51.     Prepetition, the Debtors endeavored to identify potential sources of postpetition financing.  The diligent efforts of the Debtors and FTI notwithstanding, the Debtors

were and are unable to obtain the requisite postpetition financing absent the granting of superpriority claims and priming liens. All of the Debtors' assets are substantially fully encumbered, and the Prepetition Agent represented that the Prepetition Secured Lenders would not consent to any third party postpetition financing that primed their liens on the Prepetition Collateral. In light of these limitations, the Debtors have successfully negotiated postpetition financing on the best and only viable terms available. Absent the requisite financing, the Debtors' operations would come to an immediate halt, resulting in irreparable harm to their businesses, their going concern value, and ultimately, their ability to pursue a sale of substantially all of their assets − a course of action that the Debtors believe to be the most expeditious and effective means of maximizing the value of the Debtors' estates.

52.    Accordingly, the circumstances of the Chapter 11 Cases necessitate postpetition financing under section 364(c) of the Bankruptcy Code, and the DIP Facility reflect the sound exercise of the Debtors' business judgment.

**B.    Approval of Priming Liens and Adequate Protection under Section 364(d)**

53.    The Debtors have been and are unable to obtain sufficient financing without granting priming liens pursuant to section 364(d) of the Bankruptcy Code. Despite their concerted efforts, the Debtors did not find a lender or lender group, within the timeframe necessitated by the Debtors' liquidity needs, willing to extend (i) unsecured credit pursuant to 364(a) or (b) of the Bankruptcy Code, allowable under section 503(b)(l) as an administrative expense or (ii) credit in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code. Similarly, the Debtors' efforts to procure postpetition financing or other financial accommodations from any other prospective lender on terms and conditions more favorable than the proposed DIP Facility proved unsuccessful.

Accordingly, the Debtors propose to obtain the financing set forth in the DIP Credit Agreement by providing, among other things, superpriority claims, security interests, and liens pursuant to sections 364(c)(1), (2), (3), and (d) of the Bankruptcy Code.

54.    If a debtor is unable to obtain credit under the provisions of section 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien." 11 U.S.C. § 364(d).  Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of postpetition debt secured by senior or "priming" liens, provides that the court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

      (a)    the trustee is unable to obtain credit otherwise; and

      (b)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

55.    Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used by the trustee, the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).  Section 361 of the Bankruptcy Code sets forth a non-exhaustive list of forms of adequate protection, including periodic cash payments, additional liens and replacement liens.  11 U.S.C. § 361.  The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis.  See In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996).  "Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization

process." Id. (quoting In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).  The

focus of the inquiry is whether a secured creditor is protected from diminution in the value of its

interest in the collateral during the period of use.  See In re Swedeland Dev. Group, Inc., 16 F.3d

552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure

that the creditor receives the value for which he bargained prebankruptcy.") (internal citations

omitted).

56.     In consideration for the adequate protection proposed in this Motion, the

Prepetition Secured Lenders have consented to the priming of their liens provided the relief

requested herein is granted.  The various protections afforded the Prepetition Secured Lenders

provide protection against any diminution in the value of their respective interests in the

Prepetition Collateral.  Accordingly, the proposed adequate protection is fair, reasonable, and

sufficient to satisfy the requirements of sections 363(c)(2) and (e) of the Bankruptcy Code.

57.     Having determined that the best viable postpetition financing option

available was only under sections 364(c) and (d) of the Bankruptcy Code, the Debtors negotiated

extensively with the DIP Agent, in good faith and at arm's length, regarding the DIP Facility, the

use of Cash Collateral, and adequate protection.  The Debtors determined that the proposed DIP

Facility were the only viable alternative available to avoid a value-destructive, disorderly

liquidation of their assets.  Given these circumstances, the proper exercise of the Debtors'

fiduciary obligations mandated entry into the proposed DIP Facility to prevent immediate and

irreparable harm to the Debtors' estates and to maximize recoveries to the Debtors' creditors.

58.     Accordingly, based on the circumstances described above, the Debtors

request approval to grant superpriority claims, security interests, and "priming" liens pursuant to

section 364(d) of the Bankruptcy Code.

C.      **The Use of Cash Collateral**

59.     In addition to the DIP Facility, the Debtors require the use of Cash Collateral to ensure that they have the liquidity necessary to fund their ordinary course business operations and the administration of the Chapter 11 Cases, including implementation of the sale process in the time frame required by the DIP Facility.

60.     Section 363 of the Bankruptcy Code governs the Debtors' use of property of the estates.[12]  Section 363(c)(1) of the Bankruptcy Code provides that:

> If the business of the debtor is authorized to be operated under Section . . . 1108 . . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

61.     Section 363(c)(2) of the Bankruptcy Code, however, provides an exception with respect to "cash collateral" to the general grant of authority to use property of the estate in the ordinary course.  Specifically, a trustee or debtor-in-possession may not use, sell, or lease "cash collateral" under subsection (c)(1) unless:

> (A)     each entity that has an interest in such collateral consents; or
>
> (B)     the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

---

[12] Pursuant to section 1107 of the Bankruptcy Code, a debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with section 363 of the Bankruptcy Code.  See 11 U.S.C. § 1107(a).

62.     As discussed above, without authority to use Cash Collateral, the Debtors'

liquidity needs will not be satisfied, jeopardizing the Debtors' ability to conduct an efficient and

effective sale process, and, ultimately, their ability to maximize value for the benefit of all parties

in interest.  Thus, the use of Cash Collateral is imperative to the success of the Chapter 11 Cases.

63.     Accordingly, the Debtors submit that, under the circumstances here, their

request to use Cash Collateral should be approved.  Absent such authority, the Debtors would not

have access to any funds to administer these Chapter 11 Cases.

**D.      No Adequate Alternative to the DIP Facility is Currently Available**

64.     The diligent efforts of the Debtors and FTI notwithstanding, the Debtors

were and are unable to obtain the requisite postpetition financing within the Debtors' expedited

timeframe absent the granting of superpriority claims and priming liens.  All of the Debtors'

assets are substantially fully encumbered, and the Prepetition Agent represented that the

Prepetition Secured Lenders would not consent to any third party postpetition financing that

primed their liens on the Prepetition Collateral.[13]  In light of these limitations, the Debtors have

successfully negotiated postpetition financing on the best and only viable terms available.  The

circumstances of the Chapter 11 Cases necessitate postpetition financing under section 364(c)

and (d) of the Bankruptcy Code.

65.     A debtor need only demonstrate "by a good faith effort that credit was not

available without" the protections afforded to potential lenders by sections 364(c) and (d) of the

Bankruptcy Code.  See In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986); see also In re

Plabell Rubber Prods., Inc., 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).

---

[13] See Buenzow Declaration, ¶ 5.

66. So long as a debtor's business judgment does not run afoul of the letter and spirit of the Bankruptcy Code, courts grant a debtor considerable discretion with respect to postpetition financing. See, e.g., In re CB Holding Corp., 447 B.R. 222, 227 (Bankr. D. Del. 2010 ("[T]he terms of the Post-Petition Financing appear to be fair and reasonable, are ordinary and appropriate for secured financing to debtors in possession, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration"); Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment . . ."); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); see also Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co., Inc.), 789 F.2d 1085, 1088 (4th Cir. 1986); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985); In Farmland Indus., Inc., 294 B.R. 855, 881-84 (Bankr. W.D. Mo. 2003); In re Curlew Valley Assocs., 14 B.R. 506, 513-14 (Bankr. D. Utah 1981).

67. A debtor is not required to seek alternative financing from every possible lender in order to satisfy the requirements of section 364(d) of the Bankruptcy Code. In re 495 Central Park Ave. Corp., 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992). Rather, a debtor need only demonstrate sufficient efforts to obtain financing from other sources without the granting of senior liens. Id. at 631 (debtor testified to numerous failed attempts to procure financing from

various sources, explaining that "most lend money only in return for a senior secured position");

Snowshoe, 789 F.2d at 1088 (debtor demonstrated that credit could not be obtained without the

granting of a senior lien by providing evidence that efforts to obtain financing from other

financial institutions in the geographic area had proven unsuccessful).

68.    As discussed above, the Debtors have successfully negotiated postpetition

financing on the best and only viable terms available.   The circumstances of the Chapter 11

Cases necessitate postpetition financing under section 364(c) and (d) of the Bankruptcy Code,

and the DIP Facility reflects the sound exercise of the Debtors' business judgment.

**E.**    **The Terms of DIP Credit Agreement are Fair, Reasonable, and Appropriate**

69.    The purpose of the proposed DIP Facility is to provide the Debtors with

sufficient liquidity to bridge the Debtors through a successful sale of substantially all of their

assets as a going concern.   Without the financing provided pursuant to the DIP Facility, the

Debtors would not be able to realize the full value of their assets, to the detriment of all

stakeholders.

70.    Given the exigent circumstances of the Chapter 11 Cases, the terms and

conditions of the DIP Facility are fair and reasonable, and were negotiated extensively by well-

represented, independent parties in good faith and at arm's length.   Specifically, the interest rate

under the DIP Facility is the same as the prepetition interest rate the Debtors were already

paying.   The Debtors' advisors believe the DIP Facility is the Debtors' only likely source of

postpetition financing, and represents the best postpetition financing proposal available to the

Debtors.[14] Accordingly, the DIP Agent and the DIP Lenders and all obligations incurred under

the DIP Facility should be accorded the benefits of section 364(e) of the Bankruptcy Code.

---

[14] See Buenzow Declaration ¶ 6.

71.     Upon entry of the Interim Order, the amount of $27,500,000 shall be made available on the Closing Date; however, during such interim period, the DIP Borrowers shall be permitted to use only such amounts as are consistent with the Budget and the DIP Credit Agreement.  The DIP Credit Agreement also provides for a "roll-up" of the Prepetition Debt conditioned upon the entry of the Final Order.  Under the circumstances, the DIP Lenders are the only viable source of postpetition financing for the Debtors and, importantly, the proposed terms of the DIP Facility presently before the Bankruptcy Court, including the roll-up of the amounts due prepetition under the Prepetition Loan Agreement, is the only terms under which the DIP Lenders are willing to lend.  Thus, absent approval of refinancing of the Roll-Up Obligations by the DIP Lenders in connection with the proposed DIP Facility, the Debtors would have no ability to finance the Chapter 11 Cases.  Simply stated, the Debtors' only alternative to the proposed DIP Facility is an immediate, piecemeal liquidation of their estates and the value destruction attendant thereto.

72.     Additionally, the Roll Up Obligations comprise an essential component of the adequate protection package for the Prepetition Agent and the Prepetition Secured Lenders, given that such parties have assumed increasingly greater credit risk through providing multiple loans while the Debtors are in an "overadvance" state under the Prepetition Loan Agreement and other events of default had occurred. In addition, the roll up is a necessity for the Prepetition Lenders and the DIP Lenders due to an unequal allocation of prepetition loans and DIP loan commitments among those lenders. On this basis, the Debtors have demonstrated extraordinary circumstances warranting the roll-up of the Prepepition Debt upon entry of the Final Order.

73.     To further illustrate that the terms are fair, reasonable and adequate, the proposed DIP Credit Agreement and the Interim Order provide that the security interests and

administrative expense claims granted to the DIP Lenders are subject to the Carve-Out.  In In re Ames Dep't Stores, 115 B.R. 34 (Bankr. S.D.N.Y. 1990), the court found that such "carve-outs" are not only reasonable, but are necessary to ensure that official committees and the debtor's estate will be assured of the assistance of counsel.  Id. at 40.

74.    Accordingly, the terms of the DIP Facility are fair, reasonable and adequate, and the DIP Lenders under the DIP Credit Agreement should be accorded the benefits of section 364(e) of the Bankruptcy Code in respect of such agreement.

**F.    The Automatic Stay Should Be Modified on a Limited Basis**

75.    The relief requested in this Motion contemplates a modification of the automatic stay pursuant to section 362 of the Bankruptcy Code to (a) permit the DIP Obligors to grant the security interests, liens, and superpriority claims described above with respect to the DIP Lenders and the Prepetition Secured Lenders, as the case may be, and to perform such acts as may be reasonably requested to assure the perfection and priority of such security interests and liens, (b) permit the DIP Agent and the DIP Lenders to exercise (solely with respect to the DIP Facility), upon the occurrence and continuance of an Event of Default, the rights and remedies provided in the DIP Credit Agreement, the Interim Order, and the Final Order, as applicable, and (c) implement the terms of the proposed DIP Orders.  In the Debtors' business judgment, the stay modification requested in this Motion is fair and reasonable under the circumstances.

**G.    Interim Approval Should Be Granted**

76.    Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than fourteen (14) days after service of such motion.  Upon request, however, the Bankruptcy Court is

empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a hearing to consider the relief requested on a final basis.

77.    Pursuant to Bankruptcy Rule 4001(b) and (c), the Debtors respectfully request that the Bankruptcy Court conduct an expedited preliminary hearing on this Motion and (i) authorize the Debtors to use Cash Collateral and, consistent with the Budget and the DIP Credit Agreement, use the proceeds of the DIP Facility on an interim basis, pending the Final Hearing and entry of the Final Order, to avoid immediate and irreparable harm to the Debtors' estates and (ii) schedule the Final Hearing.

78.    As of the Petition Date, the Debtors held no unrestricted cash.   The proposed DIP Facility and the proposed use of Cash Collateral are the only available funds to finance their ordinary course business operations and the administration of the Chapter 11 Cases.[15]   Thus, the Debtors have an urgent and immediate need for liquidity.   Absent authorization to use Cash Collateral and obtain credit under the DIP Facility, on an interim basis pending the Final Hearing, the Debtors will suffer immediate and irreparable harm, as the Debtors would be unable to fund business operations.   Further, any delay in commencing the sale process poses grave risk to the Debtors and their ability to implement a strategy that will yield the highest recovery for their estates and creditors.   In short, the interim relief requested in the Motion is necessary to maintain critical stasis while the Debtors endeavor to achieve a value-maximizing sale of their assets − and accordingly, is vital to the ultimate success of the Chapter 11 Cases.

---

[15] See Buenzow Declaration ¶ 6.

## THE DEBTORS SATISFY BANKRUPTCY RULE 6003

79.    Pursuant to Bankruptcy Rule 6003, the Bankruptcy Court may grant a motion to "pay all or part of a claim that arose before the filing of the petition" within twenty-one (21) days after the Petition Date to the extent the relief is necessary to avoid immediate and irreparable harm.  Fed. R. Bankr. P. 6003.  As set forth above and in the First Day Declaration, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates, and therefore, entry of an order granting such relief on an interim basis is appropriate under Bankruptcy Rule 6003.

## WAIVER OF BANKRUPTCY RULES 6004(A) AND (H)

80.    To implement the foregoing immediately, the Debtors request that the Bankruptcy Court waive the notice requirements under Bankruptcy Rule 6004(a), if applicable, and the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## NOTICE

81.    Notice of this Motion will be provided to:  (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to Crystal Financial LLC; and (iii) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (iv) the Debtors' cash management banks; and (v) the Internal Revenue Service.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

WHEREFORE, the Debtors respectfully request entry of interim and final orders granting the relief requested in this Motion and such other and further relief as is just and proper.

Dated:    February 18, 2014
          Wilmington, Delaware              YOUNG CONAWAY STARGATT
                                            & TAYLOR, LLP

                                            */s/ M. Blake Cleary*
                                            M. Blake Cleary (No. 3614)
                                            Kenneth J. Enos (No. 4544)
                                            Andrew L. Magaziner (No. 5426)
                                            Rodney Square
                                            1000 North King Street
                                            Wilmington, Delaware 19801
                                            Telephone: (302) 571-6600
                                            Facsimile: (302) 571-1253

                                                -and-

                                            WINSTON & STRAWN LLP

                                            Daniel J. McGuire
                                            Gregory M. Gartland
                                            Caitlin S. Barr
                                            35 West Wacker Drive
                                            Chicago, Illinois 60601
                                            Telephone: (312) 558-5600
                                            Facsimile: (312) 558-5700

                                            *Proposed Counsel for Debtors and
                                            Debtors in Possession*

# **EXHIBIT A**

**Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------------- x

In re                                               :      Chapter 11
                                                    :
QUANTUM FOODS, LLC, *et al.*,[1]                    :      Case No.  14-10318 (___)
                                                    :
            Debtors.                                :      Jointly Administered
                                                    :
                                                    :      **Ref. Docket No.** _____
---------------------------------------------------------------- x

**INTERIM ORDER (1) AUTHORIZING POST-PETITION FINANCING,**
**(2) GRANTING LIENS AND PROVIDING SUPER PRIORITY**
**ADMINISTRATIVE EXPENSE PRIORITY, (3) AUTHORIZING**
**USE OF CASH COLLATERAL AND PROVIDING FOR ADEQUATE**
**PROTECTION, (4) MODIFYING THE AUTOMATIC STAY AND (5) SCHEDULING**
**A FINAL HEARING, PURSUANT TO SECTIONS 105, 361, 362, 363 AND 364**
**OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 4001 AND 9014**

Upon the motion (the "***Motion***")[2] of Quantum Foods, LLC, Quantum Foods 213-D, LLC, Quantum Culinary, LLC, GDC Logistics, LLC, and Choice One Foods, LLC, each as a debtor and debtor-in-possession (collectively, the "***Debtors***"), pursuant to sections 105, 361, 362, and 364 of title 11 of the United States Code (the "***Bankruptcy Code***") and in accordance with Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "***Local Rules***"), in these Chapter 11 Cases (the "***Chapter 11 Cases***"), for entry of an interim order (this "***Interim Order***"), granting the following relief on an interim basis:

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Quantum Foods, LLC (9437); Quantum Foods 213-D, LLC (1862); Quantum Culinary, LLC (1302); GDC Logistics, LLC (1997); Choice One Foods, LLC (9512).  The Debtors' mailing address is c/o Quantum Foods, LLC, 750 South Schmidt Road, Bolingbrook, Illinois 60440.

[2]     Capitalized terms used in this Interim Order but not defined herein shall have the meanings ascribed to such terms in the DIP Financing Agreements (as defined below).

01:15063722.1

**(I)**   **Interim DIP Financing**

(A)   Authorizing the Debtors to obtain $60,000,000 in post-petition financing, pursuant to that certain *Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement* (as may be amended, modified, or supplemented, the "***DIP Credit Agreement***"), substantially in the form attached here to as ***Exhibit "1,"*** by and between the Debtors, as borrowers, and Crystal Financial LLC, as Administrative Agent and Collateral Agent (the "***DIP Agent***"), and the Lenders party thereto (the "***DIP Lenders***"), which may be used for the following:

   (i)   Funding the Debtors' day-to-day operations and working capital needs; and

   (ii)   Upon entry of the Final Order (as defined below), a roll-up of all outstanding prepetition amounts under the Prepetition Revolving Credit Loan Agreement.

(B)   Approval of the DIP Credit Agreement and all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of the DIP Agent and the DIP Lenders, including, without limitation, security agreements, pledge agreements, notes, guaranties, mortgages, and Uniform Commercial Code ("***UCC***") financing statements, and all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto (collectively, as may be amended, modified, or supplemented and in effect from time to time, the "***DIP Financing Agreements***");

(C)   Granting the DIP Agent for itself and the DIP Lenders the following Liens (as defined in section 101(37) of the Bankruptcy Code) and claims:

   (i)   First priority priming, valid, perfected, and enforceable Liens (as defined below), subject only to the Carve Out (as defined below) and the Permitted Prior Liens (as defined below), upon substantially all of the Debtors' real and personal property as provided in and as contemplated by this Interim Order and the DIP Financing Agreements;

   (ii)   A superpriority administrative claim status in respect of all obligations under the DIP Financing Agreements (collectively, the "***DIP Obligations***"), subject to the Carve Out as provided herein;

**(II)**   **Interim Use of Cash Collateral**

(A)   Authorizing the Debtors' use of "cash collateral," as such term is defined in section 363 of the Bankruptcy Code ("***Cash Collateral***"), in which the Prepetition Lenders (as defined below) has an interest;

      (B)    Granting the Prepetition Agent and the Prepetition Lenders (each as defined below) certain adequate protection, including, among other things, Prepetition Replacement Liens and Prepetition Superpriority Claims (each as defined below) and certain other adequate protection as described in this Interim Order, to the extent of any diminution in the value of the Prepetition Agent's and the Prepetition Lenders' interest in the Prepetition Collateral, having the priority set forth in this Interim Order, as adequate protection for the granting of the DIP Liens to the DIP Agent for itself and the DIP Lenders, the use of Cash Collateral, and for the imposition of the automatic stay;

**(III)**    **Modifying the Automatic Stay –** Modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Financing Agreements and this Interim Order;

**(IV)**    **Final Hearing** – Scheduling a final hearing (the "***Final Hearing***") to consider entry of an order (the "***Final Order***") granting the relief requested in the DIP Motion on a final basis and approve the form of notice with respect to the Final Hearing;

and upon consideration of the *Declaration of Edgar Reilly in Support of the Company's Chapter 11 Petition and Requests for First Day Relief*, dated February 18, 2014 (the "***Reilly Declaration***") and the *Declaration of Michael Buenzow in Support of the Company's Chapter 11 Petition and Requests for First Day Relief*, dated February 18, 2014 (the "***Buenzow Declaration***"), and the Court having reviewed the Motion and held a hearing with respect to the Motion (the "***Interim Hearing***"); upon the Motion, the Reilly Declaration, and the record of the Interim Hearing and all objections, if any, to the entry of this Interim Order having been withdrawn, resolved, or overruled by this Court; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

**I.**     <u>**Procedural Findings of Fact**</u>

      A.     **Petition Date.** On February 18, 2014 (the "***Petition Date***"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the

United States Bankruptcy Court for the District of Delaware (the "**Court**").  The Debtors have continued in the management and operation of their businesses and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases.

B.      **Jurisdiction and Venue.**      This Court has jurisdiction over these proceedings, pursuant to 28 U.S.C. §§ 157(b) and 1334, and over the persons and property affected hereby.  Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for the Chapter 11 Cases and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      **Committee Formation.**      No official committee (a "**Committee**") of unsecured creditors, equity interest holders, or other parties in interests has been appointed in the Chapter 11 Cases.

D.      **Notice.**  The Interim Hearing is being held pursuant to the authorization of Bankruptcy Rule 2002, 4001(b), (c), and (d) and Rule 9014, and the Local Rules.  Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors, to certain parties in interest, including: (i) the Office of the United States Trustee; (ii) those creditors holding the twenty (20) largest unsecured claims against the Debtors' estate; (iii) Crystal Financial LLC, as the agent for the Debtors' Prepetition Lenders and for the DIP Lenders (each as defined below); (iv) the attorneys for Crystal Financial LLC; and (v) all secured creditors of record.  Under the circumstances, such notice of the Interim Hearing and the relief requested in the Motion is due, proper, and sufficient notice and complies with Bankruptcy Rules 2002 and 4001 and Local Rule 4001-2.

II.   **Debtors' Acknowledgements and Agreements**

E.   Without prejudice to the rights of parties in interest as set forth in Paragraphs 22-24 below, each of the Debtors admits, stipulates, acknowledges, and agrees that (collectively, Paragraphs E (1) through E (6) hereof shall be referred to herein as the "***Debtors' Stipulations***"):

(1)   **Prepetition Credit Agreements**.   Prior to the commencement of the Chapter 11 Cases, each of the Debtors was a party to the following agreements:

(a)   that certain Credit Agreement dated as of February 6, 2013 (as amended, supplemented or otherwise modified and in effect from time to time (as amended and in effect, the "***Prepetition Credit Agreement***") with Crystal Financial LLC, as Agent (the "***Prepetition Agent***") and the Lenders party thereto (the "***Prepetition Lenders***"),

(b)   that certain Security Agreement and that certain Trademark Security Agreement each dated as of February 6, 2013 (as amended and in effect, collectively the "***Prepetition Security Agreement***") with the Prepetition Agent for its benefit and the benefit of the Prepetition Lenders;

(c)   all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of Prepetition Agent or the Prepetition Lenders, including, without limitation, security agreements, guaranties, and UCC financing statements and all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto,

(collectively, as amended, modified, or supplemented and in effect, collectively, the "***Prepetition Financing Agreements***").

(2)   **Prepetition Debt Amounts**.   As of the Petition Date, the Debtors were indebted to the Prepetition Lenders under the Prepetition Financing Agreements, on account of extensions of credit in the approximate principal amount of $_____, plus interest accrued and accruing (at the rates (including, to the extent allowed, the default rate) set forth in the Prepetition Financing Agreements), costs, expenses, fees (including attorneys' fees and legal expenses) other charges and other obligations (collectively the "***Prepetition Debt***"), and

(3)  **Prepetition Collateral**.  To secure the Prepetition Debt, each of the Debtors granted security interests and Liens (collectively, the "***Prepetition Liens***") to the Prepetition Lenders upon substantially all of its personal property, (collectively, the "***Prepetition Collateral***").[3]  The Liens of the Prepetition Lenders have priority over all other Liens except any Liens which are valid, properly perfected, unavoidable, and senior to the Prepetition Liens (collectively, the "***Permitted Prior Liens***").

(4)  **Prepetition Liens**.

    (a)  As of the Petition Date, each of the Debtors believes the following:

        (i)  the Prepetition Liens are valid, binding, enforceable, and perfected first-priority Liens, subject only to any Permitted Prior Liens, and are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law,

        (ii)  the Prepetition Debt constitutes legal, valid, and binding obligations of each of the Debtors, enforceable in accordance with the terms of the Prepetition Financing Agreements (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code),

        (iii)  no offsets, defenses, or counterclaims to any of the Prepetition Debt exists, and

        (iv)  the Prepetition Debt constitutes an allowed secured claim, and

    (b)  On the date that this Interim Order is entered, each of the Debtors has waived, discharged, and released the Prepetition Agent and Prepetition Lenders, together with their affiliates, agents, attorneys, officers, directors, and employees, of any rights each of the Debtors may have

        (i)  to challenge or object to any of the Prepetition Debt,

        (ii)  to challenge or object to the security for the Prepetition Debt, and

---

[3] The acknowledgment and agreement by the Debtors of the Prepetition Debt and the related liens, rights priorities and protections granted to or in favor of the Prepetition Agent and the Prepetition Lenders, as set forth herein and in the Prepetition Financing Agreements, shall constitute a proof of claim on behalf of the Prepetition Agent and the Prepetition Lenders in this Case in respect of the Prepetition Debt.

(iii)     to bring or pursue any and all claims, objections, challenges, causes of action, and/or choses in action arising out of, based upon, or related to the Prepetition Financing Agreements or otherwise.

(c)     Each of the Debtors does not possess and will not assert any claim, counterclaim, setoff, or defense of any kind, nature, or description which would in any way affect the validity, enforceability, and non-avoidability of any of the Prepetition Financing Agreements or the Prepetition Liens, or any claim of the Prepetition Agent and the Prepetition Lenders pursuant to the Prepetition Financing Agreements or otherwise.

(5)     **Cash Collateral.**  The Prepetition Agent and the Prepetition Lenders have a security interest in and Lien on certain Cash Collateral, including all amounts on deposit in the Debtors' banking, checking, or other deposit accounts and all proceeds of the Prepetition Collateral, to secure the Prepetition Debt.

(6)     **Priming of DIP Facility**.  In entering into the DIP Financing Agreements, and as consideration therefor, each of the Debtors hereby agrees that until such time as all DIP Obligations have been irrevocably paid in full in cash (or other arrangements for payment of the DIP Obligations satisfactory to the DIP Lenders in its sole and exclusive discretion have been made) and the DIP Financing Agreements have been terminated in accordance with the terms thereof, each of the Debtors shall not in any way prime or seek to prime the security interests and DIP Liens provided to the DIP Agent for itself and the DIP Lenders under this Interim Order by offering subsequent lenders or a party-in-interest a superior or *pari passu* Lien or claim pursuant to section 364(d) of the Bankruptcy Code or otherwise.

## III.    Findings Regarding the Post-Petition Financing.

      F.    **Need for Post-Petition Financing**.  An immediate need exists for the Debtors to obtain funds from the DIP Facility in order to continue operations and to administer and preserve the value of their estates.  The ability of the Debtors to finance their operations, to preserve and maintain the value of the Debtors' assets, and to maximize a return for all creditors requires the availability of working capital from the DIP Facility, the absence of which would immediately and irreparably harm the Debtors, their estate, their creditors, their equity holders, and the possibility for a successful reorganization or sale of the Debtors' assets.

G.    **No Credit Available on More Favorable Terms**.    The Debtors have

been unable to obtain any of the following:

(1)    unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense,

(2)    credit for money borrowed with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code,

(3)    credit for money borrowed secured solely by a Lien on property of the estate that is not otherwise subject to a Lien, or

(4)    credit for money borrowed secured by a junior Lien on property of the estate which is subject to a Lien,

in each case, on more favorable terms and conditions than those provided in the DIP Credit Agreement and this Interim Order.

The Debtors are unable to obtain credit for borrowed money without granting to the DIP Agent

and the DIP Lenders the DIP Protections (as defined below).

H.    **Prior Liens**.    Nothing herein shall constitute a finding or ruling by this

Court that any Permitted Prior Liens or Prepetition Liens are valid, senior, perfected, or

unavoidable.    Moreover, nothing shall prejudice the following:

(1)    the rights of any party-in-interest, including, but not limited to, the Debtors, the DIP Agent, the DIP Lenders, and any Committee appointed pursuant to section 1102 of the Bankruptcy Code, to challenge the validity, priority, perfection, and extent of any such Permitted Prior Liens, or

(2)    the rights of any Committee appointed pursuant to section 1102 of the Bankruptcy Code to challenge the validity, priority, perfection, and extent of the Prepetition Liens as set forth in this Order.

I.    **Adequate Protection for Prepetition Agent and Prepetition Lenders.**

As a result of the grant of the DIP Liens, subordination to the Carve Out, the use of Cash

Collateral authorized herein, and the imposition of the automatic stay, the Prepetition Agent and

the Prepetition Lenders are entitled to receive adequate protection pursuant to sections 361, 362,

363, and 364 of the Bankruptcy Code for any decrease in the value of its interest in the Prepetition Collateral (including Cash Collateral) resulting from the automatic stay or the Debtors' use, sale, or lease of the Prepetition Collateral (including Cash Collateral) during these Chapter 11 Cases.  As adequate protection, the Prepetition Agent and the Prepetition Lenders will receive the Adequate Protection (as defined below) described in Paragraph 14 of this Interim Order.  In light of such Adequate Protection, the Prepetition Agent and the Prepetition Lenders have agreed (1) to the Debtors' use of Cash Collateral, on the terms set forth in this Interim Order, (2) that such Adequate Protection adequately protects the Prepetition Agent and the Prepetition Lenders, and (3) that subject to Paragraphs, 15, 35, and 36 no further adequate protection is necessary. **Prepetition Agent's and Prepetition Lenders' Consent to Priming**. The Prepetition Agent and the Prepetition Lenders have consented to the priming of the Prepetition Liens by the DIP Liens.

K.      **Adequacy of the Approved Budget.**    The Debtors believe that the Approved Budget (as defined below), attached hereto as ***Exhibit "2,"*** is adequate, considering all the available assets, to pay the administrative expenses due and accruing during the period covered by this Interim Order.

L.      **Section 552 of the Bankruptcy Code**.   In light of their agreement to subordinate their Liens and superpriority claims (1) to the Carve Out, in the case of the DIP Agent and the DIP Lenders, and (2) to the Carve Out and the DIP Liens, in the case of the Prepetition Agent and the Prepetition Lenders, the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders are each entitled to all rights and benefits of section 552(b) of the Bankruptcy Code and upon entry of the Final Order, the Debtor shall not assert that the "equities of the case" exception shall apply.

01:15063722.1                                             9

M.       **Conditions Precedent to DIP Lenders' Extension of Financing.**   The

DIP Lenders have indicated a willingness to provide financing to the Debtors in accordance with

the DIP Credit Agreement and the other DIP Financing Agreements and subject to the following:

(1)       the entry of this Interim Order and the Final Order, and

(2)       findings by this Court that such financing is essential to the Debtors' estates, that the DIP Lenders is a good faith financier, and that the DIP Lenders' claims, superpriority claims, security interests, and Liens and other protections granted pursuant to this Interim Order (and the Final Order) and the DIP Facility will not be affected by any subsequent reversal, modification, vacation, or amendment of this Interim Order (or the Final Order) or any other order, as provided in section 364(e) of the Bankruptcy Code.

N.       **Business Judgment and Good Faith Pursuant to Section 364(e) of the**

**Bankruptcy Code.**   The terms and conditions of the DIP Facility, the DIP Credit Agreement,

and the other DIP Financing Agreements, and the fees paid and to be paid thereunder (i) are fair,

reasonable, and the best available under the circumstances, (ii) reflect the Debtors' exercise of

prudent business judgment consistent with their fiduciary duties, and (iii) are supported by

reasonably equivalent value and consideration.   The DIP Facility was negotiated in good faith

and at arms' length between the Debtors and the DIP Agent and the DIP Lenders, and the use of

the proceeds to be extended under the DIP Facility will be so extended in good faith, and for

valid business purposes and uses, as a consequence of which the DIP Agent and the DIP Lenders

are entitled to the protections and benefits of section 364(e) of the Bankruptcy Code.

O.       **Relief Essential; Best Interest.**   The relief requested in the Motion (and

as provided in this Interim Order) is necessary, essential, and appropriate for the continued

operation of the Debtors' business and the management and preservation of the Debtors' assets

and personal property.   It is in the best interest of the Debtors' estates that the Debtors be

allowed to establish the DIP Facility contemplated by the DIP Credit Agreement and the other

DIP Financing Agreements.  The Debtors have demonstrated good and sufficient cause for the relief granted herein. **NOW, THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS:**

1.    The DIP Motion is granted in accordance with the terms and conditions set forth in this Interim Order, the DIP Credit Agreement, and the other DIP Financing Agreements.

**I.    DIP FINANCING. Approval of Entry into the DIP Financing Agreements**.

2.    The Debtors are expressly and immediately authorized, and empowered to execute and deliver the DIP Financing Agreements and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Financing Agreements, and to execute and deliver all instruments, certificates, agreements, and documents which may be required or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Financing Agreements.  The Debtors are hereby authorized to do and perform all acts, pay the principal, interest, fees, expenses, and other amounts described in the DIP Credit Agreement and all other DIP Financing Agreements as such become due, including, without limitation, the Closing Fee, Administrative Fee, Commitment Fee, and reasonable attorneys', financial advisors' and accountants' fees, and disbursements as provided for in the DIP Credit Agreement which amounts, subject to the provisions of Paragraph 45 below, shall not otherwise be subject to approval of this Court.  Upon execution and delivery, the DIP Financing Agreements shall represent valid and binding obligations of the Debtors enforceable against the Debtors in accordance with their terms.

**B.    Authorization to Borrow**.

3.    In order to enable them to continue to operate their businesses during the Interim Period and subject to the terms and conditions of this Interim Order, the DIP Credit Agreement, the other DIP Financing Agreements, and the Approved Budget (subject to any

variances thereto permitted under the terms and conditions of the DIP Credit Agreement), the Debtors are hereby authorized under the DIP Facility to borrow up to a total committed amount of [$27,500,000] in accordance with the terms and conditions of the DIP Credit Agreement.

  **C.**  **Application of DIP Proceeds**.

  4.  The proceeds of the DIP Facility (net of any amounts used to pay fees, costs, and expenses under the DIP Credit Agreement) shall be used, in each case in a manner consistent with the terms and conditions of the DIP Financing Agreements, and in accordance with and as may be limited by the Approved Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Credit Agreement), solely as follows:

  (a)  to pay costs, expenses and fees in connection with the preparation, negotiation, execution and delivery of the DIP Credit Agreement and the other DIP Financing Agreements;

  (b)  for general operating and working capital purposes, for the payment of transaction expenses, for the payment of fees, expenses, and costs incurred in connection with the Chapter 11 Cases, and other proper corporate purposes of the Debtors not otherwise prohibited by the terms hereof for working capital, capital expenditures, and other lawful corporate purposes of the Debtors;

  (c)  upon entry of the Final Order, to refinance the Roll-Up Obligations, as provided in Paragraph 14(c)(iv) below; and

  (d)  upon entry of the Final Order, to fund the Prepetition Indemnity Account (as defined below).

  **D.**  **Conditions Precedent**.

  5.  The DIP Lenders shall have no obligation to make any loan or advance under the DIP Credit Agreement during the Interim Period unless the conditions precedent to make such loan under the DIP Credit Agreement have been satisfied in full or waived, as determined by the DIP Lenders in their reasonable discretion, in accordance with the DIP Credit Agreement.

E.    **The DIP Liens**.

6.    Subject to the limitations set forth in paragraph 6(b) below, effective immediately upon the entry of this Interim Order, the DIP Agent for itself and the DIP Lenders is hereby granted pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, priming first priority, continuing, valid, binding, enforceable, non-avoidable, and automatically perfected post-petition security interests and Liens (collectively, the "***DIP Liens***") senior and superior in priority to all other secured and unsecured creditors of the Debtors' estates except as otherwise provided in this Interim Order, upon and to all of the following (collectively, the "***DIP Collateral***"):

(a)  The Collateral, as defined in the Prepetition Security Agreement, including:

(i)        all Accounts;

(ii)       all Goods, including Equipment, Inventory and Fixtures;

(iii)      all Documents, Instruments and Chattel Paper;

(iv)      all Letters of Credit and Letter-of-Credit Rights;

(v)       all Securities Collateral;

(vi)      all Investment Property;

(vii)     all Intellectual Property Collateral;

(viii)    all Commercial Tort Claims, including, without limitation, those described in Section IV of the Information Certificate;

(ix)      all General Intangibles;

(x)       all Deposit Accounts;

(xi)      all Supporting Obligations;

(xii)     all books and records relating to the Collateral; and

(xiii)    to the extent not covered by the foregoing clauses (i) through (xii), all other personal property of the Debtors, whether tangible or intangible, and all Proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Debtors from time to time with respect to any of the foregoing.

(b)       Bankruptcy Recoveries (as defined below), but only (A) the full amount of any such recovery or settlement thereof to the extent arising under Section 549 of the Bankruptcy Code and (B) subject to entry of the Final Order, all amounts necessary to

reimburse the DIP Lenders for the amount of the Carve Out, if any, used to finance the pursuit of such recovery or settlement with respect to all other Bankruptcy Recoveries (the foregoing Bankruptcy Recoveries in (A) and (B) being referred to collectively as the "**Specified Bankruptcy Recoveries**").  As used herein, "Bankruptcy Recoveries" shall mean any claims and causes of action to which the Debtors may be entitled to assert by reason of any avoidance or other power vested in or on behalf of the Debtors or the estates of the Debtors under Chapter 5 of the Bankruptcy Code and any and all recoveries and settlements thereof.

(c)     The proceeds of all of the Debtors' interests in leaseholds, but not the leaseholds themselves, whether or not so perfected prior to the Petition Date.


    **F.     DIP Lien Priority.**

    7.     The DIP Liens to be created and granted to the DIP Lenders, as provided

herein, are:

        (a)     created pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code,

        (b)     first, valid, prior, perfected, unavoidable, and superior to any security, mortgage, or collateral interest or Lien or claim to the DIP Collateral, and

        (c)     subject only to (i) the Carve Out, and (ii) the Permitted Prior Liens.

The DIP Liens shall secure all DIP Obligations and the proceeds of the DIP Collateral shall be

applied in the same order and priority set forth in the DIP Credit Agreement.  The DIP Liens

shall not be made subject to or *pari passu* with any Lien or security interest by any court order

heretofore or hereafter entered in the Chapter 11 Cases and shall be valid and enforceable against

any trustee appointed in the Chapter 11 Cases, upon the conversion of the Chapter 11 Cases to a

case under chapter 7 of the Bankruptcy Code, or in any other proceedings related to any of the

foregoing (each a "***Successor Case***"), and/or upon the dismissal of the Chapter 11 Cases.  The

DIP Liens shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code or the

assertion by the Debtors of the "equities of the case" exception of section 552 of the Bankruptcy

Code, and, upon entry of the Final Order, shall not be subject to section 506(c) of the Bankruptcy

Code.

G.      **Enforceable Obligations**.

8.      The DIP Financing Agreements shall constitute and evidence the valid and binding obligations of the Debtors, and shall be enforceable against the Debtors, their estates, and any successors thereto, and their creditors in accordance with their terms.

H.      **Protection of the DIP Lenders and Other Rights**.

9.      From and after the Petition Date, the Debtors shall use the proceeds of the extensions of credit under the DIP Facility only for the purposes specifically set forth in the DIP Financing Agreements and this Interim Order and in compliance with the Approved Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Credit Agreement).

I.      **Superpriority Administrative Claim Status.**

10.     Subject to the Carve Out, all DIP Obligations shall be an allowed superpriority administrative expense claim (the "***DIP Superpriority Claim***" and, together with the DIP Liens, collectively, the "***DIP Protections***") with priority in the Chapter 11 Cases under sections 364(c)(1), 503(b), and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in, arising, or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113, and 1114 of the Bankruptcy Code, and, upon entry of the Final Order, section 506(c) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy, or attachment; ***provided, however***, that the DIP Protections shall not attach to any Bankruptcy Recoveries other than the Specified Bankruptcy Recoveries.

11.    Other than the Carve Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in the Chapter 11 Cases, or in any Successor Case, and no priority claims are, or will be, senior to, prior to, or on a parity with the DIP Protections or the DIP Obligations, or with any other claims of the DIP Agent and the DIP Lenders arising hereunder.

**II.    USE OF CASH COLLATERAL.**

    **A.    Authorization to Use Cash Collateral.**

12.    Pursuant to the terms and conditions of this Interim Order, the DIP Facility, the DIP Credit Agreement, and the other DIP Financing Agreements, and in accordance with and as may be limited by the budget (as the same may be modified, supplemented, or updated from time to time consistent with the terms of the DIP Credit Agreement, the "***Approved Budget***"), the Debtors are authorized to use Cash Collateral and to use the advances under the DIP Facility during the period commencing immediately after the entry of the Interim Order and terminating upon notice being provided by the DIP Lenders to the Debtor that (i) a DIP Order Event of Default (as defined below) has occurred and is continuing, and (ii) the termination of the DIP Credit Facility.

13.    Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business or other proceeds resulting therefrom, except (x) with respect to the sale of assets as contemplated in the Sale Motion (as defined in the DIP Credit Agreement) and the assumption and assignment of leases as contemplated in the Sale Motion, and (y) as otherwise permitted in the DIP Facility under the DIP Credit Agreement and the other DIP Financing Agreements and in accordance with and as

16

may be limited by the Approved Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Credit Agreement).

**B.     Adequate Protection for Prepetition Agent and Prepetition Lenders.**

14.     As adequate protection for the interest of the Prepetition Agent and the Prepetition Lenders in the Prepetition Collateral (including Cash Collateral) on account of the granting of the DIP Liens, subordination to the Carve Out, the Debtors' use of Cash Collateral, and other decline in value arising out of the automatic stay or the Debtors' use, sale, depreciation, or disposition of the Prepetition Collateral, including the disposition of assets as contemplated in the Sale Motion, the Prepetition Agent and the Prepetition Lenders shall receive adequate protection as follows (collectively, "***Adequate Protection***"):

(a)     **Prepetition Replacement Liens**.  Solely to the extent of the diminution in the value of the interest of the Prepetition Agent and the Prepetition Lenders in the Prepetition Collateral, the Prepetition Agent and the Prepetition Lenders shall have, subject to the terms and conditions set forth below, pursuant to sections 361 and 363(e) of the Bankruptcy Code additional and replacement security interests and Liens in the DIP Collateral (the "***Prepetition Replacement Liens***") which shall be junior only to the Carve Out, the DIP Liens securing the DIP Facility, and Permitted Prior Liens.

(b)     **Prepetition Superpriority Claim**.  Solely to the extent of the diminution in the value of the interests of the Prepetition Agent and the Prepetition Lenders in the Prepetition Collateral, the Prepetition Agent and the Prepetition Lenders shall have an allowed superpriority administrative expense claim (the "***Prepetition Superpriority Claim***") which shall have priority (except with respect to (i) the DIP Liens, (ii) the DIP Superpriority Claim, and (iii) the Carve Out), in the Chapter 11 Cases under sections 364(c)(1), 503(b), and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 552, 726, 1113, and 1114 of the Bankruptcy Code, and, upon entry of the Final Order, section 506(c) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy, or attachment; ***provided, however***, that the Prepetition

Superpriority Claim shall not attach to any Bankruptcy Recoveries other than the Specified Bankruptcy Recoveries.

Other than the DIP Liens, the DIP Superpriority Claim, and the Carve Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in the Chapter 11 Cases, or in any Successor Case, will be senior to, prior to, or on parity with the Prepetition Superpriority Claim.

(c)    **Adequate Protection Payments**.    The Prepetition Agent and the Prepetition Lenders shall receive adequate protection in the form of the following:

    (i)    the current payment of the reasonable documented out-of-pocket costs and expenses of its financial advisors and attorneys,

    (ii)    on the first day of each calendar month, commencing March 1, 2014, cash interest at the "Default Rate" as provided in the Prepetition Financing Agreements,

    (iii)    all products and proceeds of the Prepetition Collateral and the DIP Collateral (including, for the avoidance of doubt, proceeds from receivables and sales in the ordinary course of business, insurance proceeds, and proceeds of all dispositions thereof, whether or not in the ordinary course,) regardless of whether such collateral came into existence prior to the Petition Date, shall be applied as follows: (x) first, to reduce the Prepetition Debt until paid in full, and (y) second, to reduce the DIP Obligations until paid in full, and

    (iv)    upon entry of the Final Order, payment in full of the remaining Prepetition Debt (the "***Roll-Up Obligations***").

(d)    **Adequate Protection Upon Closing of Sale**.  Upon the disposition of Prepetition Collateral as contemplated in the Sale Motion and the closing conducted under the Sale Agreement, any such Prepetition Collateral shall be sold free and clear of the Prepetition Liens, the Prepetition Replacement Liens, and the DIP Liens, ***provided***, ***however***, that such Prepetition Liens, Prepetition Replacement Liens, and DIP Liens shall attach to the proceeds of any such sale in the order and priority as set forth in this Interim Order.

(e)    **Prepetition Indemnity Account**.    Upon the earlier of the entry of the Final Order or the sale of the Debtors' assets as provided in clause (d) above, the Debtors shall establish an account in the control of the Prepetition Agent and the Prepetition Lenders (the "***Prepetition Indemnity Account***"), into which the sum of $150,000 of Cash Collateral shall be deposited as security for any reimbursement, indemnification, or similar

continuing obligations of the Debtors in favor of the Prepetition Agent or the Prepetition Lenders under the Prepetition Financing Agreements, including without limitation, the provisions of Sections 10.04 (a) and (b) of the Prepetition Credit Agreement (the "***Prepetition Indemnity Obligations***").

(i)     Upon the Challenge Period Termination Date (as defined below) if, as of such date, no party has filed (x) an adversary proceeding, cause of action, objection, claim, defense, or other challenge as contemplated in Paragraph 22 hereof, or (y) an adversary proceeding, cause of action, objection, claim, defense, or other challenge against the Prepetition Agent or the Prepetition Lenders related to the Prepetition Debt, whether in the Chapter 11 Cases or independently in another forum, court, or venue (together, a "***Challenge Proceeding***"), all amounts held in the Prepetition Indemnity Account shall be released to the Debtors.

(ii)    The Prepetition Indemnity Obligations shall be secured by a first priority lien on the Prepetition Indemnity Account and by a lien on the Prepetition Collateral, Prepetition Replacement Liens, and the Pre-Petition Superpriority Claim.

(iii)   The Prepetition Agent and the Prepetition Lenders may apply amounts in the Prepetition Indemnity Account against the Prepetition Indemnity Obligations as and when they arise, without further notice to or consent from the Debtors, the Committee or any other parties in interest and without further order of this Court.

**C.    Section 507(b) Reservation for the Prepetition Lenders to Seek Further Adequate Protection.**

15.    Nothing herein shall impair or modify the Prepetition Agent's or the Prepetition Lenders' rights under section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Agent and the Prepetition Lenders hereunder is insufficient to compensate for the diminution in value of the interest of the Prepetition Agent and the Prepetition Lenders in the Prepetition Collateral during the Chapter 11 Cases or any Successor Case; ***provided***, ***however***, that any section 507(b) claim granted in the Chapter 11 Cases to the Prepetition Agent and the Prepetition Lenders shall be junior in right of payment to all DIP Obligations and subject to the Carve Out.

III.    **POST-PETITION LIEN PERFECTION.**

16.    This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens and the Prepetition Replacement Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, security agreement, notice of Lien, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement or securities account control agreement) to validate or perfect the DIP Liens and the Prepetition Replacement Liens or to entitle the DIP Liens and the Prepetition Replacement Liens to the priorities granted herein.

17.    Notwithstanding the foregoing, the DIP Agent and/or the Prepetition Agent may, in their discretion, file such financing statements, deeds of trust, mortgages, security agreements, notices of Liens, and other similar instruments and documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, deeds of trust, mortgages, security agreements, notices of Liens, and other similar instruments and documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of the Chapter 11 Cases.

18.    The Debtors shall execute and deliver to the DIP Agent all such financing statements, deeds of trust, mortgages, security agreements, notices of Liens, and other similar instruments and documents as the DIP Agent or the DIP Lenders may reasonably request to evidence, confirm, validate, or perfect, or to ensure the contemplated priority of, the DIP Liens granted pursuant hereto.

19.    The DIP Agent and the Prepetition Agent, in their discretion, may file a photocopy of this Interim Order as a financing statement with any recording office designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in

which any of the Debtors has real or personal property, and in such event, the subject filing or recording office shall be authorized to file or record such copy of this Interim Order.

20. The DIP Agent and the DIP Lenders shall, in addition to the rights granted to it under the DIP Financing Agreements, be deemed to be have the co-equal rights with the Prepetition Agent and the Prepetition Lenders (and upon payment in full of the Prepetition Debt, shall succeed to the rights of the Prepetition Agent and the Prepetition Lenders) with respect to all third party notifications in connection with the Prepetition Revolver Financing Agreements, all Prepetition collateral access agreements, and all other agreements with third parties (including any agreement with a customs broker, freight forwarder, or credit card processor) relating to, or waiving claims against, any Prepetition Collateral, including without limitation, each collateral access agreement duly executed and delivered by any landlord of the Debtor and including, for the avoidance of doubt, all deposit account control agreements, securities account control agreements, and credit card agreements.

21. The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified pursuant to the terms of the DIP Financing Agreements as necessary to:

    (a)     permit the Debtors to grant the Prepetition Replacement Liens and the DIP Liens and to incur all liabilities and obligations to the DIP Agent and the DIP Lenders under the DIP Financing Agreements, the DIP Facility, and this Interim Order, and

    (b)     authorize the DIP Agent , the DIP Lenders, the Prepetition Agent and the Prepetition Lenders to retain and apply payments hereunder as provided by the DIP Financing Agreements and this Interim Order.

## IV.    RESERVATION OF CERTAIN THIRD-PARTY RIGHTS AND BAR OF CHALLENGES AND CLAIMS.

22. Nothing in this Interim Order or the DIP Credit Agreement shall prejudice whatever rights any Committee(s) or any other party-in-interest with requisite standing (other than the Debtors) may have to bring a Challenge Proceeding, including any of the following:

(a)    to object to or challenge the Debtors' Stipulations, including (i) the validity, extent, perfection, or priority of the security interests and Liens of the Prepetition Agent and the Prepetition Lenders in and to the Prepetition Collateral, or (ii) the validity, allowability, priority, status, or amount of the Prepetition Debt, or

(b)    to bring suit against the Prepetition Agent or the Prepetition Lenders in connection with or related to the Prepetition Debt, or the actions or inactions of the Prepetition Agent and the Prepetition Lenders arising out of or related to the Prepetition Debt;

*provided*, *however*, that any official Committee(s) or any other party-in-interest with requisite standing must commence a contested matter or adversary proceeding raising such objection or challenge, including, without limitation, any claim against the Prepetition Agent and the Prepetition Lenders in the nature of a setoff, counterclaim, or defense to the Prepetition Debt (including but not limited to, those under sections 506, 544, 547, 548, 549, 550, and/or 552 of the Bankruptcy Code or by way of suit against the Prepetition Agent or the Prepetition Lenders), by the later of (x) sixty (60) days following the appointment of the first official Committee, or (y) if no official Committee is appointed, seventy-five (75) days following entry of the Final Order (collectively, (x) and (y) shall be referred to as the "***Challenge Period***" and the date that is the next calendar day after the termination of the Challenge Period, in the event that no objection or challenge is raised during the Challenge Period, shall be referred to as the "***Challenge Period Termination Date***").

23.    Upon the Challenge Period Termination Date, any and all such challenges and objections by any party (including, without limitation, any official Committee(s), any chapter 11 or chapter 7 trustee appointed herein or in any Successor Case, and any other party-in-interest) **shall be deemed to be forever waived and barred**, and the Prepetition Debt shall be deemed to be allowed in full and shall be deemed to be allowed as a fully secured claim within the meaning of section 506 of the Bankruptcy Code for all purposes in connection with the

22

Chapter 11 Cases and the Debtors' Stipulations shall be binding on all creditors, interest holders, and parties-in-interest.

24.     To the extent any such Challenge Proceeding is filed, the Prepetition Agent and the Prepetition Lenders shall be entitled to include the costs and expenses, including but not limited to reasonable attorneys' fees and disbursements, incurred in defending the objection or complaint as part of the Prepetition Debt to the extent permitted pursuant to the relevant Prepetition Financing Agreement.  To the extent any such objection or complaint is filed (or as part of any agreed upon resolution thereof), the Prepetition Agent and the Prepetition Lenders shall be entitled to include such costs and expenses, including but not limited to reasonable attorneys' fees, incurred in defending the objection or complaint as part of the Prepetition Debt and as part of the Prepetition Indemnity Obligations which shall be reimbursed by the Debtors, including (x) each month as provided for in Paragraph 44, below, and (y) out of the Prepetition Indemnity Account, and as one of the Prepetition Superpriority Claims, and the Pre-Petition Indemnity Account shall be maintained until the final resolution of all such objections or claims.  The Debtors shall remain liable to the Prepetition Agent and the Prepetition Lenders for all unpaid Prepetition Indemnity Obligations to the extent that the funds in the Prepetition Indemnity Account are insufficient to satisfy them in full.

**V.**     **CARVE OUT AND PAYMENT OF PROFESSIONALS.**

25.     Subject to the terms and conditions contained in this Paragraph 25, the DIP Liens, DIP Superpriority Claim, the Prepetition Liens, the Prepetition Replacement Liens, and the Prepetition Superpriority Claims are subordinate only to the following (collectively, the "***Carve Out***"):

    (a)     allowed administrative expenses pursuant to 28 U.S.C. Section 1930(a)(6)
            and 28 U.S.C. § 156(c) for fees required to be paid to the Clerk of the

Court and to the Office of the United States Trustee (collectively, the "***U.S. Trustee Fees***");

(b)    all accrued and unpaid fees, disbursements, costs and expenses, to the extent allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice and incurred by professionals retained by the Debtors or a Committee, if any, (the "***Case Professionals***"), through the date of service by the DIP Agent of a Carve Out Trigger Notice (as defined below), as limited by the respective Approved Budget amounts for each Case Professional or category of Case Professional through the date of service of said Carve Out Trigger Notice (including partial amounts for any Carve Out Trigger Notice given other than at the end of a week), less the amount of pre-petition retainers received by such Case Professionals; and

(c)    (iv) all accrued and unpaid fees, disbursements, costs and expenses incurred by the Case Professionals after the date of service of a Carve Out Trigger Notice, to the extent allowed at any time, in an aggregate amount not to exceed $150,000 less the amount of pre-petition retainers received by such Case Professionals and not applied to the fees, disbursements, costs and expenses set forth in clause (b) above. The Carve-Out shall be reduced on a dollar-for-dollar basis by any payments of fees or expenses of the Case Professionals. For purposes of the foregoing, "***Carve Out Trigger Notice***" shall mean a written notice delivered by the DIP Agent to the Borrowers and their counsel, the U.S. Trustee, and lead counsel to any Committee, which notice may be delivered at any time following the occurrence and continuance of any DIP Order Event of Default.

26.    For the avoidance of doubt, the Carve Out shall be senior to the DIP Liens, the DIP Superpriority Claim, the Prepetition Replacement Liens, and the Prepetition Superpriority Claims, and any and all other forms of adequate protection, Liens, or claims securing the DIP Obligations and/or the Prepetition Debt granted or recognized as valid. Any unused portion of the Carve Out shall at all times remain Cash Collateral as provided herein.

27.    Nothing herein, including the inclusion of line items in the Approved Budget for Case Professionals, shall be construed as consent to the allowance of any particular professional fees or expenses of the Debtors, of any Committee, or of any other person or shall affect the right of the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders to object to the allowance and payment of such fees and expenses on any ground other

than the existence or priority of the DIP Liens, the DIP Superpriority Claim, the Prepetition

Liens, the Prepetition Replacement Liens, and the Prepetition Superpriority Claims.

## VI.    COMMITMENT TERMINATION DATE, DIP EVENT OF DEFAULT, AND REMEDIES

### A.    Commitment Termination Date

28.    All DIP Obligations shall be immediately due and payable and all

authority to use the proceeds of the DIP Facility and to use Cash Collateral shall cease on the

date that is the earliest to occur of any of the following (the "***Commitment Termination Date***"):

(a)    August __, 2014;

(b)    the date on which the maturity of the DIP Obligations is accelerated and the commitments under the DIP Facility (the "***DIP Commitments***") have been irrevocably terminated as a result of the occurrence of an Event of Default (as defined in the DIP Credit Agreement) in accordance with the DIP Credit Agreement;

(c)    the failure of the Debtors to obtain entry of the Final Order on or before the date which is thirty (30) days after the date this Interim Order is entered;

(d)    the effective date of a chapter 11 plan (a "***Plan***"); or

(e)    the closing of a sale following entry of an Order by the Bankruptcy Court authorizing the sale of all or substantially all of the assets of the Debtor pursuant to the provisions of Section 363 of the Bankruptcy Code.

### B.    DIP Events of Default.

29.    The occurrence of the Commitment Termination Date shall constitute a

"***DIP Order Event of Default.***"

30.    Unless and until the Prepetition Debt and the DIP Obligations have been

irrevocably repaid in full in cash (or other arrangements for payment of the Prepetition Debt and

the DIP Obligations satisfactory to the Prepetition Agent and the Prepetition Lenders, and the

DIP Agent and the DIP Lenders, respectively, in their sole and exclusive discretion have been

made) and all DIP Commitments have been irrevocably terminated, the protections afforded to

the Prepetition Agent, the Prepetition Lenders, the DIP Agent and the DIP Lenders pursuant to this Interim Order and under the DIP Financing Agreements, and any actions taken pursuant thereto, shall survive the entry of any order confirming a Plan or converting the Chapter 11 Cases into a Successor Case, and the DIP Liens, the DIP Superpriority Claim, the Prepetition Replacement Liens, and the Prepetition Superpriority Claims shall continue in the Chapter 11 Cases and in any Successor Case, and such DIP Liens, DIP Superpriority Claim, Prepetition Replacement Liens, and Prepetition Superpriority Claims shall maintain their respective priorities as provided by this Interim Order.

> **C.**      **Rights and Remedies Upon DIP Order Event of Default.**

31.      Any automatic stay otherwise applicable to the DIP Lenders is hereby modified so that (i) after the occurrence of any Event of Default under the DIP Financing Agreements, the DIP Agent and the DIP Lenders may accelerate the DIP Obligations without further order of the Court, and (ii)(A) after the occurrence of any DIP Order Event of Default or (B) at any time thereafter during the continuance of such DIP Order Event of Default, upon three (3) days prior written notice of such occurrence, in each case given to each of (w) the Debtors, (x) counsel to the Debtors, (y) counsel for any Committee(s) or the twenty (20) largest unsecured creditors, and (z) the Office of the United States Trustee, the DIP Lenders shall be entitled to exercise its rights and remedies in accordance with the DIP Financing Agreements.

32.      Upon the occurrence of an Event of Default under the DIP Financing Agreements and provided that such Event of Default is still continuing:

> (a)      the Debtors shall continue to deliver and cause the delivery of the proceeds of DIP Collateral to the DIP Lenders as provided in the DIP Financing Agreements and this Interim Order;
>
> (b)      the DIP Lenders shall continue to apply such proceeds in accordance with the provisions of the DIP Financing Agreements and this Interim Order;

(c)     the Debtors shall have no right to use any of such proceeds, nor any other Cash Collateral, other than towards the satisfaction of the DIP Obligations and the Carve Out; and

(d)     any obligation otherwise imposed on the DIP Lenders to provide any loan or advance to the Debtors pursuant to the DIP Facility shall be suspended.

33.     Following the giving of written notice by the DIP Lenders of the occurrence of a DIP Order Event of Default, the Debtors and any Committee(s) appointed in the Chapter 11 Cases, if any, shall be entitled to an emergency hearing before this Court solely for the purpose of contesting whether a DIP Order Event of Default has occurred.  If the Debtors or any such Committee(s) do not contest the occurrence of a DIP Order Event of Default and the right of the DIP Lenders to exercise its remedies, or if the Debtors or any such Committee(s) do timely contest the occurrence of a DIP Order Event of Default and the Court after notice and hearing declines to stay the enforcement thereof, the automatic stay, as to the DIP Lenders, shall automatically terminate at the end of the three (3) day notice period provided in paragraph 31 above.

34.     Subject to the provisions of Paragraphs 31, 32, and 33 above, upon the occurrence of a DIP Order Event of Default, the DIP Agent and the DIP Lenders are authorized to exercise their remedies and proceed under or pursuant to the DIP Financing Agreements; except that, with respect to any of the Debtors' leasehold locations, the DIP Lenders' rights shall be limited to such rights (i) as may be ordered by the Court upon motion and notice to the applicable landlord with an opportunity to respond that is reasonable under the circumstances; (ii) to which the applicable landlord agrees in writing with the DIP Agent; or (iii) which the DIP Agent and the DIP Lenders have under applicable non-bankruptcy law.  All proceeds realized from any of the foregoing shall be turned over to the DIP Agent for application to the Carve Out (if not previously funded as provided herein), the DIP Obligations, and the Prepetition Debt

under, and in accordance with the provisions of, the DIP Financing Agreements and this Interim Order.

35.     Nothing included herein shall prejudice, impair, or otherwise affect the Prepetition Agent's, the Prepetition Lenders', the DIP Agent's or the DIP Lenders' rights to seek any other or supplemental relief in respect of the Debtors, nor the DIP Agent's or the DIP Lenders' rights, as provided in the DIP Credit Agreement, to suspend or terminate the making of loans and granting financial accommodations under the DIP Credit Agreement.

**D.      <u>No Waiver of Remedies</u>**.

36.     The delay in or the failure of the Prepetition Agent, the Prepetition Lenders, the DIP Agent or the DIP Lenders to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the Prepetition Agent's, the Prepetition Lenders', the DIP Agent's and the DIP Lenders' rights and remedies.  Notwithstanding anything herein, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the rights and remedies of the Prepetition Agent's, the Prepetition Lenders', the DIP Agent's or the DIP Lenders under the Bankruptcy Code or under non-bankruptcy law, including without limitation, the rights of the Prepetition Agent's, the Prepetition Lenders', the DIP Agent's and the DIP Lenders to (i) request conversion of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, dismissal of the Chapter 11 Cases, or the appointment of a trustee in the Chapter 11 Cases; (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Plan; or (iii) exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) the Prepetition Agent, the Prepetition Lenders, the DIP Agent and DIP Lenders may have.

**VII.    CERTAIN LIMITING PROVISIONS**

    **A.**    **Section 506(c) Claims and Waiver**

    37.    Nothing contained in this Interim Order shall be deemed a consent by the Prepetition Agent, the Prepetition Lenders, the DIP Agent and DIP Lenders to any charge, Lien, assessment, or claim against the DIP Collateral, the DIP Liens, the Prepetition Collateral, or the Prepetition Replacement Liens under section 506(c) of the Bankruptcy Code or otherwise; *provided*, *however*, that during the Interim Period there shall be no waiver of section 506(c) of the Bankruptcy Code.

    38.    As a further condition of the DIP Facility and any obligation of the DIP Lenders to make credit extensions pursuant to the DIP Financing Agreements, upon entry of the Final Order, the Debtors (and any successors thereto or any representatives thereof, including any trustees appointed in the Chapter 11 Cases or any Successor Case) shall be deemed to have waived any rights or benefits of section 506(c) of the Bankruptcy Code with respect to the Prepetition Agent, the Prepetition Lenders, the DIP Agent, DIP Lenders, the Prepetition Collateral, and the DIP Collateral.

    **B.**    **Proceeds of Subsequent Financing**

    39.    Without limiting the provisions and protections of Paragraph 40 below, if at any time prior to the irrevocable repayment in full of all Prepetition Debt and DIP Obligations and the termination of the DIP Lenders' obligations to make loans and advances under the DIP Facility, including subsequent to the confirmation of any Plan with respect to the Debtors, the Debtors' estates, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed, shall obtain credit or incur debt pursuant to sections 364(c)(1) or 364(d) of the Bankruptcy Code in violation of the DIP Financing Agreements, then all of the cash proceeds derived from such credit or debt and all Cash Collateral shall immediately be turned

over to the DIP Agent and applied in reduction of the DIP Obligations and thereafter to the Prepetition Agent to be applied in reduction of the Prepetition Debt.

### C.    Prohibited Orders.

40.    Unless each of the Prepetition Agent and the DIP Agent has provided its prior written consent or all Prepetition Debt and all DIP Obligations have been irrevocably paid in full in cash (or will be irrevocably paid in full in cash upon entry of an order approving indebtedness described in Paragraph 39 above, or other arrangements for the payment of the Prepetition Debt and the DIP Obligations satisfactory to the Prepetition Agent and the DIP Agent, respectively, in its sole and exclusive discretion have been made) and all DIP Commitments (as defined below) have terminated, there shall not be entered in the Chapter 11 Cases, or in any Successor Case, any order which authorizes any of the following:

(a)    Any modification, stay, vacation or amendment to the DIP Orders to which the DIP Agent and the DIP Lenders have not consented;

(b)    A priority claim or administrative expense or unsecured claim against the Debtors (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the DIP Agent and the DIP Lenders in respect of the Obligations, except with respect to the Carve Out;

(c)    Any Lien on any DIP Collateral having a priority equal or superior to the Lien securing the DIP Obligations, except (a) with respect to the Carve Out, or (b) for the Permitted Prior Liens;

(d)    Any order which authorizes the return of any of the Debtors' property pursuant to section 546(h) of the Bankruptcy Code; or

(e)    Any order which authorizes the payment of any Indebtedness (other than the Prepetition Debt, Indebtedness reflected in the Approved Budget, and other Indebtedness approved by the DIP Lenders, in each case incurred prior to the Petition Date or the grant of "adequate protection" (whether payment in cash or transfer of property) with respect to any such

Indebtedness which is secured by a Lien other than as set forth in the DIP Orders).

**D.    Restrictions on Disposition of Collateral.**

41.    The Debtors shall not do the following:

(a)    sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral without the prior written consent of the requisite DIP Lenders to the extent required under the DIP Financing Agreements (and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lenders or an order of this Court), except for the following:

(i)    sales of the Debtors' Inventory in the ordinary course of business,

(ii)    as part of the disposition of assets as contemplated in the Sale Motion, or

(iii)    except as otherwise provided for in the DIP Financing Agreements and this Interim Order and approved by the Court, or

(b)    assume, reject, or assign any Lease without the prior written consent of the DIP Lenders, except as contemplated in the Sale Motion, a Plan, or as otherwise provided for in the DIP Financing Agreements.

## VIII.    OTHER RIGHTS AND OBLIGATIONS

**A.    Good Faith Under Section 364(e) of the Bankruptcy Code. No Modification or Stay of this Interim Order.**

42.    Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility contemplated by this Interim Order, in the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of this or any other court, the Prepetition Agent, the Prepetition Lenders, DIP Agent, and the DIP Lenders are entitled to the protections provided in section 364(e) of the Bankruptcy Code and, no such appeal, modification, amendment, or vacation shall affect the validity and enforceability of any advances made hereunder or the Liens or priority authorized or created hereby.

01:15063722.1

31

43.     Notwithstanding any modification, amendment, or vacation of any or all of the provisions of this Interim Order, any claim or protection granted to the Prepetition Agent, the Prepetition Lenders, the DIP Agent, or the DIP Lenders hereunder arising prior to the effective date of such modification, amendment, or vacation of any such claim or protection granted to the Prepetition Agent, the Prepetition Lenders, the DIP Agent, or the DIP Lenders shall be governed in all respects by the original provisions of this Interim Order, and the Prepetition Agent, the Prepetition Lenders, the DIP Agent, and the DIP Lenders shall be entitled to all of the rights, remedies, privileges, and benefits, including the Adequate Protection and the DIP Protections granted herein, with respect to any such claim.   Since the agreements made herein by the Prepetition Agent and the Prepetition Lenders, and the loans made pursuant to the DIP Facility are made in reliance on this Interim Order, the claims and protections afforded hereunder and the obligations owed the DIP Agent or the DIP Lenders prior to the effective date of any stay, modification, or vacation of this Interim Order shall not, as a result of any subsequent order in the Chapter 11 Cases or in any Successor Case, be subordinated, lose their Lien priority or superpriority administrative expense claim status, or be deprived of the benefit of the status of the Liens and claims granted to the Prepetition Agent, the Prepetition Lenders, the DIP Agent, and the DIP Lenders under this Interim Order and/or the DIP Financing Agreements.

**B.      Prepetition Lenders and DIP Lenders Expenses.**

44.     As provided in the Prepetition Financing Agreements and in the DIP Financing Agreements, all reasonable out-of-pocket costs and expenses of the Prepetition Agent, the Prepetition Lenders, the DIP Agent and the DIP Lenders, including, without limitation, reasonable legal, accounting, collateral examination, monitoring and appraisal fees and disbursements, financial advisory fees, fees and expenses of other consultants, indemnification and reimbursement obligations with respect to fees and expenses, and other out of pocket

expenses, whether or not contained in the Approved Budget and without limitation with respect to the dollar estimates contained in the Approved Budget, will be paid by the Debtors, whether or not the transactions contemplated hereby are consummated.  Payment of such fees shall not be subject to allowance by the Court; ***provided***, ***however***, the Debtors may seek a determination by the Court whether such fees and expenses are reasonable.  Under no circumstances shall professionals for the DIP Agent, the DIP Lenders, the Prepetition Agent or Prepetition Lenders be required to comply with the U.S. Trustee fee guidelines; ***provided***, ***however***, the Debtors shall provide to the Office of the United States Trustee a copy of any invoices received from the DIP Agent and the Prepetition Agent for professional fees and expenses during the pendency of the Debtors' Chapter 11 Cases and shall reimburse the Prepetition Agent, the Prepetition Lenders, the DIP Agent and the DIP Lenders for all such fees in expenses within ten (10) days of receipt of a copy of each invoice, in the absence of a written objection as to the reasonableness of the amounts contained in the subject invoice setting forth with reasonable specificity the basis for the objection.

   C.   **Binding Effect**.

   45.   The provisions of this Interim Order shall be binding upon and inure to the benefit of the DIP Agent, the DIP Lenders, the Prepetition Agent, the Prepetition Lenders, the Debtors, and their respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors), and any Committee(s) (subject to the provisions of Paragraphs 22-24 above), whether in the Chapter 11 Cases, in any Successor Case, or upon dismissal of any such chapter 11 or chapter 7 case.

**D.      No Third Party Rights**.

46.      Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

**E.      No Marshaling**.

47.      None of the DIP Agent, the DIP Lenders, the Prepetition Agent, nor the Prepetition Lenders shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral, as applicable.

**F.      Section 552(b) of the Bankruptcy Code.**

48.      The DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the Debtors shall not assert that the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall apply to the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral or the DIP Collateral.

**G.      Amendments**.

49.      The Debtors, the DIP Agent, and the DIP Lenders may amend, modify, supplement, or waive any provision of the DIP Financing Agreements with the consent of the Prepetition Agent and the Prepetition Lenders, but without further approval of the Court, unless such amendment, modification, supplement, or waiver (i) increases the interest rate (other than as a result of the imposition of the Default Rate), (ii) increases the DIP Commitments, or (iii) changes the maturity date of the DIP Facility.   Except as set forth above, all waivers, modifications, or amendments of any of the provisions hereof shall not be effective unless set forth in writing, signed by on behalf of the Debtors, the DIP Agent and the DIP Lenders (after

having obtained the approval of the Prepetition Agent and the Prepetition Lenders, and the DIP

Lenders as provided in the DIP Financing Agreements) and approved by the Court.

   **H.**   **Survival of Interim Order**.

    50.   The provisions of this Interim Order and any actions taken pursuant hereto

shall survive entry of any order which may be entered:

    (a)   confirming any Plan in the Chapter 11 Cases,

    (b)   converting the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code,

    (c)   to the extent authorized by applicable law, dismissing the Chapter 11 Cases,

    (d)   withdrawing of the reference of the Chapter 11 Cases from this Court, or

    (e)   providing for abstention from handling or retaining of jurisdiction of the Chapter 11 Cases in this Court.

    51.   The terms and provisions of this Interim Order including the DIP

Protections granted pursuant to this Interim Order and the DIP Financing Agreements and any

protections granted the Prepetition Agent and the Prepetition Lenders shall continue in full force

and effect notwithstanding the entry of any order described in paragraph 50, and such DIP

Protections and protections for the Prepetition Agent and Prepetition Lenders shall maintain their

priority as provided by this Interim Order until all of the DIP Obligations of the Debtors to the

DIP Agent and the DIP Lenders pursuant to the DIP Financing Agreements and the Prepetition

Debt have been irrevocably paid in full and discharged (such payment being without prejudice to

any terms or provisions contained in the DIP Facility which survive such discharge by their

terms).

**I.      Inconsistency**.

52.      In the event of any inconsistency between the terms and conditions of the DIP Financing Agreements and of this Interim Order, the provisions of this Interim Order shall govern and control.

**J.      Enforceability**.

53.      This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof.

**K.      Objections Overruled**.

54.      Notwithstanding any reservations of rights made on the record at the first day hearing with respect to this Interim Order, all objections to the DIP Motion to the extent not withdrawn or resolved, are hereby overruled.

**L.      Waiver of Any Applicable Stay**.

55.      Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Interim Order.

**M.      Proofs of Claim.**

56.      The Prepetition Agent, the Prepetition Lenders, the DIP Agent and the DIP Lenders will not be required to file proofs of claim in the Chapter 11 Cases or in any Successor Case.

**N.      Headings.**

57.      The headings in this Order are for purposes of reference only and shall not limit or otherwise affect the meaning of this Order.

01:15063722.1

## IX.    FINAL HEARING.

58.    **The Final Hearing on the Motion shall be held before this Court on March __, 2014, at __:__ _.m. (ET).**

59.    If no objections to the relief sought in the Motion are filed and served in accordance with this Interim Order, no Final Hearing may be held, and a separate Final Order may be presented jointly by the Debtors and by the DIP Lenders and entered by this Court.

60.    Any party in interest objecting to the relief sought in the Motion shall submit any such objection in writing and file same with the Court and serve such objection so as to be received no later than **March __, 2014 at 4:00 p.m. (ET)** on the following parties:

| *Debtor* | *Office of the U.S. Trustee* |
|---|---|
| Quantum Foods, LLC<br>750 South Schmidt Road<br>Bolingbrook, Illinois 60440<br>Attn:  Edgar Reilly<br>Fax: (630) 679-9402<br>Email: ereilly@quantumfoods.com | Office of the United States Trustee for the District of Delaware<br>844 King Street, Suite 2207<br>Lockbox 35<br>Wilmington, Delaware 19801<br>Attn:  Richard L. Schepacarter<br>Email: richard.schepacarter@usdoj.gov |
| *Counsel for the Debtors*<br>Winston & Strawn LLP<br>Daniel J. McGuire<br>Gregory M. Gartland<br>35 West Wacker Drive<br>Chicago, Illinois 60601<br>Telephone: (312) 558-5600<br>Facsimile: (312) 558-5700<br>Email: dmcguire@winston.com<br>          ggartland@winston.com<br><br>and<br><br>Young Conaway Stargatt & Taylor, LLP<br>M. Blake Cleary (No. 3614)<br>Rodney Square<br>1000 North King Street<br>Wilmington, Delaware 19801<br>Telephone: (302) 571-6600<br>Facsimile: (302) 571-1253<br>Email: mbcleary@ycst.com | |

| | |
|---|---|
| **Counsel for the DIP Lenders**<br>Riemer & Braunstein LLP<br>Three Center Plaza,<br>Boston, Massachusetts 02108<br>Attn: Donald E. Rothman, Esq.<br>E-mail: drothman@riemerlaw.com<br>Fax: (617) 880-3456<br><br>and<br><br>Womble Carlyle Sandridge & Rice, LLP<br>222 Delaware Avenue, Suite 1501<br>Wilmington, DE  19801<br>Attn: Steven K. Kortanek, Esq.<br>E-mail: skortanek@wcsr.com<br>Fax: 302-661-7728 | |

61.    The Debtors shall serve a copy of this Order on all parties on the attached distribution list no later than 7 days after the date of this Order and to file a certificate of service no later than 24 hours after service.

Dated: February __, 2014

_____

United States Bankruptcy Judge

**Exhibit "1"**

**DIP Credit Agreement**

**Exhibit "2"**

**Approved Budget**

**<u>Distribution List</u>**

**<u>EXHIBIT B</u>**

**DIP Credit Agreement**

**SENIOR SECURED, SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT
AGREEMENT**

Dated as of February [__], 2014,

among

**QUANTUM FOODS, LLC**,

as Debtor and Debtor-in-Possession and as the Lead Borrower

For

The Borrowers Named Herein,


The Guarantors Named Herein,

**CRYSTAL FINANCIAL LLC**,

as Administrative Agent and Collateral Agent,


and


The Lenders Party Hereto

# TABLE OF CONTENTS

**Section**                                                                                           **Page**

ARTICLE I DEFINITIONS AND ACCOUNTING TERMS .......................................... 1

    1.01    Definitions ............................................................................ 1
    1.02    Other Interpretive Provisions .......................................... 39
    1.03    Accounting Terms. ........................................................... 41
    1.04    Rounding ......................................................................... 41
    1.05    Times of Day ................................................................... 41
    1.06    Letter of Credit Amounts ................................................ 41

ARTICLE II THE REVOLVING COMMITMENTS AND CREDIT EXTENSIONS .............. 42

    2.01    Revolving Loans............................................................... 42
    2.02    Revolving Borrowings. ..................................................... 43
    2.03    Letters of Credit............................................................... 45
    2.04    Prepayments. ................................................................... 52
    2.05    Termination or Reduction of Aggregate Commitments......... 53
    2.06    Interest. ........................................................................... 53
    2.07    Fees. ................................................................................ 54
    2.08    Computation of Interest and Fees..................................... 55
    2.09    Evidence of Debt. ............................................................ 55
    2.10    Payments Generally; Agent's Clawback. .......................... 56
    2.11    Sharing of Payments by Lenders...................................... 58
    2.12    Settlement Amongst Lenders. .......................................... 60

ARTICLE III TAXES, YIELD PROTECTION AND ILLEGALITY; APPOINTMENT OF
    LEAD BORROWER............................................................................. 60

    3.01    Taxes. .............................................................................. 60
    3.02    Illegality.......................................................................... 62
    3.03    Inability to Determine Rates. ........................................... 62
    3.04    Increased Costs................................................................ 62
    3.05    Mitigation Obligations. ................................................... 64
    3.06    Survival .......................................................................... 65
    3.07    Designation of Lead Borrower as Borrowers' Agent.......... 65

ARTICLE IV CONDITIONS PRECEDENT TO CREDIT EXTENSIONS .............................. 66

    4.01    Conditions of Initial Credit Extension.............................. 66
    4.02    Conditions to all Credit Extensions ................................. 69

ARTICLE V REPRESENTATIONS AND WARRANTIES ................................................ 71

    5.01    Existence, Qualification and Power ................................. 72
    5.02    Authorization; No Contravention ..................................... 72
    5.03    Governmental Authorization; Other Consents .................. 72
    5.04    Binding Effect ................................................................. 73
    5.05    Financial Statements; No Material Adverse Effect............ 73
    5.06    Litigation ........................................................................ 73
    5.07    No Default ....................................................................... 73
    5.08    Ownership of Property; Liens. ......................................... 74
    5.09    Environmental Compliance. ............................................ 74
    5.10    Insurance ........................................................................ 75

# TABLE OF CONTENTS

| Section | | Page |
|---|---|---|
| 5.11 | Taxes | 75 |
| 5.12 | ERISA Compliance. | 75 |
| 5.13 | Subsidiaries; Equity Interests | 77 |
| 5.14 | Margin Regulations; Investment Company Act. | 77 |
| 5.15 | Disclosure | 78 |
| 5.16 | Compliance with Laws | 78 |
| 5.17 | Intellectual Property; Licenses, Etc | 78 |
| 5.18 | Labor Matters | 79 |
| 5.19 | Security Documents. | 79 |
| 5.20 | Deposit Accounts | 80 |
| 5.21 | Brokers | 81 |
| 5.22 | Customer and Trade Relations | 81 |
| 5.23 | Material Contracts | 81 |
| 5.24 | Casualty | 81 |
| 5.25 | Notices from Farm Products Sellers, etc. | 81 |
| ARTICLE VI | AFFIRMATIVE COVENANTS | 82 |
| 6.01 | Financial Statements. | 83 |
| 6.02 | Certificates; Other Information | 84 |
| 6.03 | Notices | 86 |
| 6.04 | Payment of Obligations | 89 |
| 6.05 | Preservation of Existence, Etc | 89 |
| 6.06 | Maintenance of Properties | 89 |
| 6.07 | Maintenance of Insurance | 89 |
| 6.08 | Compliance with Laws | 91 |
| 6.09 | Books and Records; Accountants. | 92 |
| 6.10 | Inspection Rights. | 92 |
| 6.11 | Additional Loan Parties. | 94 |
| 6.12 | Cash Management. | 94 |
| 6.13 | Information Regarding the Collateral | 96 |
| 6.14 | Physical Inventories. | 96 |
| 6.15 | Environmental Laws | 97 |
| 6.16 | Further Assurances. | 97 |
| 6.17 | Compliance with Terms of Leaseholds | 98 |
| 6.18 | Material Contracts | 98 |
| 6.19 | Third Party Consultant. | 98 |
| 6.20 | Sell-Side Advisor and Capital Contribution. | 100 |
| 6.21 | Bankruptcy Related Covenants | 100 |
| ARTICLE VII | NEGATIVE COVENANTS | 101 |
| 7.01 | Liens | 102 |
| 7.02 | Investments | 102 |
| 7.03 | Indebtedness; Equity Issuances | 102 |
| 7.04 | Fundamental Changes | 102 |
| 7.05 | Dispositions | 103 |
| 7.06 | Restricted Payments | 103 |
| 7.07 | Prepayments of Indebtedness | 103 |
| 7.08 | Change in Nature of Business | 103 |
| 7.09 | Transactions with Affiliates | 103 |

# TABLE OF CONTENTS

| Section | | Page |
|---|---|---|
| 7.10 | Burdensome Agreements. | 105 |
| 7.11 | Use of Proceeds | 105 |
| 7.12 | Amendment of Material Documents | 105 |
| 7.13 | Fiscal Year | 105 |
| 7.14 | Deposit Accounts | 105 |
| 7.15 | Indebtedness and Liens of CFI. | 105 |
| 7.16 | Budgeted Expenses | 106 |
| **ARTICLE VIII EVENTS OF DEFAULT AND REMEDIES** | | 108 |
| 8.01 | Events of Default | 108 |
| 8.02 | Remedies Upon Event of Default | 114 |
| 8.03 | Application of Funds | 115 |
| **ARTICLE IX THE AGENT** | | 117 |
| 9.01 | Appointment and Authority | 117 |
| 9.02 | Rights as a Lender | 117 |
| 9.03 | Exculpatory Provisions | 117 |
| 9.04 | Reliance by Agent | 119 |
| 9.05 | Delegation of Duties | 119 |
| 9.06 | Resignation of Agent | 120 |
| 9.07 | Non-Reliance on Agent and Other Lenders | 120 |
| 9.08 | Agent May File Proofs of Claim | 120 |
| 9.09 | Collateral and Guaranty Matters | 122 |
| 9.10 | Notice of Transfer | 122 |
| 9.11 | Reports and Financial Statements | 122 |
| 9.12 | Agency for Perfection | 124 |
| 9.13 | Indemnification of Agent | 124 |
| 9.14 | Relation Among Lenders | 124 |
| 9.15 | Defaulting Lender | 124 |
| **ARTICLE X MISCELLANEOUS** | | 125 |
| 10.01 | Amendments, Etc | 126 |
| 10.02 | Notices; Effectiveness; Electronic Communications. | 127 |
| 10.03 | No Waiver; Cumulative Remedies | 129 |
| 10.04 | Expenses; Indemnity; Damage Waiver. | 131 |
| 10.05 | Payments Set Aside | 132 |
| 10.06 | Successors and Assigns. | 132 |
| 10.07 | Treatment of Certain Information; Confidentiality | 138 |
| 10.08 | Right of Setoff | 140 |
| 10.09 | Interest Rate Limitation | 140 |
| 10.10 | Counterparts; Integration; Effectiveness | 140 |
| 10.11 | Survival | 141 |
| 10.12 | Severability | 141 |
| 10.13 | Governing Law; Jurisdiction; Etc. | 141 |
| 10.14 | Waiver of Jury Trial | 143 |
| 10.15 | No Advisory or Fiduciary Responsibility | 144 |
| 10.16 | USA Patriot Act Notice | 145 |
| 10.17 | Foreign Asset Control Regulations | 145 |
| 10.18 | Time of the Essence | 145 |

**TABLE OF CONTENTS**

**Section**                                                                                      **Page**

10.19   Press Releases.................................................................................... 145

10.20   Additional Waivers.............................................................................. 146

10.21   No Strict Construction ......................................................................... 148

10.22   Attachments......................................................................................... 148

10.23   Relationship with DIP Orders .............................................................. 148

SIGNATURES……………………………………………………………………………………

…S-1

1652368.6

**SCHEDULES**

| | |
|---|---|
| 1.01 | Borrowers |
| 1.03 | Fiscal Accounting Periods |
| 1.04 | Pre-Petition Letters of Credit |
| **Error! Reference source not found.** | Commitments and Revolving Credit Facility Applicable Percentages |
| 5.01 | Loan Parties Organizational Information |
| 5.08 | Leased Real Estate |
| 5.10 | Insurance |
| 0 | Subsidiaries; Other Equity Investments |
| 5.18 | Collective Bargaining Agreements |
| 5.20 | DDAs; Collection Account |
| 5.23(a) | Material Contracts |
| 5.23(b) | Leases |
| 6.02 | Financial and Collateral Reporting |
| 0 | Existing Liens |
| 7.02 | Existing Investments |
| 0 | Existing Indebtedness |
| 0 | Agent's Office; Certain Addresses for Notices |

**EXHIBITS**

*Form of*

| | |
|---|---|
| A | Revolving Loan Notice |
| B | Revolving Note |
| C | Compliance Certificate |
| D | Assignment and Assumption |
| E | Borrowing Base Certificate |

**SENIOR SECURED, SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

This **SENIOR SECURED, SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT** ("Agreement") is entered into as of February [__], 2014, among

**Quantum Foods, LLC**, a Delaware limited liability company, as Debtor and Debtor-in-Possession (the "Lead Borrower"),

the Persons named on Schedule **Error! Reference source not found.** hereto (individually, a "Borrower", and collectively, the "Borrowers"),

the Guarantors party hereto,

each lender from time to time party hereto (collectively, the "Lenders" and individually, a "Lender"), and

**Crystal Financial LLC**, as Administrative Agent and Collateral Agent.

W I T N E S S E T H

WHEREAS, on February __, 2014 (the "Petition Date"), the Borrowers commenced Chapter 11 Case No. [_____] (the "Chapter 11 Case") by filing a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code, with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Borrowers continue to operate their businesses and manage their properties as debtor and debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code; and

WHEREAS, The Borrowers have requested that the Lenders provide a revolving credit facility with a sub-facility for the issuance of Letters of Credit, and the Lenders have indicated their willingness to lend and the Agent has indicated its willingness to issue or to cause to be issued Letters of Credit, in each case, on the terms and conditions set forth herein.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

**DEFINITIONS AND ACCOUNTING TERMS**

**Definitions**. As used in this Agreement, the following terms shall have the meanings set forth below:

"Account" means "accounts" as defined in the UCC, and also means a right to payment of a monetary obligation, whether or not earned by performance, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of or (b) for services rendered or to be rendered.

"ACH" means automated clearing house transfers.

"Act" shall have the meaning provided in <u>Section 0</u>.

"Affiliate" means, with respect to any Person, (a) another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified, (b) any director, officer, managing member, partner, trustee, or beneficiary of that Person, (c) any other Person directly or indirectly holding 10% or more of any class of the Equity Interests of that Person, and (d) any other Person 10% or more of any class of whose Equity Interests is held directly or indirectly by that Person.

"Agent" means Crystal in its capacity as administrative agent and collateral agent under any of the Loan Documents, or any successor thereto.

"Agent's Office" means the Agent's address and, as appropriate, account as set forth on <u>Schedule 0</u>, or such other address or account as the Agent may from time to time notify the Lead Borrower and the Lenders.

"Aggregate Commitments" means the sum of the Revolving Commitments (or, if the Revolving Commitments have been terminated, the then Total Revolving Outstandings) of all Lenders.  As of the Effective Date, the Aggregate Commitments are $60,000,000.

"Agreement" means this Credit Agreement.

"Applicable Lenders" means the Required Lenders, all affected Lenders, or all Lenders, as the context may require.

"Applicable Margin" means 11.5% per annum <u>provided</u> that if the provisions of <u>Section 3.02</u> or <u>Section 3.03</u> apply as a result of which the Obligations bear interest with reference to the Base Rate, "Applicable Margin" shall mean 10.5% for such period as interest is determined by reference to the Base Rate; <u>provided</u>, further, however, that notwithstanding anything to the contrary set forth herein, upon the occurrence of an Event of Default, interest shall accrue at the Default Rate.

"Appraised Value" means (a) with respect to all Inventory, the appraised orderly liquidation value, net of costs and expenses to be incurred in connection with any such liquidation, which value is expressed as a percentage of Cost of such Inventory as set forth in the inventory stock ledger of the Lead Borrower, which value shall be determined from time to time by the most recent appraisal undertaken by an independent appraiser engaged by the Agent, which may be an Affiliate of (i) the Administrative Agent, (ii) any Lender, (iii) any Participant or (iv) any SPC, assignee or other participant permitted under Section 10.06, and (b) with respect to Equipment, the appraised orderly liquidation value, net of costs and expenses to be incurred in connection with any such liquidation, as set forth in the most recent appraisal of the Borrowers' Equipment as determined from time to time by an independent appraiser engaged by the Agent, which may be an Affiliate of (i) the Administrative Agent, (ii) any Lender, (iii) any Participant or

- 2 -

(iv) any SPC, assignee or other participant permitted under Section 10.06, which appraisal shall assume, among other things, a marketing time of not greater than seven months.

"Approved Budget" has the meaning specified in Section 7.15.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender, (c) an entity or an Affiliate of an entity that administers or manages a Lender, or (d) the same investment advisor or an advisor under common control with such Lender, Affiliate or advisor, as applicable.

"Asian Food Solutions Note" means that certain Promissory Note dated November 1, 2012 in the original principal amount of $1,000,000.00 by Chinese Food Solutions, Inc., a Florida corporation, in favor of the Lead Borrower.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 0), and accepted by the Agent, in substantially the form of Exhibit D or any other form approved by the Agent.

"Attributable Indebtedness" means, on any date, (a) in respect of any Capital Lease Obligation of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease or similar payments under the relevant lease or other applicable agreement or instrument that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease, agreement or instrument were accounted for as a capital lease.

"Availability" means, as of any date of determination thereof by the Agent, the result, if a positive number, of:

(a)     the Loan Cap

        minus

(b)     the Total Revolving Outstandings

        minus

(c)     the outstanding Pre-Petition Liabilities.

In calculating Availability at any time and for any purpose under this Agreement, the Lead Borrower shall certify to the Agent that all post-petition accounts payable and Taxes are being paid on a timely basis.

"Availability Period" means the period from and including the Effective Date to the earliest of (a) the Maturity Date, (b) the date of termination of the Aggregate Commitments

pursuant to <u>Section 0</u>, and (c) the date of termination of the commitment of each Revolving Lender hereunder pursuant to <u>Section 0</u>.

"Availability Reserves" means, without duplication of any other Reserves or items that are otherwise addressed or excluded through eligibility criteria, such reserves as the Agent from time to time determines in its Permitted Discretion as being appropriate (a) to reflect the impediments to the Agent's ability to realize upon the Collateral, (b) to reflect claims and liabilities that the Agent determines will need to be satisfied in connection with the realization upon the Collateral, (c) to reflect criteria, events, conditions, contingencies or risks which adversely affect any component of the Borrowing Base, or the assets, business, financial performance or financial condition of any Loan Party, or (d) to reflect that a Default or an Event of Default then exists. Without limiting the generality of the foregoing, Availability Reserves may include, in the Agent's Permitted Discretion, (but are not limited to) reserves based on: (i) rent; (ii) outstanding Taxes and other governmental charges, including, without limitation, ad valorem, real estate, personal property, sales, claims of the PBGC and other Taxes which may have priority over the interests of the Agent in the Collateral; (iii) salaries, wages and benefits due to employees of any Loan Party; (iv) customer deposits; (vi) reserves for reasonably anticipated changes in the Appraised Value of Eligible Inventory or Eligible Equipment between appraisals; (vii) payables to vendors entitled to the benefits of PASA or any similar statute or regulation; and (viii) warehousemen's or bailee's charges and other Liens which may have priority over the interests of the Agent in the Collateral.

"Bankruptcy Code" means title 11, United States Code.

"Bankruptcy Court" has the meaning specified in the recitals to this Agreement.

"Bankruptcy Recoveries" means any claims and causes of action to which any Borrower may be entitled to assert by reason of any avoidance or other power vested in or on behalf of any Borrower or the estate of any Borrower under Chapter 5 of the Bankruptcy Code and any and all recoveries and settlements thereof.

"Base Rate" means, for any day, a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate, as in effect from time to time, plus one-half of one percent (0.50%), or (b) the rate of interest in effect for such day published in the "Money Rates" section of The Wall Street Journal as the "prime rate." Any change in the Federal Funds Rate or the prime rate shall take effect at the opening of business on the day of such change.

"Bleka Receivable" means accounts payable from Edward Bleka to the Borrowers, which as of the Effective Date are in the principal amount of $7,548,000, plus accrued interest.

"Blocked Account" has the meaning provided in <u>Section 0</u>.

"Blocked Account Agreement" means with respect to any deposit account established by a Loan Party, an agreement, in form and substance satisfactory to the Agent, establishing control (as defined in the UCC) of such deposit account by the Agent and whereby the bank maintaining such deposit account agrees to comply only with the instructions originated by the Agent without the further consent of any Loan Party.

- 4 -

"Blocked Account Bank" means each bank with whom deposit accounts are maintained and with whom a Blocked Account Agreement has been, or is required to be, executed in accordance with the terms hereof.

"Borrowers" has the meaning specified in the introductory paragraph hereto.

"Borrowing Base" means, at any time of calculation, an amount equal to:

(a)     the Cost of Eligible Finished Goods Inventory, net of Inventory Reserves, *multiplied by* 85% *multiplied by* the Appraised Value of Eligible Finished Goods Inventory;

> plus

(b)     the Cost of Eligible Raw Material Inventory, net of Inventory Reserves, *multiplied by* 85% *multiplied by* the Appraised Value of Eligible Raw Material Inventory;

> plus

(c)     the Cost of Eligible Packaging and Spices Inventory, net of Inventory Reserves, *multiplied by* 85% *multiplied by* the Appraised Value of Eligible Packaging and Spices Inventory;

> plus

(d)     the Cost of Eligible Aged Raw Material Inventory, net of Inventory Reserves, *multiplied by* 85% *multiplied by* the Appraised Value of Eligible Aged Raw Material Inventory;

plus

(e)     85% <u>multiplied by</u> the face amount of Eligible Trade Receivables (net of Receivables Reserves applicable thereto);

> plus

(f)     the least of (i) 85% of the face amount of Eligible CFI Receivables as set forth in clause (a) of the definition thereof, (ii) 85% of the face amount of Eligible CFI Receivables as set forth in clause (b) of the definition thereof (net of Receivables Reserves applicable thereto), and (iii) $4,000,000;

> plus

(g)     85% <u>multiplied by</u> the Appraised Value of Eligible Equipment;

> minus

- 5 -

(i)    the Professional Expense Carve-Out Reserve;

minus

(j)    the then amount of all Availability Reserves.

Notwithstanding the foregoing, (i) from the Effective Date through March 31, 2014, each of the advance rates set forth in clauses (a) through (g) above shall be increased by 25.0%; provided that the aggregate additional amount available to be borrowed under the Borrowing Base as a result of such increase shall not exceed $12,500,000 in the aggregate, and (ii) thereafter, each of the advance rates set forth in clauses (a) through (g) above shall be increased by 20.0%; provided that the aggregate additional amount available to be borrowed under the Borrowing Base as a result of such increase shall not exceed $10,600,000 in the aggregate.

"Borrowing Base Certificate" means a certificate substantially in the form of Exhibit E hereto (with such changes therein as may be required by the Agent to reflect the components of and reserves against the Borrowing Base as provided for hereunder from time to time), executed and certified as accurate and complete by a Responsible Officer of the Lead Borrower and the CRO which shall include appropriate exhibits, schedules, supporting documentation, and additional reports as reasonably requested by the Agent.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Agent's Office is located.

"Capital Expenditures" means, with respect to any Person for any period, (a) all expenditures made (whether made in the form of cash or other property) or costs incurred for the acquisition or improvement of fixed or capital assets of such Person (excluding normal replacements and maintenance which are properly charged to current operations), in each case that are (or should be) set forth as capital expenditures in a Consolidated statement of cash flows of such Person for such period, in each case prepared in accordance with GAAP, and (b) Capital Lease Obligations incurred by a Person during such period.

"Capital Lease Obligations" means, with respect to any Person for any period, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as liabilities on a balance sheet of such Person under GAAP and the amount of which obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Carve Out Trigger Notice" means written notice from the Agent to the Lead Borrower, its lead counsel, the U.S. Trustee and lead counsel to the Creditors' Committee of the occurrence and during the continuance of an Event of Default.

"Case Professionals" means Persons or firms retained by the Borrowers or the Creditors' Committee or other statutory committee appointed in the Chapter 11 Case pursuant to Sections 327 and 1103 of the Bankruptcy Code.

"Cash Collateralize" means to deposit with or deliver to the Agent, for the benefit of one or more of the Agent or the Lenders, as collateral for L/C Obligations or obligations of the Lenders to fund participations in respect thereof (as the context may require), L/C Obligations, cash or deposit account balances or, if the Agent shall agree in its sole discretion, other credit support, in each case pursuant to documentation in form and substance satisfactory to the Agent. "Cash Collateral" shall have a meaning correlative to the foregoing and shall include the proceeds of such cash collateral and other credit support.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq.

"CERCLIS" means the Comprehensive Environmental Response, Compensation, and Liability Information System maintained by the United States Environmental Protection Agency.

"CFI" means Chinese Food Solutions, Inc., a Florida corporation.

"CFO" means the chief financial officer of the Lead Borrower.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means an event or series of events by which:

(a)      Edward B. Bleka shall cease to own and control legally and beneficially (free and clear of all Liens other than Liens in favor of the Agent), either directly or indirectly, equity securities in the Lead Borrower representing more than 51% of the combined economic and voting power of all of Equity Interests of the Lead Borrower on a fully-diluted basis; or

(b)        any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person or its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) other than Edward B. Bleka becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that a person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time (such right, an "option right")), directly or indirectly, of 25% or more of the Equity Interests of the Lead Borrower on a fully-diluted basis (and taking into account all such Equity Interests that such "person" or "group" has the right to acquire pursuant to any option right); or

(c)        the Lead Borrower fails at any time to own, directly or indirectly, 100% of the Equity Interests of each other Borrower, free and clear of all Liens (other than the Liens in favor of the Agent), except where such failure is as a result of a transaction permitted by the Loan Documents.

"Chapter 11 Case" has the meaning provided in the recitals to this Agreement.

"Code" means the Internal Revenue Code of 1986, and the regulations promulgated thereunder, as amended and in effect.

"Collateral" means any and all "Collateral" as defined in any applicable Security Document and DIP Orders and all other property that is or is intended under the terms of the Security Documents or DIP Orders to be subject to Liens in favor of the Agent. Notwithstanding anything to the contrary contained in this definition, the term "Collateral" shall not, except as expressly provided in the DIP Orders, include Bankruptcy Recoveries.

"Collateral Access Agreement" means an agreement reasonably satisfactory in form and substance to the Agent executed by (a) a bailee or other Person in possession of Collateral, or (b) any landlord of Real Estate leased by any Loan Party, pursuant to which such Person (i) acknowledges the Agent's Lien on the Collateral, (ii) releases or subordinates such Person's Liens in the Collateral held by such Person or located on such Real Estate, (iii) provides the Agent with access to the Collateral held by such bailee or other Person or located in or on such Real Estate, (iv) as to any landlord, provides the Agent with a reasonable time to sell and dispose of the Collateral from such Real Estate, and (v) makes such other agreements with the Agent as the Agent may reasonably require.

"Collection Account" has the meaning provided in Section 0.

"Compliance Certificate" means a certificate substantially in the form of Exhibit C.

"Consolidated" means, when used to modify a financial term, test, statement, or report of a Person, the application or preparation of such term, test, statement or report (as applicable) based upon the consolidation, in accordance with GAAP, of the financial condition or operating results of such Person and its Subsidiaries.

"Contractual Obligation" means, as to any Person, any provision of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

"Controlled Disbursement Account" means the disbursement account of the Lead Borrower at Union Bank, N.A., which is account number 9080000399 (or any replacement account approved by Agent) and which is subject to a Blocked Account Agreement.

"Co-Pack/Product Supply Agreement" means the Co-Pack/Product Supply Agreement dated January 15, 2010 between North Star and Quantum Foods, LLC, as amended and in effect on the Effective Date and as may be amended or modified from time to time with the consent of the Agent.

"Cost" means the lower of cost or market value of Inventory, based upon the Borrowers' accounting practices, known to the Agent, which practices are in effect on the Effective Date as such calculated cost is determined from invoices received by the Borrowers, the Borrowers' purchase journals or the Borrowers' stock ledger.  "Cost" includes in-bound freight paid by the Loan Parties but does not include inventory capitalization costs or other non-purchase price charges  used in the Borrowers' calculation of cost of goods sold.

"Credit Extensions" mean each of the following: (a) a Revolving Borrowing and (b) the issuance of any Letter of Credit.

"Credit Party" or "Credit Parties" means (a) individually, (i) each Lender and its Affiliates, (ii) the Agent, (iii) each beneficiary of each indemnification obligation undertaken by any Loan Party under any Loan Document, (iv) any other Person to whom Obligations under this Agreement and other Loan Documents are owing, and (v) the successors and assigns of each of the foregoing, and (b) collectively, all of the foregoing.

"Credit Party Expenses" means (a) all reasonable out-of-pocket expenses incurred by the Agent and its Affiliates, in connection with this Agreement and the other Loan Documents, including without limitation (i) the reasonable fees, charges and disbursements of (A) counsel for the Agent, (B) outside consultants for the Agent, (C) appraisers, (D) commercial finance examiners, and (E) all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of the Obligations, (ii) in connection with (A) the syndication of the credit facilities provided for herein, (B) the preparation, negotiation, administration, management, execution and delivery of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (C) the enforcement or protection of their rights in connection with this Agreement or the Loan Documents or efforts to preserve, protect, collect, or

enforce the Collateral or in connection with the Chapter 11 Case, or (D) any workout, restructuring or negotiations in respect of any Obligations, and (b) with respect to the Agent and its Affiliates, all reasonable out-of-pocket expenses incurred in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder; and (c) all reasonable out-of-pocket expenses incurred by the Credit Parties who are not the Agent or any Affiliate thereof, after the occurrence and during the continuance of an Event of Default, provided that such Credit Parties shall be entitled to reimbursement for no more than one counsel representing all such Credit Parties (absent a conflict of interest in which case the Credit Parties may engage and be reimbursed for additional counsel).

"Creditors' Committee" means any official committee of creditors formed, appointed or approved in the Chapter 11 Case pursuant to the Bankruptcy Code.

"CRO" shall mean Michael Buenzow, in his capacity as Chief Restructuring Officer of the Lead Borrower.

"Crossroads" means Crossroads Treatment LLC, an Illinois limited liability company.

"Crossroads Receivable" means accounts payable from Crossroads to the Borrowers, which as of the Effective Date are in the principal amount of $4,232,000, plus accrued interest.

"Crystal" means Crystal Financial LLC and its successors.

"Crystal Entity" shall mean Crystal or any of its Affiliates.

"DDA" means each checking, savings or other demand deposit account maintained by any of the Loan Parties.  All funds in each DDA shall be conclusively presumed to be Collateral and proceeds of Collateral and the Agent and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in any DDA.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Defaulting Lender" means any Lender that (a) has failed to fund any portion of the Revolving Loans or participations in L/C Obligations required to be funded by it hereunder within one Business Day of the date required to be funded by it hereunder, (b) has otherwise failed to pay over to the Agent or any other Lender any other amount required to be paid by it hereunder within one Business Day of the date when due, or (c) has, or whose holding company has, been deemed insolvent or become the subject of a bankruptcy or insolvency proceeding.

"Default Rate" means, when used with respect to Revolving Loans and other Obligations, an interest rate equal to the interest rate (including the Applicable Margin) otherwise applicable to such Revolving Loan or Obligations plus three percent (3%) per annum.

"DIP Orders" means and refers to the Interim Borrowing Order and the Final Borrowing Order.

"Disposition" or "Dispose" means the sale, transfer, exclusive license, lease or other disposition (including any sale and leaseback transaction), whether in one transaction or in a series of transactions, of any property (including, without limitation, any Equity Interests) by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Dollars" and "$" mean lawful money of the United States.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of the United States, any state thereof or the District of Columbia (excluding, for the avoidance of doubt, any Subsidiary organized under the laws of Puerto Rico or any other territory).

"Drawing Date" has the meaning set forth in Section 2.03(c)(ii).

"Effect of Bankruptcy" means, with respect to any contractual obligation, contract or agreement to which a Borrower is a party, any default or other legal consequences arising on account of the commencement or the filing of the Chapter 11 Case (including the implementation of any stay), or the rejection of any such contractual obligation, contract or agreement with the approval of the Bankruptcy Court if required under any applicable Governmental Authority.

"Effective Date" means the first date all the conditions precedent in Section 0 are satisfied or waived in accordance with Section 0.

"Eligible Assignee" means (a) a Lender or any of its Affiliates or an Approved Fund, and (b) any other Person (other than a natural Person) approved by the Agent and, so long as no Event of Default is continuing, the Lead Borrower (such consent not to be unreasonably withheld or delayed and which shall be deemed given in the event that the Lead Borrower has not responded to such request for consent within five (5) Business Days thereof); provided that notwithstanding the foregoing, "Eligible Assignee" shall not include a Loan Party or any of their respective Affiliates or Subsidiaries.

"Eligible Aged Raw Material Inventory" means items of Inventory of a Borrower that are raw materials and which have not been utilized by a Borrower within six months of their acquisition, deemed by the Agent in its Permitted Discretion to be eligible for inclusion in the calculation of the Borrowing Base, and which would otherwise constitute Eligible Inventory.

"Eligible CFI Receivables" means either of the following, as the context may require:

(a) Accounts owing to the Lead Borrower from CFI that have not been outstanding for more than thirty (30) days from the invoice date therefor and that would otherwise qualify as Eligible Trade Receivables pursuant to the definition thereof (but excluding, for the avoidance of doubt, the current outstanding amount owed to the Lead Borrower by CFI pursuant to the Asian Foods Solutions Note); or

(b) Accounts arising from the sale of CFI's Inventory that satisfy the following criteria at the time of creation and continue to meet the same at any time of

- 11 -

determination: such Accounts (i) have been earned by performance and represent the bona fide amounts due to CFI from an account debtor, and, in each case, are originated in the ordinary course of business of CFI, and (ii) in each case, are acceptable to the Agent in its Permitted Discretion.  In determining the amount to be so included, the face amount of an Account shall be reduced by, to the extent not reflected in such face amount, (x) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that CFI may be obligated to rebate to a customer pursuant to the terms of any agreement or understanding (written or oral)) and (y) the aggregate amount of all cash received in respect of such Account but not yet applied by the Borrowers to reduce the amount of such Eligible CFI Receivable.  Except as otherwise agreed by the Agent, any Account included within any of the following categories shall not constitute an Eligible CFI Receivable pursuant to this clause (b):

(i)     Accounts that are not evidenced by an invoice from CFI to such account debtor;

(ii)     Accounts that have been outstanding for more than forty-five (45) days from the invoice date;

(iii)     All Accounts owed by an account debtor and/or its Affiliates for which 50% or more of such Accounts are not Eligible CFI Receivables;

(iv)     All Accounts owed by an account debtor and/or its Affiliates together exceed ten percent (10%) of the amount of all Accounts of CFI at any one time (but the portion of the Accounts not in excess of such percentage may be deemed Eligible CFI Receivables, in the Agent's discretion);

(v)     Accounts (i) that are not subject to a perfected first-priority security interest in favor of the Lead Borrower, as assigned to the Agent pursuant to the Security Documents, or (ii) with respect to which CFI does not have good and valid title thereto, free and clear of any Lien (other than Liens granted to the Lead Borrower, and assigned to the Agent pursuant to the Security Documents and Liens under the Pre-Petition Credit Documents);

(vi)     Accounts which are disputed or with respect to which a claim, counterclaim, offset or chargeback has been asserted, but only to the extent of such dispute, counterclaim, offset or chargeback;

(vii)     Accounts which arise out of any sale (x) not made in the ordinary course of business, (y) made on a basis other than upon credit terms usual to the business of CFI or (z) are not payable in Dollars;

(viii)     Accounts which are owed by any account debtor whose principal place of business is not within the continental United States;

- 12 -

(ix)    Accounts which are owed by any Affiliate or any employee of CFI;

(x)    Accounts for which all consents, approvals or authorizations of, or registrations or declarations with any Governmental Authority required to be obtained, effected or given in connection with the performance of such Account by the account debtor or in connection with the enforcement of such Account by the Lead Borrower or the Agent have not been duly obtained, effected or given and are not in full force and effect;

(xi)    Accounts due from an account debtor which is the subject of any bankruptcy or insolvency proceeding, has had a trustee or receiver appointed for all or a substantial part of its property, has made an assignment for the benefit of creditors or has suspended its business;

(xii)    Accounts due from any Governmental Authority except to the extent that the subject account debtor is the federal government of the United States and CFI and the Borrowers have complied with the Federal Assignment of Claims Act of 1940;

(xiii)    Accounts (1) owing from any Person that is also a supplier to, or creditor of, CFI or any of its Subsidiaries unless such Person has waived any right of setoff in a manner acceptable to the Agent or (2) representing any manufacturer's or supplier's credits, discounts, incentive plans or similar arrangements entitling CFI or any of its Subsidiaries to discounts on future purchase therefrom;

(xiv)    Accounts arising out of sales on a bill-and-hold, guaranteed sale, sale-or-return, sale on approval or consignment basis or subject to any right of return;

(xv)    Accounts evidenced by a promissory note or other instrument;

(xvi)    Accounts consisting of amounts due from vendors as rebates or allowances; and

(xvii)    Accounts owed by an account debtor deemed by the Agent in its Permitted Discretion to not be creditworthy.

"Eligible Equipment" means Equipment that is owned by a Borrower (i) for which an appraisal report by a third party appraiser acceptable to the Agent has been delivered to the Agent utilizing procedures and criteria acceptable to the Agent for determining the value of such Equipment and otherwise in form, scope and substance reasonably satisfactory to the Agent, (ii) that is deemed by the Agent in its Permitted Discretion to be eligible for inclusion in the calculation of the Borrowing Base, and (iii) that the Agent is satisfied, in its Permitted Direction, meets each of the following requirements:

- 13 -

(a)     a Borrower has good title to such Equipment and no other Person has any direct or indirect ownership, interest or title therein, and if applicable under the requirements of applicable Law, such title is evidenced by a certificate of title properly registered in the United States to such Borrower that is entitled to operate such Equipment in the state that has issued such certificate of title in accordance with all applicable Laws;

(b)     the Agent has a perfected first-priority lien in such Equipment for the benefit of the Credit Parties, and the Equipment is otherwise free and clear of all other Liens of any nature whatsoever (except for Liens under the Pre-Petition Credit Documents and other Permitted Encumbrances that do not have priority over the Lien in favor of the Agent);

(c)     the full purchase price for such Equipment has been paid by the Borrowers;

(d)     such Equipment is located on premises (i) owned by a Loan Party, (ii) leased by a Loan Party, or (iii) at a location not owned by a Loan Party acceptable to the Agent, in the case of clauses (ii) and (iii) as to which a Collateral Access Agreement, executed by the Person owning any such location, has been delivered to the Agent;

(e)     such Equipment is in good working order and condition (ordinary wear and tear excepted) and meets, in all material respects, all applicable safety or regulatory standards applicable to it for the use for which it is intended or for which it is being used;

(f)     such Equipment is not subject to any agreement (other than the Loan Documents) (i) that restricts the ability of the Borrowers to use, sell, transport or dispose of such equipment or (ii) that restricts the Agent's ability to take possession of, sell or otherwise dispose of such equipment;

(g)     such Equipment is insured in compliance with the provisions of Section 0 hereof;

(h)     the Borrowers are in compliance with the representations, warranties and covenants relating to such Equipment set forth in the Loan Documents;

(i)     such Equipment does not constitute motor vehicles unless the Agent is listed on the title of such vehicle as a secured party; and

(j)     such Equipment does not constitute "real estate fixtures" under the applicable laws of the jurisdiction in which such Equipment is located.

"Eligible Finished Goods Inventory" means items of Inventory of a Borrower that are finished goods merchantable and readily saleable in the ordinary course of the Borrowers' business, deemed by the Agent in its Permitted Discretion to be eligible for inclusion in the calculation of the Borrowing Base, and which would otherwise constitute Eligible Inventory.

"Eligible Inventory" means, as of the date of determination thereof, items of Inventory of a Borrower that are deemed by the Agent in its Permitted Discretion to be eligible for inclusion

- 14 -

in the calculation of the Borrowing Base, in each case that, except as otherwise agreed by the Agent, complies with each of the representations and warranties respecting Inventory made by the Borrowers in the Loan Documents.  Except as otherwise agreed by the Agent, in its discretion, the following items of Inventory shall not be included in Eligible Inventory:

(a)    Inventory that is not solely owned by a Borrower or a Borrower does not have good and valid title thereto free and clear of any Lien (other than Liens granted to the Agent pursuant to the Security Documents and Liens under the Pre-Petition Credit Documents);

(b)    Inventory that is leased by or is on consignment to a Borrower or which is consigned by a Borrower to a Person which is not a Loan Party;

(c)    Inventory that is not located in the continental United States;

(d)    Inventory that is not located at a location that is owned or leased by a Borrower, except (i) Inventory in transit between such owned or leased locations, or (ii) to the extent that the Borrowers have furnished the Agent with (x) any UCC financing statements or other documents that the Agent may determine to be necessary to perfect its security interest in such Inventory at such location, and (y) a Collateral Access Agreement executed by the Person owning any such location;

(e)    Inventory that is comprised of goods which (i) are damaged, defective, "seconds," or otherwise unmerchantable, (ii) are to be returned to the vendor, (iii) are obsolete or slow moving, or custom items, or that constitute samples, promotional, marketing, labels, bags and other packaging and shipping materials or supplies used or consumed in a Borrower's business, (iv) are not in compliance with all standards imposed by any Governmental Authority having regulatory authority over such Inventory, its use or sale, or (v) are bill and hold goods;

(f)    Inventory that is not subject to a perfected first-priority security interest in favor of the Agent;

(g)    Inventory that is not insured in compliance with the provisions of <u>Section 0</u> hereof;

(h)    Inventory that has been sold but not yet delivered or as to which a Borrower has accepted a deposit; or

(i)    Inventory that consists of work-in-process.

"Eligible Packaging and Spices Inventory" means items of Inventory of a Borrower that consist of packaging materials and spices, deemed by the Agent in its Permitted Discretion to be eligible for inclusion in the calculation of the Borrowing Base, and which would otherwise constitute Eligible Inventory.

"Eligible Raw Material Inventory" means items of Inventory of a Borrower that are raw materials deemed by the Agent in its discretion to be eligible for inclusion in the calculation of the Borrowing Base, and which would otherwise constitute Eligible Inventory.

"Eligible Trade Receivables" means Accounts arising from the sale of the Borrowers' Inventory that satisfy the following criteria at the time of creation and continue to meet the same at any time of determination: such Account (a) has been earned by performance and represents the bona fide amounts due to a Borrower from an account debtor, and, in each case, is originated in the ordinary course of business of such Borrower, and (b) in each case, is acceptable to the Agent in its Permitted Discretion.  Without limiting the foregoing, to qualify as an Eligible Trade Receivable, an Account shall indicate no Person other than a Borrower as payee or remittance party.  In determining the amount to be so included, the face amount of an Account shall be reduced by, to the extent not reflected in such face amount, (x) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that a Borrower may be obligated to rebate to a customer pursuant to the terms of any agreement or understanding (written or oral)) and (y) the aggregate amount of all cash received in respect of such Account but not yet applied by the Borrowers to reduce the amount of such Eligible Trade Receivable.  Except as otherwise agreed by the Agent, any Account included within any of the following categories shall not constitute an Eligible Trade Receivable:

(a)     Accounts that are not evidenced by an invoice from a Borrower to such account debtor;

(b)     Accounts that have been outstanding for more than the greater of (i) thirty (30) days from the invoice date, or (ii) a number of days equal to the payment terms granted such account debtor in the ordinary course of business consistent with past practices multiplied by three (3);

(c)     All Accounts owed by an account debtor and/or its Affiliates for which 50% or more of such Accounts are not Eligible Trade Receivables;

(d)     All Accounts owed by an account debtor and/or its Affiliates together exceed twenty percent (20%) (except for Millard Refrigeration Services, Inc., which shall not exceed thirty-five percent (35%)), or such higher amount as agreed by the Agent in its Permitted Discretion, of the amount of all Accounts at any one time (but the portion of the Accounts not in excess of such percentage may be deemed Eligible Trade Receivables, in the Agent's discretion);

(e)     Accounts (i) that are not subject to a perfected first-priority security interest in favor of the Agent, or (ii) with respect to which a Borrower does not have good and valid title thereto, free and clear of any Lien (other than Liens granted to the Agent pursuant to the Security Documents and Liens under the Pre-Petition Credit Documents);

(f)     Accounts which are disputed or with respect to which a claim, counterclaim, offset or chargeback has been asserted, but only to the extent of such dispute, counterclaim, offset or chargeback;

- 16 -

(g)    Accounts which arise out of any sale (i) not made in the ordinary course of business, (ii) made on a basis other than upon credit terms usual to the business of the Borrowers or (iii) are not payable in Dollars;

(h)    Accounts which are owed by any account debtor whose principal place of business is not within the continental United States (i) except to the extent covered by credit insurance (calculated net of any deductibles or other retention by the Borrowers) in an amount, by an insurer and on terms reasonably acceptable to the Agent, or (ii) unless supported by an irrevocable letter of credit in an amount, from a financial institution and on terms reasonably acceptable to the Agent;

(i)    Accounts which are owed by any Affiliate or any employee of a Loan Party;

(j)    Accounts for which all consents, approvals or authorizations of, or registrations or declarations with any Governmental Authority required to be obtained, effected or given in connection with the performance of such Account by the account debtor or in connection with the enforcement of such Account by the Agent have not been duly obtained, effected or given and are not in full force and effect;

(k)    Accounts due from an account debtor which is the subject of any bankruptcy or insolvency proceeding, has had a trustee or receiver appointed for all or a substantial part of its property, has made an assignment for the benefit of creditors or has suspended its business;

(l)    Accounts due from any Governmental Authority except to the extent that the subject account debtor is the federal government of the United States and the Borrowers have complied with the Federal Assignment of Claims Act of 1940;

(m)    Accounts (1) owing from any Person that is also a supplier to, or creditor of, a Loan Party or any of its Subsidiaries unless such Person has waived any right of setoff in a manner acceptable to the Agent or (2) representing any manufacturer's or supplier's credits, discounts, incentive plans or similar arrangements entitling a Loan Party or any of its Subsidiaries to discounts on future purchase therefrom;

(n)    Accounts arising out of sales on a bill-and-hold, guaranteed sale, sale-or-return, sale on approval or consignment basis or subject to any right of return;

(o)    Accounts evidenced by a promissory note or other instrument (other than the Asian Food Solutions Note);

(p)    except with respect to the Eligible CFI Receivables that are specifically included as eligible pursuant to clause (f) of the Borrowing Base, Accounts owed to the Lead Borrower from CFI or otherwise evidenced by the Asian Food Solutions Note;

(q)    Accounts consisting of amounts due from vendors as rebates or allowances;

(r)    Accounts which are in excess of the credit limit for such account debtor established by the Borrowers in the ordinary course of business and consistent with past practices;

(s)    Accounts owed by an account debtor deemed by the Agent in its Permitted Discretion to not be creditworthy;

(t)    Accounts which include extended payment terms (datings) granted in the ordinary course of business, other than those in favor of Persons or terms approved by the Agent in writing in its discretion;

(u)    Accounts due with respect to the lease of the Loan Parties' facility in California; and

(v)    Accounts due on account of the Bleka Receivable and the Crossroads Receivable.

"Environmental Laws" means any and all federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"Environmental Liability" means any liability, obligation, damage, loss, claim, action, suit, judgment, order, fine, penalty, fee, expense, or cost, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Loan Party or its Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal or presence of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equipment" has the meaning set forth in the UCC.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or non-voting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with a Loan Party within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by a Loan Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by a Loan Party or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (f) the determination that any Pension Plan is considered an at-risk plan or a plan in endangered or critical status within the meaning of Sections 430, 431 and 432 of the Code or Sections 303, 304 and 305 of ERISA; or (g) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon a Loan Party or any ERISA Affiliate.

"Event of Default" has the meaning specified in <u>Section 0</u>.  An Event of Default shall be deemed to be continuing unless and until that Event of Default has been duly waived as provided in <u>Section 0</u> hereof.

 "Excluded Taxes" means, with respect to the Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Loan Parties hereunder, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located, (b) any branch profits taxes imposed by the United States or any similar tax imposed by any other jurisdiction in which any Loan Party is located and (c) any United States federal, state or local backup withholding tax, and (d) any United States federal withholding tax imposed under FATCA.

"Executive Order" has the meaning set forth in <u>Section 0</u>.

"Extraordinary Receipt" means any cash received by or paid to or for the account of any Loan Party on account of

(a)    any Disposition (including pursuant to a sale and leaseback transaction) of any property or asset of a Loan Party;

(b)    any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of (and payments in lieu thereof), any

property or asset of a Loan Party, unless the proceeds therefrom are required to be paid to the holder of a Lien on such property or asset having priority over the Lien of the Agent;

(c)    the issuance by a Loan Party of any Equity Interests, other than any such issuance of Equity Interests (i) to a Loan Party, or (ii) as a compensatory issuance to any employee, director, or consultant (including under any option plan);

(d)    the incurrence by a Loan Party of any Indebtedness for borrowed money other than Permitted Indebtedness; or

(e)    tax refunds, pension plan reversions, indemnity payments and any purchase price adjustments.

"Facility Guaranty" means a Guaranty made by the Guarantors in favor of the Agent and the other Credit Parties, in form reasonably satisfactory to the Agent.

"Family Members" means, with respect any Person that is an individual, the spouse, parents, mother-in-law, father-in-law, siblings, brother-in-law, sister-in-law, children, son-in-law, daughter-in-law and grandchildren, as applicable, of such Person.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%), as determined by the Agent, charged to such reference bank(s) as the Agent may determine on such day on such transactions.

"Final Borrowing Order" means an order of the Bankruptcy Court which order shall be in form, scope and substance reasonably acceptable to the Agent, which, among other matters but not by way of limitation, authorizes the Borrower to obtain credit, incur (or guaranty) Obligations, grant Liens under this Agreement, the other Loan Documents, and the DIP Orders, and provides for the super priority of the Agent's and the Lenders' claims, which order is a Final Order.

 "Final Order" means an order or judgment of the Bankruptcy Court, as entered on the docket of the Clerk of the Bankruptcy Court, that has not been reversed, stayed, modified or amended and as to which the time to appeal or seek leave to appeal, petition for certiorari, reargue or seek rehearing has expired and no proceeding for certiorari, reargument or rehearing is pending or if an appeal, petition for certiorari, reargument, or rehearing has been sought, the order or judgment of the Bankruptcy Court has been affirmed by the highest court to which the order was appealed, from which the reargument or rehearing

- 20 -

was sought, or certiorari has been denied and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired.

"Fiscal Accounting Periods" means the fiscal periods described and enumerated on Schedule 1.03 hereto.

"Fiscal Quarter" means any three consecutive Fiscal Accounting Periods of any Fiscal Year (or with respect to the first fiscal quarter of any Fiscal Year, four consecutive Fiscal Accounting Periods).

"Fiscal Year" means any period of thirteen (13) consecutive Fiscal Accounting Periods ending on or about December 31 of each calendar year.

"Food, Drug, and Cosmetic Act" means the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, et seq., and its implementing regulations.

"Food Industry Laws" means the Food Security Act, the Food, Drug, and Cosmetic Act (21 U.S.C. § 321, et seq.), PACA, the Egg Products Inspection Act, the Minnesota Food Law (Minnesota Statutes, Ch. 31), the MWPDA, and all other applicable Federal, state and local laws governing the production, packaging and distribution of food, and all applicable rules, regulations, ordinances and codes and all applicable administrative orders, directed duties, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"Food Security Act" means the Food Security Act of 1985, and any successor statute thereto, including all rules and regulations thereunder, all as the same may be in effect from time to time.

"Foreign Asset Control Regulations" has the meaning set forth in Section 0.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied; provided, however, that all calculations relative to liabilities shall be made without giving effect to Statement of Financial Accounting Standards No. 159 and all financial statements and calculations do not include the consolidation of Crossroads and North Star.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority,

instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien).  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof.  The term "Guarantee" as a verb has a corresponding meaning.

"Guarantor" means (i) North Star Foods (QMRE), LLC, (ii) Quantum Rosa Mystica Enterprises, LLC, and (iii) each Subsidiary of the Lead Borrower (other than a Borrower) that shall be required to execute and deliver a Facility Guaranty pursuant to Section 0.

"Hard Costs" shall mean, with respect to the purchase by a Borrower of an item of Eligible New Equipment, the net cash amount actually paid to acquire title to such item, net of all incentives, discounts and rebates, and exclusive of (i) freight, delivery charges, installation costs and charges, and software costs and charges, (ii) fees, taxes, insurance and other incidental costs or expenses and (iii) all indirect costs or expenses of any kind.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)    all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

net obligations of such Person under any hedging agreement or swap arrangement;

all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and, in each case, not outstanding for more than 30 days or past due for more than 7 days);

indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

all Attributable Indebtedness of such Person;

all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person, or any warrant, right or option to acquire such Equity Interest, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; and

all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Indemnitees" has the meaning specified in Section 0.

"Information" has the meaning specified in Section 0.

"Intellectual Property" means all present and future:  trade secrets, know-how and other proprietary information; trademarks, trademark applications, internet domain names, service marks, trade dress, trade names, business names, designs, logos, slogans (and all translations, adaptations, derivations and combinations of the foregoing) indicia and other source and/or

- 23 -

business identifiers, and all registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world; copyrights and copyright applications; (including copyrights for computer programs) and all tangible and intangible property embodying the copyrights, unpatented inventions (whether or not patentable); patents and patent applications; industrial design applications and registered industrial designs; license agreements related to any of the foregoing and income therefrom; books, records, writings, computer tapes or disks, flow diagrams, specification sheets, computer software, source codes, object codes, executable code, data, databases and other physical manifestations, embodiments or incorporations of any of the foregoing; all other intellectual property; and all common law and other rights throughout the world in and to all of the foregoing.

"Interest Payment Date" means, as to any Revolving Loan, the first Business Day of each month and the Maturity Date.

"Interest Period" means, as to each Revolving Loan, the period commencing on the first day of each calendar month and ending on the last day of such calendar month, provided that no Interest Period shall extend beyond the Maturity Date.

(a)     **"Interim Borrowing Order" means an order entered by the Bankruptcy Court, in form, scope and substance as may be reasonably acceptable to the Agent, authorizing, on an interim basis, *inter alia* the Borrowers to obtain credit and incur (or guaranty) Obligations, granting Liens to secure the Obligations, and providing for the super priority of the Agent's and granting the Agent and the Lenders under the Pre-Petition Credit Agreement adequate protection of their interests.**

.

"Internal Control Event" means a material weakness in, or fraud that involves management or other employees who have a significant role in, the Lead Borrower's and/or its Subsidiaries' internal controls over financial reporting.

"Inventory" has the meaning given that term in the UCC, and shall also include, without limitation, all: (a) goods which (i) are leased by a Person as lessor, (ii) are held by a Person for sale or lease or to be furnished under a contract of service, (iii) are furnished by a Person under a contract of service, or (iv) consist of raw materials, work in process, or materials used or consumed in a business; (b) goods of said description in transit; (c) goods of said description which are returned, repossessed or rejected; and (d) packaging, advertising, and shipping materials related to any of the foregoing.

"Inventory Reserves" means such reserves as may be established from time to time by the Agent in its Permitted Discretion (a) with respect to the determination of the saleability or market value of the Eligible Inventory, (b) which reflect claims and liabilities that the Agent determines in its Permitted Discretion will need to be satisfied in connection with the realization upon the Inventory, or (c) to reflect the Market Adjustment Reserve.

- 24 -

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person, or (c) any other investment of money or capital.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment except for reductions by an amount recovered with respect to such investment.

"IRS" means the United States Internal Revenue Service.

"Joinder Agreement" means an agreement, in form satisfactory to the Agent pursuant to which, among other things, a Person becomes a party to, and bound by the terms of, this Agreement and/or the other Loan Documents in the same capacity and to the same extent as either a Borrower or a Guarantor, as the Agent may determine.

 "Key Executive" means each of Edward B. Bleka, Vice President of Operations, Chief Financial Officer, Chief Administrative Officer and/or  President of the Lead Borrower, or any replacement of any of the foregoing as permitted by Section 8.01(p) hereof.

"Laws" means, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, including the Bankruptcy Code and all Food Industry Laws.

"L/C Issuer" means any of Deutsche Bank, Citigroup, one of their Affiliates or any other bank or financial institution that issues letters of credit on behalf of the Agent.

"L/C Obligations" means, as at any date of determination, the aggregate undrawn amount available to be drawn under all outstanding Letters of Credit plus the aggregate of all Reimbursement Obligations.  For purposes of computing the amounts available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 0.

"Lead Borrower" has the meaning specified in the introductory paragraph hereto.

"Lease" means any agreement, whether written or oral, no matter how styled or structured, pursuant to which a Loan Party is entitled to the use or occupancy of any real property for any period of time.

"Lenders" has the meaning specified in the introductory paragraph hereto.

"Lending Office" means, as to any Lender, the office or offices as such Lender may from time to time notify the Lead Borrower and the Agent.

- 25 -

"Letter of Credit" means a letter of credit (as that term is defined in the UCC) issued by an L/C Issuer on behalf of the Agent for the account of the Borrower and that is a standby or documentary letter of credit. Without limiting the foregoing, all Pre-Petition Letters of Credit shall be deemed to have been issued hereunder and shall for all purposes be deemed to be "Letters of Credit" hereunder.

"Letter of Credit Application" means an application and agreement for the issuance or amendment of a Letter of Credit in the form from time to time in use by the Agent or an L/C Issuer.

"Letter of Credit Borrowing" has the meaning set forth in Section 2.03(c)(iv).

"Letter of Credit Expiration Date" means the day that is seven days prior to the Maturity Date (or, if such day is not a Business Day, the next preceding Business Day).

"LIBOR Rate" means, for any Interest Period with respect to any Revolving Loan, the rate of interest per annum (rounded upwards, if necessary, to the nearest 1/100 of 1%) published in the "Money Rates" section of The Wall Street Journal as the London interbank offered rate for deposits in Dollars on the date which is two (2) Business Days prior to the commencement of such Interest Period (or, if more than one rate is published, then the highest of such rates) for a term of three months, or if such "Money Rates" section is unavailable for any reason on such date, the rate of interest determined by the Agent to be the average (rounded upward, if necessary, to the nearest 1/100th of 1%) of the rates per annum at which deposits in U.S. dollars are offered to such reference banks by other reference banks as the Agent determines in the London interbank market as of 10:00 a.m. two (2) Business Days prior to the first day in such Interest Period for a three month term and in an amount comparable to the amount of the applicable Revolving Loan.

"Lien" means (a) any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale, Capital Lease Obligation, Synthetic Lease Obligation, or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing) and (b) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Liquidation" means the exercise by the Agent of those rights and remedies accorded to the Agent under the Loan Documents and applicable Laws as a creditor of the Loan Parties with respect to the realization on the Collateral (subject to the terms of the DIP Orders), including (after the occurrence and during the continuation of an Event of Default) the conduct by the Loan Parties acting with the consent of the Agent, of any public, private or other similar sale or any other disposition of the Collateral for the purpose of liquidating the Collateral. Derivations of the word "Liquidation" (such as "Liquidate") are used with like meaning in this Agreement.

"Loan Account" has the meaning assigned to such term in Section 2.09(a).

"Loan Cap" means, at any time of determination, the lesser of (a) the Aggregate Commitments, or (b) the Borrowing Base, minus, in each case, the then outstanding Pre-Petition Liabilities.

"Loan Documents" means this Agreement, each Note, all Borrowing Base Certificates, the Security Documents, the Facility Guaranty, the DIP Orders and any other instrument or agreement now or hereafter executed and delivered in connection herewith.

"Loan Parties" means, collectively, each Borrower and each Guarantor.

"Management Agreement" means the Management Agreement dated April 1, 2005 between Crossroads and Quantum, Inc., as amended and in effect on the Effective Date.

"Market Adjustment Reserve" means a positive or negative Inventory Reserve established from time to time by the Agent in its Permitted Discretion to reflect the sum of (x) the amount available to be borrowed under clauses (b) and (d) of the Borrowing Base with respect to Eligible Raw Material Inventory and Eligible Aged Raw Material Inventory, *multiplied by* (y) the change in the premium of market price to inventory cost of such Eligible Raw Material Inventory and Eligible Aged Raw Material Inventory.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities (actual or contingent) or financial condition of the Loan Parties taken as a whole; (b) a material impairment of the ability of the Loan Parties taken as a whole or any Borrower to perform their or its obligations under any Loan Document to which it is a party; or (c) a material impairment of the enforceability or priority of the Agent's Liens with respect to the Collateral as a result of an action or failure to act on the part of any Loan Party. In determining whether any individual event would result in a Material Adverse Effect, notwithstanding that such event in and of itself does not have such effect, a Material Adverse Effect shall be deemed to have occurred if the cumulative effect of such event and all other then existing events would result in a Material Adverse Effect; provided that a "Material Adverse Effect shall not be deemed to exist as a result of the Effect of Bankruptcy or the events leading up to and resulting therefrom.

"Material Contract" means, with respect to any Person, each contract to which such Person is a party material to the business, financial condition, operations, performance or properties of such Person, and shall include, without limitation, the Union Contracts, the Management Agreement and the Wastewater Treatment Agreement; provided that Leases shall not be deemed to be Material Contracts hereunder.

"Material Indebtedness" means Indebtedness incurred subsequent to the commencement of the Chapter 11 Case (other than the Obligations) of the Loan Parties in an aggregate principal amount exceeding $1,000,000.   For purposes of determining the amount of Material Indebtedness at any time, (i) undrawn committed or available amounts shall be included, and (ii)

all amounts owing to all creditors under any combined or syndicated credit arrangement shall be included.

"Maturity Date" means March ____, 2014[1] unless the Final Borrowing Order shall have been entered on or before such date, in which case the Maturity Date shall mean August ____, 2014.

"Maximum Rate" has the meaning provided therefor in Section 0.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which any Loan Party or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Net Proceeds" means (a) with respect to any Disposition by any Loan Party or any of its Subsidiaries, or any other Extraordinary Receipt received or paid to the account of any Loan Party or any of its Subsidiaries, the excess, if any, of (i) the sum of cash and cash equivalents received in connection with such transaction (including any cash or cash equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the principal amount of any Indebtedness that is secured by the applicable asset by a Lien permitted hereunder which is senior to the Agent's Lien on such asset and that is required to be repaid (or to establish an escrow for the future repayment thereof) in connection with such transaction (other than Indebtedness under the Loan Documents), (B) the reasonable and customary out-of-pocket expenses incurred by such Loan Party or such Subsidiary in connection with such transaction (including, without limitation, appraisals, and brokerage, legal, title and recording or transfer tax expenses and commissions) paid by any Loan Party to third parties (other than Affiliates)) and (C) to fund an escrow account, subject to a Lien in favor of the Agent, for reasonably anticipated income taxes to be paid in connection with any such Disposition or Extraordinary Receipt; provided that any excess amount set forth in such account after the payment of such income taxes shall constitute Net Proceeds and shall be used to repay the Obligations; and

(b)     with respect to the sale or issuance of any Equity Interest by any Loan Party or any of its Subsidiaries, or the incurrence or issuance of any Indebtedness for borrowed money by any Loan Party or any of its Subsidiaries, the excess of (i) the sum of the cash and cash equivalents received in connection with such transaction over (ii) the underwriting discounts and commissions, and other reasonable and customary out-of-pocket expenses, incurred by such Loan Party or such Subsidiary in connection therewith.

"North Star" means North Star Foods (QRME), LLC, an Illinois limited liability company.

---

[1] NB: 30 days from Effective Date

"Note" means a promissory note made by the Borrowers in favor of a Lender evidencing Revolving Loans made by such Lender, substantially in the form of Exhibit B, as each may be amended, supplemented or modified from time to time.

"NPL" means the National Priorities List under CERCLA.

"Obligations" means all advances to, and debts (including principal, interest, fees, costs, and expenses), liabilities, obligations, covenants, indemnities, and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Revolving Loan, Letter of Credit (including payments in respect of reimbursement of disbursements, interest thereon and obligations to provide cash collateral therefor), whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising.

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-United States jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity; and (d) in each case, all shareholder or other equity holder agreements, voting trusts and similar arrangements to which such Person is a party or which is applicable to its Equity Interests and all other arrangements relating to the Control or management of such Person.

"Other Taxes" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"Outstanding Amount" means, at any time of determination, the then aggregate outstanding principal amount of Revolving Loans and unreimbursed Obligations with respect to Letters of Credit.

"Overadvance" means a Credit Extension to the extent that, immediately after its having been made, Availability is less than zero.

"Participant" has the meaning specified in Section 0.

"PASA" means the Packers and Stockyard Act, 1921 and all regulations promulgated thereunder, as amended from time to time.

"PBGC" means the Pension Benefit Guaranty Corporation.

- 29 -

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by any Loan Party or any ERISA Affiliate or to which any Loan Party or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"Permitted Discretion" means a determination made by the Agent in the exercise of its reasonable credit judgment, exercised in good faith in accordance with customary business practices for asset-based lending transactions.

"Permitted Disposition" means any of the following:

(a)     Dispositions of inventory in the ordinary course of business;

(b)     non-exclusive licenses of Intellectual Property of a Loan Party or any of its Subsidiaries in the ordinary course of business;

(c)     Dispositions of Equipment (other than Eligible Equipment) in the ordinary course of business that is substantially worn, damaged, obsolete or, in the judgment of a Loan Party, no longer useful or necessary in its business or that of any Subsidiary having an aggregate fair market value not in excess of $250,000 in any Fiscal Year, and Dispositions of Eligible Equipment in the ordinary course of business that is substantially worn, damaged, obsolete or, in the judgment of a Loan Party, no longer useful or necessary in its business or that of any Subsidiary as long as (i) the Net Proceeds therefrom are not less than seventy-five percent (75%) of the Appraised Value thereof and (ii) in any Fiscal Year, the difference between (x) the Appraised Value of all such Eligible Equipment Disposed pursuant to this clause (c) minus (y) the Net Proceeds received by the Loan Parties in connection with all such Dispositions during such Fiscal Year shall be not more than $100,000;

(d)     sales, transfers and dispositions among the Loan Parties or by any Subsidiary to a Loan Party.

"Permitted Encumbrances" means:

(a)     Liens imposed by law for Taxes that are not yet due or are being contested in compliance with Section 0;

(b)     carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by applicable Laws, arising in the ordinary course of business and securing obligations that are not overdue by more than thirty (30) days or are being contested in compliance with Section 0;

(c)     pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations, other than any Lien imposed by ERISA;

(d)     deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(e)     Liens in respect of judgments that would not constitute an Event of Default hereunder;

(f)     easements, covenants, conditions, restrictions, building code laws, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of a Loan Party and such other minor title defects or survey matters that are disclosed by current surveys that, in each case, do not materially interfere with the current use of the real property;

(g)     Liens existing on the Effective Date listed on <u>Schedule 0</u> and Liens to secure any Permitted Refinancings of the Indebtedness with respect thereto;

(h)     Liens in favor of the Agent;

(i)     Liens securing the Pre-Petition Liabilities;

(j)     landlords' and lessors' statutory Liens in respect of rent not in default;

(k)     Liens arising solely by virtue of any statutory or common law provisions relating to banker's Liens, Liens in favor of securities intermediaries, rights of setoff or similar rights and remedies as to deposit accounts or securities accounts or other funds maintained with depository institutions or securities intermediaries;

(l)     Liens arising from precautionary UCC filings regarding "true" operating leases.

"Permitted Indebtedness" means each of the following:

(a)     Indebtedness outstanding on the Effective Date listed on <u>Schedule 0</u> and any Permitted Refinancing thereof;

(b)     the Pre-Petition Liabilities;

(c)     Indebtedness of any Loan Party to any other Loan Party;

(d)     contingent liabilities under surety bonds or similar instruments incurred in the ordinary course of business in connection with the construction or improvement of the Loan Party's properties;

(e)     the Obligations.

"Permitted Investments" means each of the following:

(a)     readily marketable obligations issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof having maturities of not more than 360 days from the date of acquisition thereof; <u>provided</u> that the full faith and credit of the United States is pledged in support thereof;

(b)     commercial paper issued by any Person organized under the laws of any state of the United States and rated at least "Prime-1" (or the then equivalent grade) by Moody's or at least "A-1" (or the then equivalent grade) by S&P, in each case with maturities of not more than 180 days from the date of acquisition thereof;

(c)     time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) (A) is a Lender or (B) is organized under the laws of the United States, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii) issues (or the parent of which issues) commercial paper rated as described in clause (b) of this definition and (iii) has combined capital and surplus of at least $1,000,000,000, in each case with maturities of not more than 180 days from the date of acquisition thereof;

(d)      fully collateralized repurchase agreements with a term of not more than thirty (30) days for securities described in clause (a) above (without regard to the limitation on maturity contained in such clause) and entered into with a financial institution satisfying the criteria described in clause (c) above or with any primary dealer and having a market value at the time that such repurchase agreement is entered into of not less than 100% of the repurchase obligation of such counterparty entity with whom such repurchase agreement has been entered into;

(e)      Investments, classified in accordance with GAAP as current assets of the Loan Parties, in any money market fund, mutual fund, or other investment companies that are registered under the Investment Company Act of 1940, as amended, which are administered by financial institutions that have the highest rating obtainable from either Moody's or S&P, and which invest solely in one or more of the types of securities described in clauses (a) through (d) above;

(f)      Investments existing on the Effective Date set forth on <u>Schedule 0</u>, but not any increase in the amount thereof or any other modification of the terms thereof;

(g)      Investments by any Loan Party and its Subsidiaries in their respective Subsidiaries outstanding on the Effective Date, and (ii) additional Investments by any Loan Party and its Subsidiaries in Loan Parties;

(h)      Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(i)      Guarantees constituting Permitted Indebtedness;

(j)      Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case, in the ordinary course of business;

(k)      the Crossroads Receivable in an amount not to exceed the amount thereof as of the Effective Date, plus any interest accruing thereon after the Effective Date; and

(n)      the Bleka Receivable in an amount not to exceed the amount thereof as of the Effective Date, plus any interest accruing thereon after the Effective Date.

provided, however, that notwithstanding the foregoing, no such Investments specified in clauses (a) through (e) shall be permitted unless no Revolving Loans are then outstanding, and any such Investments shall be pledged to the Agent as additional collateral for the Obligations pursuant to such agreements as may be reasonably required by the Agent.

"Permitted Overadvance" means an Overadvance made by the Agent, in its discretion, which:

(a)      is made to maintain, protect or preserve the Collateral and/or the Credit Parties' rights under the Loan Documents or which is otherwise for the benefit of the Credit Parties;

(b)      is made to enhance the likelihood of, or to maximize the amount of, repayment of any Obligation;

(c)      is an Unintentional Overadvance; or

(d)      is made to pay any other amount chargeable to any Loan Party hereunder; and

(e)      together with all other Permitted Overadvances (other than any Unintentional Overadvances) then outstanding, shall not (i) exceed the greater of $8,000,000 or ten percent (10%) of the Borrowing Base at the time, in the aggregate outstanding at any time

or (ii) unless a Liquidation is taking place, remain outstanding for more than forty-five (45) consecutive Business Days;

provided however, that the foregoing shall not (i) modify or abrogate any of the provisions of Section 2.03 regarding any Lender's obligations with respect to Letters of Credit, or (ii) result in any claim or liability against the Administrative Agent (regardless of the amount of any Overadvance) for Unintentional Overadvance.

"Permitted Refinancing" means, with respect to any Person, any Indebtedness issued in exchange for, or the net proceeds of which are used to extend, refinance, renew, replace, defease or refund (collectively, to "Refinance"), the Indebtedness being Refinanced (or previous refinancings thereof constituting a Permitted Refinancing); provided, that (a) the principal amount (or accreted value, if applicable) of such Permitted Refinancing does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so Refinanced (plus unpaid accrued interest and premiums thereon and underwriting discounts, defeasance costs, fees, commissions and expenses), (b) the weighted average life to maturity of such Permitted Refinancing is greater than or equal to the weighted average life to maturity of the Indebtedness being Refinanced, (c) such Permitted Refinancing shall not require any scheduled principal payments due prior to the Maturity Date in excess of, or prior to, the scheduled principal payments due prior to such Maturity Date for the Indebtedness being Refinanced, (d) if the Indebtedness being Refinanced is subordinated in right of payment to the Obligations under this Agreement, such Permitted Refinancing shall be subordinated in right of payment to such Obligations on terms at least as favorable to the Credit Parties as those contained in the documentation governing the Indebtedness being Refinanced, (e) no Permitted Refinancing shall have direct or indirect obligors who were not also obligors of the Indebtedness being Refinanced, or greater guarantees or security, than the Indebtedness being Refinanced, (f) such Permitted Refinancing shall be otherwise on terms not materially less favorable to the Credit Parties than those contained in the documentation governing the Indebtedness being Refinanced, including, without limitation, with respect to financial and other covenants and events of default, and (g) the interest rate applicable to any such Permitted Refinancing shall not exceed the then applicable market interest rate for Indebtedness of that type.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, Governmental Authority or other entity.

"Petition Date" has the meaning provided in the recitals to this Agreement.

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by a Loan Party or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate.

"Plan of Reorganization" means a plan filed in the Chapter 11 Case pursuant to Chapter 11 of the Bankruptcy Code.

 "Pre-Petition Credit Agreement" means that certain Credit Agreement dated as of February 6, 2013 by and among the Borrowers, as borrower, the Guarantors, as guarantor, the Agent and the Lenders, as amended, restated, replaced and/or modified from time to time

"Pre-Petition Letters of Credit" means each of the Letters of Credit issued under the Pre-Petition Credit Agreement and outstanding on the Effective Date, as listed on <u>Schedule 1.04</u> hereto.

"Pre-Petition Liabilities" means the "Secured Obligations" as defined in the security agreement executed and delivered in connection with the Pre-Petition Credit Agreement.

"Pre-Petition Loan Documents" means the "Loan Documents" as defined in the Pre-Petition Credit Agreement.

"Professional Expense Carve Out" shall mean a carve out for the following expenses: (i) all fees required to be paid to the Clerk of the Bankruptcy Court; (ii) all statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) and 28 U.S.C. § 156(c); (iii) all accrued and unpaid fees, disbursements, costs and expenses incurred by Case Professionals to the extent allowed at any time, through the date of service by the Agent of a Carve Out Trigger Notice, as limited by the respective Approved Budget amounts for each Case Professional or category of Case Professional through the date of service of said Carve Out Trigger Notice, whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice less the amount of pre-petition retainers received by such Case Professionals; and (iv) all accrued and unpaid fees, disbursements, costs and expenses incurred by the Case Professionals after the date of service of a Carve Out Trigger Notice, to the extent allowed at any time, in an aggregate amount not to exceed $150,000 less the amount of pre-petition retainers received by such Case Professionals and not applied to the fees, disbursements, costs and expenses set forth in clause (iii) above. The Professional Expense Carve-Out shall be reduced on a dollar-for-dollar basis by any payments of fees or expenses of the Case Professionals.

"Professional Expense Carve Out Reserve" means a Reserve equal to the maximum possible amount of the Professional Expense Carve Out.

"Professional Fees and Expenses" means, subject to any limitations contained in the DIP Orders, (a) allowed administrative expenses payable pursuant to 28 U.S.C. § 1930(a)(6), and (b) professional fees of, and costs and expenses incurred by, Case Professionals.

"Projections" has the meaning specified in <u>Section **Error! Reference source not found.**</u>.

"Real Estate" means all Leases and all land, together with the buildings, structures, parking areas, and other improvements thereon, now or hereafter owned by any Loan Party, including all easements, rights-of-way, and similar rights relating thereto and all leases, tenancies, and occupancies thereof.

"Receivables Reserves" means such Reserves as may be established from time to time by the Agent in the Agent's reasonable discretion, exercised in good faith, with respect to the determination of the collectability in the ordinary course of Eligible Trade Receivables, including, without limitation, on account of dilution.

"Register" has the meaning specified in <u>Section 0</u>.

"Reimbursement Obligation" has the meaning set forth in <u>Section 2.03(c)(ii)</u>.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"Reports" has the meaning provided in <u>Section 0</u>.

"Request for Credit Extension" means a Revolving Loan Notice or a Letter of Credit Application, as applicable.

"Required Lenders" means, as of any date of determination, at least two (2) Lenders (which may be Affiliates) holding more than 50% of the Aggregate Commitments or, if the Revolving Commitment of each Revolving Lender to make Revolving Loans has been terminated, at least two (2) Lenders (which may be Affiliates) holding in the aggregate more than 50% of the Total Revolving Outstandings (with the aggregate amount of each Lender's risk participation and funded participation in Letters of Credit being deemed "held" by such Lender for purposes of this definition); <u>provided</u> that the Revolving Commitment of, and the portion of the Total Revolving Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"Reserves" means the Professional Expense Carve-Out Reserve, and all Inventory Reserves, Availability Reserves and Receivables Reserves. The Agent shall have the right, at any time and from time to time after the Effective Date in its reasonable discretion, exercised in good faith, to establish, modify or eliminate Reserves.

"Responsible Officer" means the chief executive officer, president or chief financial officer of a Loan Party or any of the other individuals designated in writing to the Agent by an existing Responsible Officer of a Loan Party as an authorized signatory of any certificate or other document to be delivered hereunder. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to such Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment. Without limiting the foregoing, "Restricted Payments" with respect to any Person shall also include all payments made by such Person with any proceeds of a dissolution or liquidation of such Person.

1652368.6

"Revolving Borrowing" means a borrowing of a Revolving Loan pursuant to 0.

"Revolving Commitment" means, as to each Revolving Lender, its obligation to (a) make Revolving Loans to the Borrowers pursuant to Section **Error! Reference source not found.**, and (b) purchase participations in Letters of Credit, in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Revolving Lender's name on Schedule **Error! Reference source not found.** or in the Assignment and Assumption pursuant to which such Revolving Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"Revolving Credit Facility" means the facility established pursuant to this Agreement for the making of Revolving Loans and Letters of Credit.

"Revolving Credit Facility Applicable Percentage" means with respect to any Revolving Lender at any time, the percentage (carried out to the ninth decimal place) of the Aggregate Commitments represented by such Revolving Lender's Revolving Commitment at such time. If the commitment of each Revolving Lender to make Revolving Loans has been terminated pursuant to Section 0 or Section 0 or if the Aggregate Commitments have expired, then the Revolving Credit Facility Applicable Percentage of each Revolving Lender shall be determined based on the Revolving Credit Facility Applicable Percentage of such Revolving Lender most recently in effect, giving effect to any subsequent assignments.

"Revolving Lender" means each Lender with a Revolving Commitment.

"Revolving Loan" has the meaning specified in Section **Error! Reference source not found.**.

"Revolving Loan Notice" means a notice of a Revolving Borrowing, pursuant to Section 0, which, if in writing, shall be substantially in the form of Exhibit A.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor thereto.

"Sale Motion" means that certain motion or series of motions filed by the Borrowers in the Chapter 11 Case and acceptable to the Agent requesting approval for a Section 363 sale process to sell the Borrowers' business and assets, which shall include a motion seeking authority to establish bidding procedures.

"Security Agreement" means the Security Agreement dated as of February 6, 2013 among the Loan Parties and the Agent, as amended, restated, replaced and/or modified from time to time.

"Security Documents" means the Security Agreement, the Blocked Account Agreements, the collateral assignment of the Asian Food Solutions Note and the documents executed in connection therewith, and each other security agreement or other instrument or document executed and delivered to the Agent pursuant to this Agreement or the Pre-Petition Credit

Agreement or any other Loan Document or Pre-Petition Loan Document granting a Lien to secure any of the Obligations and the DIP Orders.

"Settlement Date" has the meaning provided in Section 2.12(a).

"Shareholders' Equity" means, as of any date of determination, consolidated shareholders' equity of the Lead Borrower and its Subsidiaries as of that date determined in accordance with GAAP.

"Stated Amount" means at any time the maximum amount for which a Letter of Credit may be honored.

"Subordinated Indebtedness" means Indebtedness which is expressly subordinated in right of payment to the prior payment in full of the Obligations and which is in form and on terms approved in writing by the Agent.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the Equity Interests having ordinary voting power for the election of directors or other governing body are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Lead Borrower.  Notwithstanding the foregoing, the term "Subsidiary" shall not include any Unrestricted Subsidiary.

"Synthetic Lease Obligation" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property (including sale and leaseback transactions), in each case, creating obligations that do not appear on the balance sheet of such Person but which, upon the application of any applicable Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Date" means the earliest to occur of (i) the Maturity Date, (ii) the date on which the maturity of the Obligations is accelerated and the Aggregate Commitments are irrevocably terminated in accordance with Article VIII, (iii) the closing date of the sale of all or substantially all of the assets of the Loan Parties, or (iv) the termination of the Aggregate Commitments in accordance with the provisions of Section 2.05 hereof.

"Third Party Consultant" means FTI Consulting, Inc. or another independent, third party consultant engaged by the Lead Borrower and acceptable to the Agent in its reasonable discretion.

"Total Revolving Outstandings" means the aggregate Outstanding Amount of all Revolving Loans and Letters of Credit.

"Trading with the Enemy Act" has the meaning set forth in <u>Section 0</u>.

"UCC" or "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that if a term is defined in Article 9 of the Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning set forth in Article 9; provided further that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

"UFCA " has the meaning specified in <u>Section 0</u>.

"UFTA" has the meaning specified in <u>Section 10.20(d)</u>.

"Unfunded Pension Liability" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"Unintentional Overadvance" means an Overadvance which, to the Agent's knowledge, did not constitute an Overadvance when made but which has become an Overadvance resulting from changed circumstances beyond the control of the Credit Parties, including, without limitation, a reduction in the Appraised Value of property or assets included in the Borrowing Base, a change in eligibility criteria, Reserves, or a misrepresentation by the Loan Parties.

"Union Contracts" means each of the following and any replacements and substitutions therefor: (a) Agreement dated January 1, 2010 between United Food & Commercial Workers International Union, Local 1546, and Culinary, as amended pursuant to an Addendum dated December 20, 2010, and (b) Agreement dated January 1, 2010 between United Food & Commercial Workers International Union, Local 1546, and Quantum, as amended pursuant to an Addendum dated December 20, 2010.

"United States" and "U.S." mean the United States of America.

"Unrestricted Subsidiaries" shall mean Crossroads.

"Variance Report" means a report prepared by the Lead Borrower's management reflecting on a line-item basis the Loan Parties' actual performance compared to the Approved Budget for the immediately preceding week and on a cumulative basis for the period after the

Petition Date and the percentage variance of the Loan Parties' actual results from those reflected in the then extant Approved Budget, along with management's explanation of such variance.

"Wastewater Treatment Agreement" means the Wastewater Treatment Agreement dated April 1, 2005 among Crossroads, Quantum Foods, Inc. and Quantum Culinary, LLC, as amended and in effect on the Effective Date.

**Other Interpretive Provisions**.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

*The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.*

*In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."*

*Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.*

*Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean the repayment in Dollars in full in cash or immediately available funds (or, in the case of contingent reimbursement obligations with respect to Letters of Credit, providing Cash Collateralization) of all of the Obligations other than unasserted contingent indemnification Obligations.*

**Accounting Terms.**

**Generally.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein.**

**Changes in GAAP.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Lead Borrower or the Required Lenders shall so request, the Agent, the Lenders and the Lead Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Lead Borrower shall provide to the Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.**

**Rounding**.  Any financial ratios required to be maintained by the Loan Parties pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

**Times of Day**.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

**Letter of Credit Amounts.**  Unless otherwise specified, all references herein to the amount of a Letter of Credit at any time shall be deemed to be the Stated Amount of such Letter of Credit in effect at such time; provided, however, that with respect to any Letter of Credit that, by its terms or the terms of any Letter of Credit Application or other documents related thereto, provides for one or more automatic increases in the Stated Amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum Stated Amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum Stated Amount is in effect at such time.

**THE REVOLVING COMMITMENTS AND CREDIT EXTENSIONS**

**Revolving Loans.**

Subject to the terms and conditions set forth herein, including <u>Section 2.01(c)</u> hereof, each Revolving Lender severally agrees to make loans (each such loan, a "Revolving Loan") to the Borrowers from time to time during the Availability Period in an aggregate amount not to exceed at any time outstanding the lesser of (x) the amount of such Revolving Lender's Revolving Commitment, or (y) such Revolving Lender's Revolving Credit Facility Applicable Percentage of the Borrowing Base; subject in each case to the following limitations:

after giving effect to any Revolving Borrowing, the Total Revolving Outstandings shall not exceed the Loan Cap,

after giving effect to any Revolving Borrowing, such Revolving Lender's Revolving Credit Facility Applicable Percentage of the Total Revolving Outstandings shall not exceed such Revolving Lender's Revolving Commitment, and

after giving effect to any Revolving Borrowing, the Total Revolving Outstandings shall not exceed the Loan Cap.

The advance rates set forth in the Borrowing Base may be increased or decreased by the Agent at any time and from time to time in its Permitted Discretion based on the Agent's review of updated field examinations, collateral appraisals or evaluations, historical rates of dilution, changes in chargeoff rates and other like metrics. Each Borrower consents to any such increases or decreases and acknowledges that decreasing such advance rates or increasing or imposing any Reserves may limit or restrict the amounts available to be borrowed hereunder. The rights of the Agent to increase advance rates hereunder are subject to the provisions of <u>Section 10.01</u> hereof. The amount of any such decrease in advance rates or any Reserves established or increased by the Agent shall not be duplicative of any factors accounted for in determining Appraised Value, in each case as determined by the Agent in its Permitted Discretion. The Agent shall provide the Lead Borrower with contemporaneous notice of any such decrease in advance rates or any establishment or increase in Reserves (and any adjustments to the calculations made under the Borrowing Base as a result thereto) established by the Agent at any time after the date hereof; <u>provided</u>, <u>that</u>, the Agent's failure to provide such notice shall in no manner limit or otherwise affect the validity of any such decrease in advance rates or establishment or increase to any Reserve with respect to which the Agent neglected to provide such notice and the Agent shall have no liability for the failure to provide such notice. In the event the Agent decreases any advance rates or establishes or increases any Reserves and the Lead Borrower objects, the Agent agrees to discuss with the Lead Borrower the circumstances regarding such decrease in advance rates or establishment or increase to such Reserves; <u>provided further that</u>, notwithstanding any such discussion period, such decrease to any such advance rate or establishment or increase to any such Reserves shall take effect immediately.

Within the limits of each Revolving Lender's Revolving Commitment, and subject to the other terms and conditions hereof, the Borrower may borrow under <u>Section</u> Error! Reference source not found.<u>(a)</u>, prepay under <u>Section 0</u>, and reborrow under <u>Section</u> Error! Reference source not found.<u>(a)</u>.

**Revolving Borrowings**.

**Each Revolving Borrowing shall be made upon the Lead Borrower's irrevocable notice to the Agent by delivery to the Agent of a written Revolving Loan Notice, which must be received by the Agent not later than 12:00 p.m. on the date which is at least two (2) Business Days prior to the requested date of such Revolving Borrowing (each, a "<u>2-Day Advance</u>"); <u>provided</u> that the Lead Borrower may request a Revolving Borrowing not later than 12 p.m. on a Business Day to be made on that same day if the amount of such requested Revolving Borrowing is not more than the total cash receipts received by the Agent on such requested advance date (each, a "<u>Same Day Advance</u>").  Each Revolving Borrowing which is a 2-Day Advance shall be in a principal amount of $200,000 or a whole multiple of $100,000 in excess thereof.  Each Revolving Borrowing which is a Same Day Advance shall be in a principal amount of $25,000 or a whole multiple of $25,000 in excess thereof.  Each Revolving Loan Notice shall specify (i) the requested date of the Revolving Borrowing (which must be a Business Day), and (ii) the principal amount of Revolving Loans to be borrowed.  The Lead Borrower may request up to three (3) 2-Day Advances in any fiscal week, and no more than one (1) Same Day Advance on any Business Day.**

**Following receipt of a Revolving Loan Notice and upon satisfaction of the applicable conditions set forth in <u>Section 0</u> (and, if such Revolving Borrowing is the initial Credit Extension, <u>Section 0</u>), the Agent shall use its best efforts to make all funds so requested available to the Borrowers by no later than 4:00 p.m. by wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Agent by the Lead Borrower.**

**The Agent, without the request of the Loan Parties, may advance any interest, fee, service charge (including direct wire fees), expenses, or other payment to which any Credit Party is entitled from the Loan Parties pursuant hereto or any other Loan Document and may charge the same to the Loan Account as a Revolving Loan notwithstanding that an Overadvance may result thereby.  The Agent shall advise the Lead Borrower of any such advance or charge promptly after the making thereof.  Such action on the part of the Agent shall not constitute a waiver of the Agent's rights and the Borrowers' obligations under <u>Section 2.04</u>.  Any amount which is added to the principal balance of the Loan Account as provided in this <u>Section 0</u> shall bear interest at the interest rate then and thereafter applicable to Revolving Loans.**

**The Agent shall promptly notify the Lead Borrower and the Lenders of the interest rate applicable to any Interest Period upon determination of such interest rate.**

The Agent and the Lenders shall have no obligation to make any Revolving Loan, and the Agent shall have no obligation to issue or to cause to be issued any Letter of Credit, if an Overadvance would result.  The Agent may, in its discretion, make Permitted Overadvances without the consent of the Borrowers and the Lenders, and the Borrowers and each Lender shall be bound thereby.  Any Permitted Overadvance shall constitute a Revolving Loan and an Obligation, shall accrue interest at the Default Rate and shall be repaid by the Borrowers in accordance with the provisions of <u>Section 2.04</u>.  The making of any such Permitted Overadvance on any one occasion shall not obligate the Agent or any Lender to make or permit any Permitted Overadvance on any other occasion or to permit such Permitted Overadvances to remain outstanding.  The making by the Agent of a Permitted Overadvance shall not modify or abrogate any of the provisions of <u>Section 0</u> regarding the Revolving Lenders' obligations to purchase participations with respect to Letter of Credits.  The Agent shall have no liability for, and no Loan Party or Credit Party shall have the right to, or shall, bring any claim of any kind whatsoever against the Agent with respect to Unintentional Overadvances regardless of the amount of any such Overadvances.

**Letters of Credit**.

<u>Letters of Credit</u>.  Subject to the terms and conditions hereof, the Agent shall issue or cause the issuance of Letters of Credit for the account of any Loan Party; <u>provided</u> that the Agent will not be required to issue or cause to be issued any Letters of Credit to the extent that the issuance thereof would cause (i) Availability to be less than zero, or (ii) the aggregate Outstanding Amount of Letters of Credit to exceed $5,000,000.

<u>Issuance of Letters of Credit</u>.

The Lead Borrower, on behalf of Borrowers, may request that the Agent issue or cause an L/C Issuer to issue a Letter of Credit by delivering to the Agent at the Agent's Office, prior to 11:00 a.m., at least seven (7) Business Days' prior to the proposed date of issuance, a Letter of Credit Application completed to the satisfaction of the Agent and such L/C Issuer and, such other certificates, documents and other papers and information as the Agent and such L/C Issuer may reasonably request.

Each Letter of Credit shall, among other things, (i) provide for the payment of sight drafts, other written demands for payment, or acceptances of usance drafts when presented for honor thereunder in accordance with the terms thereof and when accompanied by the documents described therein and (ii) have an expiry date not later than twelve (12) months after such Letter of Credit's date of issuance and in no event later than the Letter of Credit Expiration Date. Each Letter of Credit shall be subject either to the Uniform Customs and Practice for Documentary Credits as most recently published by the International Chamber of Commerce at the time a Letter of Credit is issued (the "UCP") or the International Standby Practices (ISP98-International Chamber of Commerce Publication Number 590) (the "ISP98 Rules"), and any subsequent revision thereof at the time such Letter of Credit is issued, as determined by the Agent.

**Disbursements; Reimbursements.**

Immediately upon the issuance of each Letter of Credit by an L/C Issuer, the Borrowers shall be deemed to have requested a Revolving Loan in the amount of such Letter of Credit, and such Revolving Loan shall be held by the L/C Issuer as Cash Collateral for such Letter of Credit.  Each Revolving Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from the Agent a participation in such Letter of Credit and each drawing thereunder in an amount equal to such Revolving Lender's Revolving Credit Facility Applicable Percentage of the Stated Amount of such Letter of Credit and the amount of such drawing, respectively.

1652368.6

In the event of any request for a drawing under a Letter of Credit by the beneficiary or transferee thereof, the Agent will promptly notify the Lead Borrower, and the Borrowers shall reimburse (such obligation to reimburse the Agent shall sometimes be referred to as a "Reimbursement Obligation") the Agent prior to 1:00 p.m. on each date that an amount is paid by the Agent under any Letter of Credit (each such date, a "Drawing Date") in an amount equal to the amount so paid by the Agent. In the event that the Borrowers fail to reimburse the Agent for the full amount of any drawing under any Letter of Credit by 1:00 p.m. on the Drawing Date, the Agent will promptly notify each Revolving Lender thereof, and the Borrowers shall be deemed to have requested that a Revolving Loan be made by the Revolving Lenders to be disbursed on the Drawing Date under such Letter of Credit pursuant to <u>Section 2.03(c)(iii)</u> below, subject to <u>Section 4.02</u> hereof.

Each Revolving Lender shall, upon any notice pursuant to <u>Section 2.03(c)(ii)</u>, make available to the Agent an amount in immediately available funds equal to its Revolving Credit Facility Applicable Percentage of the amount of the drawing, whereupon the participating Revolving Lenders shall (subject to clause (iv) below) each be deemed to have made a Revolving Loan to the Borrowers in that amount. If any Revolving Lender so notified fails to make available to the Agent the amount of such Revolving Lender's Revolving Credit Facility Applicable Percentage of such amount by no later than 2:00 p.m. on the Drawing Date, then interest shall accrue on such Revolving Lender's obligation to make such payment, from the Drawing Date to the date on which such Revolving Lender makes such payment (i) at a rate per annum equal to the Federal Funds Rate during the first three days following the Drawing Date and (ii) at a rate per annum equal to the rate applicable to Revolving Loans on and after the fourth day following the Drawing Date. The Agent will promptly give notice of the occurrence of the Drawing Date, but failure of the Agent to give any such notice on the Drawing Date or in sufficient time to enable any Revolving Lender to effect such payment on such date shall not relieve such Revolving Lender from its obligation under this <u>Section 2.03(c)</u>, provided that such Revolving Lender shall not be obligated to pay interest as provided in this <u>Section 2.03(c)(iii)</u> until and commencing from the date of receipt of notice from the Agent of a drawing.

With respect to any unreimbursed drawing that is not converted into a Revolving Loan to the Borrowers in whole or in part as contemplated by this <u>Section 2.03(c)</u> because of the Borrowers' failure to satisfy the conditions set forth in <u>Section 4.02</u> or for any other reason, the Borrowers shall be deemed to have incurred from the Agent a borrowing (each a "Letter of Credit Borrowing") in the amount of such drawing, and each Lender shall be deemed to have purchased a participation in such Letter of Credit Borrowing. Such Letter of Credit Borrowing shall be due and payable on demand (together with interest) and shall bear interest at the rate per annum applicable to a Revolving Loan. Each Revolving Lender's payment to the Agent pursuant to <u>Section 2.03(c)(iii)</u> shall be deemed to be a payment in respect of its participation in such Letter of Credit Borrowing and shall constitute a "Participation Advance" from such Revolving Lender in satisfaction of its agreement under this <u>Section 2.03</u>.

- 47 -

**Repayment of Participation Advances.**

**Upon (and only upon) receipt by the Agent for its account of immediately available funds from the Borrowers (i) in reimbursement of any payment made by the Agent under the Letter of Credit with respect to which any Revolving Lender has made a Participation Advance to the Agent, or (ii) in payment of interest on such a payment made by the Agent under such Letter of Credit, the Agent will pay to each participating Revolving Lender, in the same funds as those received by the Agent, the amount of such participating Revolving Lender's Revolving Credit Facility Applicable Percentage of such funds.**

**If the Agent is required at any time to return to any Borrower, or to a trustee, receiver, liquidator, custodian, or any official in any insolvency proceeding, any portion of the payments made by the Borrowers to the Agent pursuant to this <u>Section 2.03</u> in reimbursement of a payment made under any Letter of Credit or interest or fee thereon, each Revolving Lender shall, on demand of the Agent, forthwith return to the Agent the amount of its Revolving Credit Facility Applicable Percentage of any amounts so returned by the Agent plus interest at the Federal Funds Rate.**

**<u>Documentation</u>.  Each Borrower agrees to be bound by the terms of the Letter of Credit Application and by the Agent's and/or the L/C Issuers' interpretations of any Letter of Credit issued on behalf of such Borrower and by the Agent's and/or the L/C Issuer's written regulations and customary practices relating to letters of credit, though the Agent's and/or the L/C Issuers' interpretations may be different from such Borrower's own. In the event of a conflict between the Letter of Credit Application and this Agreement, this Agreement shall govern. It is understood and agreed that, except in the case of gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final nonappealable judgment), neither the Agent not any L/C Issuer shall be liable for any error, negligence and/or mistakes, whether of omission or commission, in following the Lead Borrower's or any Borrower's instructions or those contained in the Letters of Credit or any modifications, amendments or supplements thereto.**

**<u>Determination to Honor Drawing Request</u>.  In determining whether to honor any request for drawing under any Letter of Credit by the beneficiary thereof, the Agent and the L/C Issuer shall be responsible only to determine that the documents and certificates required to be delivered under such Letter of Credit have been delivered and that they comply on their face with the requirements of such Letter of Credit and that any other drawing condition appearing on the face of such Letter of Credit has been satisfied in the manner so set forth.**

**Nature of Participation and Reimbursement Obligations.** **Each Revolving Lender's obligation in accordance with this Agreement to make the Revolving Loans or Participation Advances as a result of a drawing under a Letter of Credit, and the obligations of the Borrowers to reimburse the Agent upon a draw under a Letter of Credit, shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this __Section 2.03__ under all circumstances, including, without limitation, (i) the existence of any set-off, counterclaim, recoupment, defense or other right which any Lender may have against the Agent, any Borrower or any other Person for any reason whatsoever, (ii) the failure of any Borrower or any other Person to comply, in connection with a Letter of Credit Borrowing, with the conditions set forth in this Agreement for the making of a Revolving Loan, it being acknowledged that such conditions are not required for the making of a Letter of Credit Borrowing and the obligation of the Revolving Lenders to make Participation Advances hereunder, (iii) any lack of validity or enforceability of any Letter of Credit, (iv) any claim of breach of warranty that might be made by any Borrower or any Lender against the beneficiary of a Letter of Credit, or the existence of any claim, set-off, recoupment, counterclaim, cross-claim, defense or other right which any Borrower or any Lender may have at any time against a beneficiary, any successor beneficiary or any transferee of any Letter of Credit or the proceeds thereof (or any Persons for whom any such transferee may be acting), the Agent, the L/C Issuer or any Lender or any other Person, whether in connection with this Agreement, the transactions contemplated herein or any unrelated transaction (including any underlying transaction between any Borrower or any Subsidiaries of such Borrower and the beneficiary for which any Letter of Credit was procured), (v) the lack of power or authority of any signer of (or any defect in or forgery of any signature or endorsement on) or the form of or lack of validity, sufficiency, accuracy, enforceability or genuineness of any draft, demand, instrument, certificate or other document presented under or in connection with any Letter of Credit, or any fraud or alleged fraud in connection with any Letter of Credit, or the transport of any property or provisions of services relating to a Letter of Credit, in each case even if the Agent or any of the Agent's Affiliates or the L/C Issuer has been notified thereof, (vi) any payment by the Agent or the L/C Issuer under any Letter of Credit against presentation of a demand, draft or certificate or other document which does not comply with the terms of such Letter of Credit, (vii) the solvency of, or any acts or omissions by, any beneficiary of any Letter of Credit, or any other Person having a role in any transaction or obligation relating to a Letter of Credit, or the existence, nature, quality, quantity, condition, value or other characteristic of any property or services relating to a Letter of Credit, (viii) any failure by the Agent or any L/C Issuer to issue any Letter of Credit in the form requested by the Lead Borrower (ix) any Material Adverse Effect, (x) any breach of this Agreement or any other Loan Document by any party thereto, (xi) the occurrence or continuance of an insolvency proceeding with respect to any Loan Party, (xii) the fact that a Default or Event of Default shall have occurred and be continuing, (xiii) the fact that the Termination Date shall have occurred, and (xiv) any other circumstance or happening whatsoever, whether or not similar to any of the foregoing.**

**Indemnity**. In addition to amounts payable as provided in **Section 10.04**, each Borrower hereby agrees to protect, indemnify, pay and save harmless the Agent and each L/C Issuer from and against any and all claims, demands, liabilities, damages, taxes, penalties, interest, judgments, losses, costs, charges and expenses (including reasonable fees, expenses and disbursements of counsel) which the Agent or such L/C Issuer may incur or be subject to as a consequence, direct or indirect, of the issuance of any Letter of Credit, other than as a result of (a) the gross negligence or willful misconduct of the Agent or L/C Issuer as determined by a final and non-appealable judgment of a court of competent jurisdiction or (b) the wrongful dishonor by the Agent or such L/C Issuer of a proper demand for payment made under any Letter of Credit, except if such dishonor resulted from any act or omission, whether rightful or wrongful, of any present or future Governmental Authority.

**Liability for Acts and Omissions.**

As between the Borrowers and the Agent and the Lenders, each Borrower assumes all risks of the acts and omissions of, or misuse of the Letters of Credit by, the respective beneficiaries of such Letters of Credit. In furtherance and not in limitation of the respective foregoing, neither the Agent nor the L/C Issuer shall be responsible for (i) the form, validity, sufficiency, accuracy, genuineness or legal effect of any document submitted by any party in connection with the application for an issuance of any such Letter of Credit, even if it should in fact prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged (even if the Agent or L/C Issuer shall have been notified thereof), (ii) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign any such Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason, (iii) the failure of the beneficiary of any such Letter of Credit, or any other party to which such Letter of Credit may be transferred, to comply fully with any conditions required in order to draw upon such Letter of Credit or any other claim of any Borrower against any beneficiary of such Letter of Credit, or any such transferee, or any dispute between or among any Borrower and any beneficiary of any Letter of Credit or any such transferee, (iv) errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, facsimile, telex or otherwise, whether or not they be in cipher, (v) errors in interpretation of technical terms, (vi) any loss or delay in the transmission or otherwise of any document required in order to make a drawing under any such Letter of Credit or of the proceeds thereof, (vii) the misapplication by the beneficiary of any such Letter of Credit of the proceeds of any drawing under such Letter of Credit, or (viii) any consequences arising from causes beyond the control of the Agent or any L/C Issuer, including any acts of any Governmental Authority, and none of the above shall affect or impair, or prevent the vesting of, any of the Agent's or L/C Issuer's rights or powers hereunder.  In no event shall the Agent or any L/C Issuer be liable to any Borrower for any indirect, consequential, incidental, punitive, exemplary or special damages or expenses (including without limitation attorneys' fees), or for any damages resulting from any change in the value of any property relating to a Letter of Credit.

**Without limiting the generality of the foregoing, the Agent, each L/C issuer and each of their respective Affiliates (i) may rely on any oral or other communication believed in good faith by the Agent, such L/C Issuer or such Affiliate to have been authorized or given by or on behalf of the applicant for a Letter of Credit, (ii) may honor any presentation if the documents presented appear on their face substantially to comply with the terms and conditions of the relevant Letter of Credit, (iii) may honor a previously dishonored presentation under a Letter of Credit, whether such dishonor was pursuant to a court order, to settle or compromise any claim of wrongful dishonor, or otherwise, and shall be entitled to reimbursement to the same extent as if such presentation had initially been honored, together with any interest paid by the Agent, an L/C issuer or their respective Affiliates, (iv) may honor any drawing that is payable upon presentation of a statement advising negotiation or payment, upon receipt of such statement (even if such statement indicates that a draft or other document is being delivered separately), and shall not be liable for any failure of any such draft or other document to arrive, or to conform in any way with the relevant Letter of Credit, (v) may pay any paying or negotiating bank claiming that it rightfully honored under the laws or practices of the place where such bank is located, and (vi) may settle or adjust any claim or demand made on the Agent, an L/C Issuer or any of their respective Affiliates in any way related to any order issued at the applicant's request to an air carrier, a letter of guarantee or of indemnity issued to a carrier or any similar document (each an "Order") and honor any drawing in connection with any Letter of Credit that is the subject of such Order, notwithstanding that any drafts or other documents presented in connection with such Letter of Credit fail to conform in any way with such Letter of Credit.**

**In furtherance and extension and not in limitation of the specific provisions set forth above, any action taken or omitted by the Agent or any L/C Issuer under or in connection with the Letters of Credit issued by it or any documents and certificates delivered thereunder, if taken or omitted in good faith and without gross negligence (as determined by a court of competent jurisdiction in a final non-appealable judgment), shall not put the Agent or such L/C Issuer under any resulting liability to any Borrower or any Lender.**

**<u>Letter of Credit Fees</u>.  The Borrowers shall pay to the Agent for its own account the customary issuance, fronting, presentation, amendment and other processing fees, and other standard costs and charges, of the Agent and the applicable L/C Issuer relating to letters of credit as from time to time in effect.  Such customary fees and standard costs and charges are due and payable on demand and are nonrefundable.  The Agent may charge the Loan Account for the payment of any such fees.**

**Cash Collateral.  If, as of the Letter of Credit Expiration Date, any L/C Obligation for any reason remains outstanding, the Borrowers shall, in each case, immediately Cash Collateralize the then Outstanding Amount of all L/C Obligations in an amount equal to 105% of the Outstanding Amount of all L/C Obligations, pursuant to documentation in form and substance satisfactory to the Agent and the applicable L/C Issuer.  The Borrower hereby grants to the Agent a security interest in all such cash, deposit accounts and all balances therein and all proceeds of the foregoing to secure all Obligations.  If at any time any funds held as cash collateral are subject to any right or claim of any Person other than the Agent or the total amount of such funds is less than the aggregate Outstanding Amount of all L/C Obligations, the Borrower will, forthwith upon demand by the Agent, pay to the Agent, as additional funds to be deposited as cash collateral, an amount equal to the excess of (x) such aggregate Outstanding Amount over (y) the total amount of funds, if any, then held as cash collateral that are free and clear of any such right and claim.  Upon the drawing of any Letter of Credit for which funds are on deposit as cash collateral, such funds shall be applied to reimburse the applicable L/C Issuer and, to the extent not so applied, shall thereafter be applied to satisfy other Obligations.**

**Prepayments.**

**The Borrowers may, upon irrevocable notice from the Lead Borrower to the Agent, at any time or from time to time voluntarily prepay Revolving Loans in whole or in part; provided that (i) such notice must be received by the Agent not later than 11:00 a.m. on the date of prepayment of Revolving Loans; and (ii) any prepayment of Revolving Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof. Each such notice shall specify the date and amount of such prepayment.  The Agent will promptly notify each applicable Lender of its receipt of each such notice, and of the amount of such Lender's Revolving Credit Facility Applicable Percentage of such prepayment.  If such notice is given by the Lead Borrower, the Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  Each such prepayment shall be applied to the applicable Revolving Loans of the Revolving Lenders in accordance with their respective Revolving Credit Facility Applicable Percentages.**

**Subject to the following sentences of this clause (b), if for any reason the Total Revolving Outstandings at any time exceed the Loan Cap as then in effect, the Borrowers shall immediately prepay the Revolving Loans and, if after repayment in full of such Revolving Loans, the Total Revolving Outstandings at such time still exceed the Loan Cap as then in effect, Cash Collateralize the L/C Obligations, in an aggregate amount equal to such excess. If after making such payments, the Total Revolving Outstandings continue to exceed the Loan Cap, the Borrowers shall Cash Collateralize such excess.**

Subject to the following sentences of this clause (c), on each Business Day, the Borrowers shall prepay the Revolving Loans and, after the occurrence and during the continuance of an Event of Default or to the extent required by the provisions of <u>Section 2.05(b)(i)</u>, Cash Collateralize the L/C Obligations with all funds required to be deposited in the Collection Account in accordance <u>Section 0</u> hereof.  Any such funds held as Cash Collateral shall, subject to the provisions of Sections 2.01, 2.02, 2.03 and 4.02, be available to the Borrowers in place of any Revolving Loans that the Borrowers may otherwise request.

The Borrowers shall repay to the Lenders on the Termination Date all Obligations outstanding on such date (other than contingent indemnification claims for which a claim has not been asserted) and shall cause each Letter of Credit to be returned to the L/C Issuer undrawn or shall Cash Collateralize all L/C Obligations (to the extent not previously Cash Collateralized as required herein).

**Termination or Reduction of Aggregate Commitments.**

The Borrowers may, upon irrevocable notice from the Lead Borrower to the Agent terminate the Aggregate Commitments or from time to time permanently reduce the Aggregate Commitments; <u>provided</u> that (i) any such notice shall be received by the Agent not later than 11:00 a.m. five Business Days prior to the date of termination or reduction, and (ii) any such partial reduction shall be in an aggregate amount of $1,000,000 or any whole multiple of $500,000 in excess thereof.

The Agent will promptly notify the Revolving Lenders of any termination or reduction of the Aggregate Commitments under this <u>Section  0</u>.  Upon any reduction of the Aggregate Commitments, the Revolving Commitment of each Revolving Lender shall be reduced by such Revolving Lender's Revolving Credit Facility Applicable Percentage of such reduction amount.  If, as a result of such termination or reduction, the Revolving Loans hereunder would exceed the Aggregate Commitments, the Borrowers shall contemporaneously with such reduction or termination, pay the Agent an amount equal to such excess.

**Interest**.

Subject to the provisions of <u>Section 2.06(b)</u> below, each Revolving Loan (including, without limitation, any Revolving Loan deemed to be made pursuant to Section 2.03(c)(i) hereof) shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the LIBOR Rate for such Interest Period <u>plus</u> the Applicable Margin.

- 53 -

If any amount payable under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by Law.

If any other Event of Default exists, then the Agent may, and upon the request of the Required Lenders shall, notify the Lead Borrower that all outstanding Obligations shall bear interest retroactively from the date such Default arose at a fluctuating interest rate per annum at all times equal to the Default Rate and such Obligations shall bear interest retroactively from the date such Default arose at the Default Rate to the fullest extent permitted by Law.

Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

Except as provided in <u>Section 2.06(b)(ii)</u>, interest on each Revolving Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment.

**Fees.**  In addition to certain fees described in <u>Section 0(j)</u>:

**<u>Commitment Fee</u>.  The Borrowers shall pay to the Agent for the account of each Revolving Lender in accordance with its Revolving Credit Facility Applicable Percentage, a commitment fee equal to 0.75% per annum *multiplied by* the actual daily amount by which the Aggregate Commitments exceed the Total Revolving Outstandings during the immediately preceding month.  The commitment fee shall accrue at all times during the Availability Period, including at any time during which one or more of the conditions in <u>Article 0</u> is not met, and shall be due and payable monthly in arrears on the first day of each month, commencing with the first such date to occur after the Effective Date, and on the last day of the Availability Period.**

**<u>Closing Fee</u>.  The Borrowers shall pay to the Agent for the account of each Revolving Lender in accordance with its Revolving Credit Facility Applicable Percentage, a closing gfee equal to $1,650,000, which shall be fully earned on the Effective Date and payable in full on the Termination Date, and against which closing fee shall be credited fifty (50%) percent of the Early Termination Fee previously paid under the Pre-Petition Credit Agreement.**

- 54 -

**Administrative Fee.  The Borrowers shall pay the Agent, for its own account, a administrative fee in the amount of $5,000 per month, which administrative fee shall be due and payable on the Effective Date and on the first day of each calendar month thereafter and on the Termination Date.**

**Except as set forth in clause (b) above, all fees set forth in this <u>Section 2.07</u> shall be fully earned when paid and shall not be refundable for any reason whatsoever.**

**Computation of Interest and Fees.**  All computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed.  Interest shall accrue on each Revolving Loan for the day on which the Revolving Loan is made, and shall not accrue on a Revolving Loan, or any portion thereof, for the day on which the Revolving Loan is paid, <u>provided</u> that any Revolving Loan that is repaid on the same day on which it is made shall, subject to <u>Section 2.10(a)</u>, bear interest for one day.  Each determination by the Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

**Evidence of Debt**.

      The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by the Agent (the "<u>Loan Account</u>") in the ordinary course of business.  In addition, each Lender may record in such Lender's internal records, an appropriate notation evidencing the date and amount of each Revolving Loan from such Lender, each payment and prepayment of principal of any such Revolving Loan, and each payment of interest, fees and other amounts due in connection with the Obligations due to such Lender.  The accounts or records maintained by the Agent and each Lender shall be conclusive absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrowers and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Agent in respect of such matters, the accounts and records of the Agent shall control in the absence of manifest error.  Upon the request of any Lender made through the Agent, the Borrowers shall execute and deliver to such Lender (through the Agent) one or more Notes, which shall evidence such Lender's Revolving Loans, in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse thereon the date, amount and maturity of its Revolving Loans, and payments with respect thereto.  Upon receipt of an affidavit of a Lender as to the loss, theft, destruction or mutilation of such Lender's Note and upon cancellation of such Note, the Borrowers will issue, in lieu thereof, a replacement Note in favor of such Lender, in the same principal amount thereof and otherwise of like tenor.

**Payments Generally; Agent's Clawback**.

**General**.  All payments to be made by the Borrowers shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrowers hereunder shall be made to the Agent, for the account of the respective Lenders to which such payment is owed, at the Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein.  The Agent will promptly distribute to each Lender its Revolving Credit Facility Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office.  All payments received by the Agent after 2:00 p.m. shall, at the option of the Agent, be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  If any payment to be made by the Borrowers shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

**Funding by Lenders; Presumption by Agent**.  Unless the Agent shall have received notice from a Lender prior to (A) 12:00 noon on the date of such Revolving Borrowing, or (B) the date that such Lender's participation in a Letter of Credit is required to be funded, that such Lender will not make available to the Agent such Lender's share of such Revolving Borrowing or participation, the Agent may assume that such Lender has made such share available on such date in accordance with **Section 0** or **Section 0**, as applicable, and may, in reliance upon such assumption, make available to the Borrowers a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Revolving Borrowing or participation available to the Agent, then the applicable Lender and the Borrowers severally agree to pay to the Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to the Agent, at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation plus any administrative processing or similar fees customarily charged by the Agent in connection with the foregoing, and (B) in the case of a payment to be made by the Borrowers, the interest rate applicable to Revolving Loans.  If the Borrowers and such Lender shall pay such interest to the Agent for the same or an overlapping period, the Agent shall promptly remit to the Borrowers the amount of such interest paid by the Borrowers for such period.  If such Lender pays its share of the applicable Revolving Borrowing or participation to the Agent, then the amount so paid shall constitute such Lender's Revolving Loan included in such Revolving Borrowing or participation in such Letter of Credit.  Any payment by the Borrowers shall be without prejudice to any claim the Borrowers may have against a Lender that shall have failed to make such payment to the Agent.

**Payments by Borrowers; Presumptions by Agent.**  Unless the Agent shall have received notice from the Lead Borrower prior to the time at which any payment is due to the Agent for the account of any of the Lenders hereunder that the Borrowers will not make such payment, the Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrowers have not in fact made such payment, then each of the Lenders severally agrees to repay to the Agent forthwith on demand the amount so distributed to such Lender, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Agent, at the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation.

A notice from the Agent to any Lender or the Lead Borrower with respect to any amount owing under this Section 2.10(a) shall be conclusive, absent manifest error.

**Failure to Satisfy Conditions Precedent.  If any Lender makes available to the Agent funds for any Revolving Loan to be made by such Lender as provided in the foregoing provisions of this Article 0, and such funds are not made available to the Borrowers by the Agent because the conditions to the applicable Credit Extension set forth in Article 0 are not satisfied or waived in accordance with the terms hereof (subject to the provisions of the last paragraph of Section 0 hereof), the Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.**

**Obligations of Lenders Several.  The obligations of the Lenders hereunder to make Revolving Loans, to fund participations in Letters of Credit and to make payments hereunder are several and not joint. The failure of any Lender to make any Revolving Loan, to fund any such participation or to make any payment hereunder on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its applicable Revolving Loan, to purchase its participation or to make its payment hereunder.**

**Funding Source.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Revolving Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Revolving Loan in any particular place or manner.**

**Sharing of Payments by Lenders**.  If any Credit Party shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of, interest on, or other amounts with respect to, any of the Obligations resulting in such Credit Party's receiving payment of a proportion of the aggregate amount of such Obligations greater than its pro rata share thereof as provided herein (including as in contravention of the priorities of payment set forth in Section 0), then the Credit Party receiving such greater proportion shall (a) notify the Agent of such fact, and (b) purchase (for cash at face value) participations in the Obligations of the other Credit Parties, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Credit Parties ratably and in the priorities set forth in Section 0, provided that:

**if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and**

**the provisions of this Section shall not be construed to apply to (x) any payment made by the Loan Parties pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Revolving Loans or sub-participations in L/C Obligations to any assignee or participant, other than to the Borrowers or any Subsidiary thereof (as to which the provisions of this Section shall apply).**

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

**Settlement Amongst Lenders.**

The amount of each Revolving Lender's Revolving Credit Facility Applicable Percentage of outstanding Revolving Loans shall be computed weekly, on Thursday of each week as of the close of business on the immediately preceding Wednesday (or more frequently in the Agent's discretion) and shall be adjusted upward or downward based on all Revolving Loans and repayments of Revolving Loans received by the Agent as of 3:00 p.m. on the first Business Day (such date, the "<u>Settlement Date</u>") following the end of the period specified by the Agent.

The Agent shall deliver to each of the Revolving Lenders promptly after a Settlement Date a summary statement of the amount of outstanding Revolving Loans for the period and the amount of repayments received for the period.  As reflected on the summary statement, (i) the Agent shall transfer to each Revolving Lender its Revolving Credit Facility Applicable Percentage of repayments, and (ii) each Revolving Lender shall transfer to the Agent (as provided below) or the Agent shall transfer to each Revolving Lender, such amounts as are necessary to insure that, after giving effect to all such transfers, the amount of Revolving Loans made by each Revolving Lender shall be equal to such Revolving Lender's Revolving Credit Facility Applicable Percentage of all Revolving Loans outstanding as of such Settlement Date.  If the summary statement requires transfers to be made to the Agent by the Revolving Lenders and is received prior to 1:00 p.m. on a Business Day, such transfers shall be made in immediately available funds no later than 3:00 p.m. that day; and, if received after 1:00 p.m., then no later than 3:00 p.m. on the next Business Day. The obligation of each Revolving Lender to transfer such funds is irrevocable, unconditional and without recourse to or warranty by the Agent.  If and to the extent any Revolving Lender shall not have so made its transfer to the Agent, such Revolving Lender agrees to pay to the Agent, forthwith on demand such amount, together with interest thereon, for each day from such date until the date such amount is paid to the Agent, equal to the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation plus any administrative, processing, or similar fees customarily charged by the Agent in connection with the foregoing.

**TAXES, YIELD PROTECTION AND ILLEGALITY; APPOINTMENT OF LEAD BORROWER**

**Taxes**.

**Payments Free of Taxes**.  Any and all payments by or on account of any obligation of the Borrowers hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes, **provided** that if the Borrowers shall be required by Law to deduct any Indemnified Taxes (including any Other Taxes) from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the applicable Credit Party receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrowers shall make such deductions and (iii) the Borrowers shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with Law.

**Payment of Other Taxes by the Borrowers**.  Without limiting the provisions of subsection **0** above, the Borrowers shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with Law.

**Indemnification by the Loan Parties**.  The Loan Parties shall indemnify each Credit Party, within 10 days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) paid by such Credit Party and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Lead Borrower by a Credit Party (with a copy to the Agent), or by the Agent on its own behalf or on behalf of any Credit Party, shall be conclusive absent manifest error.

**Evidence of Payments**.  As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrowers to a Governmental Authority, the Lead Borrower shall deliver to the Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Agent.

**Treatment of Certain Refunds.  If any Credit Party determines that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Loan Parties or with respect to which the Borrowers have paid additional amounts pursuant to this Section, it shall pay to the Loan Parties an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrowers under this Section with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of such Credit Party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Loan Parties, upon the request of such Credit Party, agree to repay the amount paid over to the Loan Parties (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Credit Party in the event that such Credit Party is required to repay such refund to such Governmental Authority.  This subsection shall not be construed to require any Credit Party to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Loan Parties or any other Person.**

**Illegality**.  If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender to determine or charge interest rates based upon the LIBOR Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on notice thereof by such Lender to the Lead Borrower through the Agent, all Revolving Loans of such Lender shall accrue interest at the Base Rate plus the Applicable Margin.

**Inability to Determine Rates**.  If the Agent determines that for any reason in connection with any request for a Revolving Loan that adequate and reasonable means do not exist for determining the LIBOR Rate for any requested Interest Period with respect to a Revolving Loan, the Agent will promptly so notify the Lead Borrower and each Lender.  Thereafter, for so long as the LIBOR Rate cannot be determined, all Revolving Loans shall accrue interest at the Base Rate plus the Applicable Margin.

**Increased Costs**.

**Increased Costs Generally.  If any Change in Law shall:**

**impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender subject to regulatory authority by a Governmental Authority;**

**subject any Lender subject to regulatory authority by a Governmental Authority to any tax of any kind whatsoever with respect to this Agreement, any Letter of Credit, any participation in a Letter of Credit or any Revolving Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (except for Indemnified Taxes or Other Taxes covered by** <u>Section 0</u> **and the imposition of, or any change in the rate of, any Excluded Tax payable by such Lender); or**

**impose on any Lender subject to regulatory authority by a Governmental Authority or the London interbank market any other condition, cost or expense affecting this Agreement or Revolving Loans made by such Lender or any Letter of Credit or participation therein;**

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any such Revolving Loan (or of maintaining its obligation to make any such Revolving Loan), or to increase the cost to such Lender of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, upon request of such Lender, the Loan Parties will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

**Capital Requirements**.  If any Lender subject to regulatory authority by a Governmental Authority determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Revolving Commitments of such Lender or the Revolving Loans made by, or participations in Letters of Credit held by, such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Loan Parties will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

**Certificates for Reimbursement**.  A certificate of a Lender setting forth in reasonable detail the calculation of the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection <u>0</u> or <u>0</u> of this Section and delivered to the Lead Borrower shall be conclusive absent manifest error.  The Loan Parties shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

**Delay in Requests**.  Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's right to demand such compensation, <u>provided</u> that the Loan Parties shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than ninety (90) days prior to the date that such Lender notifies the Lead Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

**Mitigation Obligations**.

**Designation of a Different Lending Office.  If any Lender requests compensation under Section 3.04, or the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 0, or if any Lender gives a notice pursuant to Section 0, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Revolving Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 0 or 0, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 0, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.**

**Survival.**  All of the Borrowers' obligations under this Article 0 shall survive termination of the Aggregate Commitments and repayment of all other Obligations hereunder.

**Designation of Lead Borrower as Borrowers' Agent.**

**Each Borrower hereby irrevocably designates and appoints the Lead Borrower as such Borrower's agent to obtain Credit Extensions, the proceeds of which shall be available to each Borrower for such uses as are permitted under this Agreement.  As the disclosed principal for its agent, each Borrower shall be obligated to each Credit Party on account of Credit Extensions so made as if made directly by the applicable Credit Party to such Borrower, notwithstanding the manner by which such Credit Extensions are recorded on the books and records of the Lead Borrower and of any other Borrower.  In addition, each Loan Party other than the Borrowers hereby irrevocably designates and appoints the Lead Borrower as such Loan Party's agent to represent such Loan Party in all respects under this Agreement and the other Loan Documents.**

**Each Borrower recognizes that credit available to it hereunder is in excess of and on better terms than it otherwise could obtain on and for its own account and that one of the reasons therefor is its joining in the credit facility contemplated herein with all other Borrowers.  Consequently, each Borrower hereby assumes and agrees to discharge all Obligations of each of the other Borrowers.**

**The Lead Borrower shall act as a conduit for each Borrower on whose behalf the Lead Borrower has requested a Credit Extension.  Neither the Agent nor any other Credit Party shall have any obligation to see to the application of such proceeds therefrom.**

1652368.6

**CONDITIONS PRECEDENT TO CREDIT EXTENSIONS**

**Conditions of Initial Credit Extension**.  The obligation of the Agent and each Lender to make its initial Credit Extension hereunder is subject to satisfaction of the following conditions precedent:

**The Agent's receipt of the following, each of which shall be originals, telecopies or other electronic image scan transmission (e.g., "pdf" or "tif" via e-mail) (followed promptly by originals) unless otherwise specified, each dated the Effective Date (or, in the case of certificates of governmental officials, a recent date before the Effective Date) and each in form and substance satisfactory to the Agent:**

**counterparts of this Agreement each properly executed by a Responsible Officer of the signing Loan Party and the Lenders sufficient in number for distribution to the Agent, each Lender and the Lead Borrower;**

**a Note executed by the Borrowers in favor of each Lender requesting a Note;**

**such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Agent may require evidencing (A) the authority of each Loan Party to enter into this Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party and (B) the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party;**

**copies of each Loan Party's Organization Documents and such other documents and certifications as the Agent may reasonably require to evidence that each Loan Party is duly organized or formed, and that each Loan Party is validly existing, in good standing, and qualified to engage in business in each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, except to the extent that failure to so qualify in such jurisdiction could not reasonably be expected to have a Material Adverse Effect;**

a certificate of a Responsible Officer of the Lead Borrower certifying (A) that the conditions specified in <u>Sections 0</u> and <u>0</u> have been satisfied, and (B) either that (1) no consents, licenses or approvals are required in connection with the execution, delivery and performance by such Loan Party and the validity against such Loan Party of the Loan Documents to which it is a party, or (2) that all such consents, licenses and approvals have been obtained and are in full force and effect;

evidence that all insurance required to be maintained pursuant to the Loan Documents and all endorsements in favor of the Agent required under the Loan Documents have been obtained and are in effect;

a Ratification Agreement executed by the Loan Parties confirming and ratifying (A) the Security Documents and all previously delivered certificates evidencing any stock being pledged thereunder, together with undated stock powers executed in blank, and (B) all other Pre-Petition Loan Documents previously delivered under the Pre-Petition Credit Agreement;

a Ratification Agreement executed by each of Edward B. Bleka, Jane Bleka and Bleka Properties, LLC confirming and ratifying the Amended and Restated Limited Guaranty of Edward B. Bleka, Jane Bleka and Bleka Properties, LLC;

results of searches or other evidence reasonably satisfactory to the Agent (in each case dated as of a date reasonably satisfactory to the Agent) indicating the absence of Liens on the assets of the Loan Parties, except for Permitted Encumbrances and Liens for which termination statements and releases satisfactory to the Agent are being tendered concurrently with such extension of credit or other arrangements satisfactory to the Agent for the delivery of such termination statements, releases, satisfactions and discharges have been made;

(A)     all documents and instruments required by law or reasonably requested by the Agent to be filed, registered, recorded or obtained to create or perfect the first priority Liens intended to be created under the Loan Documents and all such documents and instruments shall have been so filed, registered, recorded or obtain to the satisfaction of the Agent; and

such other documents as the Agent reasonably may require.

The Agent shall have received a Borrowing Base Certificate dated the Effective Date, relating to the period ended on [_____, 2014] and executed by a Responsible Officer of the Lead Borrower and the CFO.

The Agent shall have received an interim order of the Bankruptcy Court approving and permitting the continuance of the Borrowers' current cash management systems

The Agent shall have received and reviewed all so-called "first day" motions, declarations, and other pleadings to be filed in the Chapter 11 Case, including the Sale Motion, each of which shall be in form and substance satisfactory to the Lender;

The Agent shall have received and reviewed the Approved Budget, which shall be in form and substance satisfactory to the Agent.

All motions and other documents to be filed with and submitted to the Bankruptcy Court in connection with the DIP Orders shall be in form and substance reasonably satisfactory to the Agent.  The Interim Borrowing Order shall have been entered, shall be in full force and effect, and neither shall have been reversed, vacated or stayed, or modified without the prior written consent of the Agent, and all other necessary consents and approvals to the transactions contemplated hereby shall have been obtained and shall be reasonably satisfactory to the Agent.

There shall not be any Indebtedness of the Loan Parties or their Subsidiaries outstanding immediately after the Effective Date other than Permitted Indebtedness.

Except as the result of the Effect of Bankruptcy or the events leading up to or resulting therefrom, there shall not have occurred any default under any Material Contract or Lease of any Loan Party.

The Loan Parties shall be in material compliance with all requirements of any Governmental Authority having jurisdiction over the Loan Parties, and all consents and approvals required by any Governmental Authority for the transactions contemplated hereby or the operation of the Loan Parties' business shall have been obtained.

All fees required to be paid to the Agent, the Lenders or any other party on or before the Effective Date shall have been paid in full.

The Borrowers shall have paid all fees, charges and disbursements of counsel to the Agent to the extent invoiced prior to or on the Effective Date.

**The Agent and the Lenders shall have received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation, the USA PATRIOT Act.**

For purposes of determining compliance with the conditions specified in this <u>Section 0</u>, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Agent shall have received notice from such Lender prior to the proposed Effective Date specifying its objection thereto.

**Conditions to all Credit Extensions**.  The obligation of each Lender to honor any Request for Credit Extension (including any Request for Credit Extension on the Effective Date) and of the Agent to issue or to cause any L/C Issuer to issue each Letter of Credit is subject to the following conditions precedent:

*the representations and warranties of each Loan Party contained in <u>0</u> or in any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects on and as of the date of such Credit Extension, except (i) to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date, (ii) in the case of any representation and warranty qualified by materiality, they shall be true and correct in all respects, and (iii) for purposes of this <u>Section 4.02</u>, the representations and warranties contained in subsections (a) and (b) of <u>Section 5.05</u> shall be deemed to refer to the most recent statements furnished pursuant to clauses (a) and (b), respectively, of <u>Section 6.01</u>;*

*no Default or Event of Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds thereof;*

*the Agent shall have received a Request for Credit Extension in accordance with the requirements hereof;*

*the Agent shall have received an updated Borrowing Base Certificate, reflecting the then balance of Eligible Trade Receivables and all categories of Eligible Inventory as of the date of the Request for Credit Extension;*

*no event or circumstance which could reasonably be expected to result in a Material Adverse Effect shall have occurred;*

*after giving effect to the Credit Extension requested to be made on any such date and the use of proceeds thereof, Availability shall be greater than zero; and*

*There shall not be proceeding pending or threatened seeking to invalidate or avoid, or any order invalidating or avoiding, the pre-petition claims, security interests and liens securing the Pre-Petition Credit Facility or sustaining any other similar challenge under Chapter 5 of the Bankruptcy Code*

*Each Request for Credit Extension submitted by the Lead Borrower shall be deemed to be a representation and warranty by the Borrowers that the conditions specified in <u>Sections 0</u> and <u>0</u> have been satisfied on and as of the date of the applicable Credit Extension.  The conditions set forth in this <u>Section 0</u> are for the sole benefit of the Credit Parties but until the Required Lenders otherwise direct the Agent to cease making Revolving Loans and issuing Letters of Credit, the applicable Lenders will fund their Revolving Credit Facility Applicable Percentage of all Revolving Loans and participate in all Letters of Credit whenever made or issued, which are requested by the Lead Borrower and which, notwithstanding the failure of the Loan Parties to comply with the provisions of this <u>0</u>, agreed to by the Agent, <u>provided</u>, however, the making of any such Revolving Loans or the issuance of any Letters of Credit shall not be deemed a modification or waiver by any Credit Party of the provisions of this <u>0</u> on any future occasion or a waiver of any rights or the Credit Parties as a result of any such failure to comply.*

**REPRESENTATIONS AND WARRANTIES**

To induce the Credit Parties to enter into this Agreement and to make Revolving Loans and to issue Letters of Credit hereunder, each Borrower represents and warrants (and with respect to a Loan Party that is not a Borrower, to the Lead Borrower's Chief Financial Officer's actual knowledge) to the Agent and the other Credit Parties that:

**Existence, Qualification and Power**.  Each Loan Party and each Subsidiary thereof (a) is a corporation, limited liability company, partnership or limited partnership, duly incorporated, organized or formed, validly existing and, where applicable, in good standing under the Laws of the jurisdiction of its incorporation, organization or formation, (b) subject to the entry of the DIP Orders, has all requisite power and authority and all requisite governmental licenses, permits, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified and is licensed and, where applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect. Schedule 0 annexed hereto sets forth, as of the Effective Date, each Loan Party's name as it appears in official filings in its state of incorporation or organization, its state of incorporation or organization, organization type, organization number, if any, issued by its state of incorporation or organization, and its federal employer identification number.

**Authorization; No Contravention**.  Subject to the entry of the DIP Orders, the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is or is to be a party, has been duly authorized by all necessary corporate or other organizational action, and does not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach, termination, or contravention of, or constitute a default under, or require any payment to be made under (i) any Material Contract, any Lease or any Material Indebtedness to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; (c) result in or require the creation of any Lien upon any asset of any Loan Party (other than Liens in favor of the Agent under the Security Documents and the DIP Orders); or (d) violate any Law.

**Governmental Authorization; Other Consents**.  Subject to the entry of the DIP Orders, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, except for (a) the perfection or maintenance of the Liens created under the Security Documents (including the first priority nature thereof) or (b) such as have been obtained or made and are in full force and effect.

**Binding Effect**.  This Agreement has been, and each other Loan Document, when delivered, will have been, duly executed and delivered by each Loan Party that is party thereto.  Subject to the entry of the DIP Orders, this Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, subject to the DIP Orders and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

**Financial Statements; No Material Adverse Effect.**

**The Borrowers have not been advised by their independent public accounting firm of any Internal Control Event that exists or has occurred that has resulted in or could reasonably be expected to result in a misstatement in any material respect, (i) in any financial information delivered or to be delivered to the Agent or the Lenders, (ii) of the Borrowing Base, (iii) of covenant compliance calculations provided hereunder or (iv) of the assets, liabilities, financial condition or results of operations of the Lead Borrower and its Subsidiaries on a Consolidated basis.**

**The Projections and the Consolidated forecasted balance sheet and statements of income and cash flows of the Lead Borrower and its Subsidiaries delivered pursuant to <u>Section 0</u> were prepared in good faith on the basis of the assumptions stated therein, which assumptions were fair in light of the conditions existing at the time of delivery of such forecasts, and represented, at the time of delivery, the Lead Borrower's best estimate of its future financial performance.**

**Litigation**.  There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Loan Parties after due and diligent investigation, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any of its Subsidiaries or against any of its properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby or thereby, or (b) either individually or in the aggregate, if determined adversely, could reasonably be expected to have a Material Adverse Effect, except, in each case, any such actions, suits or proceedings are stayed as an Effect of Bankruptcy.

**No Default**.  No Loan Party or any Subsidiary is in default under or with respect to any material provision of any Material Contract, Lease (except with respect to the tangible net worth covenant thereof) or any Material Indebtedness, except as an Effect of Bankruptcy.  No Default or Event of Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.  No notice of default or noncompliance has been received with respect to any Lease, which has not been waived or cured to the Agent's satisfaction.

- 73 -

**Ownership of Property; Liens.**

Each of the Loan Parties and each Subsidiary thereof has good record and marketable title in fee simple to or valid leasehold interests in, all Real Estate necessary or used in the ordinary conduct of its business, except for such defects in title as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Each of the Loan Parties and each Subsidiary has good and marketable title to, valid leasehold interests in, or valid licenses to use all personal property and assets material to the ordinary conduct of its business.  The property of the Loan Parties is subject to no Liens, other than Liens permitted by <u>Section 7.01</u>.

No Loan Party owns any Real Estate..  <u>Schedule 5.08</u> sets forth the address (including street address, county and state) of all Leases of the Loan Parties, together with the name of each lessor and its contact information with respect to each such Lease as of the Effective Date.  Each of such Leases is in full force and effect and except with respect to the tangible net worth covenant thereof, the Loan Parties are not in default of the terms thereof.

**Environmental Compliance.**

No Loan Party or any Subsidiary thereof (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability, except, in each case, as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(i) None of the properties currently or formerly owned or operated by any Loan Party or any Subsidiary thereof is listed or proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list or is adjacent to any such property; (ii) there are no and never have been any underground or above-ground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned or operated by any Loan Party or any Subsidiary thereof or, to the best of the knowledge of the Loan Parties, on any property formerly owned or operated by any Loan Party or Subsidiary thereof; (iii) there is no asbestos or asbestos-containing material on any property currently owned or operated by any Loan Party or Subsidiary thereof; and (iv) Hazardous Materials have not been released, discharged or disposed of on any property currently or formerly owned or operated by any Loan Party or any Subsidiary thereof.

- 74 -

**No Loan Party or any Subsidiary thereof is undertaking, and no Loan Party or any Subsidiary thereof has completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law; and all Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or formerly owned or operated by any Loan Party or any Subsidiary thereof have been disposed of in a manner not reasonably expected to result in material liability to any Loan Party or any Subsidiary thereof.**

**Insurance**.  The properties of the Loan Parties and their Subsidiaries are insured with financially sound and reputable insurance companies which are not Affiliates of the Loan Parties, in such amounts, with such deductibles and covering such risks (including, without limitation, workmen's compensation, public liability, business interruption and property damage insurance and directors and officers liability insurance) as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Loan Parties or the applicable Subsidiary operates.  Schedule 0 sets forth a description of all insurance maintained by or on behalf of the Loan Parties and their Subsidiaries as of the Effective Date. As of the Effective Date, each insurance policy listed on Schedule 0 is in full force and effect and all premiums in respect thereof that are due and payable have been paid.

**Taxes**.  The Loan Parties and their Subsidiaries have filed all federal, state, and other material tax returns and reports required to be filed, and have paid all federal, state, and other material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings being diligently conducted, for which adequate reserves have been provided in accordance with GAAP, as to which Taxes no Lien has been filed and which contest effectively suspends the collection of the contested obligation and the enforcement of any Lien securing such obligation.  There is no proposed tax assessment against any Loan Party or any Subsidiary that would, if made, have a Material Adverse Effect.  No Loan Party or any Subsidiary thereof is a party to any tax sharing agreement.

**ERISA Compliance**.

Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other federal or state Laws.  Each Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto and, to the best knowledge of the Borrowers, nothing has occurred which would prevent, or cause the loss of, such qualification.  The Loan Parties and each ERISA Affiliate have made all required contributions to each Plan subject to Section 412 of the Code, and no application for a funding waiver or an extension of any amortization period pursuant to Section 412 of the Code has been made with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.  No Lien imposed under the Code or ERISA exists or is likely to arise on account of any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

There are no pending or, to the best knowledge of the Borrowers, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect.  There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(i) No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; (iii) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (v) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Sections 4069 or 4212(c) of ERISA, in each case, that has resulted or could reasonably be expected to result in a Material Adverse Effect.

**Subsidiaries; Equity Interests**.  As of the Effective Date, the Loan Parties have no Subsidiaries other than those specifically disclosed in Part (a) of <u>Schedule 0</u>, which Schedule sets forth the legal name, jurisdiction of incorporation or formation and authorized Equity Interests of each such Subsidiary.  All of the outstanding Equity Interests in such Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by a Loan Party (or a Subsidiary of a Loan Party) in the amounts specified on Part (a) of <u>Schedule 0</u> free and clear of all Liens except for those created under the Security Documents and Liens to secure the Pre-Petition Liabilities.  Except as set forth in <u>Schedule 0</u>, there are no outstanding rights to purchase any Equity Interests in any Subsidiary.  As of the Effective Date, the Loan Parties have no equity investments in any other corporation or entity other than those specifically disclosed in Part (b) of <u>Schedule 0</u>.  All of the outstanding Equity Interests in the Loan Parties have been validly issued, and are fully paid and non-assessable and are owned in the amounts specified on Part (c) of <u>Schedule 0</u> free and clear of all Liens except for those created under the Security Documents and Liens to secure the Pre-Petition Liabilities.  The copies of the Organization Documents of each Loan Party and each amendment thereto provided pursuant to <u>Section 0</u> are true and correct copies of each such document, each of which is valid and in full force and effect.

**Margin Regulations; Investment Company Act.**

**No Loan Party is engaged or will be engaged, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock.  None of the proceeds of the Credit Extensions shall be used directly or indirectly for the purpose of purchasing or carrying any margin stock, for the purpose of reducing or retiring any Indebtedness that was originally incurred to purchase or carry any margin stock or for any other purpose that might cause any of the Credit Extensions to be considered a "purpose credit" within the meaning of Regulations T, U, or X issued by the FRB.**

**None of the Loan Parties, any Person Controlling any Loan Party, or any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940.**

**Disclosure**.  Each Loan Party has disclosed to the Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  No report, financial statement, certificate or other information furnished (whether in writing or orally) by or on behalf of any Loan Party to the Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case, as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; <u>provided</u> that, with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

**Compliance with Laws**.  Each of the Loan Parties and each Subsidiary is in compliance with the requirements of all Laws (other than Food Industry Laws) and all orders, writs, injunctions and decrees applicable to it or to its properties, except (a) in such instances in which such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted, (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, or (c) as an Effect of Bankruptcy.  Each of the Loan Parties and each Subsidiary is in compliance with the requirements of all Food Industry Laws except in such instances in which (a) such requirement of Food Industry Law or order, writ, injunction or decree is being contested or rectified in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to materially affect the value or integrity of the Loan Parties' Inventory as required by such Food Industry Laws, the ability of the Loan Parties to collect their Accounts, or the continuing operation of the Loan Parties' business.

**Intellectual Property; Licenses, Etc**.  The Borrowers and their Subsidiaries own, or possess the right to use, all of the Intellectual Property, licenses, permits and other authorizations that are reasonably necessary for the operation of the Loan Parties' businesses, without conflict with the rights of any other Person.  To the best knowledge of the Borrowers, no slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Borrower or any Subsidiary infringes upon any rights held by any other Person.  No claim or litigation regarding any of the foregoing is pending or, to the best knowledge of the Borrowers, threatened, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**Labor Matters.** There are no strikes, lockouts, slowdowns or other material labor disputes against any Loan Party or any Subsidiary thereof pending or, to the knowledge of any Loan Party, threatened. The hours worked by and payments made to employees of the Loan Parties comply with the Fair Labor Standards Act and any other applicable federal, state, local or foreign Law dealing with such matters except to the extent that any such violation could not reasonably be expected to have a Material Adverse Effect. No Loan Party or any of its Subsidiaries has incurred any liability or obligation under the Worker Adjustment and Retraining Act or similar state Law. All payments due from any Loan Party and its Subsidiaries, or for which any claim may be made against any Loan Party or any of its Subsidiaries, on account of wages and employee health and welfare insurance and other benefits, have been paid or properly accrued in accordance with GAAP as a liability on the books of such Loan Party. Except as set forth on Schedule 0, no Loan Party or any Subsidiary is a party to or bound by any collective bargaining agreement, management agreement, employment agreement, bonus, restricted stock, stock option, or stock appreciation plan or agreement or any similar plan, agreement or arrangement. There are no representation proceedings pending or, to any Loan Party's knowledge, threatened to be filed with the National Labor Relations Board, and no labor organization or group of employees of any Loan Party or any Subsidiary has made a pending demand for recognition. There are no complaints, unfair labor practice charges, grievances, arbitrations, unfair employment practices charges or any other claims or complaints against any Loan Party or any Subsidiary pending or, to the knowledge of any Loan Party, threatened to be filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment of any employee of any Loan Party or any of its Subsidiaries. The consummation of the transactions contemplated by the Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party or any of its Subsidiaries is bound.


**Security Documents**.

**Upon the entry of the DIP Orders, the Security Agreement creates in favor of the Agent, for the benefit of the Credit Parties, a legal, valid, continuing and enforceable security interest in the Collateral (as defined in the Security Agreement), the enforceability of which is subject to the DIP Orders and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law. The financing statements, releases and other filings are in appropriate form and have been or will be filed in the offices specified in Schedule II of the Security Agreement. Upon the entry of the DIP Orders, the Agent will have a perfected Lien on, and security interest in, to and under all right, title and interest of the grantors thereunder in all Collateral that may be perfected under the UCC (in effect on the date this representation is made) by filing, recording or registering a financing statement or analogous document (including without limitation the proceeds of such Collateral subject to the limitations relating to such proceeds in the UCC) or by obtaining control, in each case, prior and superior in right to any other Person.**

**Upon the entry of the DIP Orders, the Agent shall have a fully perfected Lien on, and security interest in, all right, title and interest of the applicable Borrowers in the Intellectual Property Collateral (as defined in the Security Agreement) in which a security interest may be perfected by filing, recording or registering a security agreement, financing statement or analogous document in the United States Copyright Office and/or the United States Patent and Trademark Office, as applicable, in each case prior and superior in right to any other Person (it being understood that subsequent recordings in the United States Copyright Office and/or the United States Patent and Trademark Office may be necessary to perfect a Lien on registered Intellectual Property Collateral acquired by the Loan Parties after the Effective Date).**

**Deposit Accounts.**

Annexed hereto as <u>Schedule 5.20</u> is a list of all DDAs maintained by the Loan Parties as of the Effective Date, which Schedule includes, with respect to each DDA (i) the name and address of the depository; (ii) the account number(s) maintained with such depository; (iii) a contact person at such depository; and (iv) the identification of each Blocked Account Bank.

- 80 -

**Brokers**.  No broker or finder brought about the obtaining, making or closing of the Revolving Loans or transactions contemplated by the Loan Documents, and no Loan Party or Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

**Customer and Trade Relations**.  There exists no actual or, to the knowledge of any Borrower, threatened, termination or cancellation of, or any material adverse modification or change in the business relationship of any Loan Party with any supplier material to its operations that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**Material Contracts**.  Schedule 5.23(a) sets forth all Material Contracts to which any Loan Party is a party or is bound as of the Effective Date.  Schedule 5.23(b) sets forth all Leases to which any Loan Party is a party or is bound as of the Effective Date.  The Borrowers have delivered true, correct and complete copies of such Material Contracts and Leases to the Agent on or before the Effective Date.  Except as an Effect of Bankruptcy, the Borrowers are not in breach or in default in any material respect of or under any Material Contract and have not received any notice of the intention of any other party thereto to terminate any Material Contract. Each Material Contract is in full force and effect.  Except with respect to the tangible net worth covenant contained in each Lease (for which there is a current waiver or for which no Borrower has received notice of a default), the Borrowers are not in breach or in default in any material respect of or under any Lease and have not received any notice of the intention of any other party thereto to terminate any Lease.  Except with respect to the tangible net worth covenant contained in each Lease (for which there is a current waiver or for which no Borrower has received notice of a default), each Lease is in full force and effect.

**Casualty**.  Neither the businesses nor the properties of any Loan Party or any of its Subsidiaries are affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance) that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**Notices from Farm Products Sellers, etc.**

- 81 -

(a)    **No Loan Party has, within the one (1) year period prior to the date hereof, received any written notice pursuant to the applicable provisions of the PASA, PACA, the Food Security Act, the UCC or any other applicable Laws from (i) any supplier or seller of Farm Products (as such term is defined in the UCC) or (ii) any lender to any such supplier or seller or any other Person with a security interest in the assets of any such supplier or seller, or (iii) the Secretary of State (or equivalent official) or other Governmental Authority of any state or political subdivision thereof in which any Farm Products purchased by such Loan Party are produced, in any case advising or notifying such Loan Party of the intention of such supplier or seller or other Person to preserve the benefits of any trust applicable to any assets of any Loan Party established in favor of such supplier, seller or other Person under the provisions of any Law or claiming a Lien with respect to any perishable agricultural commodity or any other Farm Products which may be or have been purchased by a Loan Party or any related or other assets of such Loan Party.**

(b)    **No Loan Party is a "live poultry dealer" (as such term is defined in the PASA) or otherwise purchases or deals in live poultry of any type whatsoever.  The Loan Parties do not purchase livestock pursuant to cash sales as such term is defined in the PASA. Each Borrower is not engaged in, and shall not engage in, raising, cultivating, propagating, fattening, grazing or any other farming, livestock or aquacultural operations.**

**AFFIRMATIVE COVENANTS**

So long as any Lender shall have any Revolving Commitment hereunder, any Revolving Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification claims for which a claim has not been asserted), or any Letter of Credit shall remain outstanding, the Borrowers shall, and shall (except in the case of the covenants set forth in Sections 0, 0, and 0) cause each Subsidiary and each other Loan Party to:

1652368.6

**Financial Statements**.  Deliver to the Agent, in form and detail satisfactory to the Agent:

*as soon as available, but in any event (i) on or before May 31, 2014 for the Fiscal Year ended December 31, 2013, and (ii) within 90 days after the end of each Fiscal Year of the Borrowers thereafter, a Consolidated balance sheet of the Lead Borrower and its Subsidiaries as at the end of such Fiscal Year, and the related Consolidated statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Year, setting forth, in each case in comparative form, the figures for the previous Fiscal Year, all in reasonable detail and prepared in accordance with GAAP audited and accompanied by a management letter, including, a report and opinion of an independent public accounting firm of nationally recognized standing reasonably acceptable to the Agent, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any qualification or exception as to the scope of such audit except as noted in the definition of GAAP herein;*

*as soon as available, but in any event within 30 days after the end of each of the Fiscal Accounting Periods of each Fiscal Year of the Borrowers, a Consolidated balance sheet of the Lead Borrower and its Subsidiaries as at the end of such Fiscal Accounting Period, and the related Consolidated statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Accounting Period, and for the portion of the Borrowers' Fiscal Year then ended, setting forth in each case in comparative form the figures for (i) such period set forth in the projections delivered pursuant to Section 0 hereof, (ii) the corresponding Fiscal Accounting Period of the previous Fiscal Year and (iii) the corresponding portion of the previous Fiscal Year, all in reasonable detail, certified by the CFO as fairly presenting the financial condition, results of operations, Shareholders' Equity and cash flows of the Lead Borrower and its Subsidiaries as of the end of such Fiscal Accounting Period in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes;*

*as soon as available, but in any event at least 30 days before the end of each Fiscal Year of the Lead Borrower, updated Projections prepared by management of the Lead Borrower, in form satisfactory to the Agent, including an Availability model, on a Fiscal Accounting Period basis, and the Consolidated balance sheets and statements of income or operations and cash flows of the Lead Borrower and its Subsidiaries on a Fiscal Accounting Period basis for the immediately following Fiscal Year (including the*

*Fiscal Year in which the Maturity Date occurs), and as soon as available, any significant revisions to such forecast with respect to such Fiscal Year.*

*promptly after the sending, receiving or filing thereof, copies of any statement, report or pleading proposed to be furnished to or filed with the Bankruptcy Court or the Creditors' Committee in connection with the Chapter 11 Cases; and*

*as soon as possible (but in any event on the Wednesday of each week) after the end of each calendar week, (i) a rolling 13-week cash flow forecast for the Borrowers and their Subsidiaries, reflecting actual results from the prior period compared to budget and projected results for the subsequent 13 week period, and (ii) a Variance Report, in each case in form and substance reasonably acceptable to the Agent and certified as complete and correct by the CRO.*

**Certificates; Other Information**.  Deliver to the Agent, in form and detail satisfactory to the Agent:

*concurrently with the delivery of the financial statements referred to in <u>Section 0</u>, a certificate of its independent public accounting firm certifying such financial statements and stating that in making the examination necessary for their certification of such financial statements, such accounting firm has not obtained any knowledge of the existence of any Default or Event of Default or, if any such Default or Event of Default shall exist, stating the nature and status of such event;*

*concurrently with the delivery of the financial statements referred to in <u>Sections 0</u> and (b), a duly completed Compliance Certificate signed by the CFO, and in the event of any change in generally accepted accounting principles used in the preparation of such financial statements, the Lead Borrower shall also provide a statement of reconciliation conforming such financial statements to GAAP and a copy of management's discussion and analysis with respect to such financial statements;*

on Wednesday of each week (or, if Wednesday is not a Business Day, on the next succeeding Business Day), a Borrowing Base Certificate showing the Borrowing Base as of the close of business as of the immediately preceding Friday, each Borrowing Base Certificate to be certified as complete and correct by a Responsible Officer of the Lead Borrower and by the CFO; _provided that_ the Borrowers shall submit a daily roll-forward of all categories of Eligible Inventory to the Agent on each Business Day as of the close of business as of the immediately preceding Business Day;

each Fiscal Accounting Period, on the fifth (5th) Business Day of each Fiscal Accounting Period, a report reflecting the average cost of the Borrowers' Inventory and the related market price therefor;

promptly upon receipt, copies of any detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of any Borrower by its independent public accounting firm in connection with the accounts or books of such Borrower, or any audit of any of them, including, without limitation, specifying any Internal Control Event;

the financial and collateral reports described on _Schedule 0_ hereto, at the times set forth in such Schedule;

promptly after the furnishing thereof, copies of any statement or report furnished to any holder of Material Indebtedness of any Borrower or any Subsidiary thereof pursuant to the terms of any indenture, loan or credit or similar agreement and not otherwise required to be furnished to the Lenders pursuant to _Section 0_ or any other clause of this _Section 0_;

as soon as available, but in any event within 30 days after the end of each Fiscal Year of the Borrowers, a report summarizing the insurance coverage (specifying type, amount and carrier) in effect for the Lead Borrower and its Subsidiaries and containing

*such additional information as the Agent, or any Lender through the Agent, may reasonably specify;*

*promptly after the Agent's request therefor, copies of all Material Contracts, Leases and documents evidencing Material Indebtedness; and*

*promptly, such additional information as the Agent or any Lender may from time to time reasonably request.*

**Notices**.  Promptly notify the Agent:

*of the occurrence of any Default or Event of Default;*

*of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect,*

*of any breach or non-performance of, or any default under or termination of, a Material Contract, a Lease or with respect to Material Indebtedness of any Borrower or any Subsidiary thereof;*

*of any material dispute, litigation, investigation, proceeding or suspension between any Borrower or any Subsidiary thereof and any Governmental Authority (including under any Food Industry Law); or the commencement of, or any material development in, any litigation or proceeding affecting any Borrower or any Subsidiary thereof, including pursuant to any applicable regulatory Laws or Environmental Laws;*

*of the occurrence of any ERISA Event;*

*of any material change in accounting policies or financial reporting practices by the Lead Borrower or any Subsidiary thereof;*

*of any change in any Borrower's senior executive officers;*

*of the discharge by any Borrower of its present independent public accounting firm or any withdrawal or resignation by such accounting firm;*

*of any collective bargaining agreement or other labor contract to which a Borrower becomes a party, the application for the certification of a collective bargaining agent, or the occurrence of any work stoppage under any such agreement or contract, including the Union Contracts;*

*of the filing of any Lien for unpaid Taxes against any Loan Party;*

*of any casualty or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any interest in a material portion of the Collateral under power of eminent domain or by condemnation or similar proceeding or if any material portion of the Collateral is damaged or destroyed;*

*of any transaction of the nature contained in 0 hereof, occurring after the Effective Date;*

*of any product recalls initiated by a Borrower or by any supplier of or vendor to a Borrower of any product purchased by a Borrower;*

*of any notice (whether written or oral) received by a Borrower from any account debtor or other customer rejecting any Inventory delivered to such account debtor or customer or alleging that the Inventory delivered to such account debtor or customer did not conform to the specifications set forth in the purchase order or is not merchantable or fit for the purposes intended, in each case, if such amount is in excess of $500,000;*

*the receipt of any written notice from a supplier, seller, or agent pursuant to the Food Security Act, PACA or PASA of the intention of such Person to preserve the benefits of any trust applicable to any assets of any Borrower under the provisions of the PASA, PACA or any other statute and such Borrower shall promptly provide the Administrative Agent with a true, correct and complete copy of such notice and other information delivered to or on behalf of such Borrower pursuant to the Food Security Act; and*

*of any failure by any Borrower to pay rent at any of such Loan Party's locations if such failure continues for more than ten (10) days following the day on which such rent first came due (other than as an Effect of Bankruptcy).*

Each notice pursuant to this Section shall be accompanied by a statement of a Responsible Officer of the Lead Borrower and the CRO setting forth details of the occurrence referred to therein and stating what action the Borrowers have taken and/or propose to take with respect thereto.

1652368.6

**Payment of Obligations**.  Subject to the Effect of Bankruptcy, pay and discharge as the same shall become due and payable, all its obligations and liabilities, including (a) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, (b) all lawful claims (including, without limitation, claims of landlords, warehousemen, customs brokers, freight forwarders, consolidators, and carriers) which, if unpaid, would by Law become a Lien upon its property, and (c) all Material Indebtedness, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness, except, in each case, where (i) the validity or amount thereof is being contested in good faith by appropriate proceedings, (ii) such Borrower has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (iii) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation, (iv) no Lien has been filed with respect thereto and (v) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.  Nothing contained herein shall be deemed to limit the rights of the Agent with respect to determining Reserves pursuant to this Agreement.

**Preservation of Existence, Etc**.  (a) Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization or formation except in a transaction permitted by Section 0 or 0; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect (except that this qualification shall not apply with respect to rights, privileges, permits, licenses and franchises necessary under the Food Industry Laws (which must be maintained in all events whether or not a Material Adverse Effect could result)); and (c) preserve or renew all of its Intellectual Property, except to the extent such Intellectual Property is no longer used or useful in the conduct of the business of the Borrowers.

**Maintenance of Properties**.  (b)  Maintain, preserve and protect all of its material properties and Equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted; and

**make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.**

**Maintenance of Insurance**.  (c)  Maintain with financially sound and reputable insurance companies having an A.M. Best Rating of at least A-VII or better or other companies reasonably acceptable to the Agent that are not Affiliates of the Loan Parties, insurance (including product liability insurance and product recall insurance), with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business and operating in the same or similar locations or as is required by Law, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons and as are reasonably acceptable to or required by the Agent.

Maintain for themselves and their Subsidiaries, a Directors and Officers insurance policy, and a "Blanket Crime" policy including employee dishonesty, forgery or alteration, theft, disappearance and destruction, robbery and safe burglary, property, and computer fraud coverage with responsible companies in such amounts as are customarily carried by business entities engaged in similar businesses similarly situated, and will upon request by the Agent furnish the Agent certificates evidencing renewal of each such policy.

Cause fire and extended coverage policies maintained with respect to any Collateral to be endorsed or otherwise amended to include (i) a non-contributing mortgage clause (regarding improvements to Real Estate) and lenders' loss payable clause (regarding personal property), in form and substance satisfactory to the Agent, which endorsements or amendments shall provide that the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Agent, (ii) a provision to the effect that none of the Loan Parties, Credit Parties or any other Person shall be a co-insurer and (iii) such other provisions as the Agent may reasonably require from time to time to protect the interests of the Credit Parties.

Cause commercial general liability policies to be endorsed to name the Agent as an additional insured.

Cause business interruption policies (if separate from fire and extended coverage policies as set forth in clause (c) above) to name the Agent as a loss payee and to be endorsed or amended to include (i) a provision that, from and after the Effective Date, the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Agent, (ii) a provision to the effect that none of the Loan Parties, the Agent, the Agent or any other party shall be a co-insurer and (iii) such other provisions as the Agent may reasonably require from time to time to protect the interests of the Credit Parties.

Cause each such policy referred to in this <u>Section 0</u> to also provide that it shall not be canceled, modified or not renewed (i) by reason of nonpayment of premium except upon not less than ten (10) days' prior written notice thereof by the insurer to the Agent (giving the Agent the right to cure defaults in the payment of premiums) or (ii) for any other reason except upon not less than thirty (30) days' prior written notice thereof by the insurer to the Agent.

1652368.6

**Deliver to the Agent, prior to the cancellation, material reduction in scope or amount of coverage, or non-renewal of any such policy of insurance, evidence of renewal or replacement policy (including an insurance certificate) and, if requested by the Agent, a copy of such renewal or replacement policy, together with evidence satisfactory to the Agent of payment of the premium therefor.**

**Permit any representatives that are designated by the Agent to inspect the insurance policies maintained by or on behalf of the Loan Parties and to inspect books and records related thereto and any properties covered thereby.**

**None of the Credit Parties, or their agents or employees shall be liable for any loss or damage insured by the insurance policies required to be maintained under this <u>Section 0</u>. Each Loan Party shall look solely to its insurance companies or any other parties other than the Credit Parties for the recovery of such loss or damage and such insurance companies shall have no rights of subrogation against any Credit Party or its agents or employees.  If, however, the insurance policies do not provide waiver of subrogation rights against such parties, as required above, then the Loan Parties hereby agree, to the extent permitted by law, to waive their right of recovery, if any, against the Credit Parties and their agents and employees.  The designation of any form, type or amount of insurance coverage by any Credit Party under this <u>Section 0</u> shall in no event be deemed a representation, warranty or advice by such Credit Party that such insurance is adequate for the purposes of the business of the Loan Parties or the protection of their properties.**

**Compliance with Laws**.  (a) Comply with the requirements of all Laws (other than Food Industry Laws) and all orders, writs, injunctions and decrees applicable to it or to its business or property, except (i) as otherwise permitted under the Bankruptcy Code or the DIP Orders, (ii) in such instances in which such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves have been set aside and maintained by the Loan Parties in accordance with GAAP, (ii) such contest effectively suspends enforcement of the contested Laws, and (iii) in such instances in which the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect, and (b) comply with the requirements of all Food Industry Laws except in such instances in which (i) such requirement of Food Industry Law or order, writ, injunction or decree is being contested or rectified in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves have been set aside and maintained by the Loan Parties in accordance with GAAP, (ii) such contest or corrective action effectively suspends enforcement of the contested Food Industry Laws, and (iii) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to materially affect the value or integrity of the Loan Parties' Inventory as required by such Food Industry Laws, the ability of the Loan Parties to collect their Accounts, or the continuing operation of the Loan Parties' business.

**Books and Records; Accountants.**

**Maintain (i) proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Borrowers or such Subsidiary, as the case may be; and (ii) such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Borrowers or such Subsidiary, as the case may be.**

**At all times retain an independent public accounting firm which is reasonably satisfactory to the Agent and instruct such accounting firm to cooperate with, and be available to, the Agent or its representatives to discuss the Borrowers' financial performance, financial condition, operating results, controls, and such other matters, within the scope of the retention of such accounting firm, as may be raised by the Agent.**

**At all times, maintain all records required to be maintained by the United Stated Department of Agriculture and applicable Law or regulation and maintain all permits, licenses, franchises, certificates and other approvals or authorizations of Governmental Authorities as are required under applicable Laws and regulations as are applicable to the conduct of the Borrowers' businesses,**

**Inspection Rights.**

**Permit representatives and independent contractors of the Agent to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and accounting firm, all at the expense of the Borrowers and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Lead Borrower; provided, however, that when a Default or an Event of Default exists the Agent (or any of its representatives or independent contractors) may do any of the foregoing at the expense of the Borrowers at any time during normal business hours and without advance notice; and further provided that, without limiting the foregoing rights, the Agent may engage a consultant acceptable to the Agent to make up to two (2) unannounced visits in any twelve month period to inspect the Borrowers' premises, operations, and compliance with regulatory requirements, all at the expense of the Borrowers.**

Cause the senior management of the Borrowers to hold meetings with the Agent and Lenders via telephone conference on a quarterly basis, and once per twelve month period in person, to discuss the Borrowers' financial performance and projections.  The format and content of the meetings shall be acceptable to the Agent in its Permitted Discretion.  The Borrowers shall reimburse the Lenders for all reasonable out-of-pocket expenses incurred in connection with such meetings.

Upon the request of the Agent after reasonable prior notice, permit the Agent or professionals (including investment bankers, consultants, accountants, and lawyers) retained by the Agent to conduct commercial finance examinations and other evaluations, including, without limitation, of (i) the Borrowers' practices in the computation of the Borrowing Base, (ii) the assets included in the Borrowing Base (including, without limitation, the Eligible CFI Receivables included in the Borrowing Base, whether owned by the Borrowers or CFI) and related financial information such as, but not limited to, sales, gross margins, payables, accruals and reserves, and (iii) the Borrowers' business plan, forecasts and cash flows.  The Borrowers shall pay the fees and expenses of the Agent and such professionals with respect to such examinations and evaluations.

Upon the request of the Agent after reasonable prior notice, permit the Agent or professionals (including appraisers which may be an Affiliate of (i) the Administrative Agent, (ii) any Lender, (iii) any Participant or (iv) any SPC, assignee or other participant permitted under Section 10.06) retained by the Agent to conduct appraisals of the Collateral, including, without limitation, the Inventory, Equipment and other assets included in the Borrowing Base.  The Borrowers shall pay the fees and expenses of the Agent and such professionals with respect to such appraisals.

**Additional Loan Parties**.  Notify the Agent at the time that any Person becomes a Subsidiary, and promptly thereafter (and in any event within fifteen (15) days), cause any such Person (a) to (i) become a Loan Party by executing and delivering to the Agent a Joinder to this Agreement or a Joinder to the Facility Guaranty or such other documents as the Agent shall deem appropriate for such purpose, (ii) grant a Lien to the Agent on such Person's assets of the same type that constitute Collateral to secure the Obligations, and (iii) deliver to the Agent documents of the types referred to in clauses 0 and 0 of Section 0 and favorable opinions of counsel to such Person (which shall cover, among other things, the legality, validity, binding effect and enforceability of the documentation referred to in clause 0), and (b) if any Equity Interests or Indebtedness of such Person are owned by or on behalf of any Loan Party, to pledge such Equity Interests and promissory notes evidencing such Indebtedness, in each case in form, content and scope reasonably satisfactory to the Agent.  In no event shall compliance with this Section 0 waive or be deemed a waiver or consent to any transaction giving rise to the need to comply with this Section 0 if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed to constitute, with respect to any Subsidiary, an approval of such Person as a Borrower or permit the inclusion of any acquired assets in the computation of the Borrowing Base.  Notwithstanding the foregoing, the Loan Parties shall not form any Subsidiary that is not a Domestic Subsidiary.


**Cash Management**.

**On or prior to the Effective Date,**

**establish a lockbox for the collection of the Loan Parties' Accounts, and a deposit account (the "<u>Lockbox Account</u>") into which proceeds received from the lockbox shall be transferred, and enter into an agreement (the "<u>Lockbox Agreement</u>") satisfactory in form and substance to the Agent with the bank at which the Lockbox Account is maintained; and**

**enter into a Blocked Account Agreement satisfactory in form and substance to the Agent with each Blocked Account Bank (collectively, the "<u>Blocked Accounts</u>").**


**ACH or wire transfer no less frequently than daily (and whether or not there are then any outstanding Obligations) (i) to the Lockbox Account, all proceeds received in the lockbox, and (ii) to a Blocked Account, all amounts on deposit in each DDA (net of any minimum balance, not to exceed $2,500.00, as may be required to be kept in the subject DDA by the depository institution at which such DDA is maintained).**


**Cause the ACH or wire transfer to the deposit account maintained by the Agent and set forth on <u>Schedule 5.20</u> (the "<u>Collection Account</u>"), no less frequently than daily (and whether or not there are then any outstanding Obligations), all cash receipts and collections received by each Loan Party from all sources, including, without limitation, the following:**

all available cash receipts from the sale of Inventory (including without limitation, proceeds of credit card charges) and other assets (whether or not constituting Collateral);

all proceeds of collections of Accounts;

all Net Proceeds, and all other cash payments received by a Loan Party on account of any Extraordinary Receipt or from any Person or from any source or on account of any other transaction or event;

the then contents of the Lockbox Account and each Blocked Account (net of any minimum balance, not to exceed $2,500.00, as may be required to be kept in the subject Blocked Account by the Blocked Account Bank).

The Collection Account shall at all times be under the sole dominion and control of the Agent.  The Loan Parties hereby acknowledge and agree that (i) the Loan Parties have no right of withdrawal from the Collection Account, (ii) the funds on deposit in the Collection Account shall at all times be collateral security for all of the Obligations and (iii) the funds on deposit in the Collection Account shall be applied to the Obligations as provided in this Agreement; provided that, any funds remaining in the Collection Account after application to the Obligations shall be  held by the Agent as Cash Collateral and may be released to the Borrowers prior to the Credit Parties making any additional Credit Extensions hereunder); provided further that, in no event shall any amount be released to the Borrowers that would cause the amounts held in the aggregate by the Loan Parties in operating or disbursement accounts to exceed at any time the CFO's good faith estimate of cash expenditures and disbursements for the following two (2) day period as set forth in the Approved Budget for the applicable week.  In the event that, notwithstanding the provisions of this Section 0, any Loan Party receives or otherwise has dominion and control of any such cash receipts or collections, such receipts and collections shall be held in trust by such Loan Party for the Agent, shall not be commingled with any of such Loan Party's other funds or deposited in any account of such Loan Party and shall, not later than the Business Day after receipt thereof, be deposited into the Collection Account or dealt with in such other fashion as such Loan Party may be instructed by the Agent.

Upon the request of the Agent, cause bank statements and/or other reports to be delivered to the Agent not less often than monthly, accurately setting forth all amounts deposited in each Blocked Account to ensure the proper transfer of funds as set forth above.

Notwithstanding the foregoing or anything to the contrary set forth herein, at no time shall the amount held by the Lead Borrower in its disbursement account exceed the CFO's good faith estimate of cash expenditures and disbursements for the following two (2) day period as set forth in the Approved Budget for the applicable week.

1652368.6

**Information Regarding the Collateral**.

**Furnish to the Agent at least thirty (30) days prior written notice of any change in: (i) any Loan Party's name; (ii) the location of any Loan Party's chief executive office, its principal place of business, any office in which it maintains books or records relating to Collateral owned by it or any office or facility at which Collateral owned by it is located (including the establishment of any such new office or facility); (iii) any Loan Party's organizational structure or jurisdiction of incorporation or formation; or (iv) any Loan Party's Federal Taxpayer Identification Number or organizational identification number assigned to it by its state of organization.  The Loan Parties shall not effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC or otherwise that are required in order for the Agent to continue at all times following such change to have a valid, legal and perfected first priority security interest in all the Collateral for its own benefit and the benefit of the other Credit Parties.**

**Should any of the information on any of the Schedules hereto become inaccurate or misleading in any material respect as a result of changes after the Effective Date, advise the Agent in writing of such revisions or updates as may be necessary or appropriate to update or correct the same.  From time to time as may be reasonably requested by the Agent, the Loan Parties shall supplement each Schedule hereto, or any representation herein or in any other Loan Document, with respect to any matter arising after the Effective Date that, if existing or occurring on the Effective Date, would have been required to be set forth or described in such Schedule or as an exception to such representation or that is necessary to correct any information in such Schedule or representation which has been rendered inaccurate thereby (and, in the case of any supplements to any Schedule, such Schedule shall be appropriately marked to show the changes made therein).  Notwithstanding the foregoing, no supplement or revision to any Schedule or representation shall be deemed the Credit Parties' consent to the matters reflected in such updated Schedules or revised representations nor permit the Loan Parties to undertake any actions otherwise prohibited hereunder or fail to undertake any action required hereunder from the restrictions and requirements in existence prior to the delivery of such updated Schedules or such revision of a representation; nor shall any such supplement or revision to any Schedule or representation be deemed the Credit Parties' waiver of any Default or Event of Default resulting from the matters disclosed therein.**

**Physical Inventories**.

**Cause** not less than (i) one physical inventory of finished goods Inventory to be undertaken each Fiscal Year, and (ii) one physical inventory of raw material Inventory and packaging and spices Inventory to be undertaken in each Fiscal Accounting Period, each at the expenses of the Borrowers, consistent with past practices, conducted by such inventory takers as are satisfactory to the Agent and following such methodology as is consistent with the methodology used in the immediately preceding inventory or as otherwise may be satisfactory to the Agent. The Agent, at the expense of the Borrowers, may participate in and/or observe each scheduled physical count of Inventory which is undertaken on behalf of any Borrower.   The Lead Borrower, within ten (10) days following the completion of such inventory, shall provide the Agent with a reconciliation of the results of such inventory (as well as of any other physical inventory or cycle counts undertaken by a Borrower) and shall post such results to the Borrowers' stock ledgers and general ledgers, as applicable.

**Permit** the Agent, in its discretion, if any Default or Event of Default exists, to cause additional such inventories to be taken as the Agent determines (each, at the expense of the Borrowers).

**Environmental Laws.**  Conduct its operations and keep and maintain its Real Estate in material compliance with all Environmental Laws; (b) obtain and renew all environmental permits necessary for its operations and properties; and (c) implement any and all investigation, remediation, removal and response actions that are appropriate or necessary to maintain the value and marketability of the Real Estate or to otherwise comply with Environmental Laws pertaining to the presence, generation, treatment, storage, use, disposal, transportation or release of any Hazardous Materials on, at, in, under, above, to, from or about any of its Real Estate, except, in each case, where the failure to do so, either individually or in the aggregate, could not be reasonably likely to have a Material Adverse Effect, provided, however, that neither a Borrower nor any of its Subsidiaries shall be required to undertake any such cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and adequate reserves have been set aside and are being maintained by the Borrowers with respect to such circumstances in accordance with GAAP.

**Further Assurances.**

**Execute** any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements and other documents), that may be required under any Law, or which any Agent may reasonably request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the Liens created or intended to be created by the Security Documents or the validity or priority of any such Lien, all at the expense of the Borrowers. The Borrowers also agree to provide to the Agent, from time to time upon request, evidence satisfactory to the Agent as to the perfection and priority of the Liens created or intended to be created by the Security Documents.

- 97 -

**If any material assets are acquired by any Loan Party after the Effective Date (other than assets constituting Collateral under the Security Documents that become subject to the perfected first-priority Lien under the Security Documents and the DIP Orders upon acquisition thereof), notify the Agent thereof, and the Loan Parties will cause such assets to be subjected to a Lien securing the Obligations and will take such actions as shall be necessary or shall be reasonably requested by any Agent to grant and perfect such Liens, including actions described in paragraph (a) of this <u>Section 0</u>, all at the expense of the Borrowers. In no event shall compliance with this <u>Section 0</u> waive or be deemed a waiver or consent to any transaction giving rise to the need to comply with this <u>Section 0</u> if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed to constitute consent to the inclusion of any acquired assets in the computation of the Borrowing Base.**

**Compliance with Terms of Leaseholds**.  Except as otherwise expressly permitted hereunder or as otherwise permitted under the Bankruptcy Code or the DIP Orders, (a) make all payments and otherwise perform all obligations (except with respect to the tangible net worth covenant thereof) in respect of all Leases to which any Borrower or any of its Subsidiaries is a party, keep such Leases (except with respect to the tangible net worth covenant thereof) in full force and effect, (b) not allow such Leases to lapse or be terminated or any rights to renew such Leases to be forfeited or cancelled except in the ordinary course of business, consistent with past practices, and (c) notify the Agent of any default by any party with respect to such Leases and cooperate with the Agent in all respects to cure any such default, except, in any case, where the failure to do so, either individually or in the aggregate, could not be reasonably likely to have a Material Adverse Effect.

**Material Contracts**.  Except as otherwise permitted under the Bankruptcy Code or the DIP Orders, (a) perform and observe all the terms and provisions of each Material Contract to be performed or observed by it, (b) maintain each such Material Contract in full force and effect except to the extent such Material Contract is no longer used or useful in the conduct of the business of the Borrowers in the ordinary course of business, consistent with past practices, (c) enforce each such Material Contract in accordance with its terms, and, (d) upon request of the Agent, make such demands and requests for information and reports or for action from any other party to each such Material Contract as any Borrower or any of its Subsidiaries is entitled to make under such Material Contract, and (e) cause each of its Subsidiaries to do the foregoing, except, in any case, where the failure to do so, either individually or in the aggregate, could not be reasonably likely to have a Material Adverse Effect.

**Third Party Consultant.**

The Lead Borrower shall retain the Third Party Consultant pursuant to terms acceptable to Agent for the purpose of: (i) assisting in the preparation of such 13-week cash flow forecast; (ii) advising the Loan Parties with regard to their financial performance and affairs and operational initiatives, including, but not limited to, liquidity and working capital management, operational efficiencies, budgets and forecasts, and interactions with Agent and the Lenders; (iii) reviewing the Loan Parties' Projections delivered pursuant to Section 6.01(c) hereof for the Fiscal Year ending December 31, 2014; and (iv) being available to the Agent and the Lenders to discuss in detail the 13-week cash flow forecast, the Loan Parties' operating and financial performance, and the reports and other materials and matters as set forth above.  Without limiting the foregoing, at all times following the Petition Date the Loan Parties shall retain Michael Buenzow, of the Third Party Consultant, as CRO.

Without limiting the foregoing, the Borrowers acknowledge and agree that (i) the Agent retains the right, in its sole and exclusive discretion, to continue to engage its own consultant, (ii) the Borrowers and their representatives will cooperate fully with any such consultant and (iii) any such consultant shall be granted full and complete access to the Borrower's books and records as reasonably required by Agent.

**Sell-Side Advisor and Capital Contribution.**

The Loan Parties shall continue to engage and retain City Capital Advisors LLC as a sell-side advisor pursuant to the terms of an engagement agreement in form and substance acceptable to Agent, and shall promptly file all motions and other pleadings necessary to obtain Bankruptcy Court approval thereof. City Capital Advisors, LLC shall be available at all times during the engagement thereof to discuss such sale and other matters with the Agent as reasonably required by the Agent. Upon receipt thereof, the Loan Parties shall deliver to the Agent copies of all formal proposals, letters of interest, letters of intent, agreements and any final proposed definitive documentation for any sale of any or all its assets or any other investment pursuant to which additional capital is to be received by the Loan Parties.

**Bankruptcy Related Covenants**

On the Petition Date, the Borrowers shall have filed a motion to approve this Agreement and the Revolving Credit Facility as provided herein. The hearing on the Interim Borrowing Order shall occur within two (2) Business Days following the Petition Date.

The Borrowers shall have filed a motion under Section 365 of the Bankruptcy Code requesting extension of the date on which the Borrowers must assume or reject leases to 210 days after the entry of the order for relief, with an order so extending that deadline to be have been entered by the Bankruptcy Court within sixty (60) days of the Petition Date; **provided** that, in the event that the Borrowers shall not have filed such motion within a reasonable time following the Petition Date, the Agent may do so on the Borrowers behalf and the Borrowers hereby grant the Agent a power of attorney to so file such motion; and **provided further** that such motion shall not be required to be filed if the Lead Borrower and the Agent otherwise agree in the Agent's sole discretion. The Borrowers may not, without the prior written consent of the Agent, assume, assume and assign, or reject leases.

On the Petition Date, the Borrowers shall have filed the Sale Motion in the Chapter 11 Case. Incidental to the filing of such Sale Motion:

From and after the Petition Date, the Borrowers shall establish and maintain an electronic data room with current information to facilitate diligence by any potential bidders with respect to such sale.

- 100 -

On or before the date that is two (2) days following the Petition Date, the Borrowers shall have forwarded so-called "bid packages" to any potential bidders, including, without limitation, alternative bid packages to liquidation firms.

On or before the date that is five (5) days following the Petition Date, the Borrowers shall have selected one or more so-called "stalking horse" bid(s) acceptable to the Agent with respect to such sale.

On or before March 10, 2014, the Borrowers shall have executed a purchase agreement with such "stalking horse" bidder in form and substance acceptable to the Agent.

Within twenty-one (21) days after the Petition Date, the Borrowers shall have obtained approval of the bid procedures from the Bankruptcy Court (satisfactory to the Agent) approving bid procedures for the sale of the Borrowers' assets and the assumption and assignment of the Borrowers' Leases.

Within thirty-five (35) days following the Petition Date, an auction among all qualified bidders shall be conducted with the highest and best bid or combination of bids being selected, in consultation with the Agent.

Within thirty-seven (37) days following the Petition Date, the Bankruptcy Court shall have conducted a sale hearing with respect to such sale and the Borrowers shall have obtained an order of the Bankruptcy Court approving the Sale Motion.  The Borrowers shall consummate the sale of the assets described therein within two (2) Business Days after such order is entered. Unless the Agent otherwise agrees, the sale shall be for cash proceeds sufficient to pay in full all of the Obligations and the outstanding Pre-Petition Liabilities (including the Pre-Petition indemnity Account, as defined in the DIP Orders) and the proceeds shall be so utilized without further order of the Bankruptcy Court.

## NEGATIVE COVENANTS

So long as any Lender shall have any Revolving Commitment hereunder, any Revolving Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification claims for which a claim has not been asserted), or any Letter of Credit shall

remain outstanding, no Loan Party shall, nor shall it permit any Subsidiary to, directly or indirectly:

**Liens**.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, or sign or file or suffer to exist under the UCC or any similar Law or statute of any jurisdiction a financing statement that names any Loan Party or any Subsidiary thereof as debtor; sign or suffer to exist any security agreement authorizing any Person thereunder to file such financing statement; sell any of its property or assets subject to an understanding or agreement (contingent or otherwise) to repurchase such property or assets with recourse to it or any of its Subsidiaries; or assign or otherwise transfer any accounts or other rights to receive income, other than, as to all of the above, Permitted Encumbrances.

**Investments**.  Make any Investments, except Permitted Investments.

**Indebtedness; Equity Issuances**.  (a) Create, incur, assume, guarantee, suffer to exist or otherwise become or remain liable with respect to, any Indebtedness, except Permitted Indebtedness; or (b) issue and sell any other Equity Interests unless (i) such Equity Interests provide that all dividends and other Restricted Payments in respect thereof shall be made solely in additional shares of such Equity Interests, in lieu of cash, (ii) such Equity Interests shall not be subject to redemption other than redemption at the option of the Loan Party (or such Subsidiary) issuing such Equity Interests and in accordance with the limitations contained in this Agreement, (iii) all Restricted Payments in respect of such Equity Interests are expressly subordinated to the Obligations, and (iv) no Change of Control will result therefrom.

**Fundamental Changes**.  Merge, dissolve, liquidate, consolidate with or into another Person, (or agree to do any of the foregoing), except that, so long as no Default or Event of Default shall have occurred and be continuing prior to or immediately after giving effect to any action described below or would result therefrom:

*any Subsidiary which is not a Loan Party may merge with (i) a Loan Party, __provided that a Loan Party shall be the continuing or surviving Person__, or (ii) any one or more other Subsidiaries which are not Loan Parties, __provided__ that when any wholly-owned Subsidiary is merging with another Subsidiary, the wholly-owned Subsidiary shall be the continuing or surviving Person; and*

- 102 -

*any Subsidiary which is a Loan Party may merge into any Subsidiary which is a Loan Party or into a Borrower, **provided** that in any merger involving a Borrower, a Borrower shall be the continuing or surviving Person.*

**Dispositions**.  Make any Disposition or enter into any agreement to make any Disposition, except Permitted Dispositions.

**Restricted Payments**.  Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so.

**Prepayments of Indebtedness**.  (a) Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any pre-petition Indebtedness, or make any payment in violation of any subordination terms of any Subordinated Indebtedness, other than adequate protection payments on the Pre-Petition Liabilities, or (b) make any payments or any arrangements to pay on account of pre-petition amounts owed to vendors (including, without limitation, any so-called critical vendor payments) without prior written consent of the Agent.

**Change in Nature of Business.**

Engage in any line of business substantially different from the business conducted by (a) the Lead Borrower and its Subsidiaries on the Effective Date or any business substantially related or incidental thereto, (b) by North Star on the Effective Date, and (c) by Crossroads on the Effective Date..

**Transactions with Affiliates**.

*Enter into, renew, extend or be a party to any transaction of any kind with any Affiliate of any Loan Party, whether or not in the ordinary course of business, other than transactions among the Loan Parties and other transactions on fair and reasonable terms substantially as favorable to the Loan Parties as would have been obtainable by the Loan Parties at the time such transactions were made in a comparable arm's length transaction with a Person other than an Affiliate, **provided** that, so long as no Default or Event of Default shall have occurred and be continuing prior, or immediately after giving effect thereto, or would result therefrom, (a) the Loan Parties may pay salary and other compensation (whether in the form of business or personal expense reimbursements or otherwise) to Family Members of Edward*

- 103 -

*Bleka as set forth in the Approved Budget or as otherwise consented to by the Agent, (b) the Loan Parties may perform its obligations to Crossroads under the Wastewater Treatment Agreement and the Management Agreement, each as in effect on the Effective Date, as set forth in the Approved Budget, and (c) solely to the extent set forth in the Approved Budget or as otherwise consented to by the Agent, the Loan Parties may sell Inventory to GS Retail, LLC on terms and conditions substantially as favorable to the Loan Parties as would have been obtainable by the Loan Parties at the time such transactions were made in a comparable arm's length transaction with a Person other than an Affiliate.*

**Burdensome Agreements.**  Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document) that (a) limits the ability (i) of any Subsidiary to make Restricted Payments or other distributions to any Loan Party or to otherwise transfer property to or invest in a Loan Party, (ii) of any Subsidiary to Guarantee the Obligations, (iii) of any Subsidiary to make or repay loans to a Loan Party, or (iv) of the Loan Parties or any Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person in favor of the Agent; or (b) requires the grant of a Lien to secure an obligation of such Person if a Lien is granted to secure another obligation of such Person.

**Use of Proceeds.**  Use the proceeds of any Credit Extension, whether directly or indirectly, and whether immediately, incidentally or ultimately, (a) to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund Indebtedness originally incurred for such purpose, or (b) for any purposes other than (i) for payment of expenses set forth in the Approved Budget (iii) to repay Indebtedness other than under the Pre-Petition Credit Agreement and (iv) for general corporate purposes of the Loan Parties, in each case, to the extent expressly permitted under Law, the DIP Orders, and the Loan Documents.

**Amendment of Material Documents.**  Amend, modify or waive any of a Loan Party's (or any Subsidiary's) rights under (a) its Organization Documents in a manner materially adverse to the Credit Parties, or (b) any Material Contract, Lease or Material Indebtedness (other than on account of any Permitted Refinancing thereof), in each case, to the extent that such amendment, modification or waiver would result in a Default or Event of Default under any of the Loan Documents, would be materially adverse to the Credit Parties, or otherwise would be reasonably likely to have a Material Adverse Effect.

**Fiscal Year.**  Change the Fiscal Year of any Loan Party, or the accounting policies or reporting practices of the Loan Parties, except as required by GAAP.

**Deposit Accounts.**  Open new DDAs unless the Loan Parties shall have delivered to the Agent appropriate Blocked Account Agreements consistent with the provisions of <u>Section 0</u> and otherwise satisfactory to the Agent.  No Loan Party shall maintain any bank accounts other than the ones expressly contemplated herein or in <u>Section 0</u> hereof.

**Indebtedness and Liens of CFI.**

Permit CFI to create, incur, assume, guarantee, suffer to exist or otherwise become or remain liable with respect to, any Indebtedness, other than Indebtedness in favor of the Lead

Borrower, or (ii) create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, other than Liens in favor of the Lead Borrower and the Agent.

**Budgeted Expenses**

The Borrowers and their Subsidiaries shall not pay any expenses other than those set forth in the budget approved by the Agent prior to the Effective Date (together with any subsequent budget which the Agent may, in its sole discretion, approve, the "Approved Budget"), subject to variance as set forth below.  Further, the Borrowers and their Subsidiaries shall not use funds allocated to a particular line item in the Approved Budget (including line items denominated "Miscellaneous" or "Other", or words of similar import) to pay any expenses under any other line item(s) in the Approved Budget without the prior express written consent of the Agent, which consent may be conditioned, withheld, or delayed in the Agent's sole and exclusive discretion.  The Borrowers and their Subsidiaries shall (a) achieve cash receipts of at least 85% of those projected in the Approved Budget, and (b) not permit (i) actual aggregate expenses incurred and disbursements made to exceed 105% of those projected in the Approved Budget or (ii) actual expenses incurred and disbursements made for any line item in the Approved Budget to exceed 110% of those projected in the Approved Budget; provided that, the Borrowers shall be permitted to re-allocate amounts that were allocated to but not expended with respect to the line item titled "Critical Vendors" in the Approved Budget (it being understood that the payment of all such amounts is subject to prior approval from the Agent as set forth in Section 7.09 hereof) solely to the line items titled "Raw Materials" and "Packaging and Spice" set forth in the Approved Budget.  Compliance with the covenants set forth in this Section 7.16 shall be tested as of the close of business on Wednesday of each week (x) on a cumulative basis from the Petition Date through [___] 2014 (the end of the second week after the Petition Date), with the first such test of compliance herewith occurring as of the week ending [____, 2014] for the prior two week period and (y) thereafter, weekly as of the end of the prior week on a trailing two weeks basis. Compliance with the foregoing shall be reflected in the Variance Report delivered pursuant to Section 6.01(e).

**Bankruptcy Covenants.**

**The Borrowers will not consent to or permit to exist any of the following:**

**Any order which authorizes the rejection or assumption of any Leases of the Borrower without the Agent's prior written consent;**

**Any modification, stay, vacation or amendment to the DIP Orders to which the Agent has not consented in writing;**

**A priority claim or administrative expense or unsecured claim against the Borrowers (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Agent in respect of the Obligations and the Pre-Petition Liabilities, except with respect to the Professional Fee Carve Out;**

**Any Lien on any Collateral having a priority equal or superior to the Lien securing the Obligations, other than with respect to the Professional Fee Carve Out and Liens securing the Pre-Petition Liabilities;**

**Any order which authorizes the return of any of the Borrowers' property pursuant to Section 546(h) of the Bankruptcy Code;**

**Any order which authorizes the payment of any Indebtedness (other than the Pre-Petition Liabilities, Indebtedness reflected in the Approved Budget (other than so-called critical vendor payments), and other Indebtedness approved by the Agent), in each case incurred prior to the Petition Date or the grant of "adequate protection" (whether payment in cash or transfer of property) with respect to any such Indebtedness which is secured by a Lien other than as set forth in the DIP Orders); or**

**Any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents.**

**EVENTS OF DEFAULT AND REMEDIES**

**Events of Default**.  Any of the following shall constitute an Event of Default:

**_Non-Payment_.  The Borrowers or any other Loan Party fails to pay when and as required to be paid herein, (i) any amount of principal of, or interest on, any Revolving Loan or any L/C Obligation, or deposit any funds as Cash Collateral in respect of L/C Obligations, (ii) any fee due hereunder, or (iii) any other amount payable hereunder or under any other Loan Document; or**

**_Specific Covenants_.  Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of _Sections 0_, _0_, _0_, _0_, _0_, _0_, _0_, _0_, _6.18_, _6.21_ or _0_; or**

**_Other Defaults_.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in subsection _0_ or _0_ above) contained in any Loan Document on its part to be performed or observed and such failure continues for 30 days; or**

**_Representations and Warranties_.  (i)  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Loan Party in any Borrowing Base Certificate in any document delivered in connection therewith shall be incorrect or misleading when made or deemed made; or (ii) any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Loan Party herein, in any other Loan Document, or in any other document delivered in connection herewith or therewith (excluding a Borrowing Base Certificate as to which clause (i) shall govern) shall be incorrect or misleading in any material respect when made or deemed made; or**

**_Cross-Default_.  Any Loan Party or any Subsidiary thereof (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Material Indebtedness, or (B) fails to observe or perform any other agreement or condition relating to any Material Indebtedness or**

*contained in any instrument or agreement evidencing, securing or relating thereto, or any "change of control" (as defined in the documents governing such Material Indebtedness), whether or not such change of control shall constitute a default or event of default under such Material Indebtedness, occurs, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Material Indebtedness or the beneficiary or beneficiaries of any Guarantee thereof (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity or such Guarantee to become payable or cash collateral in respect thereof to be demanded; or*

*Judgments.  There is entered against any Loan Party or any Subsidiary thereof (i) one or more judgments or orders for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding $500,000 (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M. Best Company, has been notified of the potential claim and does not dispute coverage), or (ii) any one or more non-monetary judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of 10 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, is not in effect; or*

*ERISA.  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any Loan Party under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC which would reasonably likely result in a Material Adverse Effect, or (ii) a Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of $500,000 or which would reasonably likely result in a Material Adverse Effect; or*

- 109 -

***Invalidity of Loan Documents.  (i)  Any Loan Document, at any time after its execution and delivery and for any reason, ceases to be in full force and effect; or any Loan Party or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any provision of any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document or seeks to avoid, limit or otherwise adversely affect any Lien purported to be created under any Security Document; or (ii) any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by any Loan Party or any other Person not to be, a valid and perfected Lien on any Collateral, with the priority required by the applicable Security Document; or***

***Change of Control.  There occurs any Change of Control; or***

***Cessation of Business.  (i) there occurs a work stoppage under the Union Contracts or under any other labor agreements, or (ii) except as otherwise expressly permitted hereunder, the Loan Parties, taken as a whole, shall take any action to suspend the operation of their business in the ordinary course, liquidate all or a material portion of their assets or locations, or employ an agent or other third party to conduct a program of closings, liquidations or "Going-Out-Of-Business" sales of any material portion of their business; or***

***Loss of Collateral.  There occurs any uninsured loss in excess of $500,000 to any material portion of the Collateral; or***

***Breach of Contractual Obligation.  Any Loan Party or any Subsidiary thereof fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Material Contract or Lease or fails to observe or perform any other agreement or condition relating to any such Material Contract or Lease (except with respect to the tangible net worth covenant thereof) or contained in any instrument or agreement evidencing, securing or relating thereto or any Material Contract or Lease is terminated; or***

***Indictment.  (i) Any Loan Party is (A) criminally indicted or convicted of a felony in connection with the Loan Parties' business, or (B) charged by a Governmental Authority under any law that would reasonably be expected to lead to forfeiture of any material portion of Collateral or (ii) any director or senior officer of any Loan Party after the Effective Date is (A) criminally indicted or convicted of a felony, unless such director or senior officer promptly resigns or is removed or replaced or (B) charged by a Governmental Authority under any law that would reasonably be expected to lead to forfeiture of any material portion of Collateral; or***

***Key Executive.  The death, disability or failure of any Key Executive at any time to exercise that authority and discharge those management responsibilities with respect to the Borrowers as are exercised and discharged by such Person at the execution of this Agreement unless replaced within ninety (90) days of such occurrence with a Person acceptable to the Agent in its sole discretion; or***

***Subordination.  (i)  The subordination provisions of the documents evidencing or governing any Subordinated Indebtedness (the "Subordinated Provisions") shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable Subordinated Indebtedness or such holder shall fail to comply with such Subordination Provisions; or (ii) any Borrower or any other Loan Party shall, directly or indirectly, disavow or contest in any manner (A) the effectiveness, validity or enforceability of any of the Subordination Provisions, (B) that the Subordination Provisions exist for the benefit of the Credit Parties, or (C) that all payments of principal of or premium and interest on the applicable Subordinated Indebtedness, or realized from the liquidation of any property of any Loan Party, shall be subject to any of the Subordination Provisions.***

***Modification of DIP Order.  The entry of an order in the Chapter 11 Case which stays, modifies or reverses any DIP Order or which otherwise materially adversely affects the effectiveness of any DIP Order without the express written consent of the Agent;***

**_Appointment of Trustee or Examiner._  Either (i) the appointment in the Chapter 11 Case of a trustee or of any examiner having expanded powers to operate all or any part of the Borrowers' business, or (ii) the conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code;**

**_Final Borrowing Order._  The failure of the Bankruptcy Court to enter a Final Borrowing Order, in form and substance reasonably satisfactory to the Lender, within thirty (30) days after the Petition Date;**

**_Relief from Stay._  The entry of any order without the prior written consent of the Agent which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code which permits any creditor to realize upon, or to exercise any right or remedy with respect to, any asset of the Borrowers or to terminate any license, franchise, or similar agreement, where the exercise of such right or remedy or such realization or termination would reasonably be likely to have a Material Adverse Effect;**

**_Superior Claim._  The filing of any application by the Borrowers without the express prior written consent of the Agent for the approval of any super-priority claim in the Chapter 11 Case which is pari passu with or senior to the priority of the claims of the Agent and the Lenders for the Obligations or the Pre-Petition Liabilities, or there shall arise any such super-priority claim under the Bankruptcy Code (other than the Professional Fee Carve Out);**

**_Pre-Petition Indebtedness._  The payment or other discharge by the Borrowers of any Indebtedness incurred prior to the Petition Date (other than so-called critical vendor payments), except the Pre-Petition Liabilities or otherwise as expressly permitted hereunder, in the Approved Budget or by order in the Chapter 11 Case to which order the Agent has provided its written consent;**

**_Critical Vendor Payments._  The making or entering into any arrangement to make so-called critical vendor payments except as set forth in the Approved Budget and otherwise consented to by the Agent;**

- 112 -

*__Adequate Protection Order__.  The entry of any order in the Chapter 11 Case which provides adequate protection (other than on account of Liens securing the Pre-Petition Liabilities), or the granting by the Borrowers of similar relief in favor of any one or more of their pre-petition creditors, contrary to the terms and conditions of any DIP Order;*

*__Breach of Orders__.  The failure of the Borrowers (i) to comply with each and all of the terms and conditions of any DIP Order, or (ii) to materially comply with any other order entered in the Chapter 11 Case if such failure would reasonably likely result in a Material Adverse Effect;*

*__Incurrence of Post-Petition Indebtedness and Liens__.  The filing of any motion by the Borrowers or the entry of any order in the Chapter 11 Case: (i) (A) permitting working capital or other financing (other than ordinary course trade credit or unsecured debt) for the Borrowers from any Person other than the Lenders (unless the proceeds of such financing are used to pay in full of all Pre-Petition Liabilities, all Obligations, cash collateralization of all Letters of Credit, and all Obligations then due and owing in connection with any Swap Agreement, cash management, depository or similar Bank Products (collectively, the "Unliquidated Claims"), and the establishment of a reserve account for all indemnification obligations hereunder), (B) granting a Lien on, or security interest in any of the Collateral, other than with respect to this Agreement or as otherwise permitted herein (unless such Liens are granted in connection with a financing, the proceeds of which are applied to the payment in full of all Pre-Petition Liabilities, all Obligations and the cash collateralization of all Letters of Credit, other Unliquidated Claims and indemnification obligations hereunder), (C) except as permitted by this Agreement, permitting the use of any of the Collateral pursuant to Section 363(c) of the Bankruptcy Code without the prior written consent of the Agent and the Required Lenders, (D) permitting recovery from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, or (E) dismissing any of the Chapter 11 Case or (ii) the filing of any motion by the Borrowers or any Loan Party (or by any party in interest or any Creditors' Committee appointed in the Chapter 11 Case) seeking any of the matters specified in the foregoing clause (i) that is not dismissed or denied within thirty (30) days of the date of the filing of such motion (or such later date agreed to in writing by the Agent);*

**_Plan of Reorganization_**_.  The filing of a motion by the Borrowers seeking approval of a disclosure statement and a Plan of Reorganization, or the entry of an order confirming a Plan of Reorganization, that does not require repayment in full in cash of all Pre-Petition Liabilities and all Obligations on the effective date of such Plan of Reorganization or such Plan of Reorganization is defeated by the creditors of the Borrowers; or_

**_Challenges_**_.  The filing of any pleading by the Borrowers or any Affiliate thereof challenging the validity, priority, perfection, or enforceability of the Loan Documents (as defined in the Pre-Petition Credit Agreement), the Pre-Petition Liabilities, or any Lien granted pursuant to the Pre-Petition Loan Documents, or (b) any Lien granted pursuant to the Pre-Petition Loan Documents is determined to be null and void, invalid or unenforceable by the  Bankruptcy Court or another court of competent jurisdiction in any action commenced or asserted by any other party in interest in the Chapter 11 Case, including, without limitation, the Creditors' Committee._

**Remedies Upon Event of Default**.  Subject to the terms of the DIP Orders, if any Event of Default occurs and is continuing, the Agent may, or, at the request of the Required Lenders shall, take any or all of the following actions:

_declare the Revolving Commitments of each Revolving Lender to make Revolving Loans and any obligation of the Agent to issue or cause to be issued Letters of Credit to be terminated, whereupon such Revolving Commitments and obligations shall be terminated;_

_declare the unpaid principal amount of all outstanding Revolving Loans, all interest accrued and unpaid thereon, and all other Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties;_

***require that the Loan Parties Cash Collateralize the L/C Obligations; and***

***whether or not the maturity of the Obligations shall have been accelerated pursuant hereto, proceed to protect, enforce and exercise all rights and remedies of the Credit Parties under this Agreement, any of the other Loan Documents or Law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or any instrument pursuant to which the Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Credit Parties.***

No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of Law.

**Application of Funds**.

After the exercise of remedies provided for in <u>Section 0</u> (or after the Revolving Loans have automatically become immediately due and payable and the L/C Obligations have automatically been required to be Cash Collateralized as set forth in the proviso to <u>Section 0</u>), any amounts received on account of the Obligations shall be applied by the Agent in the following order:

<u>First</u>, to the payment of all accrued and unpaid Professional Fees and Expenses up to an aggregate amount not to exceed the Professional Fees Carve-Out;

<u>Second</u>, to pay all outstanding Pre-Petition Liabilities (including the Pre-Petition Indemnity Account as defined in the DIP Orders);

<u>Third</u>, to payment of that portion of the Obligations constituting fees, indemnities, Credit Party Expenses and other amounts (including fees, charges and disbursements of counsel to the Agent and amounts payable under <u>Article 0</u>) payable to the Agent;

<u>Fourth</u>, to payment of that portion of the Obligations constituting indemnities, Credit Party Expenses, and other amounts (other than principal, interest and fees) payable to the Lenders (including Credit Party Expenses to the respective Lenders and amounts payable under <u>Article 0</u>), ratably among them in proportion to the amounts described in this clause <u>Fourth</u> payable to them;

**Fifth**, to the extent not previously reimbursed by the Lenders, to payment to the Agent of that portion of the Obligations constituting principal and accrued and unpaid interest on any Permitted Overadvances;

**Sixth**, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Revolving Loans and fees ratably among the Lenders in proportion to the respective amounts described in this clause **Sixth** payable to them;

**Seventh**, to payment of that portion of the Obligations constituting unpaid principal of the Revolving Loans ratably among the Lenders in proportion to the respective amounts described in this clause **Seventh** held by them;

**Eighth**, to the Agent, to Cash Collateralize that portion of L/C Obligations comprised of the aggregate undrawn amount of Letters of Credit;

**Ninth**, to payment of all other Obligations, ratably among the Credit Parties in proportion to the respective amounts described in this clause **Ninth** held by them; and

**Last**, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Loan Parties or as otherwise required by Law.

Amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to clause Eighth above shall be applied to satisfy drawings under such Letters of Credit as they occur.  If any amount remains on deposit as Cash Collateral after all Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above.

**THE AGENT**

**Appointment and Authority.**  Each of the Lenders (in its capacity as a Lender) hereby irrevocably appoints Crystal to act on its behalf as the administrative agent and collateral agent hereunder and under the other Loan Documents and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms hereof or thereof (including, without limitation, acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations), together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article are solely for the benefit of the Agent and the Lenders, and no Loan Party or any Subsidiary thereof shall have rights as a third party beneficiary of any of such provisions.

**Rights as a Lender**.  The Person serving as the Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though they were not the Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Loan Parties or any Subsidiary or other Affiliate thereof as if such Person were not the Agent hereunder and without any duty to account therefor to the Lenders.

**Exculpatory Provisions**.  The Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Agent:

*shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;*

*shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), provided that the Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Agent to liability or that is contrary to any Loan Document or Law; and*

*shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information*

- 117 -

***relating to the Loan Parties or any of its Affiliates that is communicated to or obtained by the Person serving as the Agent or any of its Affiliates in any capacity.***

The Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.01 and 8.02) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a final and non-appealable judgment of a court of competent jurisdiction.

The Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until notice describing such Default or Event of Default is given to the Agent by the Loan Parties or a Lender.  In the event that the Agent obtains such actual knowledge or receives such a notice, the Agent shall give prompt notice thereof to each of the other Credit Parties.  Upon the occurrence of a Default or an Event of Default, the Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders.  Unless and until the Agent shall have received such direction, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to any such Default or Event of Default as it shall deem advisable in the best interest of the Credit Parties.  In no event shall the Agent be required to comply with any such directions to the extent that the Agent believes that its compliance with such directions would be unlawful.

The Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in 0 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent.

1652368.6

**Reliance by Agent.**  The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including, but not limited to, any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Revolving Loan or the issuance of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender, the Agent may presume that such condition is satisfactory to such Lender unless the Agent shall have received written notice to the contrary from such Lender prior to the making of such Revolving Loan or the issuance of such Letter of Credit.  The Agent may consult with legal counsel (who may be counsel for any Loan Party), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

**Delegation of Duties**.  The Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Agent.  The Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the Agent.

**Resignation of Agent**.  The Agent may at any time give written notice of its resignation to the Lenders and the Lead Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Lead Borrower, to appoint a successor.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent; provided that if the Agent shall notify the Lead Borrower and the Lenders that no Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any Collateral held by the Agent on behalf of the Lenders under any of the Loan Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through the Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Agent as provided for above in this Section.  Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section). The fees payable by the Borrowers to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Lead Borrower and such successor.  After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Section 0 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Agent hereunder.

**Non-Reliance on Agent and Other Lenders**.  Each Lender acknowledges that it has, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.  Except as provided in Section 9.11, the Agent shall not have any duty or responsibility to provide any Credit Party with any other credit or other information concerning the affairs, financial condition or business of any Loan Party that may come into the possession of the Agent.

**Agent May File Proofs of Claim**.  The Agent (irrespective of whether the principal of any Revolving Loan or L/C Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Agent shall have made any demand on the Loan Parties) shall be entitled and empowered, by intervention in such proceeding or otherwise:

*to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Revolving Loans, L/C Obligations and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the Agent and the other Credit Parties (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Agent, such Credit Parties and their respective agents and counsel and all other amounts due the Lenders, the Agent and such Credit Parties under <u>Sections 2.03(j)</u>, <u>0</u> and <u>0</u>) allowed in such judicial proceeding; and*

*to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;*

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Agent and to pay to the Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agent and its agents and counsel, and any other amounts due the Agent under <u>Sections 0</u> and <u>0</u>.

Nothing contained herein shall be deemed to authorize the Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Agent to vote in respect of the claim of any Lender in any such proceeding.

**Collateral and Guaranty Matters**.  Subject to the entry of a Final Order by the Bankruptcy Court, the Credit Parties irrevocably authorize the Agent, at its option and in its discretion:

**to release any Lien on any property granted to or held by the Agent under any Loan Document (i) upon termination of the Aggregate Commitments and payment in full of all Obligations (other than contingent indemnification obligations for which no claim has been asserted) and the expiration, termination or Cash Collateralization of all Letters of Credit, (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Loan Document, or (iii) if approved, authorized or ratified in writing by the Applicable Lenders in accordance with <u>Section 0</u>;**

**to release any Guarantor from its obligations under the Facility Guaranty if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder or otherwise as expressly permitted by the Facility Guaranty.**

Upon request by the Agent at any time, the Applicable Lenders will confirm in writing the Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Facility Guaranty pursuant to this <u>Section 9.09</u>.  In each case as specified in this <u>Section 0</u>, the Agent will, at the Loan Parties' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Security Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Facility Guaranty, in each case in accordance with the terms of the Loan Documents and this <u>Section 0</u>.

**Notice of Transfer.**  The Agent may deem and treat a Lender party to this Agreement as the owner of such Lender's portion of the Obligations for all purposes, unless and until, and except to the extent, an Assignment and Assumption shall have become effective as set forth in <u>Section 0</u>.

**Reports and Financial Statements.**  By signing this Agreement, each Lender:

***is deemed to have requested that the Agent furnish, and the Agent agrees to furnish, such Lender, promptly after they become available, copies of all Borrowing Base Certificates and financial statements required to be delivered by the Loan Parties hereunder and all commercial finance examinations and appraisals of the Collateral received by the Agent (collectively, the "<u>Reports</u>");***

*expressly agrees and acknowledges that the Agent makes no representation or warranty as to the accuracy of the Reports, and shall not be liable for any information contained in any Report;*

*expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Agent or any other party performing any audit or examination will inspect only specific information regarding the Loan Parties and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel;*

*agrees to keep all Reports confidential in accordance with the provisions of <u>Section 0</u> hereof; and*

*without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold the Agent and any such other Lender preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report in connection with any Credit Extensions that the indemnifying Lender has made or may make to the Borrowers, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a Revolving Loan or Revolving Loans; and (ii) to pay and protect, and indemnify, defend, and hold the Agent and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including attorney costs) incurred by the Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.*

**Agency for Perfection.**  Each Lender hereby appoints each other Lender as agent for the purpose of perfecting Liens for the benefit of the Agent and the Lenders, in assets which, in accordance with Article 9 of the UCC or any other Law of the United States can be perfected only by possession or control.  Should any Lender (other than the Agent) obtain possession or control of any such Collateral, such Lender shall notify the Agent thereof, and, promptly upon the Agent's request therefor shall deliver such Collateral to the Agent or otherwise deal with such Collateral in accordance with the Agent's instructions.

**Indemnification of Agent**.  Without limiting the obligations of Loan Parties hereunder, the Lenders shall indemnify the Agent, each L/C Issuer and any Related Party, as the case may be, ratably according to their Revolving Credit Facility Applicable Percentages, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Agent, each L/C Issuer and their Related Parties in any way relating to or arising out of this Agreement or any other Loan Document or any action taken or omitted to be taken by the Agent, such L/C Issuer and their Related Parties in connection therewith; provided, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Agent's, any L/C Issuer's and their Related Parties' gross negligence or willful misconduct as determined by a final and nonappealable judgment of a court of competent jurisdiction.

**Relation Among Lenders**.  The Lenders are not partners or co-venturers, and no Lender shall be liable for the acts or omissions of, or (except as otherwise set forth herein in case of the Agent) authorized to act for, any other Lender.

**Defaulting Lender.**

If for any reason any Lender shall become a Defaulting Lender, then, in addition to the rights and remedies that may be available to the other Credit Parties, the Loan Parties or any other party at law or in equity, and not at limitation thereof, (i) such Defaulting Lender's right to participate in the administration of, or decision-making rights related to, the Obligations, this Agreement or the other Loan Documents shall be suspended during the pendency of such failure or refusal, (ii) a Defaulting Lender shall be deemed to have assigned any and all payments due to it from the Loan Parties, whether on account of outstanding Revolving Loans, interest, fees or otherwise, to the remaining non-Defaulting Lenders for application to, and reduction of, their proportionate shares of all outstanding Obligations, and (iii) at the option of the Agent, any amount payable to such Defaulting Lender hereunder (whether on account of principal, interest, fees or otherwise) shall, in lieu of being distributed to such Defaulting Lender, be retained by the Agent as cash collateral for future funding obligations of the Defaulting Lender in respect of any Revolving Loan or existing or future participating interest in any Letter of Credit.  The Defaulting Lender's decision-making and participation rights and rights to payments as set forth in clauses (i), (ii) and (iii) hereinabove shall be restored only upon the payment by the Defaulting Lender of its Revolving Credit Facility Applicable Percentage of any Obligations, any participation obligation, or expenses as to which it is delinquent, together with interest thereon at the rate set forth in Section 2.12 hereof from the date when originally due until the date upon which any such amounts are actually paid.

The non-Defaulting Lenders shall also have the right, but not the obligation, in their respective, sole and absolute discretion, to cause the termination and assignment, without any further action by the Defaulting Lender for no cash consideration (pro rata, based on the respective Revolving Commitments of those Lenders electing to exercise such right), of the Defaulting Lender's Revolving Commitment to fund future Revolving Loans.  Upon any such purchase of the Revolving Credit Facility Applicable Percentage of any Defaulting Lender, the Defaulting Lender's share in future Credit Extensions and its rights under the Loan Documents with respect thereto shall terminate on the date of purchase, and the Defaulting Lender shall promptly execute all documents reasonably requested to surrender and transfer such interest, including, if so requested, an Assignment and Assumption.

Each Defaulting Lender shall indemnify the Agent and each non-Defaulting Lender from and against any and all loss, damage or expenses, including but not limited to reasonable attorneys' fees and funds advanced by the Agent or by any non-Defaulting Lender, on account of a Defaulting Lender's failure to timely fund its Revolving Credit Facility Applicable Percentage of a Revolving Loan or to otherwise perform its obligations under the Loan Documents.

**MISCELLANEOUS**

1652368.6

**Amendments, Etc**.  (d)  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by any Loan Party therefrom, shall be effective unless in writing signed by the Agent, with the consent of the Required Lenders, and the applicable Loan Party, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; <u>provided</u>, <u>however</u>, that no such amendment, waiver or consent shall:

**increase the Revolving Commitment of any Lender (or reinstate any Revolving Commitment terminated pursuant to <u>Section 0</u>) without the written consent of such Lender;**

**as to any Lender, postpone any date fixed by this Agreement or any other Loan Document for (i) any scheduled payment (including the Maturity Date) of principal, interest, fees or other amounts due hereunder or under any of the other Loan Documents without the written consent of such Lender, or (ii) any scheduled or mandatory reduction or termination of the Aggregate Commitments hereunder or under any other Loan Document, without the written consent of such Lender;**

**as to any Lender, reduce the principal of, or the rate of interest specified herein on, any Revolving Loan held by such Lender, or any fees or other amounts payable hereunder or under any other Loan Document to or for the account of such Lender, without the written consent of such Lender; <u>provided</u>, <u>however</u>, that only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrowers to pay interest at the Default Rate;**

**as to any Lender, change <u>Section 2.12</u> or <u>Section 0</u> in a manner that would alter the pro rata sharing of payments required thereby without the written consent of such Lender;**

**change any provision of this Section or the definition of "Required Lenders," or any other provision hereof or of any Loan Document specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or under any other Loan Document or make any determination or grant any consent hereunder or thereunder, without the written consent of each Lender;**

**except as expressly permitted hereunder or under any other Loan Document, release, or limit the liability of, any Loan Party without the written consent of each Lender;**

**except for Permitted Dispositions or as provided in <u>Section 0</u>, release all or substantially all of the Collateral from the Liens of the Security Documents without the written consent of each Lender;**

**increase the advance rates contained in, or otherwise change, the definition of the term "Borrowing Base" or any component definition thereof if as a result thereof the amounts available to be borrowed by the Borrowers would be increased without the written consent of each Lender, *provided that* the foregoing shall not limit the discretion of the Agent to change, establish or eliminate any Reserves;**

- 126 -

**modify the definition of Permitted Overadvance so as to increase the amount thereof or, except as otherwise provided in such definition, the time period for which a Permitted Overadvance may remain outstanding without the written consent of each Lender; and**

**except as expressly permitted herein or in any other Loan Document, subordinate the Obligations hereunder or the Liens granted hereunder or under the other Loan Documents, to any other Indebtedness or Lien, as the case may be without the written consent of each Lender;**

and, provided further, that no amendment, waiver or consent shall, unless in writing and signed by the Agent in addition to the Lenders required above, affect the rights or duties of the Agent under this Agreement or any other Loan Document.  Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that the Revolving Commitment of such Lender may not be increased or extended without the consent of such Lender.

**Notwithstanding anything to the contrary in this Agreement or any other Loan Document, any Loan Document may be amended and waived with the consent of the Agent at the request of the Borrower without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (i) to comply with local Law or advice of local counsel, (ii) to cure ambiguities or defects or (iii) to cause any Loan Document to be consistent with this Agreement and the other Loan Documents.**

**Notices; Effectiveness; Electronic Communications.**

**Notices Generally.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection 0 below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service or sent by electronic mail or telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:**

**if to the Loan Parties or the Agent, to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 0; and**

**if to any other Lender, to the address, telecopier number, electronic mail address or telephone number specified on the signature pages hereto or in the Assignment and Assumption delivered by such Lender.**

Notices sent by hand or overnight courier service shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during

- 127 -

normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices delivered through electronic communications to the extent provided in subsection 0 below, shall be effective as provided in such subsection 0.

**Electronic Communications.  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Agent, <u>provided</u> that the foregoing shall not apply to notices to any Lender pursuant to <u>Article 0</u> if such Lender has notified the Agent that it is incapable of receiving notices under such Article by electronic communication.  The Agent or the Lead Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, <u>provided</u> that approval of such procedures may be limited to particular notices or communications.**

Unless the Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

**Change of Address, Etc.**  **Each of the Loan Parties and the Agent may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each other Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Lead Borrower and the Agent.  In addition, each Lender agrees to notify the Agent from time to time to ensure that the Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.**

**Reliance by Agent and Lenders.**  **The Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic Revolving Loan Notices) purportedly given by or on behalf of the Loan Parties even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Loan Parties shall indemnify the Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Loan Parties.  All telephonic notices to and other telephonic communications with the Agent may be recorded by the Agent, and each of the parties hereto hereby consents to such recording.**

**No Waiver; Cumulative Remedies**.  No failure by any Credit Party to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges provided herein and in the other Loan Documents are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.  Without limiting the generality of the foregoing, the making of a Revolving Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default or Event of Default, regardless of whether any Credit Party may have had notice or knowledge of such Default or Event of Default at the time.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at Law in connection with such enforcement shall be instituted and maintained exclusively by, the Agent in accordance with Section 8.02 for the benefit of all the Credit Parties; provided, however, that the foregoing shall not prohibit (a) the Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Agent) hereunder and under the other Loan Documents, or (b) any Credit Party from exercising setoff rights in accordance with Section 10.08 (subject to the terms of Section 2.11); and provided, further, that if at any time there is no Person acting as Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Agent pursuant to

- 129 -

Section 8.02 and (ii) in addition to the matters set forth in clauses (b) and (c) of the preceding proviso and subject to Section 2.11, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

1652368.6

**Expenses; Indemnity; Damage Waiver**.

<u>Costs and Expenses</u>.  **The Borrowers shall pay all Credit Party Expenses.**

<u>Indemnification by the Loan Parties</u>.  **The Loan Parties shall indemnify the Agent (and any sub-agent thereof), each other Credit Party, and each Related Party of any of the foregoing Persons (each such Person being called an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless (on an after tax basis) from, any and all losses, claims, causes of action, damages, liabilities, settlement payments, costs, and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by any Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder, the consummation of the transactions contemplated hereby or thereby, or the administration of this Agreement and the other Loan Documents, (ii) any Revolving Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by the L/C Issuer to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit, any bank advising or confirming a Letter of Credit and any other Person seeking to enforce the rights of a Borrower, beneficiary, transferee, or assignee or Letter of Credit proceeds or the holder of an instrument or document related to any Letter of Credit), (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Loan Party or any of its Subsidiaries, or any Environmental Liability related in any way to any Loan Party or any of its Subsidiaries, (iv) any claims of, or amounts paid by any Credit Party to, a Blocked Account Bank or other Person which has entered into a control agreement with any Credit Party hereunder, or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Borrower or any other Loan Party or any of the Loan Parties' directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; <u>provided</u> that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee.**

1652368.6

**Waiver of Consequential Damages, Etc.**  **To the fullest extent permitted by Law, the Loan Parties shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Revolving Loan or Letter of Credit or the use of the proceeds thereof.  No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.**

**Payments**.  **All amounts due under this Section shall be payable on demand therefor.**

**Survival**.  **The agreements in this Section shall survive the resignation of any Agent, the assignment of any Revolving Commitment or Revolving Loan, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.**

**Payments Set Aside**.  To the extent that any payment by or on behalf of the Loan Parties is made to any Credit Party, or any Credit Party exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Credit Party in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any applicable Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Agent upon demand its Revolving Credit Facility Applicable Percentage (without duplication) of any amount so recovered from or repaid by the Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect.  The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

**Successors and Assigns**.

**Successors and Assigns Generally.**  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document without the prior written consent of the Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of <u>Section 0</u>, (ii) by way of participation in accordance with the provisions of subsection <u>Section 0</u>, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of <u>Section 0</u> (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection <u>0</u> of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Credit Parties) any legal or equitable right, remedy or claim under or by reason of this Agreement.

**Assignments by Lenders**.  Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Revolving Commitment(s) and the Revolving Loans (including for purposes of this <u>Section 0</u>, participations in L/C Obligations) at the time owing to it); <u>provided</u> that any such assignment shall be subject to the following conditions:

**Minimum Amounts.**

in the case of an assignment of the entire remaining amount of the assigning Lender's Revolving Commitment and the Revolving Loans at the time owing to it or in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, no minimum amount need be assigned; and

in any case not described in subsection 000 of this Section, the aggregate amount of the Revolving Commitments (which for this purpose includes Revolving Loans outstanding thereunder) or, if the Revolving Commitments are not then in effect, the principal outstanding balance of the Revolving Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $5,000,000 unless the Agent otherwise consents (such consent not to be unreasonably withheld or delayed);

- 133 -

**Proportionate Amounts.**  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the portion of the Revolving Loans or the Revolving Commitment assigned;

**Required Consents.**  No consent shall be required for any assignment except to the extent required in the definition of "Eligible Assignee" or by subsection <u>000</u> of this Section and, in addition, the consent of the Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of any Revolving Commitment or Revolving Loan hereunder if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender; and

**Assignment and Assumption.**  The parties to each assignment shall execute and deliver to the Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500, <u>provided</u>, <u>however</u>, that the Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.

Subject to acceptance and recording thereof by the Agent pursuant to subsection <u>0</u> of this Section, from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of <u>Sections 0</u>, <u>0</u>, and <u>0</u> with respect to facts and circumstances occurring prior to the effective date of such assignment. Upon request, the Borrowers (at their expense) shall execute and deliver one or more Notes to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with <u>Section 0</u>.

**Register.**  The Agent, acting solely for this purpose as an agent of the Borrowers, shall maintain at the Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Revolving Commitments of, and principal amounts of the Revolving Loans and L/C Obligations owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**").  The entries in the Register shall be conclusive, absent manifest error, and the Loan Parties, the Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Lead Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.


**Participations.**  Any Lender may at any time, without the consent of, or notice to, the Loan Parties or the Agent, sell participations to any Person (other than a natural person or the Loan Parties or any of the Loan Parties' Affiliates or Subsidiaries) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Revolving Commitment and/or the Revolving Loans (including such Lender's participations in L/C Obligations); **provided** that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Loan Parties, the Agent, the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any Participant shall agree in writing to comply with all confidentiality obligations set forth in **Section 0** as if such Participant was a Lender hereunder.


Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any  provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 0 that affects such Participant.  Subject to subsection 0 of this Section, the Loan Parties agree that each Participant shall be entitled to the benefits of Sections 0, and 0 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 0.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 0 as though it were a Lender, provided such Participant agrees to be subject to Section 2.11 as though it were a Lender.

**Limitations upon Participant Rights**.  A Participant shall not be entitled to receive any greater payment under <u>Section 0</u> or <u>0</u> than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Lead Borrower's prior written consent.

**Certain Pledges**.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; <u>provided</u> that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

**Electronic Execution of Assignments**.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**Assignment to SPV**.  Notwithstanding any provision to the contrary, any Lender may assign to one or more special purpose funding vehicles (each, an "<u>SPV</u>") all or any portion of its funded Revolving Loans (without the corresponding Revolving Commitment), without the consent of any Person or the payment of a fee, by execution of a written assignment agreement in a form agreed to by such Lender and such SPV, and may grant any such SPV the option, in such SPV's sole discretion, to provide the Borrowers all or any part of any Revolving Loans that such Lender would otherwise be obligated to make pursuant to this Agreement.  Such SPVs shall have all the rights which a Lender making or holding such Revolving Loans would have under this Agreement, but no obligations.  The Lender making such assignment shall remain liable for all its original obligations under this Agreement, including its Revolving Commitment (although the unused portion thereof shall be reduced by the principal amount of any Revolving Loans held by an SPV).  Notwithstanding such assignment, the Agent and Borrowers may deliver notices to the Lender making such assignment (as agent for the SPV) and not separately to the SPV unless the Agent and Borrowers are requested in writing by the SPV (or its agent) to deliver such notices separately to it.   The Borrowers shall, at the request of any such Lender, execute and deliver to such Person as such Lender may designate, a Note in the amount of such Lender's original Note to evidence the Revolving Loans of such Lender and related SPV.

**Assignments by Crystal Entities.  Notwithstanding anything in this Agreement or the other Loan Documents, (x) no Crystal Entity shall be required to comply with Section 10.06(b) in connection with any transaction involving any other Crystal Entity or any of its or their lenders or funding or financing sources, none of the foregoing shall be considered an assignee hereunder and Crystal shall have no obligation to disclose any such transaction to any Person, and (y) there shall be no limitation or restriction on (I) the ability of any Crystal Entity to assign or otherwise transfer its rights and/or obligations under this Agreement or any other Loan Document, any Revolving Commitment, or any Obligation to any other Crystal Entity or any lender or financing or funding source of a Crystal Entity or (II) any such lender's or funding or financing source's ability to assign or otherwise transfer its rights and/or obligations under this Agreement or any other Loan Document, any Revolving Commitment, or any Obligation; provided, however, that Crystal shall continue to be liable as a "Lender" under this Agreement and the other Loan Documents unless such other Person complies with the provisions of this Agreement to become a "Lender."**

**Defaulting Lenders; Non-Consenting Lenders.  If any Lender is a Defaulting Lender or if any Lender (other than the Agent) does not consent (a "Non-Consenting Lender") to a proposed amendment, waiver, consent or release with respect to any Loan Document, the Agent or the Lead Borrower may replace such Defaulting Lender or such Non-Consenting Lender, as applicable, and require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, this Section 10.06), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations; provided that if such replacement is of a Non-Consenting Lender, such amendment, waiver, consent or release can be effected as a result of the assignment contemplated by this Section (together with all other such assignments required by the Lead Borrower to be made pursuant to this paragraph), provided further that such Defaulting Lender or Non-Consenting Lender shall have received payment of an amount equal to the outstanding principal of its Revolving Loans accrued interest thereon, accrued fees (except that accrued fees shall not be payable to a Defaulting Lender) and all other amounts payable to it hereunder and under the other Loan Documents from the Eligible Assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts).**

**Treatment of Certain Information; Confidentiality**.  Each of the Credit Parties agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates, Approved Funds, and to its and its Affiliates' and Approved Funds' respective partners, directors, officers, employees, agents, funding sources, attorneys, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority), (c) to the extent required by Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (g) with the consent of the Lead Borrower, (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to any Credit Party or any of their respective Affiliates on a non-confidential basis from a source other than the Loan Parties, or (i) to any commercial finance examiner and any appraiser engaged by the Agent (which appraiser may be an Affiliate of (i) the Administrative Agent, (ii) any Lender, (iii) any Participant or (iv) any SPC, assignee or other participant permitted under Section 10.06) and such appraiser's affiliates, agents, advisors (legal or otherwise) or representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential).

    For purposes of this Section, "Information" means all information received from the Loan Parties or any Subsidiary thereof relating to the Loan Parties or any Subsidiary thereof or their respective businesses, other than any such information that is available to any Credit Party on a non-confidential basis prior to disclosure by the Loan Parties or any Subsidiary thereof.  In addition, the Agent may disclose to any agency or organization that assigns standard identification numbers to loan facilities such basic information describing the facilities provided hereunder as is necessary to assign unique identifiers (and, if requested, supply a copy of this Agreement), it being understood that the Person to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to make available to the public only such Information as such person normally makes available in the course of its business of assigning identification numbers. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

    Each of the Credit Parties acknowledges that (a) the Information may include material non-public information concerning the Loan Parties or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with Law, including federal and state securities Laws.

In addition, and notwithstanding anything herein to the contrary, (i) the Credit Parties may provide information concerning the Loan Parties and the facilities established herein to Loan Pricing Corporation and/or other recognized trade publishers of information for general circulation in the loan market, and (ii) subject to the provisions of Section 10.19, the Credit Parties may use the name, logos, and other insignia of any of the Loan Parties and the maximum credit provided hereunder in any "tombstone" or comparable advertising, on its website or in other marketing materials of such Credit Party.

1652368.6

**Right of Setoff**.  Subject to the terms of the DIP Orders, if an Event of Default shall have occurred and be continuing or if any Lender shall have been served with a trustee process or similar attachment relating to property of a Loan Party, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Agent or the Required Lenders, to the fullest extent permitted by Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) or other property at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Borrowers or any other Loan Party against any and all of the Obligations now or hereafter existing under this Agreement or any other Loan Document to such Lender, regardless of the adequacy of the Collateral, and irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrowers or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness.  The rights of each Lender and its Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or its Affiliates may have.  Each Lender agrees to notify the Lead Borrower and the Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

**Interest Rate Limitation**.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by Law (the "Maximum Rate").  If the Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Revolving Loans or, if it exceeds such unpaid principal, refunded to the Borrowers.  In determining whether the interest contracted for, charged, or received by the Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**Counterparts; Integration; Effectiveness**.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 0, this Agreement shall become effective when it shall have been executed by the Agent and when the Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy, pdf or other electronic transmission shall be as effective as delivery of a manually executed counterpart of this Agreement.

**Survival**.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Credit Parties, regardless of any investigation made by any Credit Party or on their behalf and notwithstanding that any Credit Party may have had notice or knowledge of any Default or Event of Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Revolving Loan or any other Obligation hereunder shall remain unpaid or unsatisfied or any Letter of Credit shall remain outstanding.  Further, the provisions of Sections 0, 0, and 0 and Article 0 shall survive and remain in full force and effect regardless of the repayment of the Obligations, the expiration or termination of the Letters of Credit and the Revolving Commitments or the termination of this Agreement or any provision hereof.  In connection with the termination of this Agreement and the release and termination of the security interests in the Collateral, the Agent may require such indemnities and collateral security as they shall reasonably deem necessary or appropriate to protect the Credit Parties against (x) loss on account of credits previously applied to the Obligations that may subsequently be reversed or revoked, and (y) any Obligations that may thereafter arise under Section 0 hereof.

**Severability**.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**Governing Law; Jurisdiction; Etc**.

**<u>GOVERNING LAW</u>.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT (EXCEPT, AS TO ANY OTHER LOAN DOCUMENT, AS EXPRESSLY SET FORTH THEREIN) AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE BANKRUPTCY CODE AND THE LAW OF THE STATE OF NEW YORK.**

1652368.6

**SUBMISSION TO JURISDICTION.**  **EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, AGAINST THE AGENT, ANY LENDER, OR ANY RELATED PARTY OF THE FOREGOING IN ANY WAY RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS RELATING HERETO OR THERETO, IN ANY FORUM OTHER THAN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE OR THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT.  EACH OF THE LOAN PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT ANY CREDIT PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.**

**WAIVER OF VENUE.**  **EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION.  EACH OF THE LOAN PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.**

**Waiver of Jury Trial**.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**No Advisory or Fiduciary Responsibility**.  In connection with all aspects of each transaction contemplated hereby, the Loan Parties each acknowledge and agree that: (a) the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Loan Parties, on the one hand, and the Credit Parties, on the other hand, and each of the Loan Parties is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (b) in connection with the process leading to such transaction, each Credit Party is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Loan Parties or any of their respective Affiliates, stockholders, creditors or employees or any other Person; (c) none of the Credit Parties has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Loan Parties with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether any of the Credit Parties has advised or is currently advising any Loan Party or any of its Affiliates on other matters) and none of the Credit Parties has any obligation to any Loan Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (d) the Credit Parties and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and none of the Credit Parties has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (e) the Credit Parties have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and each of the Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate.  Each of the Loan Parties hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against each of the Credit Parties or against any commercial finance examiner and any appraiser engaged by the Agent (which appraiser may be an Affiliate of (i) the Administrative Agent, (ii) any Lender, (iii) any Participant or (iv) any SPC, assignee or other participant permitted under Section 10.06) with respect to any breach or alleged breach of agency or fiduciary duty.

1652368.6

**USA Patriot Act Notice**.  Each Lender that is subject to the Act (as hereinafter defined) and the Agent (for itself and not on behalf of any Lender) hereby notifies the Loan Parties that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Agent, as applicable, to identify each Loan Party in accordance with the Act. Each Loan Party is in compliance, in all material respects, with the Patriot Act.  No part of the proceeds of the Revolving Loans will be used by the Loan Parties, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.  The Loan Parties shall, promptly following a request by the Agent or any Lender, provide all documentation and other information that the Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Act.

**Foreign Asset Control Regulations**.  Neither of the advance of the Revolving Loans nor the use of the proceeds of any thereof will violate the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) (the "Trading With the Enemy Act") or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) (the "Foreign Assets Control Regulations") or any enabling legislation or executive order relating thereto (which for the avoidance of doubt shall include, but shall not be limited to (a) Executive Order 13224 of September 21, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "Executive Order") and (b) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56)).  Furthermore, none of the Borrowers or their Affiliates (a) is or will become a "blocked person" as described in the Executive Order, the Trading With the Enemy Act or the Foreign Assets Control Regulations or (b) engages or will engage in any dealings or transactions, or be otherwise associated, with any such "blocked person" or in any manner violative of any such order.

**Time of the Essence**.  Time is of the essence of the Loan Documents.

**Press Releases**.

Each Credit Party executing this Agreement agrees that neither it nor its Affiliates will in the future issue any press releases or other public disclosure using the name of the Agent or its Affiliates or referring to this Agreement or the other Loan Documents without at least two (2) Business Days' prior notice to the Agent and the Lead Borrower and without the prior written consent of the Agent and, if such information has not been previously publically disclosed, the Lead Borrower (whose consent shall not be unreasonably withheld or delayed, unless (and only to the extent that) such Credit Party or Affiliate is required to do so under Law and then, in any event, such Credit Party or Affiliate will consult with the Agent before issuing such press release or other public disclosure.

Each Loan Party consents to the publication by the Agent or any Lender of advertising material relating to the financing transactions contemplated by this Agreement using any Loan Party's name, product photographs, logo or trademark, but not including any confidential information of any Loan Party or the covenants/pricing of the financing transactions contemplated by this Agreement.  If such information has not been previously publically disclosed, the Agent or such Lender shall provide a draft reasonably in advance of any advertising material to the Lead Borrower for its approval (not to be unreasonably withheld or delayed) prior to the publication thereof.  The Agent reserves the right to provide to industry trade organizations information necessary and customary for inclusion in league table measurements.

**Additional Waivers**.

The Loan Parties are each Affiliates of each other and will benefit from the making of loans and other financial accommodations set forth herein to each other Loan Party.  The Obligations are the joint and several obligation of each Loan Party.  To the fullest extent permitted by Law, the obligations of each Loan Party shall not be affected by (i) the failure of any Credit Party to assert any claim or demand or to enforce or exercise any right or remedy against any other Loan Party under the provisions of this Agreement, any other Loan Document or otherwise, (ii) any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, this Agreement or any other Loan Document, or (iii) the failure to perfect any security interest in, or the release of, any of the Collateral or other security held by or on behalf of the Agent or any other Credit Party.

The obligations of each Loan Party shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Obligations after the termination of the Revolving Commitments), including any claim of waiver, release, surrender, alteration or compromise of any of the Obligations, and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of each Loan Party hereunder shall not be discharged or impaired or otherwise affected by the failure of the Agent or any other Credit Party to assert any claim or demand or to enforce any remedy under this Agreement, any other Loan Document or any other agreement, by any waiver or modification of any provision of any thereof, any default, failure or delay, willful or otherwise, in the performance of any of the Obligations, or by any other act or omission that may or might in any manner or to any extent vary the risk of any Loan Party or that would otherwise operate as a discharge of any Loan Party as a matter of law or equity (other than the indefeasible payment in full in cash of all the Obligations after the termination of the Revolving Commitments).

To the fullest extent permitted by Law, each Loan Party waives any defense based on or arising out of any defense of any other Loan Party or the unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any other Loan Party, other than the indefeasible payment in full in cash of all the Obligations and the termination of the Revolving Commitments. The Agent and the other Credit Parties may, at their election, foreclose on any security held by one or more of them by one or more judicial or non-judicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Obligations, make any other accommodation with any other Loan Party, or exercise any other right or remedy available to them against any other Loan Party, without affecting or impairing in any way the liability of any Loan Party hereunder except to the extent that all the Obligations have been indefeasibly paid in full in cash and the Revolving Commitments have been terminated.  Each Loan Party waives any defense arising out of any such election even though such election operates, pursuant to Law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Loan Party against any other Loan Party, as the case may be, or any security.

**Upon payment by any Loan Party of any Obligations, all rights of such Loan Party against any other Loan Party arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and junior in right of payment to the prior indefeasible payment in full in cash of all the Obligations and the termination of the Revolving Commitments. In addition, any indebtedness of any Loan Party now or hereafter held by any other Loan Party is hereby subordinated in right of payment to the prior indefeasible payment in full of the Obligations and no Loan Party will demand, sue for or otherwise attempt to collect any such indebtedness.  If any amount shall erroneously be paid to any Loan Party on account of (i) such subrogation, contribution, reimbursement, indemnity or similar right or (ii) any such indebtedness of any Loan Party, such amount shall be held in trust for the benefit of the Credit Parties and shall forthwith be paid to the Agent to be credited against the payment of the Obligations, whether matured or unmatured, in accordance with the terms of this Agreement and the other Loan Documents.**

**No Strict Construction**.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.   In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

**Attachments**.  The exhibits, schedules and annexes attached to this Agreement are incorporated herein and shall be considered a part of this Agreement for the purposes stated herein, except that in the event of any conflict between any of the provisions of such exhibits and the provisions of this Agreement, the provisions of this Agreement shall prevail.

**Relationship with DIP Orders**

In the event of any inconsistency between the terms of the DIP Orders and the Loan Documents, the terms of the DIP Orders shall control and the representations, warranties, covenants, agreements or events of default made herein and in the other Loan Documents shall be subject to the terms of the DIP Orders.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

1652368.6

*IN WITNESS WHEREOF,* the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

<u>**BORROWERS**</u>:

**QUANTUM FOODS, LLC,** as Lead Borrower and as a Borrower

By: _____
Name: _____
Title:_____

**QUANTUM FOODS 213-D, LLC,** as a Borrower

By: _____
Name: _____
Title:_____

**QUANTUM CULINARY, LLC,** as a Borrower

By: _____
Name: _____
Title:_____

**GDC LOGISTICS, LLC,** as a Borrower

By: _____
Name: _____
Title:_____

**CHOICE ONE FOODS, LLC,** as a
Borrower

By: _____
Name: _____
Title: _____

**NORTH STAR FOODS (QRME), LLC,**
as a Guarantor

By: _____
Name: _____
Title: _____

**QUANTUM ROSA MYSTICA
ENTERPRISES, LLC,** as a Guarantor

By: _____
Name: _____
Title: _____

**CRYSTAL FINANCIAL LLC**, as Agent and as a Revolving Lender

By: _____
Name: _____
Title:_____

**SOLAR CAPITAL LTD.**, as a Revolving Lender

By: _____
Name: _____
Title:_____

**DA FUNDING, LLC**, as a Revolving Lender

By: _____
Name: _____
Title:_____

## EXHIBIT C

**Budget**

**Project Steak**
**Contingency Budget**
**Cash Flows: Source / (Use)**

| | T | T | T | T | T | T | T | T | T | T | T | T | T | T | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Period: | 2 | 2 | 3 | 3 | 3 | 3 | 4 | 4 | 4 | 4 | 5 | 5 | 5 | 5 | Total |
| Week: | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | |
| Actual / Forecast (A / F): | F | F | F | F | F | F | F | F | F | F | F | F | F | F | |
| Post-Petition: | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | |
| Week-Ended: | 14-Feb | 21-Feb | 28-Feb | 7-Mar | 14-Mar | 21-Mar | 28-Mar | 4-Apr | 11-Apr | 18-Apr | 25-Apr | 2-May | 9-May | 16-May | |
| **Sales** | $ 6,809 | $ 7,435 | $ 7,788 | $ 7,788 | $ 7,788 | $ 7,788 | $ 7,336 | $ 7,723 | $ 7,723 | $ 7,723 | $ 7,833 | $ 7,833 | $ 7,833 | $ 7,833 | 107,232 |
| **Cash Receipts:** | | | | | | | | | | | | | | | |
| AR receipts excl Asian Foods | 6,453 | 5,725 | 5,722 | 6,452 | 7,079 | 7,431 | 7,505 | 7,580 | 7,580 | 7,129 | 7,515 | 7,515 | 7,515 | 7,625 | 98,827 |
| AR receipts - Asian Foods | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 250 | 250 | 250 | 250 | 175 | 175 | 175 | 3,097 |
| Excess Funds - Operating Account | 1,812 | - | - | - | - | - | - | - | - | - | - | - | - | - | 1,812 |
| **Cash receipts - Total** | **8,490** | **5,949** | **5,947** | **6,677** | **7,303** | **7,656** | **7,730** | **7,830** | **7,830** | **7,379** | **7,765** | **7,690** | **7,690** | **7,800** | **103,736** |
| **Operating Disbursements:** | | | | | | | | | | | | | | | |
| Existing AP Runoff | (115) | - | - | - | - | - | - | - | - | - | - | - | - | - | (115) |
| Raw materials | (3,647) | (5,014) | (5,670) | (1,089) | (1,000) | (5,581) | (5,161) | (5,211) | (5,007) | (5,218) | (5,247) | (4,216) | (5,370) | (5,370) | (62,798) |
| Packaging & Spice | (317) | (436) | (493) | (58) | (53) | (53) | (50) | (53) | (488) | (453) | (455) | (381) | (401) | (401) | (4,091) |
| R&M / Supplies / Plant Services | (94) | (94) | (20) | (20) | (20) | (20) | (20) | (181) | (106) | (106) | (106) | (92) | (92) | (92) | (1,060) |
| Freight | (124) | (124) | - | - | - | - | - | - | (124) | (124) | (124) | (124) | (124) | (124) | (992) |
| Sales-related / allowances | - | (45) | (45) | (45) | (45) | (45) | (357) | (45) | (45) | (45) | (45) | (668) | (45) | (45) | (1,520) |
| Sales Commissions | (54) | (54) | (108) | - | (115) | - | (115) | - | (107) | - | (107) | - | (106) | - | (766) |
| Payroll & Benefits - DL & OH | (801) | (792) | (823) | (1,208) | (748) | (748) | (725) | (1,205) | (749) | (824) | (731) | (1,169) | (731) | (731) | (11,984) |
| Payroll & Benefits - Selling | (43) | (43) | (72) | (42) | (42) | (42) | (73) | (43) | (43) | (43) | (73) | (43) | (43) | (43) | (685) |
| Payroll & Benefits - G&A | (128) | (128) | (122) | (122) | (122) | (122) | (122) | (122) | (122) | (122) | (122) | (122) | (122) | (122) | (1,718) |
| Insurance | - | (470) | (112) | (175) | - | - | (112) | (175) | - | - | (112) | (175) | - | - | (1,330) |
| Rent | - | - | - | (691) | - | - | - | (576) | - | - | - | (340) | - | - | (1,608) |
| Utilities | - | (162) | - | - | (189) | (189) | - | - | (202) | (202) | - | - | - | (187) | (1,131) |
| Crossroads | - | - | - | (99) | - | (99) | - | (106) | - | (106) | - | - | (98) | - | (508) |
| QRME Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Consulting Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| SG&A: Other | - | (9) | (8) | (8) | (8) | (8) | (8) | (51) | (51) | (82) | (51) | (51) | (51) | (82) | (470) |
| Capex | - | - | - | - | (51) | - | - | - | (130) | - | - | - | (168) | - | (349) |
| Capital lease payments | - | (190) | (190) | - | - | (190) | (190) | - | - | (190) | (190) | - | - | - | (1,140) |
| **Operating disbursements - Total** | **(5,322)** | **(7,560)** | **(7,662)** | **(3,557)** | **(2,393)** | **(7,097)** | **(6,933)** | **(7,768)** | **(7,174)** | **(7,514)** | **(7,361)** | **(7,379)** | **(7,349)** | **(7,194)** | **(92,265)** |
| **Non-Operating Disbursements:** | | | | | | | | | | | | | | | |
| Interest | - | - | - | (520) | - | - | - | (525) | - | - | - | (535) | - | - | (1,581) |
| Professional Fees | (405) | - | - | - | - | (500) | - | - | - | (856) | - | - | - | (861) | (2,622) |
| Asset Sale Proceeds | - | 158 | - | - | - | - | - | - | - | - | - | - | - | - | 158 |
| Severance | (26) | (13) | (11) | (10) | (9) | (5) | (5) | (4) | (4) | (1) | - | - | - | - | (86) |
| Excess Inventory Sales | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| GDC Consolidation Costs | - | - | - | - | - | - | (175) | (175) | (175) | (175) | - | - | - | - | (700) |
| **Non-Operating Disbursements - Total** | **(431)** | **145** | **(11)** | **(530)** | **(9)** | **(505)** | **(180)** | **(704)** | **(179)** | **(1,032)** | **-** | **(535)** | **-** | **(861)** | **(4,831)** |
| **First Day Motion Payments:** | | | | | | | | | | | | | | | |
| Critical Vendors | - | - | (807) | (807) | (982) | (982) | (457) | (107) | (107) | - | - | - | - | - | (4,250) |
| Customer Programs | - | - | - | (655) | - | - | - | (345) | - | - | - | - | - | - | (1,000) |
| Wage & Benefits | - | - | (105) | (105) | (105) | (105) | (105) | (105) | - | - | - | - | - | - | (630) |
| Independent Contractors | - | - | (233) | (233) | - | - | - | - | - | - | - | - | - | - | (465) |
| Utility Deposits | - | - | (238) | (238) | - | - | - | - | - | - | - | - | - | - | (475) |
| | | | | | | | | | | | | | | | - |
| **First Day Motion Payments - Total** | **-** | **-** | **(1,382)** | **(2,037)** | **(1,087)** | **(1,087)** | **(562)** | **(557)** | **(107)** | **-** | **-** | **-** | **-** | **-** | **(6,820)** |
| **Net Cash Flow** | **2,737** | **(1,466)** | **(3,108)** | **553** | **3,814** | **(1,033)** | **54** | **(1,199)** | **370** | **(1,168)** | **404** | **(224)** | **341** | **(255)** | **(179)** |
| **Net Cash Flow - Cumulative** | **2,737** | **1,271** | **(1,837)** | **(1,284)** | **2,530** | **1,497** | **1,552** | **353** | **723** | **(445)** | **(42)** | **(266)** | **75** | **(179)** | |

*Note: First Day Motion payments are subject to DIP Lender assent.*

DRAFT - SUBJECT TO MATERIAL CHANGE

**Project Steak**
**Contingency Budget**
**Cash Flows: Source / (Use)**

| | T | T | T | T | T | T | T | T | T | T | T | T | T | T | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Period:** | 2 | 2 | 3 | 3 | 3 | 3 | 4 | 4 | 4 | 4 | 5 | 5 | 5 | 5 | **Total** |
| **Week:** | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | |
| **Actual / Forecast (A / F):** | F | F | F | F | F | F | F | F | F | F | F | F | F | F | |
| **Post-Petition:** | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | |
| **Week-Ended:** | 14-Feb | 21-Feb | 28-Feb | 7-Mar | 14-Mar | 21-Mar | 28-Mar | 4-Apr | 11-Apr | 18-Apr | 25-Apr | 2-May | 9-May | 16-May | |
| **AP Rollforward (Pre-Petition)** | | | | | | | | | | | | | | | |
| Beginning Balance | 17,980 | 17,846 | 17,846 | 16,702 | 14,902 | 13,815 | 12,728 | 12,165 | 11,608 | 11,501 | 11,501 | 11,501 | 11,501 | 11,501 | 17,980 |
| Purchases | 4,453 | - | - | - | - | - | - | - | - | - | - | - | - | - | 4,453 |
| Payments | (4,472) | - | (1,145) | (1,800) | (1,087) | (1,087) | (562) | (557) | (107) | - | - | - | - | - | (6,345) |
| First Day Motion Payments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other / Adj to Actuals | (115) | - | - | - | - | - | - | - | - | - | - | - | - | - | (115) |
| **Ending Balance** | 17,846 | 17,846 | 16,702 | 14,902 | 13,815 | 12,728 | 12,165 | 11,608 | 11,501 | 11,501 | 11,501 | 11,501 | 11,501 | 11,501 | 11,501 |
| **AP Rollforward (Post-Petition - Excluding Professional Fees)** | | | | | | | | | | | | | | | |
| Beginning Balance | - | - | 43 | 346 | 5,709 | 10,666 | 11,041 | 11,582 | 12,099 | 12,336 | 12,292 | 12,444 | 13,685 | 13,752 | - |
| Purchases | - | 6,712 | 6,996 | 8,059 | 6,373 | 6,611 | 6,520 | 7,422 | 6,442 | 6,608 | 6,638 | 7,851 | 6,540 | 6,462 | 89,234 |
| Payments | - | (6,670) | (6,693) | (2,695) | (1,417) | (6,236) | (5,980) | (6,905) | (6,204) | (6,652) | (6,485) | (6,611) | (6,474) | (6,426) | (75,446) |
| Other / Adj to Actuals | | | | | | | | | | | | | | | - |
| **Ending Balance** | - | 43 | 346 | 5,709 | 10,666 | 11,041 | 11,582 | 12,099 | 12,336 | 12,292 | 12,444 | 13,685 | 13,752 | 13,788 | 13,788 |
| **Crystal Loan Balance** | | | | | | | | | | | | | | | |
| Beginning Balance | 51,096 | 49,234 | 52,350 | 55,458 | 54,905 | 51,091 | 52,124 | 52,069 | 53,268 | 52,898 | 54,066 | 53,663 | 54,712 | 54,371 | 51,096 |
| Disbursements / (Paydowns) | (2,737) | 1,466 | 3,108 | (553) | (3,814) | 1,033 | (54) | 1,199 | (370) | 1,168 | (404) | 224 | (341) | 255 | 179 |
| Capitalized Fees | 875 | 1,650 | - | - | - | - | - | - | - | - | - | 825 | - | - | 3,350 |
| | | | | | | | | | | | | | | | - |
| Other / Adj to Actuals | | | | | | | | | | | | | | | - |
| **Ending Balance** | 49,234 | 52,350 | 55,458 | 54,905 | 51,091 | 52,124 | 52,069 | 53,268 | 52,898 | 54,066 | 53,663 | 54,712 | 54,371 | 54,625 | 54,625 |