## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------- x

In re                                                :   Chapter 11

                                        :

QUANTUM FOODS, LLC, *et al.,*[1]    :   Case No.  14-10318 (___)

                                        :

          Debtors.                           :   Joint Administration Requested

                                        :

                                        :   **Hearing Date: To Be Determined**

                                        :   **Objection Deadline: To Be Determined**

                                        :

------------------------------------------------------------------- x

**DEBTORS' MOTION FOR ORDERS (I)(A) APPROVING BID PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS AND AUTHORIZING THE DEBTORS TO ENTER INTO THE STALKING HORSE AGREEMENT (B) SCHEDULING THE AUCTION, (C) AUTHORIZING PAYMENT OF THE BREAK-UP FEE, (D) APPROVING THE DEPOSIT ESCROW AGREEMENT, (E) APPROVING THE ASSUMPTION AND ASSIGNMENT PROCEDURES RELATED TO THE SALE, (F) SCHEDULING THE SALE HEARING, AND (G) APPROVING THE FORM OF THE SALE NOTICE; AND (II) (A) AUTHORIZING THE SALE OF SUCH ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (B) AUTHORIZING AND APPROVING THE  PURCHASE AGREEMENT FOR SUCH SALE, (C) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO, AND (D) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby move (the "Motion") the Court, pursuant to sections 105, 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for the entry of two orders:

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Quantum Foods, LLC (9437); Quantum Foods 213-D, LLC (1862); Quantum Culinary, LLC (1302); GDC Logistics, LLC (1997); Choice One Foods, LLC (9512).  The Debtors' mailing address is c/o Quantum Foods, LLC, 750 South Schmidt Road, Bolingbrook, Illinois  60440.

(I)    **<u>Bid Procedures Order</u>** — an order substantially in the form attached hereto as <u>Exhibit A</u> (the "<u>Bid Procedures Order</u>") —

(A)    establishing procedures substantially in the form attached to the Bid Procedures Order as <u>Exhibit 1</u> (collectively, the "<u>Bid Procedures</u>") for the sale of substantially all of the Debtors' assets (collectively, as may be further defined in any applicable asset purchase agreement(s), the "<u>Acquired Assets</u>") in one or more transactions;

(B)    authorizing the Debtors to enter into an asset purchase agreement (the "<u>Asset Purchase Agreement</u>") with CTI Foods Holding Co., LLC as a stalking horse bidder (such Asset Purchase Agreement, the "<u>Stalking Horse Agreement</u>" and such bidder, the "<u>Stalking Horse Bidder</u>"), and to provide a break-up fee and expense reimbursement (together, the "<u>Break-Up Fee</u>") to the Stalking Horse Bidder in connection therewith;

(C)    scheduling an auction of the Acquired Assets (the "<u>Auction</u>");

(D)    approving the form of escrow agreement to be executed in connection with the submission of bids at the Auction (the "<u>Deposit Escrow Agreement</u>");

(E)    establishing procedures substantially in the form attached to the Bid Procedures Order as Exhibit 2 (the "<u>Assumption & Assignment Procedures</u>") for  assumption and assignment of executory contracts and unexpired leases (collectively, the "<u>Executory Contracts</u>") in connection with the Sale (as defined below);

(F)    scheduling a hearing to approve the Sale (the "<u>Sale Hearing</u>"); and

(G)    approving the form and manner of notice of the Bid Procedures, the Auction and the Sale Hearing;

(II)    **<u>Sale Order</u>** — upon the conclusion of the Sale Hearing, an order (the "<u>Sale Order</u>") —

(A)    approving the sale of the Acquired Assets, or any combination thereof, to the Successful Bidder (as defined below) free and clear of liens, claims, interests and encumbrances (the "<u>Sale</u>");

(B)    authorizing and approving the Asset Purchase Agreement of the Successful Bidder;

(C)    approving the assumption and assignment by the Debtors of the Executory Contracts in connection with the Sale to the Successful Bidder; and

(D)    granting other related relief.

In support of this Motion, the Debtors (a) rely upon the *Declaration of Edgar Reilly in Support of Chapter 11 Petitions and First-Day Pleadings* [Docket No. 2] (the "First Day Declaration")[2] and (b) respectfully represent as follows:

**Background**

1.      On February 18, 2014 (the "Petition Date"), each of the Debtors commenced a case under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  The Debtors' have requested that these Chapter 11 Cases be consolidated for procedural purposes only.  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No appointment of a trustee or examiner has been made in these Chapter 11 Cases and no committees have been appointed or designated.

2.      The Debtors, headquartered in Bolingbrook, Illinois, are a leading further-processor of proteins, including beef, pork and poultry.

3.      Founded in 1990 as a hand-cut steak butchering operation, the Debtors provide custom-menu solutions for national and regional chains, including full-service and quick-service restaurants.  The Debtors are also an important co-packer to the nation's largest retailers and serve the hospitality industry and the United States military.  The Debtors' customer base includes household names in the foodservice, retail, industrial and specialty (e.g., military, schools, home delivery, and distributor) channels.

4.      In laymen's terms, the Debtors purchase raw protein products and further prepare them for the needs of the Debtors customers at the Debtors' state of the art Bolingbrook facilities.  This preparation process includes specific portioning and packaging of serving sizes

---

[2]      The Debtors reserve the right to file one or more additional supporting declarations in connection with the hearing to consider the Bid Procedures (the "Bid Procedures Hearing") and the Sale Hearing.

custom ordered by the Debtors' clients.  The Debtors provide their restaurant clients with precise portion controlled meat products, a quality that customers in the Debtors' business greatly value. The Debtors' products include both fully-cooked and ready-to-cook items.  The Debtors' ready-to-cook offerings include portion controlled, breaded, par-cooked, unbreaded, and seasoned steaks, cutlets, tenders, and strips.  The Debtors' fully-cooked offerings include whole muscle, as well as sliced, pulled, unbreaded, seasoned, smoked, and sauced meats, often contained in reheatable bags.

5.     Further information regarding the Debtors' business, capital structure, and the circumstances leading to these Chapter 11 Cases is set forth in the First Day Declaration, which is incorporated herein by reference.

### Jurisdiction

6.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue for this matter is proper in this district pursuant to 28 U.S.C. § 1409.

### The Proposed Sale of the Acquired Assets

*The Need to Sell the Acquired Assets*

7.     As described in the First Day Declaration, the Debtors commenced these cases to conduct a prompt sale of their business assets with the goal of maximizing value for stakeholders and preserving as many jobs and customer and vendor relationships as possible.  As discussed below, filing this Motion on the Petition Date, as well as approval of the Bid Procedures within 21 days after the Petition Date are conditions of the Debtors' DIP Facility (defined below) and in the best interests of the Debtors' estates.

8.      As described in the First Day Declaration, numerous factors led to the Debtors' loss of multiple key clients.  The Debtors' attempts to improve their operational efficiencies were not enough to offset these business losses.  The Debtors' prepetition secured lenders recently informed the Debtors that they were unwilling to provide the Debtors with further financing outside of bankruptcy and have conditioned their postpetition financing on, among other things, the Debtors conducting a going concern sale of their assets.

9.      The Debtors' prepetition lenders have agreed to provide a postpetition debtor in possession financing facility (the "DIP Facility" and, the lenders thereunder the "DIP Lenders") which will allow the Debtors to pursue the Sale in a manner that will maximize asset value and preserve as many jobs and vendor and customer relationships as possible.  A motion seeking approval of the DIP Facility has been filed concurrently herewith.

10.     The Debtors' DIP Facility includes, among other things, several milestones for the Debtors' sale process, including requirements that the Debtors: (a) file this Motion on the Petition Date, (b) obtain approval of bid procedures within 21 days following the Petition Date, (c) conduct an Auction within 35 days following the Petition Date, and (d) conduct a Sale Hearing within 37 days following the Petition Date.

### The Debtors' Marketing Efforts

11.     The Debtors commenced their marketing efforts in the period before the Petition Date.  The Debtors retained City Capital Advisors, LLC ("City Capital") to identify potential buyers and to assist in completing a Sale of the Acquired Assets.  The Debtors and City Capital began populating a data room with information relevant to the Debtors and their business.  City Capital immediately began a process to aggressively market the Debtors' assets toward that goal.

12.     To date, City Capital has contacted forty-four potential buyers, including buyers that conduct business in or related to the Debtor's industry, with several having expressed at least a preliminary interest in purchasing the Acquired Assets.  Of the forty-four potential buyers contacted, twelve were strategic buyers and seven were financial buyers with strategic platforms.  As part of this process, City Capital sent out thirty-five "teasers" and confidentiality and nondisclosure agreements ("NDAs") to potential buyers, as well as thirty-three marketing memos.  As of the Petition Date, twelve parties have received access to the data room to review company relevant documents.  Currently, the Debtors have executed thirty-three of the sent NDAs.

13.     Through these efforts, the Debtors, in consultation with their advisors and their secured lenders, have designated CTI Foods Holding Co., LLC as the Stalking Horse Bidder to ensure that the Sale process can be completed expeditiously and maximum value can be achieved for the Debtors' stakeholders.

14.     The Debtors and the Stalking Horse Bidder have entered into a term sheet (the "Term Sheet") memorializing the stalking horse bid.  The Term Sheet is set forth at Exhibit B hereto, and should be referred to for specific details regarding the stalking horse bid, but in summary, the aggregate purchase price for the Debtors' assets is $51 million; in addition, at the Stalking Horse Bidder's discretion, the Stalking Horse Bidder may assume or pay up to (i) an aggregate of $8.0 million with respect to the equipment that is subject to the capital leases, (ii) an aggregate of $13.7 million of postpetition ordinary course accounts payable, and an aggregate of $5.6 million of postpetition accrued expenses.

15.     The Debtors' preference was to file this motion with a fully-negotiated Stalking Horse Agreement attached, but it proved impossible.  The Debtors' senior lenders were

unwilling to extend further loans to the Debtors outside of bankruptcy, causing the Debtors to file these cases on an expedited basis.  Therefore, the Debtors have not yet negotiated the terms of the Stalking Horse Agreement but expect to do so prior to the Bid Procedures Hearing. Notwithstanding the existence of the Term Sheet, interested third parties may conduct due diligence, and the Debtors and their representatives may provide due diligence materials to, discuss diligence materials with, and enter into customary confidentiality agreements with, such interested third parties, subject to the exclusivity provisions contained in the Term Sheet.  The milestone terms the Debtors have agreed to with the Stalking Horse Bidder (which are consistent with those required by the DIP Facility) are set forth in the Term Sheet attached hereto.

***The Bid Procedures***

16.     The Bid Procedures are attached as <u>Exhibit 1</u> to the Bid Procedures Order and incorporated herein by reference.  The Debtors developed the Bid Procedures with the assistance of their professionals to permit the Sale to be completed in an orderly, expeditious and efficient manner, and to ensure that the Debtors receive the highest and best possible price for the Acquired Assets.  The Bid Procedures provide a familiar, time-tested framework for a competitive chapter 11 bidding process to sell the Acquired Assets.

17.     In general, the Bid Procedures will permit the Debtors, as they deem necessary and appropriate in the prudent exercise of their business judgment in consultation with certain key interested parties in these cases and to grant the Break-Up Fee to the Stalking Horse Bidder.

18.     The Debtors have structured the Bid Procedures in a manner that complies with the Local Rules and toward the goal of efficiently consummating a sale that maximizes value and provides an opportunity to preserve jobs and other commercial relationships.  These procedures provide that framework, and will enable the Debtors to review, compare and

determine which bid or bids are in the best interests of the Debtors' estates and creditors. The Debtors respectfully submit that the Bid Procedures are necessary to, and will assist them in and promote, their efforts to complete a sale of the Acquired Assets.

19.     In addition to the deadlines associated with the potential assumption and assignment of Executory Contracts as outlined below, the key milestones proposed under the Bid Procedures are as follows:[3]

(a)     The Debtors will continue soliciting interest from and assisting Potential Bidders (as defined in the Bid Procedures) in conducting their respective due diligence investigations and accept bids seeking qualification as Qualified Bids (as defined in the Bid Procedures) until 4:00 p.m. (ET) on the day prior to the Auction (the "Bid Deadline") or thereafter as permitted in the Bid Procedures; and

(b)     also do the following if they receive more than one Qualified Bid — (i) negotiate with the Qualified Bidders (as defined below) in preparation for the Auction, (ii) conduct the Auction, beginning at 10:30 a.m. Chicago time, on March 25, 2014, at the offices of Winston & Strawn LLP, 35 West Wacker Drive, Chicago, Illinois 60601 and (iii) select, at the conclusion of the Auction, in their sole discretion, but after consultation with Crystal Financial, LLC ("Crystal Financial") which bidder or bidders have provided the highest and best offer(s) for the Acquired Assets in a single or multiple lots (each, a "Successful Bidder").

20.     The Debtors, in the exercise of their discretion after consultation with Crystal Financial, expressly reserve and will have the right under the Bid Procedures to modify or waive any of the Bid Procedures, including, without limitation, any deadlines thereunder, if such modification is determined by the Debtors, after consultation with Crystal Financial, to be in the best interests of the estates and to enhance the likelihood of the Sale process to maximize the sale value of the Acquired Assets; *provided*, *however*, that, prior to the commencement of the Auction, the Debtors will not modify or waive any of the Bid Procedures without the prior consent of the Stalking Horse Bidder, which consent will not be unreasonably withheld.

---

[3]     The brief description of the key milestones in the Bid Procedures described herein is for the convenience of the Court and parties in interest. The full copy of the Bid Procedures, which are annexed to the proposed Bid Procedures Order, should be reviewed in their entirety and will control in the event of any inconsistency or ambiguity in any descriptions of them herein.

***Break-Up Fee***

21.    The Debtors request that they be authorized, to provide the Stalking Horse Bidder with the Break-Up Fee, in the amount of $1,500,000, plus fees and expenses (including expenses of counsel, accountants and financial advisors, incurred by the Buyer) up to an aggregate amount of $300,000, as set forth in greater detail in the Term Sheet, and ultimately in the Stalking Horse Agreement.    The Break-Up Fee provides the Stalking Horse Bidder with assurance that it will be compensated for the time and expense it has spent and will spend preparing its offer for the Acquired Assets and the risk associated with the competitive auction process it is simultaneously helping to promote.    The Break-Up Fee was necessary to induce the Stalking Horse Bidder to execute the Term Sheet and it is in the range customarily acceptable in this jurisdiction.    The Break-Up Fee further benefits the Debtors' estates by establishing a floor for the Acquired Assets and promoting more competitive bidding.

***Deposit Escrow Agreement***

22.    The Bid Procedures require receipt of a good faith deposit equal to 10% of a purchaser's proposed purchase price upon submission of a bid ("Good Faith Deposit").    The Stalking Horse Bidder will provide the Debtors with a deposit equal to 10% of its purchase price at the time it executes the Stalking Horse Agreement.    All deposits will be held by a third party escrow agent subject to the Deposit Escrow Agreement, which sets forth the parameters under which the escrow agent will hold and release the deposits.    In the case of the Successful Bidder, the deposit shall constitute a portion of the cash purchase price to be paid to the Debtors upon the consummation of the Sale.    The Debtors request that at the Court approve the Debtors' assumption of the Deposit Escrow Agreement, to the extent that the Deposit Escrow Agreement is an executory contract, in conjunction with the approval of the proposed Bid Procedures.    The form of Deposit Escrow Agreement is set forth at Exhibit C hereto.

*The Proposed Notice of the Sale Hearing*

23.     Pursuant to Bankruptcy Rule 2002(a) and Local Rule 2002-1, the Debtors are required to provide the U.S. Trustee and all of the Debtors' creditors with 21 days' notice of the Sale Hearing.  Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction and the Sale Hearing as well as the deadline for filing any objections to the relief requested herein.  As set forth below, the Debtors' proposed form and manner of notice will satisfy these obligations.

24.     Within three business days after entry of the Bid Procedures Order (the "Mailing Deadline"), the Debtors will:

(a)     serve, by first class mail, postage prepaid, a copy of the Bid Procedures Order upon (i) the U.S. Trustee, (ii) counsel to the Crystal Financial, and (iii) all entities who have requested service in these cases pursuant to Bankruptcy Rule 2002;

(b)     serve, by first class mail, postage prepaid, a notice of the Sale, the Auction, the Sale Hearing and related information in substantially the form annexed to the Bid Procedures Order as Exhibit 3 (the "Sale Notice") upon: (i) all of the parties listed above in paragraph 26(a); (ii) all parties on the Debtors' creditor matrix; (iii) all parties that, in the past year, have expressed in writing to the Debtors an interest in purchasing some or all of the Acquired Assets; (iv) all nondebtor parties to the Executory Contracts; (v) all parties who are known or reasonably believed to have asserted a lien, encumbrance, claim or other interest in the Acquired Assets or any claims against the Debtors; (vi) the Internal Revenue Service and applicable state and local taxing authorities; and (vii) all applicable state attorneys general.

In addition, within one business day after entry of the Bid Procedures Order, the Debtors will publish notice of the Sale, the time and place of the proposed Auction, and time and place of the Hearing in The Wall Street Journal or such other publications as the Debtors determine will promote the marketing and sale of the Acquired Assets.

25.     The Sale Notice provides that any party that wishes to obtain a copy of this Motion, including all exhibits and annexes thereto, or the Bid Procedures Order, may do so, free of charge, by written request to proposed counsel to the Debtors, c/o Winston & Strawn

LLP, 35 West Wacker Drive, Chicago, IL 60601, Attn: Daniel J. McGuire.  In addition, copies of the aforementioned pleadings may be found on the Bankruptcy Court's website, www.deb.uscourts.gov, and are on file with the Bankruptcy Court and available for inspection during regular business hours at the office of the Clerk of the Bankruptcy Court, United States Bankruptcy Court for the District of Delaware, 5th Floor, 824 Market Street, Wilmington, Delaware 19801.  Copies of these pleadings can also be viewed on the website of the Debtors' claims, noticing and balloting agent, BMC Group, Inc., at http://www.bmcgroup.com/.

26.    The Debtors propose that, to be timely and otherwise eligible for consideration by the Court, objections to the Sale and/or any component thereof (except with respect to issues concerning Executory Contracts, as addressed below) must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) set forth the name of the objecting party, the nature and amount of any claims or interests held or asserted against the Debtors' estates or properties, the basis for the objection and the specific grounds therefor; (iv) shall be filed with the Clerk of the United States Bankruptcy Court for the District of Delaware, 824 Market St., 3rd Floor, Wilmington, DE 19801, on or before 4:00 p.m. (prevailing Eastern Time) on March __, 2014, or such later date and time as the Debtors may agree; and (v) be served so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on the same day upon (a) Quantum Foods, LLC, et al., Quantum Foods, LLC, 750 South Schmidt Road, Bolingbrook, IL 60440, Attn.: Edgar Reilly, Chief Administrative Officer; (b) Winston & Strawn LLP, 35 West Wacker Drive, Chicago, IL 60601, Attn.: Daniel J. McGuire, proposed counsel to the Debtors; (c) City Capital Advisors, 444 N. Michigan Ave., Suite 3200, Chicago, IL 60611, Attn.: Rachel Corn Kluge; (d) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn.: M. Blake Cleary, proposed co-counsel to the

Debtors; (e) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153, Attn.: Michael F. Walsh, counsel to Stalking Horse Bidder; (f) Riemer & Braunstein LLP, Three Center Plaza, Boston, Massachusetts 02108, Attn.: David S. Berman, counsel to Crystal Financial, LLC and (g) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Richard Schepacarter.

27.    The Debtors submit that the proposed Sale Notice, and providing notice of the Motion, the Auction and the Sale Hearing as described herein, complies fully with Bankruptcy Rule 2002 and Local Rule 2002-1 and constitutes good and adequate notice of the Sale and the proceedings with respect thereto. Therefore, the Debtors respectfully request that this Court approve the form of the Sale Notice and the notice procedures proposed above.

***Request for Procedures for the Assumption and Assignment of Executory Contracts***

28.    In connection with the possible assumption and assignment of Executory Contracts pursuant to the Sale, the Debtors believe that it is necessary to establish Assumption & Assignment Procedures by which the Debtors and the counterparties to the Executory Contracts that may be assumed and assigned to the Successful Bidder (collectively, the "Contract Counterparties") can promptly: (a) establish the cure obligations, if any, to be paid in accordance with section 365 of the Bankruptcy Code or resolve any disputes concerning cure issues; and (b) resolve any other objections the Contract Counterparties may assert against the assumption and assignment of their Executory Contracts. Accordingly, within three business days after entry of the Bid Procedures Order, the Debtors will file with the Court a schedule of cure obligations (the "Contract & Cure Schedule")[4] concerning the applicable Executory Contracts, which schedule shall: (a) identify, with reasonable specificity within the limits of information contained within

---

[4]    The Debtors reserve the right to amend and/or supplement the Contract and Cure Schedule if necessary by no later than the Cure Objection Deadline and, if appropriate, to establish a reasonable additional and/or modified Cure Objection Deadline in connection therewith.

the Debtors' books and records, each Executory Contract potentially to be assumed and assigned in connection with the Sale and the amount, if any, that the Debtors maintain would be necessary pursuant to section 365 of the Bankruptcy Code to cure any monetary defaults under such Executory Contracts; and (b) set forth the procedures and deadlines for asserting Assignment Objections (as such terms are defined below).

29.    The Debtors propose that, to be timely and eligible for consideration by the Court, any objections either: (a) to the ability and qualifications of a Successful Bidder to provide adequate assurance of future performance under any Executory Contract identified on the Contract and Cure Schedule; or (b) raising any other objection to the assumption and assignment of any Executory Contract (any objections to any cure amount(s) set forth on the Contract and Cure Schedule (any such objection, an "Assignment Objection"), must be made in writing, must clearly specify the grounds for the objection and must be filed with the Court by, and served so as to be received by the Objection Notice Parties by the date set forth in the Contract & Cure Schedule  (the "Assignment Objection Deadline"); *provided, however*, that in the event the Stalking Horse Bidder is not the Successful Bidder, this deadline shall be automatically extended with respect to adequate assurance of future performance to immediately prior to the Sale Hearing.

30.    Any counterparty to an Assigned Contract or Lease that wishes to obtain adequate assurance information regarding other bidders that will or may participate at the Auction (other than the Stalking Horse Bidder) may do so by notifying the Debtors in writing, c/o Daniel J. McGuire, Winston & Strawn LLP, 35 West Wacker Drive, Chicago, IL 60601-9703.

31.    If no timely Assignment Objection with respect to an Executory Contract is filed and served on the Objection Notice Parties by the Assignment Objection Deadline, (a) the cure amounts set forth in the Contract & Cure Schedule with respect to the applicable Executory Contract will become liquidated and established on a final basis as the only amount(s) necessary under section 365(b) of the Bankruptcy Code to cure any and all monetary defaults under such Executory Contract and the payment of the identified cure amount by the Successful Bidder shall be a full, final and complete cure of any defaults under the Executory Contract in satisfaction of section 365(b) of the Bankruptcy Code, (b) the applicable Executory Contract will be deemed subject to assumption and assignment as proposed by the Debtors and the Successful Bidder and (c) the Successful Bidder will be deemed to have provided or to be able to provide adequate assurance of future performance of the applicable Executory Contract in satisfaction of section 365(f)(2)(B) of the Bankruptcy Code.

32.    The Debtors intend to cooperate, and will expect any Successful Bidder to cooperate, as much as reasonably possible with any applicable Contract Counterparties to attempt to reconcile and resolve any Assignment Objections before the Sale Hearing, if possible. If any timely Assignment Objections cannot be resolved by the parties, the Debtors request that the Court address such Assignment Objections at the Sale Hearing and either resolve them on a final basis in connection therewith or, if necessary based on the facts and circumstances of each such matter, hear such matters as a status conference in conjunction with the Sale Hearing and establish an appropriate procedural course for the prompt resolution of the matters thereafter.

33.    Finally, the Debtors request that any Contract Counterparty that does not timely assert an Assignment Objection be deemed to have consented to the Sale and the treatment of its Executory Contract under section 365 of the Bankruptcy Code and this Motion.

See, e.g., Hargrave v. Twp. of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (finding that creditor deemed to consent to the sale by not objecting to the sale motion); Pelican Homestead v. Wooten (In re Gabel), 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same). Moreover, the Debtors request that each Contract Counterparty be deemed to have consented to the assumption and assignment of its Executory Contract notwithstanding any anti-alienation provision or other restriction on assignment contained therein.  See 11 U.S.C. §§ 365(c)(1)(B), (e)(2)(A)(ii) and (f).

## Legal Basis for Relief Requested

### Approval of the Bid Procedures and Sale Under Section 363 of the Bankruptcy Code

34.     Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  A debtor must demonstrate a sound business justification for a sale or use of assets outside the ordinary course of business.  See, e.g., In re Martin, 91 F.3d 389 (3d Cir. 1996) (citing In re Schipper, 933 F.2d 513 (7th Cir. 1991)); In re Chateaugay Corp., 973 F.2d 141, 143 (2d Cir. 1992); Stephens Indus., Inc. v. McClung, 789 F.2d 386 (6th Cir. 1986); In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983).

35.     Courts typically consider the following factors in determining whether a proposed sale meets this standard:

(a)     whether a sound business justification exists for the sale;

(b)     whether adequate and reasonable notice of the sale was given to interested parties;

(c)     whether the sale will produce a fair and reasonable price for the property; and

(d)     whether the parties have acted in good faith.

In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991).

*Sound Business Reasons*

36.     As set forth in the First Day Declaration, the Debtors possess ample and sound business reasons for selling the Acquired Assets at this time.   As a result of the unwillingness of the Debtors' prepetition secured lenders to extend further financing, and the Debtors' DIP Facility being conditioned on a sale process, the Debtors have determined that a prompt sale of the Acquired Assets is the best — and quite likely the only — course to preserve and maximize value (including going concern value, if possible) and preserve as many jobs and customer and vendor relationships as possible.   Any extended delay in selling the Acquired Assets could have a severe detrimental effect on the Debtors' ability to continue operations and preserve going concern value to the fullest extent possible.   Indeed, under the terms of the DIP Facility and the interim financing order, the Debtors' postpetition financing and continued ability to use cash collateral are conditioned on, among other things, the Debtors' pursuit of the Sale and adherence to the sale timeline set forth herein.   The Debtors have no alternative financing and all of their cash is encumbered.   Accordingly, if the Debtors fail to pursue the Sale, they risk losing the funds they require to operate and administer these Chapter 11 Cases and undermining their ability to maximize value for stakeholders.   If the Debtors cease operating, it may result in not only a loss of going concern value and the attendant possibility of preserving commercial relationships, but the loss of employment for most if not all of the Debtors' employees.

*Accurate and Reasonable Notice*

37.     The proposed Sale Notice and the Bid Procedures described in this Motion will ensure that there is accurate and reasonable notice of the Sale.   First and foremost, the form of the Sale Notice that will be provided to parties in interest will be approved by this Court in advance.   As described above, City Capital has been in contact with potential purchasers of the

Acquired Assets over the past several weeks.  Under the terms of the Bid Procedures, all potential purchasers of the Acquired Assets will have ample opportunity to participate in the Sale process.  Likewise, all Contract Counterparties and other parties in interest in these cases will have ample notice of and opportunity to object to the Sale and the possible assumption and assignment of Executory Contracts.  Accordingly, the Debtors will have provided fair, accurate and reasonable notice of the Sale.

### *Adequate Price*

38.     By utilizing the Bid Procedures, any sale of the Acquired Assets will be for a fair and adequate price, reflecting fair market value.  The Debtors intend to maximize the number of potential purchasers who may participate at the Auction and thereby maximize and establish the fairness and adequacy of the purchase price for the Acquired Assets (the "Purchase Price").  Under these circumstances, the purchase price is expected to exceed the value the Debtors would receive if the Acquired Assets were merely sold in a piecemeal liquidation to multiple purchasers or through some other process less orderly, competitive and efficient than provided for by the Bid Procedures.

### *Good Faith*

39.     The Sale is being conducted in good faith.  Courts in the Third Circuit generally have considered three factors when assessing good faith in connection with the sale of the Acquired Assets pursuant to section 363 of the Bankruptcy Code: (a) whether the sale was negotiated at arms' length; (b) whether any officer or director holds an interest in or is otherwise related to the potential purchaser; and (c) whether fraud or collusion exists among the prospective purchaser, any other bidders or the debtor.  In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 147-50 (3d Cir. 1986).

40.    In this instance, the Debtors are negotiating the sale of the Acquired Assets at arms' length, and in accordance with the Bid Procedures.  The Debtors submit that the Successful Bidder at the conclusion of the Auction should be entitled to the protections of section 363(m) of the Bankruptcy Code.  Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

41.    As set forth above, the Bid Procedures ensure that the Sale will be conducted in good faith and, therefore, that the Successful Bidder will be a "good faith purchaser" under section 363(m) of the Bankruptcy Code and entitled to the full protection thereof.

42.    In summary, all of the factors for establishing a sound business purpose for the sale of the Acquired Assets have been satisfied, and the Court should approve the proposed Bid Procedures, as well as the Sale to the eventual Successful Bidder.

***Authority to Enter Into the Stalking Horse Agreements and the Provision of the Break-Up Fee***

43.    The proposed Break-Up Fee is appropriate in these cases because the Term Sheet and, ultimately the Stalking Horse Agreement will maximize the value the Debtors' realize from the sale of the Acquired Assets.  Under Third Circuit precedent, break-up fees constitute administrative expenses, and therefore, the payment of such fees must provide a postpetition benefit to the bankruptcy estate.  Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 533 (3d Cir. 1999).  In O'Brien, the Third Circuit provided two examples of a potential benefit accruing from the payment of a termination fee.

Id. One example provided that, a benefit to the estate may arise if, "assurance of a breakup fee promoted [a] more competitive bidding [process], such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Id. at 537.

44.     As noted above, the Debtors have negotiated the Term Sheet with the Stalking Horse Bidder at arms' length, in good faith and with the belief that the Term Sheet will maximize the return for the sale of the Acquired Assets. The Debtors expect to do the same with respect to the Stalking Horse Agreement. Thus, the Debtors are justified in offering the Break-Up Fee to the Stalking Horse Bidder.

***Approval of the Sale Free and Clear***

45.     The Debtors request approval to sell the Acquired Assets free and clear of any and all liens, claims, interests and encumbrances (except for assumed liabilities) in accordance with section 363(f) of the Bankruptcy Code.  Pursuant to section 363(f), a debtor in possession may sell estate property "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

(a)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(b)     such entity consents;

(c)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(d)     such interest is in bona fide dispute; or

(e)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); see Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988) (because section 363(f) is written in the disjunctive, a court may approve a "free and clear" sale even if only one of the subsections is met).

46.     Section 363(f) is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a); see In re Trans World Airlines, Inc., 2001 WL 1820325, at *3, 6 (Bankr. D. Del. March 27, 2001); Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of claims] is within the court's equitable powers when necessary to carry out the provisions of Title 11.").

47.     The Debtors submit that the Sale will satisfy the requirements of section 363(f) of the Bankruptcy Code.  For example, the Debtors will provide all parties holding liens in the Acquired Assets with notice of, and an opportunity to object to, the Sale.  Absent objection, each such party will be deemed to have consented to the sale of the Acquired Assets.  Finally, any lien, claim, interest or encumbrance in the Acquired Assets will attach to the net proceeds of the Sale with the same validity and in the relative priorities established under the interim financing order and applicable nonbankruptcy law.

48.     Accordingly, the Debtors believe that the Sale (a) will satisfy the statutory prerequisites of section 363(f) of the Bankruptcy Code and (b) should be approved free and clear of all liens, claims, interests and encumbrances.

***Approval of the Assumption of Contracts***

49.     The standard for a debtor to assume and assign or reject an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code is whether the Debtors' decision is made within its sound business judgment.  See Sharon Steel Corp. v. National Fuel Gas Dist. Corp. (In re Sharon Steel Corp.), 872 F.2d 36, 39-40 (3d Cir. 1989); In re AbitibiBowater, Inc., 418 B.R. 815, 831 (Bankr. D. Del. 2009); In re Nickels Midway Pier, LLC, 341 B.R. 486, 493 (D.N.J. 2006).

50.    The Debtors seek authority to assume and assign the Executory Contracts in accordance with the Assumption & Assignment Procedures.  The Debtors assert that, upon compliance with the Assumption & Assignment Procedures outlined herein, the Debtors will have met all requirements of sections 365(b) and 365(f) of the Bankruptcy Code and should be permitted to assume the Executory Contracts and assign them to the applicable Successful Bidder.  Further, to the extent a Contract Counterparty is concerned the Successful Bidder cannot provide the necessary adequate assurance of future performance, the Bid Procedures require that any Qualified Bidder demonstrate why it meets the adequate assurance requirement.  As a safeguard, any counterparty to an Executory Contract may challenge the Successful Bidder's ability to provide the necessary assurances by filing an Assignment Objection.

51.    The assumption and assignment of Executory Contracts is a necessary part of almost any going concern sale under section 363 of the Bankruptcy Code.  In light of the proposed Sale, the Executory Contracts at issue will no longer be necessary to the Debtors' estates.  In contrast, certain Executory Contracts are expected to be critical to potential bidders in pricing their bid, and their ability to seamlessly operate the Debtors' businesses post-closing. Accordingly, the assumption and assignment of the Executory Contracts is warranted, in the Debtors' business judgment, to eliminate the ongoing liabilities associated therewith and to complete (and maximize the value of) the Sale. Assumption and assignment of the Executory Contracts, thus, represents a sound and reasonable exercise of the Debtors' business judgment and should be approved.

### *Waiver of the Certain Requirements of Local Rule 6004-1(b)*

52.    Local Rule 6004-1(b) requires, among other things, that any motion to sell property of the estate pursuant to section 363 of the Bankruptcy Code attach "[a] copy of the proposed purchase agreement, or a form of such agreement substantially similar to the one the

debtor reasonably believes it will execute in connection with the proposed sale [and a] copy of a proposed form of sale order." Local Rule 6004-1(b). As set forth above, the Debtors and their professionals have commenced an aggressive marketing of the Acquired Assets. Nevertheless, the terms of the Sale beyond the Term Sheet, including any form of sale order and final terms of a definitive agreement, are unknown at this time. Any such forms the Debtors might submit at this time would be merely generic in nature, rather than based on any actual transaction or terms being proposed. Ultimately, the transaction(s) and term(s) proposed could differ materially from any speculative forms presented at this time. Consequently, submitting these forms now would be counterproductive and could confuse potential bidders and other interested parties and could have a chilling effect on bidding.[5] Accordingly, the Debtors request a waiver of the provisions of Local Rule 6004-1 to the extent applicable.

***Waiver of the 14-Day Stay***

53.    Finally, the Debtors request a waiver of the 14-day stay that would otherwise apply to the Sale and the assumption and assignment of the Executory Contracts pursuant to Bankruptcy Rules 6004(h) and 6006(d). The Asset Purchase Agreement likely will contemplate a closing of the Sale as soon as possible after the Court's approval of the Sale. Moreover, a prompt closing of the Sale will allow the Debtors to proceed expeditiously with concluding their bankruptcy cases, thus preserving estate assets for the benefit of all constituencies. Therefore, the Court should approve the waiver of the 14-day stay under Bankruptcy Rules 6004(h) and 6006(d).

---

[5]    As set forth above, pursuant to the Bid Procedures, the Debtors intend to file with the Court and serve on interested parties the Stalking Horse Agreement (when it is available). In addition, following any designation of a Successful Bid, such bid (including the applicable Asset Purchase Agreement) will be filed with the Court and served on interested parties. As such, notice of the terms of any Asset Purchase Agreement will be provided to interested parties prior to approval of any Sale.

**No Prior Request**

54.     No prior request for the relief sought in this Motion has been made to this or any other Court in connection with these chapter 11 cases.

**Notice**

55.     Notice of this Motion shall be provided to the following parties consistent with the terms hereof: (a) the U.S. Trustee; (b) counsel to the Crystal Financial; (c) all parties that have filed a request for notice pursuant to Bankruptcy Rule 2002; (d) all parties who are known by the Debtors to assert liens with respect to the Acquired Assets; (e) the United States Attorney's office; (f) all state attorneys general in states in which the Acquired Assets are located; (g) the Internal Revenue Service; and (h) for each state in which the Acquired Assets are located, the applicable taxing authorities.  The Debtors respectfully submit that no further notice of the Motion is necessary.

WHEREFORE, the Debtors respectfully request that the Court: (a) enter the Bid Procedures Order in substantially the form attached hereto as Exhibit A; (b) enter a Sale Order (or Sale Orders) in a form to be determined, authorizing the sale of the Acquired Assets to the Successful Bidder at the Auction, if any; and (c) grant such other and further relief to the Debtors as the Court may deem proper.

Dated:    February 18, 2014
            Wilmington, Delaware            YOUNG CONAWAY STARGATT
                                            & TAYLOR, LLP


                                            */s/ M. Blake Cleary*
                                            M. Blake Cleary (No. 3614)
                                            Kenneth J. Enos (No. 4544)
                                            Andrew L. Magaziner (No. 5426)
                                            Rodney Square
                                            1000 North King Street
                                            Wilmington, Delaware 19801
                                            Telephone: (302) 571-6600
                                            Facsimile: (302) 571-1253

                                                -and-

                                            WINSTON & STRAWN LLP

                                            Daniel J. McGuire
                                            Gregory M. Gartland
                                            Caitlin S. Barr
                                            35 West Wacker Drive
                                            Chicago, Illinois 60601
                                            Telephone: (312) 558-5600
                                            Facsimile: (312) 558-5700

                                            *Proposed Counsel for Debtors and*
                                            *Debtors in Possession*