## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|   |   |
|---|---|
| In re | : Chapter 11 |
| | : |
| QUANTUM FOODS, LLC, et al.,[1] | : Case No. 14-10318 (KJC) |
| | : |
| Debtors. | : Jointly Administered |
| | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|   |   |
|---|---|
| RAGING BULL ACQUISITION COMPANY LLC, | : Adv. Proc. No. 14-_____ |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| QUANTUM FOODS, LLC, QUANTUM FOODS 213-D, LLC, QUANTUM CULINARY, LLC, GDC LOGISTICS, LLC, and CHOICE ONE FOODS, LLC, | : |
| | : |
| Defendants. | : |
| | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### COMPLAINT FOR RETURN OF DEPOSIT UNDER ASSET PURCHASE AGREEMENT

Raging Bull Acquisition Company LLC (the "Plaintiff"), by and through its

undersigned attorneys, hereby files the instant complaint (this "Complaint") against each of

Quantum Foods, LLC, Quantum Foods 213-D, LLC, Quantum Culinary, LLC, GDC Logistics,

---

[1] The debtors in these cases, along with the last four digits of each debtor's federal tax identification number, are Quantum Foods, LLC (9437); Quantum Foods 213-D, LLC (1862); Quantum Culinary, LLC (1302); GDC Logistics, LLC (1997); Choice One Foods, LLC (9512). The debtors' mailing address is c/o Quantum Foods, LLC, 750 South Schmidt Road, Bolingbrook, Illinois 60440.

LLC, and Choice One Foods, LLC (the "Defendants") for the Defendants' breach of the Asset

Purchase Agreement dated March 14, 2014, by and between the Defendants and the Plaintiff (the

"Agreement"),[2] as required by the Order (A) Approving Bid Procedures for the Sale of

Substantially All of the Debtors' Assets and Authorizing the Debtors to Enter into the Stalking

Horse Agreement, (B) Scheduling the Auction, (C) Authorizing Reimbursement of Purchaser

Expenses, (D) Approving the Deposit Escrow Agreement, (E) Approving the Assumption and

Assignment Procedures Related to the Sale, (F) Scheduling the Sale Hearing, and (G) Approving

the Form of the Sale Notice [Docket No. 162] the ("Bid Procedures Order").  The Agreement

was filed as an exhibit to the Notice of Filing of Asset Purchase Agreement in Connection with

the Proposed Auction and Sale of Substantially All of the Debtors' Assets [Docket No. 137],

which is attached hereto as Exhibit A.  In support of this Complaint, the Plaintiff alleges upon

knowledge with respect to itself and its own acts, and upon information and belief as to all other

matters, as follows:

## SUMMARY OF ACTION

The Plaintiff brings the instant action to recover the $5,400,000 deposit (the

"Deposit") that the Plaintiff paid to the Defendants under the Agreement as approved by the Bid

Procedures Order.  Pursuant to the Bid Procedures Order, the Deposit is not property of the

Defendants' estates and must be returned to the Plaintiff under the circumstances present here

where the Plaintiff is not in default of the Agreement, but the Defendants are in breach.

Specifically, the Defendants have breached the Agreement and failed to pursue

the satisfaction of conditions to Closing in at least the following ways:

---

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement.

- the Defendants failed to honor their representations regarding their primary assets, namely customer contracts and relationships, particularly with respect to budgeted gross revenue of $414 million for 2014;

- the Defendants failed to preserve such customer contracts and relationships resulting in "Material Adverse Effects" which preclude Closing under the Agreement;

- the Defendants, through their founding principal and fiduciary, Edward Bleka, converted valuable customer information and sought to exploit customer relationships for his own benefit with an eye toward establishing a competing business which was extremely damaging to the Defendants' ongoing business;

- the Defendants are unable to transfer to the Plaintiff the right to use the wastewater facilities, which are critical to the Defendants' operations, as required by the Agreement;

- the Defendants sold to PPL Group LLC certain equipment, including equipment subject to capital leases, which was promised to the Plaintiff under the Agreement;

- the Defendants breached representations by failing to appropriately disclose an ongoing investigation by the Equal Employment Opportunity Commission involving allegations of at least $5 million in fees or penalties, and failing to cure the material risks under the Equal Employment Opportunity Act posed by the Defendants' employment practices; and

- the Sale Order was not entered by April 30, 2014, as required by the Agreement.

Accordingly, the Plaintiff requests that this Court enter judgment ordering the Defendants to return the Deposit to the Plaintiff and such other relief as is appropriate under the circumstances.

## THE PARTIES

1.    The Plaintiff is a Delaware limited liability company, with a registered office in the State of Delaware at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808 (Corporation Service Company is its registered agent at such address).

2.      Defendant Quantum Foods, LLC is a Delaware limited liability company, with its principal place of business at 750 South Schmidt Road, Bolingbrook, Illinois 60440.

3.      Defendant Quantum Foods 213-D, LLC is a Delaware limited liability company, with its principal place of business at 750 South Schmidt Road, Bolingbrook, Illinois 60440.

4.      Defendant Quantum Culinary, LLC is an Illinois limited liability company, with its principal place of business at 525 Crossroads Parkway, Bolingbrook, Illinois 60440.

5.      Defendant GDC Logistics, LLC is a Delaware limited liability company, with its principal place of business at 550 West North Frontage Road, Bolingbrook, Illinois 60440.

6.      Defendant Choice One Foods, LLC is a Delaware limited liability company, with its principal place of business at 4020 South Compton Avenue, Los Angeles, California 90011.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the parties and subject matter of this adversary proceeding pursuant to (a) 28 U.S.C. §§ 157 and 1334, (b) paragraph 20 of this Court's Bid Procedures Order, and (c) Section 9.7(c) of the Agreement.  This adversary proceeding is brought in the chapter 11 bankruptcy cases captioned In re Quantum Foods, LLC, et al., which are jointly administered under Case No. 14-10318 (KJC) in the United States Bankruptcy Court for the District of Delaware.

8.      This adversary proceeding is a "core" matter pursuant to 28 U.S.C. § 157(b).  The Plaintiff consents to the entry of final orders and judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

9.      Venue of this adversary proceeding is proper in this Court pursuant to 28 U.S.C. § 1409(a).

10.     This proceeding is initiated pursuant to Rules 7001(1) and 7001(9) of the Federal Rules of Bankruptcy Procedure.

## FACTUAL BACKGROUND

### I.      The Bankruptcy Cases

11.     On February 18, 2014, each of the Defendants filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code.

12.     On the same date, the Defendants filed the Debtors' Motion for Orders (I)(A) Approving Bid Procedures for the Sale of Substantially All of the Debtors' Assets and Authorizing the Debtors to Enter into the Stalking Horse Agreement (B) Scheduling the Auction, (C) Authorizing Payment of the Break-Up Fee, (D) Approving the Deposit Escrow Agreement, (E) Approving the Assumption and Assignment Procedures Related to the Sale, (F) Scheduling the Sale Hearing, and (G) Approving the Form of the Sale Notice; and (II) (A) Authorizing the Sale of Such Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (B) Authorizing and Approving the Purchase Agreement for Such Sale, (C) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (D) Granting Related Relief  [Docket No. 16] (the "Sale Motion").

13.     By the Sale Motion, the Defendants sought, among other things, approval of CTI Foods Holding Co., LLC as the stalking horse bidder for the Defendants' assets.

14.     Subsequent to the filing of the Sale Motion, the Plaintiff engaged in due diligence regarding the assets of the Defendants, in part at the urging of the official committee of unsecured creditors appointed in the Defendants' bankruptcy cases (the "Committee").

15.     During such due diligence, the Defendants' senior management made multiple presentations and participated in multiple meetings during which they made various

representations to the Plaintiff regarding anticipated 2014 gross revenue of $414 million, notwithstanding recently reported customer defections and reductions in orders, including by "Denny's" branded restaurants.

16.     As a result of this process, the Committee presented the Defendants with the Agreement.  On March 14, 2014, the Defendants and the Plaintiff executed the Agreement, and the Defendants filed the Agreement with the Court.

17.     On March 18, 2014, the Court entered the Bid Procedures Order, which, among other things, established the terms, conditions, and procedures applicable to the auction and sale of the Defendants' assets.  No bids were submitted for the Defendants' assets by the applicable deadline.

18.     On March 20, 2014, the Court entered a final order approving debtor-in-possession financing provided by certain lenders for which Crystal Financial LLC ("Crystal") is the agent, and granting related relief [Docket No. 167].

19.     On April 22, 2014, the Plaintiff issued a notice of the Defendants' default under the Agreement (the "Plaintiff's Default Notice"), a copy of which is attached hereto as Exhibit B. In the Plaintiff's Default Notice, the Plaintiff outlined the Defendants' various breaches of the Agreement that had occurred after the signing of the Agreement on March 14, 2014, and were continuing to occur.

20.     On April 29, 2014, the Defendants' counsel responded to the Plaintiff's Default Notice (the "Defendants' Default Notice Response"), a copy of which is attached hereto as Exhibit C.  The Defendants' Default Notice Response rejected the identified breaches of the Agreement, and therefore contained no indication that any breaches would be cured.

6

21.     On May 1, 2014, the Plaintiff issued its letter terminating the Agreement effective May 6, 2014, and demanding that the Defendants return the Deposit to the Plaintiff no later than May 9, 2014, as required by Section 2.2(b) of the Agreement (the "Plaintiff's Termination Notice").  A copy of the Plaintiff's Termination Notice is attached hereto as Exhibit D.

22.     On May 7, 2014, the Defendants responded to the Plaintiff's Termination Notice (the "Defendants' Termination Notice Response"), a copy of which is attached hereto as Exhibit E.  In the Defendants' Termination Notice Response, the Defendants, among other things, refuse to return the Deposit to the Plaintiff.

## II.     Termination of the Agreement

23.     Several breaches of the Agreement by the Defendants occurred following the signing of the Agreement on March 14, 2014.  See Plaintiff's Default Notice; Plaintiff's Termination Notice.  As a result, the Plaintiff terminated the Agreement effective as of May 6, 2014.  See Plaintiff's Termination Notice.

24.     Section 7.3 of the Agreement expressly conditions the Plaintiff's obligations to effect the Closing on the fulfillment of various conditions.  Section 7.3(a) of the Agreement requires that:  "(a) Each of the representations and warranties set forth in ARTICLE IV shall be true and correct (i) as if restated on and as of the Closing Date or (ii) if made as of a date specified therein, as of such date."  In addition, Section 7.3(c) of the Agreement requires that: "Since the date of this Agreement, there shall not have occurred any changes, effects, or circumstances constituting, or which would be reasonably likely to result in, individually or in the aggregate, a Material Adverse Effect."

25.     Under Section 8.1(b) of the Agreement, the Plaintiff may terminate the Agreement at any time prior to the Closing "in the event of a material breach by [the Defendants]

7

of [the Defendants'] representations, warranties, agreements, or covenants set forth in this

Agreement, which breach (i) would result in a failure of the conditions to Closing set forth in

[Section 7.3], and (ii) is not cured within seven (7) days from receipt of a written notice from the

non-breaching Party . . . ."  Section 8.1(b) of the Agreement further provides for termination by

the non-breaching party upon ten days' written notice to the other party.  In exchange for the

Plaintiff refraining from issuing a default notice before the applicable bid deadline had passed,

which default notice might have upset the Defendants' auction prospects, the Defendants agreed

to shorten the time period for termination from ten days to four days.  See Plaintiff's Default

Notice, at 2.

### A.    Customer Contracts

26.    As set forth in the Plaintiff's Default Notice, there had been at least two

significant impacts on the value and viability of the Defendants' customer contracts and

relationships that not only breached the Defendants' representations under Section 7.3 (and

Article IV) of the Agreement, but also constituted, both alone as well as together with the other

matters referenced in this Complaint, "Material Adverse Effects" under Section 7.3(c) of the

Agreement.

27.    First, the Defendants had knowingly supplied customers with subpar product and

performance under customer contracts.  Apparently, unreasonable liquidity restraints imposed by

Crystal exacerbated the Defendants' operational problems and financial troubles, making it

virtually impossible for the Defendants to perform under those contracts.  As a consequence, the

Defendants had little choice but to ship customers subpar product at lesser volumes than promised.[3]

28.    Second, the Defendants, through their founding principal and fiduciary, engaged in a program to develop one or more businesses to compete with the Business.  The Plaintiff is informed that Edward Bleka engaged in discussions with current employees and brokers of the Defendants about potentially spinning off business from the Defendants to a competitor that he would form.  In addition, the Plaintiff is informed that Edward Bleka converted certain of the Defendants' confidential customer information for his own use in connection with these activities.

29.    Naturally, such occurrences and Edward Bleka's conduct adversely affected customer confidence and customer relationships.  Since the Agreement was executed, the Defendants have lost several customers and significant business.  See, e.g., Plaintiff's Default Notice Schedule 1 (identifying certain adverse impacts on some significant customer relationships).  Notably, the Defendants were not even aware of certain customer problems until the Plaintiff broached such problems with the Defendants.  In fact, despite the Defendants' predictions of $414 million in gross revenue for 2014, their management had, as of the Default Notice, retreated from such predictions by almost 25%, and such customer problems alone may have wiped out expected profit for 2014 altogether.

---

[3]    Against its own interests, Crystal insisted on restricting the Defendants' access to much-needed liquidity, leaving the Defendants unable to build raw material and finished goods inventory necessary to service their customers.  In addition, Crystal's inexplicable rigidity hampered the Defendants' ability to make timely payments to critical vendors and to build credit terms, which expectedly intensified the Defendants' already strained financial condition.  Crystal's conduct also unnecessarily distracted the Defendants' management, which had to deal with various Crystal-imposed problems on a daily basis, rather than focusing on the overall operational health of the Defendants.  Regardless of Crystal's role in the Defendants' difficulties, the fact remains that the Defendants breached the Agreement and failed to cure their breaches.

30.    Although the Agreement had been breached, the Plaintiff nonetheless attempted to formulate solutions to the customer problems.  Significantly, the Plaintiff engaged in good-faith discussions with Crystal regarding various options to complete the purchase described in the Agreement on economic terms that would be identical from the Defendants' and their estates' perspectives but would involve a compromise of Crystal's liens, given that the liquidity constraints imposed by Crystal on the Defendants were among the root causes of the harm to customer relationships.  In addition, the Plaintiff engaged in good-faith discussions with Edward Bleka regarding an arrangement, which would include a non-compete injunction, that might give the Plaintiff needed comfort that Edward Bleka's past breaches of his fiduciary duty to the Defendants would not continue going forward.  The Plaintiff ultimately was not able to reach any resolutions in connection with its proposals.

### B.    Inventory Limitations

31.    The Defendants' recent undertaking of exposure with respect to protein commodity inputs, despite clear representations during the management presentation on February 27, 2014 that the Defendants would not do so, only worsened the Defendants' financial position.  During that presentation, Edward Bleka explained that the Defendants have always locked in ingredient costs when agreeing to fixed-price contracts with customers, essentially guaranteeing a fixed margin for the duration of those contracts.  The Plaintiff subsequently learned that, as a result of liquidity constraints imposed by Crystal, the Defendants departed from their ordinary-course, historical advance-purchase practices.  This fact alone materially impaired the Defendants' profit margins as Beef 50 spot prices have increased by over 50% this year to date and 13% in March and April combined.  The Plaintiff believes that this deviation from historical practice will alone adversely impact the Defendants' profitability by $8 million to $10

million, and may reduce actual EBITDA to negative $8 million to $10 million from the

Defendants' management's expected EBITDA of $17.5 million.  Apart from not being disclosed

in the data room or presentations, such actions by the Defendants have, among other things,

accelerated customer defections because products were late, short, and/or did not meet applicable

protein specification requirements as a result of substandard materials being used because of the

liquidity constraints imposed by Crystal.  Such adverse impacts on the Business constitute

"Material Adverse Effects" under Section 7.3(c) of the Agreement, by themselves as well as

together with the other matters referenced in this Complaint.

>    C.    **Wastewater Rights**

>    32.    Under the Agreement, the Defendants are required to transfer the Assets to the

Plaintiff at Closing, "free and clear of any and all Liens, Claims, and other Liabilities except for

(i) the Assumed Liabilities and (ii) the Permitted Encumbrances."  Under Section 4.3 of the

Agreement, the Assets expressly include those "material assets, rights, and properties, tangible or

intangible, real or personal, which are used in connection with the operation of the Business, as

operated in the ordinary course outside of bankruptcy, including, without limitation, the right to

use the wastewater treatment facilities used in the operation of the Business."

>    33.    In the ordinary course of business, the Defendants contract with Crossroads

Treatment LLC ("Crossroads"), an entity owned and/or controlled by Edward Bleka, for the

disposition of wastewater and other waste by-products of its cooked and raw meat processing

business lines.  Crossroads is not the subject of any chapter 11 proceeding.  Crossroads was

financed by the issuance of approximately $8 million in tax-exempt, industrial revenue bonds

(the "Bonds") issued under a related trust indenture (the "Indenture").  Under the contract

between the Defendants and Crossroads, the Defendants undertake to pay the amounts owing

under the Bonds, plus other maintenance expenses.  By virtue of the Defendants' bankruptcy cases and a cross-default under the Indenture, the Bonds are currently in default.  As a consequence of such default, the Defendants do not have a legally enforceable "right to use" the wastewater treatment facilities within the meaning of the Agreement.  The Plaintiff endeavored in good faith to achieve resolutions of these issues through a proposed arrangement with Edward Bleka, under which the Plaintiff would undertakes $4 million of obligations under the Indenture (even though the Plaintiff was under no requirement to do so), but could not reach an agreement with Edward Bleka.  In the end, the Defendants failed to satisfy their express obligation to transfer to the Plaintiff the right to use the wastewater facilities "free and clear" of obligations that are not Assumed Liabilities under the Agreement.

> **D.      Delivery of Assets**

34.      On or about January 8, 2014, Defendant Quantum Foods LLC entered into an agreement with PPL Group LLC ("PPL") with respect to the purchase of certain assets comprising the contents of some twenty tractor trailers (the "PPL Agreement").  The PPL Agreement was not disclosed in the Defendants' data room, but was subsequently brought to the Plaintiff's attention on or about March 21, 2014, one week after the Agreement was executed. The equipment  sold to PPL appears to have a book value of at least $2 million.  See Plaintiff's Termination Notice, at 4.

35.      Significantly, the Defendants sold, pursuant to the PPL Agreement, equipment that is subject to the Defendants' capital leases.  See Plaintiff's Termination Notice attachment (reflecting equipment subject to capital leases, hand-marked by Herman Brons, the Defendants' Chief Financial Officer, to designate equipment that was sold pursuant to the PPL Agreement). The importance of the capital leases to the Defendants' operations is underscored by the

Committee's express request that the Agreement provide for the assumption of some $8 million in capital lease obligations.  In addition, inasmuch as execution of the PPL Agreement impaired the Plaintiff's ability to make determinations with respect to the capital leases, the Defendants' conduct was certainly material to consummation of the Agreement.  Although the Defendants claimed to have been actively working to unwind the sale to PPL, see Defendants' Default Notice Response, at 2, they did not accomplish such cure timely under the Agreement.

36.     The Defendants' failure to disclose the sale of assets to PPL at the time of execution of the Agreement breached the Defendants' representations under Section 7.3 (and Article IV) of the Agreement, and the attendant adverse impact on the Defendants' capital leases and operations constituted "Material Adverse Effects" under Section 7.3(c) of the Agreement, particularly when considered in the aggregate with the other matters referenced in this Complaint.

### E.    Compliance with Law

37.     Under the Agreement, the Defendants represented that there are no pending or threatened actions which could adversely affect the Assets, and that the Defendants are in compliance with applicable laws.  Agreement §§ 4.5, 4.6.  Specifically, under Section 4.6 of the Agreement, the Defendants expressly represented that "[n]o [Defendant] has received any written notification or communication from any Government Entity asserting that it is not in compliance with any material Law applicable to the operation of the Business."  The Plaintiff understands, however, that the Defendants have been the subject of an ongoing investigation by the Equal Employment Opportunity Commission involving allegations of at least $5 million in fees or penalties.  It is self-evident that the operation of the Business depends on the availability and performance of skilled labor.  Although the Defendants had an opportunity to identify exclusions or qualifications of their representations in the Agreement that would be material, the

Defendants executed the Agreement without availing themselves of such opportunity—hence, indicating to the Plaintiff that any prior disclosed information was deemed by the Defendants to be immaterial.  The Plaintiff determined that the Defendants' existing employment practices pose material risk under the Equal Employment Opportunity Act, but the Defendants failed to cure the applicable breaches of the Agreement.

### F.      Sale Order Not Entered

38.     Section 8.1(c) of the Agreement allowed the Plaintiff to terminate the Agreement if  the Sale Order was not entered by April 30, 2014.  As the Court is aware, as of the date hereof, the Sale Order has not been entered.  More specifically, the Defendants, without the knowledge or participation of the Plaintiff, postponed earlier hearings at which it may have been possible to obtain entry of the Sale Order.  The Defendants notified the Plaintiff of such postponements only after they had been accomplished with the Court.

### III.    The Plaintiff's Good Faith

39.     The Plaintiff acted in good faith at all times, including in its dealings with the United Food & Commercial Workers International Union Local 1546.  Despite the Defendants' breaches of the Agreement, the Plaintiff worked diligently and promptly (in many cases responding in less than 24 hours) with Crystal and others in connection with formulating potential alternatives and options that might allow the Business to continue.  In addition, as it learned of operational and other issues, the Plaintiff raised such issues, early and often, with both the Defendants and Crystal.  In fact, the Defendant conferred with Crystal almost weekly to highlight the negative impact of Crystal's unreasonable restraint on liquidity.

40.     Unfortunately, the Plaintiff's efforts did not ultimately bear fruit, as its proposals, which presented the only reasonable and potentially feasible alternatives available under the

circumstances, were rejected.  After going above and beyond what should reasonably be expected, the Plaintiff terminated the Agreement as a result of the Defendants' breaches.  By this Complaint, the Plaintiff simply seeks return of its Deposit, to which it clearly is entitled.

## IV.   The Deposit

41.     Paragraph H of the Bid Procedures expressly provides that "[t]he Deposit is not property of the [Defendants'] bankruptcy estates and shall not become property of the estates except as expressly provided in the [Agreement]."  In addition, paragraph 4 of the Bid Procedures Order provides that, "[n]otwithstanding anything to the contrary in this Order, the Bid Procedures, or elsewhere, the Deposit shall be treated in the manner provided under the [Agreement] and shall not be subject to [the] Deposit Escrow Agreement or any related escrow provisions."  Section 2.2(b) of the Agreement requires the Defendants to return the Deposit to the Plaintiff within three Business Days of termination.

42.     Accordingly, given that the Deposit is not property of the Defendants' bankruptcy estates, and the Defendants have no claim to the Deposit under the Agreement, the Defendants must return the Deposit to the Plaintiff.  Because the Plaintiff has properly exercised its rights to terminate the Agreement, the Defendants are required by Section 2.2(b) of the Agreement to return the Deposit to the Plaintiff.

## FIRST CAUSE OF ACTION
## RETURN OF DEPOSIT
## (PLAINTIFF AGAINST ALL DEFENDANTS)

43.     Plaintiff alleges and re-alleges and incorporates by reference each and every paragraph above and below as though fully set forth herein.

44.    The Deposit is not property of the estates pursuant to the Bid Procedures Order, and the Plaintiff is entitled to return of the Deposit following the proper termination of the Agreement under the terms of the Bid Procedures Order.

### SECOND CAUSE OF ACTION
### BREACH OF CONTRACT
### (PLAINTIFF AGAINST ALL DEFENDANTS)

45.    Plaintiff alleges and re-alleges and incorporates by reference each and every paragraph above and below as though fully set forth herein.

46.    The Defendants have breached the Agreement.  As a result of the Defendants' breaches of the Agreement, the Defendants are required by Section 2.2(b) of the Agreement to return the Deposit to the Plaintiff.

### PRAYER

WHEREFORE, the Plaintiff prays for judgment against the Defendants and each of them (1) directing the Defendants to return immediately the entirety of the Deposit to the Plaintiff, and (2) providing such other and further relief as the Court may deem proper.

Dated: Wilmington, Delaware
       May 12, 2014

*/s/ Van C. Durrer, II*
Van C. Durrer, II (I.D. No. 3827)
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
300 South Grand Avenue
Los Angeles, California 90071
(213) 687-5000

Counsel for Raging Bull Acquisition
Company LLC