## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

-------------------------------------------------------x

| | |
|---|---|
| *In re:* | : Chapter 11 |
| | : |
| QUANTUM FOODS, LLC, *et al.*,[1] | : Case No. 14-10318 (KJC) |
| | : |
| Debtors. | : Jointly Administered |
| | : |
| | : **Requested Hearing Date: May 28, 2014 at 3:00 p.m. (ET)** |
| | : **Proposed Obj. Deadline: May 27, 2014 at 12:00 p.m. (ET)** |

-------------------------------------------------------x

**DEBTORS' MOTION FOR ENTRY OF AN ORDER: (I) APPROVING THE AGENCY AND SALE AGREEMENT BETWEEN THE DEBTORS AND TIGER REMARKETING SERVICES WITH RESPECT TO THE SALE OF THE DEBTORS' MACHINERY, EQUIPMENT, FURNITURE AND FIXTURES; (II) APPROVING THE AGENCY AND SALE AGREEMENT BETWEEN THE DEBTORS AND TIGER CAPITAL GROUP, LLC WITH RESPECT TO THE SALE OF THE DEBTORS' INVENTORY AND INTELLECTUAL PROPERTY; (III) ESTABLISHING SALE PROCEDURES RELATING TO TURN-KEY ASSET SALES; (IV) AUTHORIZING ALTERNATIVE SALE AND LIQUIDATION OF ASSETS THROUGH PUBLIC AUCTION; AND (V) WAIVING ONE OR MORE OF THE INFORMATION REQUIREMENTS OF LOCAL RULE 2016-2**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby move the Court for the entry of an order, in substantially the form attached hereto as **Exhibit I** (the "Proposed Order"), pursuant to sections 105, 327, 328, 330 and 363 of title 11, United States Code (the "Bankruptcy Code"), Rules 2002, 2014, 6004 and 6005 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 2014-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"): (i) approving the Agency and Sale Agreement (the "FF&E Agreement") between the Debtors and Tiger Remarketing Services ("Tiger

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Quantum Foods, LLC (9437); Quantum Foods 213-D, LLC (1862); Quantum Culinary, LLC (1302); GDC Logistics, LLC (1997); Choice One Foods, LLC (9512). The Debtors' mailing address is c/o Quantum Foods, LLC, 750 South Schmidt Road, Bolingbrook, Illinois 60440.

Remarketing") with respect to the sale of the Debtors' machinery, equipment, furniture and fixtures (the "FF&E"); (ii) approving the Agency and Sale Agreement (the "Inventory and IP Agreement", and together with the FF&E Agreement, the "Agreements") between the Debtors and Tiger Capital Group, LLC ("Tiger Capital", and together with Tiger Remarketing, "Tiger") with respect to the sale of the Debtors' inventory and intellectual property (the "Inventory and IP" and together with the FF&E, the "Assets"); (iii) establishing sale procedures regarding a potential sale or sales (collectively, the "Turn-Key Asset Sale") of certain machinery, equipment, and other associated assets (the "Turn-Key Assets") owned by, leased by, or loaned to the Debtors,  (iv) if all the Assets are not sold through a Turn-Key Asset Sale by the deadline set forth herein, establishing procedures (the "Liquidation Procedures," as defined below) for the liquidation and sale of the Assets without further order of the Court, and (v) waiving the information requirements of Local Rule 2016-2.  In support of the relief requested herein, the Debtors submit the Declaration of Jeffrey J. Tanenbaum (the "Tanenbaum Declaration"), a copy of which is attached hereto as **Exhibit II**, and further respectfully represent as follows:

**PRELIMINARY STATEMENT**

1.      As the Court is aware, the Debtors attempted to sell all their assets through a first-day sale motion, but Raging Bull (defined below) determined not to proceed with the transaction.  Since then, the Debtors have explored various options for selling the estates' assets and maximizing the value to all stakeholders.

2.      After extensive analysis, the Debtors have determined that the process set forth and the relief requested in this Motion is the best option for selling the Debtors' assets.  As more fully set forth herein, the Debtors propose a dual-track process:  the Debtors (a) will pursue "turn-key" sales of groups of assets, on one track, and (b) at the same time on the other track

retain Tiger and prepare for a liquidation at public action if all the assets are not sold through "turn-key" sales. The Debtors submit that the dual-track process requested through this Motion is the best process to maximize the potential value of the Debtors' assets.

## JURISDICTION

3.    This Court has jurisdiction to hear the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Court may enter a final order consistent with Article III of the United States Constitution. Venue for these cases and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105, 327, 328 and 363 of the Bankruptcy Code, Bankruptcy Rules 2002, 2014, 6004 and 6005, and Local Rule 2014-1.

## BACKGROUND

4.    On February 18, 2014 (the "Petition Date"), the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") in the United States Bankruptcy Court for the District of Delaware (the "Court"). The Debtors continue to manage and operate their businesses as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code. The Official Committee of Unsecured Creditors (the "Committee") was appointed on February 27, 2014 [D.I. 67].

5.    The factual background regarding the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of the Chapter 11 Cases is set forth in detail in the *Declaration of Edgar Reilly in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* [D.I. 2], which is fully incorporated herein by reference.

## BACKGROUND REGARDING PRIOR SALE EFFORTS

6.      On the Petition Date, the Debtors filed the *Debtors' Motion for Orders (I)(A) Approving Bid Procedures for the Sale of Substantially All of the Debtors' Assets and Authorizing the Debtors to Enter Into the Stalking Horse Agreement, (B) Scheduling the Auction, (C) Authorizing Payment of the Break-Up Fee, (D) Approving the Deposit Escrow Agreement, (E) Approving the Assumption and Assignment Procedures Related to the Sale, (F) Scheduling the Sale Hearing, and (G) Approving the Form of the Sale Notice; and (II)(A) Authorizing the Sale of Such Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (B) Authorizing and Approving the Purchase Agreement of Such Sale, (C) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (D) Granting Related Relief* [D.I. 16] (the "Sale Motion").  Pursuant to the Sale Motion, the Debtors sought to establish certain bid procedures in connection with the proposed sale of substantially all of the Debtors' assets (collectively, the "Operating Assets") to the Debtors' proposed stalking horse purchaser, CTI Foods Holding Co., LLC ("CTI").

7.      Upon the Committee's appointment, the Debtors, in consultation with their financial advisor City Capital Advisors, LLC ("City Capital"), began exploring alternative stalking horse purchasers with the assistance of the Committee and its advisors.  As a result of those discussions and diligence conducted in conjunction therewith, the Debtors entered into a stalking horse agreement (the "Stalking Horse Agreement") with Raging Bull Acquisition, LLC ("Raging Bull") whereby Raging Bull replaced CTI as the stalking horse purchaser for the Operating Assets.  The Court approved bid procedures in connection with the contemplated auction (the "Auction") for the Operating Assets, and established April 16, 2014 (the "Bid Deadline") as the deadline for interested bidders to submit offers for the Operating Assets.  The

Debtors did not receive any qualifying bids other than the Stalking Horse Agreement prior to the Bid Deadline, and the Auction was cancelled.  *See* D.I. 241.

8.     Subsequent to the Bid Deadline, and in advance of the scheduled sale hearing (the "Sale Hearing") with respect to the Stalking Horse Agreement, the Debtors and Raging Bull engaged in negotiations for multiple weeks regarding the purchase price for the Operating Assets and the terms of the transaction.  The Sale Hearing was adjourned multiple times to allow the parties to reach a consensual resolution regarding open items concerning the contemplated sale, but as announced at the status conference held on May 12, 2014, Raging Bull has determined not to proceed with the transaction and elected not to purchase the Operating Assets.  In light of Raging Bull's decision and the ramifications generated thereby, the Debtors, in consultation with their advisors and their postpetition lender, determined that it was in the estates' best interest to immediately commence liquidation initiatives and the Debtors' employees were notified of their impending termination.  Consequently, the Debtors hereby seek authority to retain Tiger to liquidate the Assets.

### THE AGREEMENTS

9.     As indicated above, the Debtors have begun in earnest the process of liquidating the Assets, which are located at the Debtors' culinary plant, global distribution center, and main operating plant (the "Facilities"), all respectively located in Bolingbrook, Illinois.  The Debtors have separately sought [D.I. 316] entry of an order modifying City Capital's retention to allow City Capital to pursue a purchaser that will operate one or more of the Debtors' Facilities, and Tiger has agreed to cooperate in full with City Capital and assist in the pursuit of such a purchaser.

10.     As set forth in the Agreements, in the event City Capital and Tiger secure one or more turn-key purchasers for such facilities acceptable to the Debtors, Crystal Financial LLC ("Crystal") and the Committee by June 4, 2014, and the underlying Turn-Key Asset Sales are approved by the Court on or before June 9, 2014, Tiger's engagement to sell the Assets, approved to be sold as a Turn-Key Asset Sale, shall automatically cease, subject to Tiger's rights to receive compensation in such a situation under the Agreements.  However, at this time with respect to the Assets, the Debtors have determined that most efficient and effective way to maximize the value of the Assets is to pursue a dual track: one, to pursue Turn-Key Asset Sales, and two, to retain Tiger to sell the Assets at public auction.

11.     In order to market the Assets most effectively and, thereby, to liquidate the Assets for the highest and best price, the Debtors request authorization to employ Tiger as their sales agent pursuant to the terms and conditions of the Agreements.  After considering a number of potential liquidators for the Assets, the Debtors chose Tiger because of its extensive expertise and experience in liquidating assets.  The Debtors and Tiger engaged in lengthy discussions and negotiated the terms of the Agreements, copies of which are attached as **Exhibit A** and **Exhibit B**, to the Proposed Order.  The Debtors believe that the sale of the Assets through Tiger in accordance with the terms of the Agreements is in the best interests of the Debtors and their estates.

12.     As part of its duties as the Debtors' agent, Tiger shall plan, promote, and manage the sale of the Assets, including but not limited to preparing the Assets for sale, creating marketing materials, booking advertising, promoting the sales, conducting the sales, and coordinating the transfer and delivery of the Asset at the conclusion of the sales.

13.     The pertinent terms of the FF&E Agreement[2] are set forth below:

a)      <u>Purpose of the FF&E Agreement</u>.  The Debtors have agreed to retain Tiger to act as their exclusive agent to sell all FF&E at a publicly marketed sale. Tiger agrees to use its professional skill, knowledge and experience, but makes no representations or warranties regarding the outcome of the FF&E sale, except to the extent as may be provided for in the FF&E Agreement.

b)      <u>Turn-Key Sales.</u>  Tiger acknowledges that the Debtors have engaged City Capital to seek one or more Turn-Key Asset Sales.  Tiger and City Capital agree to reasonably cooperate with each other in City Capital's efforts toward the Turn-Key Asset Sales. In the event that City Capital obtains one or more purchasers acceptable to the Debtors on or before June 4, 2014 and approved by the Court on or before June 9, 2014, Tiger's engagement shall automatically be terminated upon consummation of any such sales (it being understood that Tiger's engagement with respect to the FF&E not sold shall continue).

c)      <u>Date and Time of Sale by Auction</u>.  In the absence of Turn-Key Asset Sales approved by the Court on or before June, 9, 2014, consistent with the Liquidation Procedures (defined below), Tiger shall schedule the auction of FF&E to occur no later than the week of June 23, 2014. Upon execution of the FF&E Agreement, Tiger shall be authorized to begin immediate preparation and promotion of the FF&E auction.

d)      <u>Manner of Sale</u>.  The Debtors authorize Tiger to sell the FF&E, in whole or in part, at live, online and/or sealed bid auction(s) and/or private sale(s) to the highest bidder thereof (the "<u>Auction</u>").

e)      <u>FF&E</u>.  The FF&E consists of the various items referenced on <u>Exhibit A</u> to the FF&E Agreement.

f)      <u>Compensation</u>.  The following shall define Tiger's fees, which shall be charged on the Gross Sales:

  i)       Gross Sales proceeds received from $0 to $7,500,000 shall be subject to a 6.0% commission; plus

  ii)      Gross Sales proceeds received in excess of $7,500,001 but less than or equal to $8,500,000 shall be subject to a 7.0% commission, plus

---

[2] Terms not otherwise defined in this paragraph shall be given the meanings ascribed to them in the FF&E Agreement.

       iii)     Gross Sales proceeds received in excess of $8,500,001 shall be subject to a 8.5% commission.

g)    <u>FF&E Sale Costs</u>.  Tiger shall be entitled to reimbursement for all reasonable and necessary FF&E sale related expenses incurred in preparing for and conducting the FF&E sale, including labor, marketing, supplies and other related costs.

h)    <u>Allocation of FF&E Sale Proceeds</u>.   As soon as practical, but no later than 5 days after the consummation of the FF&E sale, Tiger shall deposit the proceeds of the FF&E sale net of Tiger's compensation, costs and all other amounts payable to Tiger as the Debtors may direct. Within (10) business days following the completion of Tiger's FF&E sale activities onsite, including the removal of the sold FF&E, Tiger shall provide the Debtors with an accounting of the FF&E sale and the Debtors and Tiger shall make any payments due to the other on account of any such reconciliation.

i)    <u>Term FF&E Agreement.</u>  The rights and obligations of the parties shall terminate upon the earliest of (i) with respect to any FF&E sold by City Capital, the consummation of a sale of such FF&E (it being understood that Tiger's engagement with respect to the FF&E not so sold shall continue until all remaining FF&E is sold), (ii) completion of the sale of all FF&E by Tiger, the removal of the sold FF&E following the FF&E sale and/or the abandonment of such sold FF&E, and satisfaction of the Parties respective payment obligations to one another as set forth herein, or (iii) August 10, 2014.

j)    <u>Buyer's Premium.</u>  Tiger shall assess auction purchasers a 15% buyers' premium, which shall be added to the high bid prices to comprise the gross sales.  Additionally, third party online webcast services may assess up to an additional 3% buyers' premium to online bidders, payable directly to the webcast service.

k)    <u>Taxes</u>.  Tiger shall be responsible to collect, report and remit any sales taxes due from the FF&E sale.

l)    <u>Turn-Key Pre-Sales.</u> In the event that all or a subset of the Assets are sold as a package prior to the Auction, and such package of assets is sold to a purchaser who will utilize them in-place at a Debtor's Facility (a "<u>Turn-Key Pre-Sale</u>"), Tiger shall be entitled to 2.5% of sale proceeds attributable to the Turn-Key Pre-Sale, as well as reimbursement of costs incurred.

m)    <u>Schneider Industries Alliance</u>.  As disclosed in the FF&E Agreement, Tiger intends to work with Schneider Industries, Inc. ("<u>Schneider</u>"), a party unrelated to Tiger, in connection with this engagement.

14.     The pertinent terms of the Inventory and IP Agreement[3] are set forth

below:

a)      <u>Purpose of the Inventory and IP Agreement</u>.  The Debtors have agreed to
retain Tiger to act as their exclusive agent to sell the Inventory and IP
through privately negotiated sales, at a publicly marketed sale, and/or
through an auction process.  Tiger acknowledges that the Debtors have
initiated their own efforts to sell various assets through the potential Turn-
Key Asset Sales, and that the Debtors will continue such efforts in the
normal course.

b)      <u>Sale Period</u>.  The Inventory and IP Agreement will be in effect until an
auction of the Inventory and IP is held.  The Auction is tentatively
scheduled for the week of June 23, 2014.  Terms are addressed under a
separate agreement.

c)      <u>Sale Process</u>.  The Debtors authorize Tiger to market the Inventory and IP
in whole or in part to competitors, closeout food brokers, retailers and
other opportunistic buyers.

d)      <u>Compensation</u>.  The following shall define Tiger's fees:  2% of proceeds
generated from the Inventory and IP sales, excluding raw material
inventory sales, and; 0.5% of raw material inventory sales negotiated by
the Debtors; provided, however, that the minimum compensation shall not
be less than $50,000.

e)      <u>Sale Costs</u>.  Tiger shall also be entitled to reimbursement for all
reasonable and necessary Inventory and IP sale related expenses.

f)      <u>Allocation of Sales Proceeds</u>.  Upon the consummation of each Inventory
and IP sale, Tiger shall deposit the proceeds of such sale as the Debtors
may direct.  The Debtors shall pay Tiger the compensation, costs, and all
other amounts payable to Tiger under the Inventory and IP Agreement
from the proceeds of the Inventory and IP sales within seven (7) days of
the collection of funds.  Within (10) business days following the
completion of Tiger's Inventory and IP sale activities, Tiger shall provide
the Debtors with an accounting of the Inventory and IP sale income and
expenses and the Debtors and Tiger shall make any payments due to the
other on account of any such reconciliation.

g)      <u>Taxes</u>.  With the exception of sales taxes, Tiger shall have no liability
whatsoever for taxes owed by the Debtors as a result of the transactions
contemplated by the Inventory and IP Agreement.

---

[3]  Terms not otherwise defined in this paragraph shall be given the meanings ascribed to them in Inventory and IP
Agreement.

15.    Given the nature of the services to be performed by Tiger and the manner of compensation of such services, the Debtors respectfully request that they be permitted to pay Tiger in accordance with the Agreements at the time such fees and expenses become due and without the need for Tiger to file interim applications for compensation with the Court, and without further order of the Court.

16.    As set forth in this Motion and the Agreements, Tiger has been engaged to provide limited services to the Debtors for a limited time period.  In exchange for its services, Tiger will receive the compensation set forth in the Agreements, which consists largely of a set-rate commission or a fee paid by purchasers. The detailed filing requirements of Bankruptcy Rule 2016 and the informational requirements of Local Rule 2016-2 would require the expenditure of unnecessary time and fees in compiling time records and preparing fee applications.  Bankruptcy Code section 105 allows this Court to issue any order that is necessary or appropriate to carry out the provisions of the Bankruptcy Code. See 11 U.S.C. § 105(a). In addition, Bankruptcy Code section 328 allows this Court to approve the employment of professionals retained pursuant to Bankruptcy Code section 327 on any reasonable terms and conditions. See 11 U.S.C. § 328(a). Given the limited scope and duration of Tiger's employment and the largely set-rate commission, the Debtors believe that a waiver of the detailed filing requirements of Bankruptcy Rule 2016 and the informational requirements of Local Rule 2016-2 is warranted and appropriate.

17.    Finally, the Debtors request that Tiger be relieved of the requirements of the interim compensation order in these cases [D.I. 124] (the "Interim Compensation Order"). In light of Tiger's largely commission-based compensation structure, the procedures detailed in the Interim Compensation Order will burden—without providing any benefit to—the Debtors'

estates.  If the Debtors and Tiger are required to prepare, file and serve monthly and quarterly fee

statements, substantial administrative costs and professional time may be incurred, without any

benefit provided to these estates because Tiger's fee is largely a set-rate commission per

transaction or a fee not paid by the Debtors at all.  Therefore, the Debtors request that Tiger be

relieved of the requirement to file monthly or quarterly interim fee applications.  Instead, the

Debtors propose that Tiger be required to file a final fee application, which shall be served upon

the Notice Parties (as defined in the Interim Compensation Order), for allowance of its

compensation and reimbursement of its expenses in accordance with applicable provisions of the

Bankruptcy Code, the Bankruptcy Rules and the Local Rules; provided, however, that such final

fee application need only to describe the services provided by Tiger generally, and that Tiger

shall not be required to keep time records of hours spent performing their services.  In

connection with its final fee application, Tiger shall be required to provide supplemental

information regarding Tiger's fees and expenses to the extent requested by the Notice Parties.

18.     As disclosed in the Agreements, Tiger has contracted with Schneider

Industries to co-market and coordinate the sale.  Schneider Industries specializes in food and

meat processing equipment sales, maintains a deep database of regular food processing

equipment buyers and is headquartered in the Midwest.

19.     The Debtors and their estates require an experienced and efficient

liquidator to render these essential professional services.  As noted above, Tiger has substantial

expertise in all these areas.  Accordingly, the Debtors respectfully submit that Tiger is uniquely

well qualified to serve as their agent with respect to the liquidation of the Assets.

## THE TURN-KEY ASSETS SALE PROCEDURES

20.     Pending approval of the Debtors' motion to amend the terms of City

Capital's engagement [D.I. 316], City Capital intends to market the Assets to potential

purchasers that may be interested in purchasing the Assets for use in-place at the Debtors'
current facility(ies), referred to as "Turn-Key Sales" and as part of a streamlined sale process,
rather than through piecemeal dispositions.

21.     To the extent that the Debtors, after consultation with the Committee,
Crystal, City Capital and Tiger, accept one or more bids, the hearing to approve such sales (the
"Turn-Key Sale Hearing") shall be scheduled for June 9, 2014 or as soon thereafter as the
Court's schedule will allow, with objections to any Turn-Key Assets Sales to be filed no later
than twenty-four hours prior to the scheduled hearing.

22.     To the extent the Court approves a Turn-Key Sale as to any Assets,
Tiger's engagement to sell such Assets by Auction shall automatically be terminated.

## THE ALTERNATIVE LIQUIDATION PROCEDURES

23.     If not all Assets are sold through a Turn-Key Sale approved on or before
the Turn-Key Sale Hearing, the Assets will then be sold through a public auction as provided
under the Agreements. Through this Motion, the Debtors respectfully request approval of the
following procedures (the "Liquidation Procedures") governing the sale of the Assets through
auction:

a)  If the Court does not approve of the sale of all Assets at the Turn-Key Sale
    Hearing, as per the Agreements, Tiger shall move forward with a public
    auction (the "Auction") of the Assets.

b)  To avoid the time and expense involved in seeking separate court approval
    for each sale of an Asset, the order approving this Motion shall authorize
    Tiger to sell or otherwise dispose of such Assets for the highest and best

offer received, at the Auction, free and clear of all liens, claims and encumbrances, without further order of the Court.

c) The auction of the Assets will be conducted by "open outcry auction" process, where bids and overbids must be made out in public or by webcast participation, giving all participants a chance to compete for the order with the best price.

d) The sale shall be marketed by newspaper, trade advertising, direct mail and email, notifying all prospective industry and related industry buyers of the sale.

e) The assets will be offered to buyers on an "as-is, where-is" basis individually and/or in small lots.

f) Buyers will be required to register and post a $500 refundable deposit as a qualification to participate in the auction and shall be required to maintain a deposit of 25% of their purchases throughout the auction.  Buyers will be required to pay their bills within 24-48 hours following the completion of the auction in Cash, Certified Funds, by Wire and/or by Credit Card (up to $10,000).

g) Buyers shall be required to arrange for the removal of their purchases from the premises to occur by July 25, 2014.

h) In the event, following the sealed bid deadline and prior to the auction, Tiger receives an offer or offers with regard to the sales or other dispositions of Assets that Tiger, Crystal, and the Debtors believe to be in the best interests of the Estate to accept:

i)   The Debtors are authorized to consummate such transactions if the
Debtors determine in the reasonable exercise of their business
judgment that such sales or dispositions are in the best interests of their
estates, without further order of the Court, subject to the procedures set
forth herein.

ii)  Any such transactions shall be free and clear of all liens with such
liens attaching to the net proceeds of the transaction with the same
validity, extent, and priority as immediately prior to the transaction.

iii) The Debtors are authorized to take any actions that are reasonable and
necessary to close the sale or disposition of Assets and obtain the
proceeds thereof.

iv)  If the consideration to be received by the Debtors from a purchaser of
Assets is $100,000 or less, on a per-transaction basis, the Debtors may
sell the assets upon providing informal notice to, and obtaining
consent from, counsel to the Committee and Crystal without further
notice to any other party, or order of the Court, unless such sale is to
an insider, as that term is defined in section 101(31) of the Bankruptcy
Code.

v)   If the consideration to be received by the Debtors from a purchaser for
the Assets, on a per-transaction basis, exceeds $100,000, or if the sale
is to an insider in an amount less than or equal to $100,000, the
Debtors shall file a written notice of the sale or transfer in substantially
the form attached to the Proposed Order as Exhibit 1 (the "Transaction

Notice") with the Court and serve such Transaction Notice, via electronic or overnight mail, on the following parties: (i) the U.S. Trustee, (ii) counsel to the Committee, (iii) counsel to Crystal, (iv) any known affected creditor(s) asserting a lien on the relevant Asset(s); and (v) any party that has expressed an interest in purchasing the relevant Asset(s) (collectively, the "Notice Parties"), at least seven (7) calendar days prior to closing the transaction.

vi) The Transaction Notice shall describe in reasonable detail: (a) the Asset(s) being sold or otherwise disposed; (b) the counterparty to the proposed transaction; (c) the cash proceeds expected to be realized by the estates from the transaction; and (d) the material terms of the agreement governing the transaction.

vii) Any objection to the proposed transaction (a "Transaction Objection") must: (i) be in writing; (ii) state with specificity the nature of the objection; and (iii) be served on counsel to the Debtors: (a) Winston & Strawn LLP, 35 W. Wacker Drive, Chicago, Illinois 60601 (Attn: Greg Gartland, Esq.) and (ii) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 N. King Street, Wilmington,  DE 19801 (Attn: Andrew L. Magaziner, Esq.) so as to be received by the Debtors within seven (7) calendar days from the date of service of the Transaction Notice.

viii)    If no Transaction Objections are received by the Debtors within seven (7) calendar days of the service of the Transaction Notice, or,

upon the consent of the Notice Parties, the Debtors may immediately

consummate the proposed transaction without further Court order.

ix) If a Transaction Objection is timely received by the Debtors and

cannot be resolved consensually, then the Asset(s) will be sold at the

Public Auction without any further order of the Court.

## THE COURT SHOULD AUTHORIZE THE DEBTORS' ENTRY INTO THE AGREEMENTS AND TIGER'S RETENTION

24.     Tiger has substantial experience in liquidating property both in and out of

bankruptcy, and has conducted liquidation processes in numerous bankruptcy cases including

Circuit City, Steve and Barry's, Linens N Things, and Borders.  Accordingly, Tiger is

particularly well qualified to serve as the Debtors' agent for the sale of the Assets.

25.     The Debtors seek authority to employ and retain Tiger as their agent under

section 327 of the Bankruptcy Code, which provides that a trustee (or debtor or debtor in

possession, by virtue of sections 1101(1) and 1107(a)), subject to court approval—

> may employ one or more attorneys, accountants, appraisers,
> auctioneers, or other professional persons, that do not hold or
> represent an interest adverse to the estate, and that are disinterested
> persons, to represent or assist the trustee in carrying out the
> trustee's duties under this title.

11 U.S.C. § 327(a).

26.     The Debtors seek approval of the terms of the Agreements, including the

proposed compensation to be paid to Tiger, pursuant to section 328(a) of the Bankruptcy Code.

Section 328(a) of the Bankruptcy Code provides that a debtor, subject to court approval—

> may employ or authorize the employment of a professional person under
> section 327 or 1103 of this title, as the case may be, on any reasonable
> terms and conditions of employment, including on a retainer, on an hourly
> basis, on a fixed or percentage fee basis, or on a contingent fee basis.

11 U.S.C. § 328(a).

27.    Section 328(a), together with section 330, establishes a "two-tiered system for judicial review and approval of the terms of the professional's retention." *In re Smart World Technologies, LLC*, 552 F.3d 228, 232 (2d Cir. 2009).  Whereas section 330 authorizes a bankruptcy court to award reasonable compensation "based on an after-the-fact consideration," section 328(a) "permits a bankruptcy court to forego a full post-hoc reasonableness inquiry" if it pre-approves the terms of employment. *Id.* "These two inquiries are mutually exclusive, as '[t]here is no question that a bankruptcy court may not conduct a § 330 inquiry into the reasonableness of the fees and their benefit to the estate if the court already has approved the professional's employment under 11 U.S.C. § 328.'" *Id.* at 233 (quoting *In re B.U.M. Intl., Inc.*, 229 F.3d 824, 829 (9th Cir. 2000)).

28.    Furthermore, the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 specifically amended section 328(a) to extend its reach to include approval of compensation "on a fixed or percentage fee basis." This change makes clear that a debtor may seek to retain a professional on a fixed or percentage fee basis, such as is proposed herein, with bankruptcy court approval.

29.    Finally, Bankruptcy Rule 6005 expressly requires that "[t]he order of the court approving the employment of an appraiser or auctioneer shall fix the amount or rate of compensation." Fed. R. Bankr. P. 6005.

30.    The Agreements appropriately reflects (i) the nature and scope of services to be provided by Tiger, and (ii) the proposed terms and conditions of Tiger's employment, including the proposed fee structure.

31.     Pursuant to Bankruptcy Rule 6005, no Tiger employee that will be assisting the Debtors in the sale of the Assets is an officer or employee of the Judicial Branch of the United States or the United States Department of Justice.

32.     To the best of the Debtors' knowledge and except as disclosed in the Tanenbaum Declaration, Tiger has not been engaged by, and does not have any connection, with the Debtors, their creditors, their insiders, their shareholders, their attorneys or accountants, or any other parties in interest in any matters relating to the Assets.[4]

33.     To the best of the Debtors' knowledge and except as disclosed in the Tanenbaum Declaration and the Schneider Declaration, attached hereto as **Exhibit III**, Tiger and Schneider Industries do not hold or represent any interest adverse to the Debtors or their estates, Tiger and Schneider Industries are "disinterested person[s]" as that term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code and as required by section 327(a) of the Bankruptcy Code, and Tiger's employment and retention by the Debtors is necessary and in the best interests of the Debtors and their estates.

34.     Accordingly, the Debtors believe that Tiger's retention on the terms and conditions proposed herein is appropriate and should be approved.

**THE TURN-KEY ASSET SALE PROCEDURES AND THE ALTERNATIVE
SALE OF THE ASSETS PURSUANT TO THE LIQUIDATION PROCEDURES
SHOULD BE AUTHORIZED**

35.     Section 363(b) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  In general, a debtor may engage in transactions outside the ordinary

---

[4]   As set forth in section 34 of the FF&E Agreement, Tiger has formed a strategic alliance with Schneider Industries in connection with this engagement.  As a result and out of an abundance of caution, disinterestedness disclosures will be provided for both Tiger and Schneider Industries.

course of its business where the transaction represents an exercise of the debtor's sound business judgment.  *See, e.g., In re Lionel Corp.,* 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business purpose" test).  In determining whether to approve a transaction, the Court should consider the following:  (a) whether a sound business justification exists for the transaction; (b) whether accurate and reasonable notice of the transaction was given to interested parties; (c) whether the transaction will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith.  *See, e.g., In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Titusville Country Club*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991).

36.     <u>Sound Business Purpose</u>.  There is a sound business justification for the sale of the Assets pursuant to the Turn-Key Asset Sales and the alternative Liquidation Procedures.  As described above, the Debtors have ceased their operations, terminated their employees and no longer have any need for the Assets.  The Debtors have concluded, in consultation with Crystal, that the sale of the Assets through Turn-Key Asset Sales or, failing that, through an Auction, will maximize the value of these assets to the Debtors' estates, to the benefit of all stakeholders.  Moreover, the Debtors believe that the Turn-Key Asset Sales and the alternative Liquidation Procedures outlined herein will allow all interested parties to monitor the Asset sales without the significant cost accrual that would otherwise be required were the Debtors to seek approval for each Asset sale through the Court process.

37.     <u>Accurate and Reasonable Notice</u>.  Tiger and City Capital has committed to marketing the Assets to wide variety of potentially interested parties.  Tiger, in particular, regularly deals in the disposition of assets for distressed companies and has developed a

substantial list of potential purchasers of the Assets to which it will directly market the upcoming sales and auctions.  In addition, as needed, Tiger will advertise the sale of the Assets in appropriate trade journals to ensure that the widest possible audience will receive notice of the ongoing sales and auctions, once scheduled.

38.     <u>Fair and Reasonable Price</u>.  The process established by the Turn-Key Asset Sales and the alternative Liquidation Procedures is the best means of ensuring that the sale price for each of the Assets will be fair and reasonable.  The sale process will provide a market test for the price of each Asset, ensuring that each asset will be sold for the best and highest offer.

39.     <u>Good Faith</u>.  Courts generally conclude that parties have acted in good faith with respect to a proposed transaction if the consideration is adequate and reasonable and the terms of the transaction are fully disclosed.  *See, e.g., In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986).  Pursuant to the Agreements, Tiger and/or City Capital will conduct a well-noticed sale to ensure that each transaction is at arm's-length, without collusion or fraud, and in good faith and will ensure that each of the Assets will be sold to the highest and best bidder.  At the conclusion of the process, Tiger shall prepare, and the Debtors shall file, a report with the Court that identifies each of the Assets sold pursuant to the Liquidation Procedures, the applicable purchaser, and the price paid for each Asset.

**REQUEST TO SELL THE ASSETS FREE AND**
**<u>CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS</u>**

40.     The Debtors further submit that it is appropriate that the Assets be sold free and clear of liens, claims, encumbrances and other interests, pursuant to section 363(f) of the Bankruptcy Code.  Section 363(f) of the Bankruptcy Code provides as follows:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—
>
> > (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
> >
> > (2) such entity consents;
> >
> > (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
> >
> > (4) such interest is in bona fide dispute; or
> >
> > (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

41.     The court also may authorize the sale of a debtor's assets free and clear of any liens, claims or encumbrances under section 105 of the Bankruptcy Code. *See In re Trans World Airlines, Inc.*, 322 F.3d 283 (3d Cir. 2003); *see also Volvo White Truck Corporation v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of liens] is within the court's equitable powers when necessary to carry out the provisions of [the Bankruptcy Code].")

42.     The Debtors submit that they should be authorized to sell the Assets free and clear of any and all liens, claims and encumbrances, with such liens to be transferred and attached to the proceeds of the sale with the same validity and priority, and subject to the same defenses, that such liens had against the Assets.

43.     To the extent there is a lien, claim, encumbrance or interest, the Debtors believe that they would satisfy at least one of the five conditions of section 363(f), and the Debtors submit that any such lien, claim, encumbrance or interest will be adequately protected by attachment to the proceeds of the sale, subject to any claims and defenses that the Debtors

may possess with respect thereto.  The Debtors believe that each of the parties holding liens on the assets could be compelled to accept a monetary satisfaction of such interests, satisfying section 363(f)(5) of the Bankruptcy Code.

## NOTICE

44.    Notice of this Motion has been provided to: (a) the United States Trustee; (b) counsel to the Committee; (c) any party known by the Debtors to have asserted an interest in the Assets; (d) counsel to Crystal; and (e) parties entitled to receive notices under Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Debtors submit that no further notice need be given.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Order granting the relief requested herein, and grant such other and further relief as is just and proper.

Dated:    May 16, 2014
         Wilmington, Delaware               YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Andrew L. Magaziner*
M. Blake Cleary (No. 3614)
Kenneth J. Enos (No. 4544)
Andrew L. Magaziner (No. 5426)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

WINSTON & STRAWN LLP

Daniel J. McGuire
Gregory M. Gartland
Caitlin S. Barr
35 West Wacker Drive
Chicago, Illinois 60601
Telephone: (312) 558-5600
Facsimile: (312) 558-5700

*Counsel for Debtors and Debtors in Possession*